UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY CHANG, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HELIOS AND MATHESON ANALYTICS INC., THEODORE FARNSWORTH and STUART BENSON, <br><br> Defendants. | Case No. 1:18-cv-6965 <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Jeffrey Chang ("Plaintiff"), by his attorneys, except for his own acts, which are based on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Helios And Matheson Analytics Inc. ("Helios" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## NATURE OF THE ACTION

1.       This is a federa1 securities class action on behalf of all investors who purchased or otherwise acquired Helios common stock between August 15, 2017, and July 26, 2018, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District.

## PARTIES

5.      Plaintiff Jeffrey Chang purchased Helios common stock within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is attached hereto as Exhibit A.

6.      Defendant Helios is incorporated in Delaware and maintains its principal offices located at the Empire State Building, 350 Fifth Avenue, New York, NY 10118. Helios' common stock trades on the NasdaqCM under the ticker symbol "HMNY."

7.      Defendant Theodore Farnsworth ("Farnsworth") was the Company's Chief Executive Officer ("CEO") and President at all relevant times.

8.      Defendant Stuart Benson ("Benson") was the Company's Chief Financial Officer ("CFO") at all relevant times.

2

9.     Defendants in paragraphs 7-8 are collectively referred to herein as the "Individual Defendants."

10.    Each of the Individual Defendants:

    (a)     directly participated in the management of the Company;

    (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    (d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    (e)     was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    (f)     approved or ratified these statements in violation of the federal securities laws.

11.    Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Helios' business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

12.     As officers of a publicly held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Helios' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

14.     Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Helios common stock by

disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Helios' business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase Helios securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A.     Company Background

15.     Helios identifies itself as a provider of information technology, services and solutions including a range of technology platforms focusing on big data, business intelligence, and consumer-centric technology.

### B.     Material Misstatements and Omissions during the Class Period

16.     The Class Period begins on August 15, 2017, when Helios issued a press release, also attached as exhibit 99.1 to a Form 8-K filed with the SEC announcing it would acquire a majority stake in MoviePass Inc. ("MoviePass"), a movie subscription technology company, and introduce a new $9.95 flat no-contract monthly fee  ("August 2017 Press Release"). Therein, Helios stated in relevant part:

**Helios and Matheson Analytics Inc. To Acquire Majority Stake in MoviePassTM, Today's #1 Movie Theater Subscription Service**

MoviePass Launches New $9.95
No-Contract Monthly Movie Theater Subscription Program
With Plans to Disrupt the Entertainment Industry

**MIAMI & NEW YORK (August 15, 2017)—** Helios and Matheson Analytics Inc. (Nasdaq: HMNY) announced today that is has entered into a definitive agreement to acquire a majority stake of movie subscription technology company MoviePass Inc. HMNY's innovative growth strategy through the expansion into industries with opportunities for big data and artificial intelligence innovations seeks to increase shareholder value.

MoviePass is led by Netflix co-founder and former Redbox president Mitch Lowe. Film marketing executive and producer Stacy Spikes co-founded MoviePass in

5

2011. Early investors include True Ventures, AOL Ventures and Chris Kelly, MoviePass' largest investor and former Chief Privacy Officer of Facebook.

HMNY continues to acquire companies on the cutting edge, with first-mover advantage, disruptive technology and solid management. MoviePass is available in over 91% of all theaters in the U.S. This includes AMC, Regal and Cinemark theaters along with independent theaters. ***The MoviePass app enables subscribers to see unlimited movies, in theaters with no blackout dates; no contracts; just a low flat $9.95 monthly fee.***

"MoviePass was founded to make it easier for passionate moviegoers and casual fans to see films the way they're meant to be seen — in the theater," said Mitch Lowe, CEO of MoviePass. "Our vision has always been to make the moviegoing experience more affordable and enjoyable for our subscribers. We are changing the way consumers think about going to the movies by making it possible to experience a broader array of films — from the latest summer blockbuster to a critically-acclaimed documentary — through a subscription model. ***Today's acquisition by Helios & Matheson is a huge step towards making our vision a reality by allowing us to introduce a new $9.95 nationwide subscription service that completely disrupts the movie industry in the same way that Netflix and Redbox have done in years past."***

Emphasis added.

17.     On September 15, 2017, Helios issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing more than 400,000 monthly subscribers to MoviePass and describing Helios' "***sustainable***" business model ("September 2017 Press Release"). Therein, Helios stated in pertinent part:

**MIAMI & NEW YORK (September 14, 2017) – Helios and Matheson Analytics Inc. (NASDAQ: HMNY)** MoviePass Inc., a company that Helios and Matheson has agreed to buy majority stake in, announced today it has surpassed over 400,000 paying monthly subscribers in the past 30 days and achieved outstanding movie theater attendance.  Up from less than 20,000 subscribers on August 14, 2017, the viral subscriber growth is due in part by the innovative and disruptive technology MoviePass and Helios & Matheson offer in combination with massive interest for the new $9.95 per month subscription plan.  To test the success of the MoviePass product, 30,000 new MoviePass subscribers were surveyed. We were thrilled to find that 75.3% asserted the only reason they went to the movies was the result of being a MoviePass subscriber. Furthermore, participating theaters have reported back with increased attendance by over 400% from MoviePass subscribers.

"I think it's positive for the industry," said Eric Wold, an analyst at B. Riley & Co. The most visible opposition has come from AMC. "The exhibitors I have spoken with are very happy."

Additionally, MoviePass projects that it will acquire at least 2.5 million additional paying subscribers during the next twelve months, and expects to retain at least 2.1 million of those additional paying subscribers at the end of that period.

Using the Helios and Matheson Analytics resources, MoviePass Inc. analyzes consumer trends, patterns and activities to engage subscribers with movie related merchandise, advertising, and concessions relevant to their MoviePass experiences. ***Helios and Matheson believes its technology stack combined with the MoviePass business model will transform the movie going experience and create great value for both companies.***

"MoviePass is the 'all-you-can-eat' movie theater experience," said Mitch Lowe, co-founder of Netflix Inc. (NASDAQ: NFLX), former president of RedBox, and current CEO of MoviePass. "Though expensive for the company in the short-term, it's a significant benefit and more convenient for customers. With MoviePass, there's no movie ticket prices to think about -- going to the movies will become an everyday experience rather than an occasional treat."

Helios and Matheson's technology learns individual moviegoer's tastes and makes recommendations based on recorded preferences for specific genres, actors and even the opinions of friends with similar likings. There currently is no end-to-end consumer analysis from the moment someone sees a movie ad on Facebook to the moment they take their seat at the movie theater. MoviePass is bridging that gap, which should prove to be of tremendous value to production studios.

"***This explains our sustainable business model: Helios and Matheson is incorporating advertising models with the MoviePass application using artificial intelligence, algorithms, and machine learning so we can provide studios with more precise data for their advertising efforts.*** We want to understand the data generated by the movie goers and cater directly to their needs. For example, MoviePass will understand their genre choice films: horror, action-thrillers, drama, comedy, romance, animation, etc. Through testing, we found viewership is up 18% on films we choose to market more heavily in the MoviePass app," said Ted Farnsworth, Chairman/CEO of Helios and Matheson, about the strategic investment being made by Helios and Matheson in MoviePass. "We will seek to sell our advertising to the studios, channeling MoviePass subscribers to see certain movies. Also, we plan to use the viewing history and habit information of each user to guide them to select upcoming movies that appeal to their interests. Our goal is to serve the interests of moviegoers, movie studios and movie theaters alike," Mr. Farnsworth concluded.

Emphasis added.

18.     On October 12, 2017, Helios issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing it had increased its ownership stake in MoviePass to 53.71 percent and was providing another advance payment to MoviePass ("October 12, 2017 Press Release"). Therein, Helios stated in pertinent part:

> **NEW YORK (October 12, 2017)** — Helios and Matheson Analytics Inc. (NASDAQ: HMNY) ("HMNY") announced today that, since August 15, 2017, it has received aggregate gross cash proceeds of approximately $12.8 million from the holder of its senior secured convertible notes, thereby satisfying the $10 million financing condition to HMNY's pending acquisition of a majority stake in MoviePass Inc. ("MoviePass"), which was announced in August 2017. HMNY also announced that it has agreed to increase the purchase price for its stake in MoviePass from $27 million to $28.5 million, which will increase its ownership stake in MoviePass from 53% to 53.71% upon the closing of the transaction. HMNY agreed to make the additional $1.5 million investment in MoviePass for an additional 0.71% ownership stake based on an agreed $210 million pre-money valuation of MoviePass. In conjunction with the additional investment, MoviePass also granted HMNY an option to purchase additional shares of MoviePass common stock for $20 million in cash based on the agreed $210 million pre-money valuation of MoviePass, pursuant to an option agreement, which, if exercised in full, would amount to an additional 8.7% ownership stake in MoviePass as of the date of the option agreement. If HMNY were to exercise the option in full prior to the closing of the transaction, its total ownership stake in MoviePass would be 62.41% as of the date of the option agreement.
>
> In connection with increasing its investment commitment to MoviePass, HMNY provided $6.5 million in cash to MoviePass on October 6, 2017, consisting of an advance payment of $5 million that would have otherwise been due within 90 days after closing the acquisition transaction with MoviePass plus the additional $1.5 million investment amount, for which HMNY received an amended and restated convertible promissory note of MoviePass in the amount of $11.5 million, which superseded and replaced the $5 million convertible promissory note issued by MoviePass to HMNY on August 18, 2017.
>
> HMNY agreed to increase its MoviePass investment commitment and acquired the additional MoviePass investment option after evaluating the significant and rapid increase in the number of MoviePass subscribers since MoviePass announced its new $9.95 per month subscription fee on August 15, 2017 and the public's interest in the MoviePass monthly movie theater subscription service.
>
> "***I believe we are witnessing a major disruption in the movie industry," said Ted Farnsworth, Chairman and CEO of HMNY. "The marketplace has responded, and we could not be more thrilled with the new subscriber results of MoviePass."***

Emphasis added.

19.     On October 24, 2017, Helios issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing more than 600,000 monthly subscribers to MoviePass ("October 24, 2017 Press Release"). Therein, Helios stated in pertinent part:

**New York, NY (October 24, 2017)** —Helios and Matheson Analytics Inc. (NASDAQ:HMNY) announced today that MoviePass Inc., the movie theater subscription service that HMNY has agreed to buy a majority stake in, has surpassed over 600,000 paying monthly subscribers as of October 18, 2017, up from approximately 20,000 as of August 14, 2017, the day before MoviePass announced its new $9.95 per month subscription price. ***The continued growth trajectory exceeded MoviePass' initial projections, and now MoviePass projects that it will acquire at least 3.1 million additional paying subscribers through August 18, 2018, exceeding its previous estimate of 2.5 million subscribers.*** HMNY also announced that MoviePass had a subscriber churn rate of 4.2% for month 1 and 2.4% for month 2 after announcing its new $9.95 per month subscription price.  Based on current churn rates, monthly subscriber retention is above 96% and average paying monthly subscriber life expectancy is 46.8 months.

"Month after month we aim to improve our service with faster card delivery, improved application updates, and an easier-to-use web site. We believe our strategy is paying off in terms of increased satisfaction, reduced churn, and faster growth," said Mitch Lowe, CEO of MoviePass.  "I believe our ongoing investments in customer experience, usability and convenience have steadily improved customer satisfaction and retention."

Following HMNY's purchase of a majority stake in MoviePass, which remains subject to the approval of HMNY's stockholders, HMNY plans to further integrate its data analytics capabilities with the MoviePass service to analyze moviegoer's behaviors and preferences, with the goal of helping the film industry better understand what audiences want. With HMNY's capabilities, HMNY believes that MoviePass can bridge an intelligence gap for the movie theater industry so the entire film ecosystem can better serve audiences in areas ranging from production to advertising.

"When you apply computer science and machine learning to an industry that we believe has lacked significant innovation, useful patterns start to emerge," said Ted Farnsworth, Chairman and CEO of HMNY.  "More subscribers mean more data.  Together, I believe HMNY and MoviePass can offer important analytics to movie studios and exhibitors while serving the interests of moviegoers in the process. "

Emphasis added.

20.     On January 9, 2018, Helios filed a Form 8-K with the SEC announcing that it had "*surpassed over 1.5 million paying subscribers as of January 7, 2018.*"

21.     On March 14, 2018, Helios filed a Form 8-K with the SEC announcing a new subscription agreement with MoviePass, whereby in lieu of MoviePass repaying previous advance payments Helios had accepted to receive MoviePass common stock "*based on a pre-money valuation of MoviePass of $240 million as of December 31, 2017*" ("March 2018 Form 8-K"). Therein, Helios stated in relevant:

**New Subscription Agreement with MoviePass**

Following the full exercise of the Option, from December 19, 2017 through February 20, 2018, Helios provided cash advances to MoviePass to support MoviePass' working capital and operational requirements, as well as to support the expansion of MoviePass' business plans and objectives. The total amount advanced by Helios to MoviePass during this period totaled $55,525,000 (the "Advance").

On March 8, 2018, Helios entered into a Subscription Agreement with MoviePass (the "March 2018 Agreement"), pursuant to which, in lieu of MoviePass repaying the Advance, MoviePass agreed to sell to Helios, and Helios agreed to accept, an amount of MoviePass Common Stock equal to 18.79% of the total then outstanding MoviePass Common Stock (excluding shares underlying MoviePass options and warrants) (the "MoviePass Purchased Shares"), based on a pre-money valuation of MoviePass of $240 million as of December 31, 2017 (the "Pre-Money Valuation Amount"). Pursuant to the Agreement, MoviePass also agreed to issue to Helios, in addition to the MoviePass Purchased Shares, without payment of additional consideration by Helios, for purposes of providing Helios with anti-dilution protection with respect to Helios' prior equity investments in MoviePass, an amount of shares of MoviePass Common Stock that caused Helios' total ownership of the outstanding shares of MoviePass Common Stock (excluding shares underlying MoviePass options and warrants), together with the MoviePass Purchased Shares, to equal 81.2% as of March 8, 2018.

Accordingly, as of March 8, 2018, Helios owns 81.2% of the outstanding shares of MoviePass Common Stock (excluding shares underlying MoviePass options and warrants). MoviePass has no class of shares outstanding or designated other than Common Stock.

22.     The statements in paragraphs ¶16-21 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (i) Helios was touting MoviePass' valuation and path to profitability; (ii) MoviePass' business model was not sustainable, (iii) consequently, Helios would run out of cash, (iv) Defendants' actions were only reducing shareholder value, and (v) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## C.     The Truth Emerges

23.     On July 27, 2018, Helios filed a Form 8-K with the SEC announcing that it had issued a demand note in the principal amount of $6.2 million because it was unable to make required payments to its merchants and fulfillment processors leading to a service interruption ("July 2018 Form 8-K"). Therein, Helios stated in relevant part:

*Demand Note*

On July 27, 2018, the Company issued a demand note (the "Demand Note") to the Holder in the principal amount of $6,200,000, which includes $5.0 million in cash borrowed by the Company from the Holder and $1.2 million of original issue discount. No additional interest will accrue under the Demand Note aside from any Late Charges (as defined in the Demand Note) upon the failure to pay outstanding amounts under the Demand Note. The Holder may make a demand for full payment of the Demand Note from and after (x) with respect to up to $3,100,000 of the principal outstanding under the Demand Note (the "Initial Principal"), August 1, 2018 or (y) with respect to any other amounts then outstanding under the Demand Note, August 5, 2018. Upon demand, the Company is also required to pay to the Holder any sum required to cover the costs and expenses incurred by the Holder in connection with the drafting and negotiation of the Demand Note as well as all costs and expenses of any enforcement or collection of the Demand Note, including, without limitation, reasonable attorneys' fees, expenses and disbursements. All proceeds received by the Company on or after July 31, 2018 from sales of common stock under its outstanding at-the-market offering (the "ATM Offering") pursuant

11

to the Equity Distribution Agreement, dated as of April 18, 2018 (the "Equity Distribution Agreement") between the Company and Canaccord Genuity LLC, must be applied against any Initial Principal until no Initial Principal remains outstanding, and thereafter, against any remaining amounts due under the Demand Note. The Demand Note's principal, together with accrued and unpaid Late Charges may be prepaid by the Company without penalty. With the agreement of the Holder, principal and accrued and unpaid Late Charges on the Demand Note may be applied to all, or any part, of the purchase price of securities to be issued upon the consummation, after July 27, 2018, of an offering of securities by the Company to the Holder. Any amount of principal or other amounts due which is not paid when due (a "Payment Default") will result in a late charge being incurred and payable by the Company to the Holder in an amount equal to interest on such amount as the rate of 15% per year from the date such amount was due until the same is paid in full. If a Payment Default remains outstanding for a period of 48 hours, Holder may require the Company to redeem all or a portion of the Demand Note at a redemption price of 130%.

**The $5.0 million cash proceeds received from the Demand Note will be used by the Company to pay the Company's merchant and fulfillment processors. If the Company is unable to make required payments to its merchant and fulfillment processors, the merchant and fulfillment processors may cease processing payments for MoviePass, Inc. ("MoviePass"), which would cause a MoviePass service interruption. Such a service interruption occurred on July 26, 2018. Such service interruptions could have a material adverse effect on MoviePass' ability to retain its subscribers.** This would have an adverse effect on the Company's financial position and results of operations.

MoviePass will execute a guaranty (the "MoviePass Demand Note Guaranty") pursuant to which MoviePass guarantees the punctual payment of the Demand Note, including, without limitation, all principal, interest and other amounts that accrue after the commencement of any insolvency proceeding of the Company or MoviePass, whether or not the payment of such interest and/or other amounts are enforceable or are allowable and agrees to pay any and all costs and expenses (including counsel fees and expenses) incurred by the Holder in enforcing any rights under the MoviePass Demand Note Guaranty or the Demand Note.

Emphasis added.

24.     On this news, the price of the Company's common stock declined $4.83 from a close on July 26, 2018 at $6.83 per share of Helios common stock, to a close on July 27, 2018 at $2.00 per share of Helios common stock, *a drop of approximately 70.72%.*

25.     In the course of the following trading days, the price of the Company's common stock declined another $1.76 to close on August 1, 2018 at $0.228 per share of Helios common stock, ***an overall drop from July 26, 2018 of approximately 96.49%.***

### ADDITIONAL SCIENTER ALLEGATIONS

26.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Helios, their control over, and/or receipt and/or modification of Helios' allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Helios, participated in the fraudulent scheme alleged herein.

### LOSS CAUSATION AND ECONOMIC LOSS

27.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock. As detailed above, when the truth about Helios' misconduct and its lack of operational and financial controls was revealed, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Helios' common stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference

that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

28.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Helios' business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Helios' common stock to be artificially inflated. Plaintiff and other Class members purchased Helios' common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

**PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET**

29.     At all relevant times, the market for Helios common stock was an efficient market for the following reasons, among others:

> (a) Helios common stock met the requirements for listing, and were listed and actively traded on the NasdaqCM, a highly efficient market;
>
> (b) During the Class Period, Helios common stock were actively traded, demonstrating a strong presumption of an efficient market;
>
> (c) As a regulated issuer, Helios filed with the SEC periodic public reports during

14

the Class Period;

(d) Helios regularly communicated with public investors via established market communication mechanisms;

(e) Helios was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about Helios was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

30.     As a result of the foregoing, the market for Helios common stock promptly digested current information regarding Helios from all publicly available sources and reflected such information in Helios' stock price. Under these circumstances, all purchasers of Helios common stock during the Class Period suffered similar injury through their purchase of Helios' common stock at artificially inflated prices and a presumption of reliance applies.

31.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's financials and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in Helios.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

32.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

33.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

34.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Helios who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Helios common stock on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family

16

members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

36.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Helios securities were actively traded on the NasdaqCM. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Helios or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, as of May 11, 2018, Helios had more than 82,655,182 shares of common stock outstanding. On July 24, 2018, Helios completed a 1 for 250 reverse stock split. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

37.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

38.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b)      whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)      whether the price of Helios securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### Violation of Section 10(b) and Rule 10b-5 Against All Defendants

41.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42.      During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Helios common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

43.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Helios securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

44.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Helios as specified herein.

45.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Helios' value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Helios and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Helios common stock during the Class Period.

46.     Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team

or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

47.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Helios' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

48.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Helios' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Helios'

publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Helios' common stock during the Class Period at artificially high prices and were or will be damaged thereby.

49.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Helios' financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Helios securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

50.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

51.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

52.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of common stock giving rise to the cause of action.

## COUNT II
### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     The Individual Defendants acted as controlling persons of Helios within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

55.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

56.     As set forth above, Helios, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

57.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

58.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of common stock giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: August 2, 2018

/s/ *Eduard Korsinsky*
**LEVI & KORSINSKY, LLP**
Eduard Korsinsky
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email:ek@zlk.com