**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE HELIOS AND MATHESON ANALYTICS, INC. SECURITIES LITIGATION** | No. 1:18-CV-06965-JGK<br><br>**CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

# AMENDED CLASS ACTION COMPLAINT

Dated: January 4, 2019

**LEVI & KORSINSKY, LLP**

Shannon L. Hopkins (SH-1887)
shopkins@zlk.com
Stephanie A. Bartone
sbartone@@zlk.com (Pro Hac Vice forthcoming)
733 Summer Street, Suite 304
Stamford, CT 06901
Telephone: (203) 992-4523
Facsimile: (212) 363-7171

Eduard Korsinsky (EK-8989)
ek@zlk.com
William J. Fields (*admission pending*)
wfields@zlk.com
Christopher J. Kupka (CK-9010)
ckupka@zlk.com
55 Broadway, 10th Floor
New York, New York 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

# TABLE OF CONTENTS


SUMMARY OF THE ACTION ........ 2

JURISDICTION AND VENUE ........ 5

PARTIES ........ 6

A. Plaintiffs ........ 6

B. Defendants ........ 7

STATEMENT OF FACTS ........ 9

I. BACKGROUND OF COMPANY AND ITS MOUNTING LOSSES ........ 9

II. A CASH-STRAPPED HELIOS OBTAINS A MAJORITY INTEREST IN MOVIEPASS TO STAY AFLOAT ........ 11

III. DEFENDANTS SLASH MOVIEPASS TICKET PRICES WITH THE PROMISE OF GENERATING REVENUE THROUGH A NOVEL DATA COLLECTION AND MARKETING BUSINESS PLAN THAT HELIOS KNEW IT LACKED THE INFRASTRURE, KNOWLEDGE AND CAPABILITY TO IMPLEMENT OR SUSTAIN ........ 14

A. The Rapid Increase In Subscription Plans Cause Tens of Millions of Dollars In Losses Each Month That Could Not Be Sustained ........ 16

B. Defendants Did Not Have the Technology or Capabilities to Gather Let Alone Analyze Data ........ 19

C. Movie Theaters Had No Incentive to Pay MoviePass ........ 23

IV. DEFENDANTS ENGAGED IN DILUTIVE STOCK SALES TO COVER THEIR MASSIVE LOSSES ........ 25

V. DEFENDANTS ANNOUNCE A SPIN-OFF OF ZONE IN ORDER TO REPEAT ITS FRAUDULENT PATTERN ........ 27

VI. HELIOS' FRAUD RESULTS IN RESIGNATIONS AND AN INVESTIGATION BY THE NEW YORK ATTORNEY GENERAL ........ 28

DEFENDANTS' MATERIAL CLASS PERIOD MISREPRESENTATIONS AND OMISSIONS ........ 29

I. FALSE AND MISLEADING STATEMENTS IN THE AUGUST 15, 2017 PRESS RELEASE ........ 29

II. FALSE AND MISLEADING STATEMENTS IN THE AUGUST 17, 2017 INTERVIEW WITH VARIETY MAGAZINE ........ 31

III. FALSE AND MISLEADING STATEMENTS IN THE AUGUST 17, 2018 INTERVIEW WITH WIRED.COM ........ 33

IV. FALSE AND MISLEADING STATEMENTS IN THE SEPTEMBER 14, 2017 PRESS RELEASE ........ 35

V. FALSE AND MISLEADING STATEMENTS IN THE SEPTEMBER 25, 2017 ARTICLE ........ 38
VI. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 11, 2017 PRESS RELEASE ........ 41
VII. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 13, 2017 ARTICLE ........ 42
VIII. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 24, 2017 PRESS RELEASE ........ 45
IX. FALSE AND MISLEADING STATEMENTS IN THE DECEMBER 14, 2017 PROSPECTUS SUPPLEMENT ........ 47
X. FALSE AND MISLEADING STATEMENTS IN THE FEBRUARY 14, 2018 PROSPECTUS SUPPLEMENT ........ 48
XI. FALSE AND MISLEADING STATEMENTS IN THE MARCH 23, 2018 PRESS RELEASE ........ 49
XII. FALSE AND MISLEADING STATEMENTS IN THE APRIL 17, 2018 ANNUAL REPORT ........ 50
XIII. FALSE AND MISLEADING STATEMENTS IN APRIL 2018 VARIETY.COM ARTICLE ........ 53
XIV. FALSE AND MISLEADING STATEMENTS IN THE APRIL 18, 2018 AND APRIL 20, 2018 PROSPECTUS SUPPLEMENTS ........ 54
XV. FALSE AND MISLEADING STATEMENTS IN THE MAY 15, 2018 QUARTERLY REPORT ON FORM 10-Q ........ 55
XVI. DEFENDANT LOWE'S JUNE 28, 2018 REDDIT "AS ME ANYTHING" ........ 58
THE TRUTH EMERGES ........ 59
POST CLASS PERIOD EVENTS ........ 61
I. THE PRECIPITOUS DECLINE IN HELIOS STOCK RESULTS IN NASDAQ NON-COMPLIANCE AND COMMENCEMENT OF THE DELISTING PROCESS ........ 61
II. BOARD MEMBERS RESIGN AMID TURMOIL CITING "CONCERNS" REGARDING HELIOS' MANAGEMENTS' LACK OF TRANSPARENCY AND WITHHOLDING OF INFORMATION FROM THE BOARD ........ 63
III. THE NEW YORK AG ANNOUNCES INVESTIGATION INTO WHETHER HELIOS DEFRAUDED INVESTORS ........ 64
IV. HELIOS IS FORCED TO SPIN-OFF OF THE MOVIEPASS™ BUSINESS ........ 65
V. KEY HELIOS PERSONNEL ARE FIRED OR ABANDON THE SINKING SHIP ........ 65
ADDITIONAL ALLEGATIONS OF SCIENTER ........ 66

I. THE INDIVIDUAL DEFENDANTS KNOWINGLY AND/OR RECKLESSLY MADE MATERIAL MISSTATEMENTS AND/OR OMITTED MATERIAL FACTS ............ 67

A. Helios and MoviePass' Inadequate Technology, Systems, Knowledge and Experience to Handle and Mine Subscription Data Supports A Strong Inference of Scienter ............ 68

B. Board Member Resignations as a Direct Result of the Individual Defendants' Deception and Lack of Transparency Supports A Strong Inference of Scienter ............ 68

C. The New York Attorney General Investigation Into Allegations that Helios Management Intentionally Mislead Investors Supports A Strong Inference of Scienter ............ 69

D. MoviePass Was Helios' Core Business Supports Scienter ............ 70

E. The Individual Defendants' History of Defrauding Investors and Business Partners Supports Scienter ............ 70

II. THE INDIVIDUAL DEFENDANTS WERE MOTIVATED TO COMMIT THE FRAUD ALLEGED HEREIN ............ 73

A. The Individual Defendants and Other Company Insiders Profited from Exorbitant Compensation Packages ............ 73

B. The Individual Defendants Were Motivated to Inflate the Company's Stock Price in Order yo Secure Desperately Needed Proceeds from the Various Class Period Note Issuances and Conceal the Company's Ailing Cash Position and Financial Losses ..... 76

1. The August 2017 Notes and Investor Warrant ............ 76

2. The November 2017 Senior Secured Convertible Notes ............ 77

3. The January 2018 Senior Convertible Notes ............ 78

4. The Company Uses its Stock as Currency to Pay its Placement Agent in the Various Note Offerings ............ 79

C. The Individual Defendants Were Motivated to Inflate the Company's Common Stock To Raise Capital in the Follow-On Public Offerings ............ 81

D. Defendants' Motive to Inflate Helios' Stock Price to Use Helios Stock As Currency to Make Acquisitions ............ 82

LOSS CAUSATION ............ 83

CLASS ACTION ALLEGATIONS ............ 85

PRESUMPTION OF RELIANCE ............ 87

NO STATUTORY SAFE HARBOR ............ 89

CLAIMS FOR RELIEF ............ 90

PRAYER FOR RELIEF ............ 95

JURY DEMAND ............ 95

The Helios and Matheson Investor Group ("Lead Plaintiff"), comprised of George Hurst, Marcus Washington, Daniel Mercer, Juan Taveras, and Amit Katiyar ("Plaintiffs"), bring this action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. §240.10b-5 ("Rule 10b-5") promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), on behalf of themselves and all persons and entities other than Defendants (defined below) who purchased or otherwise acquired shares of the common stock of Helios and Matheson Analytics Inc. ("Helios" or the "Company") between August 15, 2017 and July 26, 2018, inclusive (the "Class Period").

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their undersigned attorneys ("Lead Counsel"), which included, among other things: (i) review and analysis of Helios' public filings with the SEC; (ii) review and analysis of Helios' other public statements, including press releases and interviews with various news sources; (iii) discussions with an industry expert; (iv) interviews with individuals who are former employees of Helios; (v) review and analysis of reports of securities and financial analysts, news articles, and other commentary and analysis concerning Helios and the industry in which it operates; and (vi) review of pertinent court filings. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1. Since 1983, Helios has purported to provide "high quality IT services and solutions to Fortune 1000 companies and other large organizations." Despite the longevity of the Company, Helios was suffering from significant financial troubles that led to the threat of being delisted from the Nasdaq Stock Market ("NASDAQ"). As a means of salvaging the Company, Helios acquired MoviePass, Inc. ("MoviePass") in August 2017. MoviePass, the Company's primary asset throughout the Class Period, was a movie theater subscription service in the United States that allowed subscribers to see a new movie every day in theaters nationwide for a fixed monthly price.

2. Immediately upon acquiring a majority stake in MoviePass, defendant Farnsworth ("Farnsworth") implemented changes that were guaranteed to cost hundreds of millions of dollars without a chance for profit. Indeed, Defendants' first order of business was to slash the monthly subscription memberships from $50.00 per month in the most expensive cities to a nationwide flat rate of $9.95, and in some instances to as low as $5.83 per month. While MoviePass holders could see one movie *every day* for as little as $5.83 per month, Helios was required to pay the full price of the movie ticket for each movie. With the cost of movie tickets as high as $15.00 per ticket in certain cities, and the average national ticket price around $8.97 in 2017, Helios was left paying tens of millions of dollars in losses ***each month***. Indeed, with subscriptions soaring exponentially to millions of viewers, this deficit only increased throughout the Class Period to as much as a reported net loss of $150,824,842 for 2017.

3. Though Defendants' knew this business model would never be profitable and Helios would soon run out of cash, Farnsworth told investors throughout the Class Period, "***I assure you that capital is not an issue. I'm sitting on hundreds of millions of dollars of dry powder***" and that Helios "can be profitable on the subscription at $9.95." Thus, even while the Company was generating losses, investors were led to believe this was of no concern.

4. This is because Farnsworth assured investors that the real money would be made through the Company's purported proprietary technology, "big data," and artificial intelligence platforms used to "analyze[] consumer trends, patterns and activities" that would bring "a significant technological advantage to MoviePass and "completely disrupt[] the movie industry in the same way that Netfix and Redbox have done in years past." Helios purportedly would be able to "learn[] individual moviegoer's tastes and make[] recommendations based on recorded preferences for specific genres, actors and even the opinions of friends with similar likings."

5. After slashing the price of MoviePass tickets from $50 per month to a just $9.95, Helios explained it intended to "attract a mass market," at which point the Company would then purportedly "derive revenue from sales of digital advertising and data analytics services to large movie studios." In essence, Defendants represented that they would use the MoviePass app to collect data on consumers' habits and then use "artificial intelligence, algorithms, and machine learning" through its app, as well as emails, to advertise movies catered to each individual's viewing habits, thereby influencing consumers to view and attend movies that they otherwise would not. In turn, this would generate more ticket and concession sales for theaters from the increased theater attendance who would then kick back profits to Helios.

6. In reality, Defendants knew Helios had no chance of succeeding because: (i) Helios did not have the data mining capability, technology, or ability to profit from partnerships; (2) movie theatres declined to partner with Helios and MoviePass; (3) the monthly fee of $9.95 per month would result in unsustainable losses of tens of millions of dollars per month; and (4) Helios' did not have the liquidity or cash available to fund operations. One former employee described numerous technological issues that MoviePass was not equipped to handle due to the sheer volume of subscribers, resulting in a "huge" backlog of customer inquiries and complaints that were

multiple months old, the creation of multiple, duplicative accounts or phantom accounts, unwanted charges, outages, and other sorts of problems.

7. Meanwhile, Helios was desperately engaging in a series of dilutive stock sales in order to cover their massive losses and create a façade of success.

8. The truth finally broke on July 27, 2018, when Helios announced that it had issued a demand note in the principal amount of $6.2 million because it had not able to make required payments to its merchants and processors, which had led to a service interruption.

9. On this news, the price of the Company's common stock declined $4.83, or 70.72%, from a closing price of $6.83 per share on July 26, 2018 to a closing price of $2.00 per share on July 27, 2018. The Company's common stock continued to fall until closing at $0.228 per share on August 1, 2018, an overall drop from July 26, 2018 of approximately 96.49%, causing investors to suffer significant damages.

10. The revelation of the truth also led to a number of insider resignations and the investigation into Helios' fraudulent representation. First, on August 25, 2018, Carl J. Schramm resigned from Helios' board of directors (the "Board"), stating his resignation was due to Helios' management withholding of material information from the Board "for several months."

11. Next, on October 18, 2018, the New York Attorney General opened an official securities fraud investigation into Helios regarding whether the Company misled investors regarding the Company's finances.

12. Only days later, two members of MoviePass' board of directors, Christopher Kelly and Maria Stipp, resigned while similarly expressing "their belief that they had not received sufficient access to information" regarding decisions made by the Company.

13. Finally, on November 17, 2018, the entire two-person human resources department of MoviePass was suddenly fired and, on January 4, 2019, Eric Jeng, a former product manager at MoviePass, quit, sending a '"scathing' 704-word letter" to all MoviePass employees regarding the toxic work environment endured over the past year.

14. While Helios investors were left with substantial losses, Defendants were unscathed, as they had made sure to award themselves handsome compensation packages.

15. Plaintiffs seek to recover losses they suffered as a result of the misconduct alleged herein on behalf of themselves and investors.

## JURISDICTION AND VENUE

16. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

17. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and section 27 of the Exchange Act, codified at 15 U.S.C. §78aa ("Section 27"). In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications, and the facilities of national securities exchanges. Helios trades in an efficient market on The Nasdaq Capital Market ("NASDAQ").

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Exchange Act Section 27 because many of the false and misleading statements were made in or issued from the Southern District of New York. Defendants conduct business and maintain offices in this District, and Helios is headquartered in this District, with its principal place of business located at 350 Fifth Avenue, New York, New York 10118.

## PARTIES

### A. Plaintiffs

19. Plaintiffs are members of the Helios and Matheson Investor Group, which was appointed Lead Plaintiff by the Court pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(3), on November 11, 2018.

20. Plaintiff George Hurst, as previously set forth in his certification supporting the Motion of the Helios and Matheson Investor Group for Consolidation of the Actions, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel, incorporated by reference herein, purchased Helios securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

21. Plaintiff Marcus Washington, as previously set forth in his certification supporting the Motion of the Helios and Matheson Investor Group for Consolidation of the Actions, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel, incorporated by reference herein, purchased Helios securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22. Plaintiff Daniel Mercer, as previously set forth in his certification supporting the Motion of the Helios and Matheson Investor Group for Consolidation of the Actions, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel, incorporated by reference herein, purchased Helios securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

23. Plaintiff Juan Taveras, as previously set forth in his certification supporting the Motion of the Helios and Matheson Investor Group for Consolidation of the Actions, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel, incorporated by reference herein,

purchased Helios securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

24. Plaintiff Amit Katiyar, as previously set forth in his certification supporting the Motion of the Helios and Matheson Investor Group for Consolidation of the Actions, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel, incorporated by reference herein, purchased Helios securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

**B. Defendants**

25. Defendant Helios is incorporated in Delaware and maintains its principal offices at the Empire State Building, 350 Fifth Avenue, New York, NY 10118. Helios' common stock trades or traded on the NASDAQ under the ticker symbol "HMNY." Helios describes itself as providing "high quality information technology, or IT, services and solutions including a range of technology platforms focusing on big data, business intelligence, and consumer-centric technology."

26. Defendant Farnsworth has been the Company's Chief Executive Officer ("CEO") since January 20, 2017. Farnsworth has been Chairman of Helios' Board and the CEO of Helios' wholly-owned subsidiary, Zone Technologies, Inc. ("Zone"), since November 9, 2016. Farnsworth was president of Zone prior to its acquisition by Helios. During the class Period, Farnsworth made materially false and misleading statements and omissions in, *inter alia*, press releases, interviews, and executed documents filed by Helios with the SEC containing false and misleading statements and omissions.

27. Defendant Stuart Benson ("Benson") has been the Company's Chief Financial Officer ("CFO") since November 2016. Benson previously provided consulting services to the Company from September 2016 to November 2016. During the class Period, Benson executed documents filed by Helios with the SEC containing false and misleading statements and omissions.

28. Defendant Mitch Lowe ("Lowe") has been the Chief Executive Officer ("CEO") of MoviePass since June 2016. During the Class Period, Lowe made materially false and misleading statements and omissions, in *inter alia*, interviews and press releases. Lowe worked in step with Farnsworth throughout the Class Period. According to Farnsworth, "Mitch [Lowe] and I work together literally 24-7. We are constantly in contact with each other every day. I handle the marketing and the financing side. Mitch handles all of the day to day operations and relationships with theatres." Previously, Lowe worked as an executive at Netflix, McDonald's, Redbox, and Quarterly Co.

29. Defendants Farnsworth, Benson and Lowe are collectively referred to as the "Individual Defendants."

30. The Individual Defendants, by virtue of their high-level positions at Helios, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at its highest levels. As such, they were privy to confidential, proprietary information concerning the Company and its business operations, growth, and financial condition. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

31. As senior executives at a publicly held company with common stock registered with the SEC and traded on the NASDAQ, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Helios' publicly traded common stock would be based on accurate information. Each Officer Defendant violated these requirements and obligations during the Class Period.

32. As a result of their positions of control and authority as senior executives, the Individual Defendants were able to and did control the content of the SEC filings, press releases, and other public statements issued by Helios during the Class Period. Each Officer Defendant had the ability to correct the statements or prevent them from being released into the public sphere. Accordingly, the Individual Defendants are responsible for the accuracy of the public statements detailed in this complaint.

33. As a result of their positions of control and authority as senior executives, the Individual Defendants had access to adverse, undisclosed information about Helios' business, operations, financial statements, and internal controls through their access to internal corporate documents and conversations with other corporate officers and employees. The Individual Defendants knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Helios materially false and misleading.

34. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Helios' common stock by disseminating materially false and misleading statements and/or concealing adverse facts as alleged herein. This deception caused Plaintiffs and members of the Class to purchase Helios' common stock at artificially inflated prices.

## STATEMENT OF FACTS

### I. BACKGROUND OF COMPANY AND ITS MOUNTING LOSSES

35. Originally incorporated in 1983 under the name Software Ben-Tov, Inc., Helios describes itself as providing high-quality IT, services, and solutions, including a range of technology platforms focusing on big data, business intelligence, and consumer-centric technology. The Company is headquartered in New York City and has an office in Bangalore, India. Helios also purportedly has an office in Miami, Florida; however, Plaintiffs' investigation

has been unable to find any evidence that such office exists. The Company's common stock is listed on NASDAQ under the symbol HMNY.

36. The Company's parent company is Helios and Matheson Information Technology Limited ("HMIT"). Between 2001 and 2007, HMIT purchased five companies in the United States and India, one of which was the Company acquired in 2006 when it was known as The A Consulting Team, Inc. The Company was later renamed Helios and Matheson Analytics Inc., which is the name it presently uses.

37. HMIT started as a purported information technology ("IT") service company in India. HMIT raised money by issuing "fixed deposits," pursuant to which depositors would lend HMIT money in exchange for HMIT issuing the depositors postdated checks, in an amount reflecting the sum lent by each depositor plus interest, that was meant to be cashed when the fixed deposit reached maturity. In June 2014, however, HMIT simply stopped paying its debts, leading to civil lawsuits, investigations by police and regulators in India, and the arrest of three of HMIT's officers, including Muralikrishna Gadiyaram, HMIT's co-founder, CEO and majority shareholder who was also a consultant for Helios during the Class Period. In 2016, an Indian court ordered HMIT liquidated and slammed HMIT for making a "deliberate attempt to hoodwink" court orders. At the time the company was ordered liquidated, HMIT was the beneficial owner of over 75% of Helios' outstanding common stock. In May of 2018, HMIT was delisted from both of India's stock exchanges.

38. At the same time HMIT was facing the repercussions of defrauding its investors, Helios was itself performing poorly, reporting growing net losses of $7,381,071 and $2,110,117 for the years ended December 31, 2016 and 2015, respectively. It had also received multiple

notifications from The Nasdaq Stock Market in November 2015 that it was facing delisting for failing to satisfy certain conditions prerequisite to listing.

39. With a fraudulent parent company, a failing business, and the threat of being delisted, in July 2016, Helios signed a definitive agreement and plan of merger with Zone, a technology company being run by Farnsworth out of Florida. Zone only added to Helios' financial troubles, however.

40. Specifically, at the time of the merger, Zone's primary business was developing RedZone Maps, "a real-time crime and navigation map application." While Zone was "fully functioning," it earned no advertising revenue from RedZone Maps and had $1.5 million in expenses from the start of 2016 until the acquisition. Nevertheless, on November 9, 2016, Helios completed its acquisition of Zone, which enabled Helios to satisfy certain Nasdaq Stock Market listing requirements that allowed it to continue trading. Following the merger, HMIT and Farnsworth both owned approximately 39% of Helios. While on the surface the merger with Zone gave the appearance that Helios was rebounding, in reality it was still floundering.

## II. A CASH-STRAPPED HELIOS OBTAINS A MAJORITY INTEREST IN MOVIEPASS TO STAY AFLOAT

41. By June 30, 2017, Helios had an accumulated deficit of $54,980,789, which included a net loss of $11,719,371 for the six months ended June 30, 2017 alone. In order sustain its company, on August 15, 2017, Helios entered into a Securities Purchase Agreement with MoviePass (the "MoviePass SPA"), pursuant to which Helios agreed to purchase 51% of MoviePass' common stock for an aggregate purchase price of $27,000,000.

42. MoviePass is a Delaware corporation whose primary product offering is a movie theater subscription service in the United States that formerly allowed subscribers to see a new movie every day in theaters nationwide for a fixed monthly price. Once customers sign up for

MoviePass online, they are prompted to download the MoviePass application on their smart phones and are then mailed a MoviePass debit card. Subscribers use the debit card or MoviePass application to purchase up to one movie ticket per day at any of the theaters listed in the MoviePass application.

43. In connection with the MoviePass SPA, Helios and MoviePass entered into a Second Amended and Restated Subordinated Convertible Note Purchase Agreement (the "NPA"), pursuant to which Helios would loan MoviePass $4,950,000 in cash in exchange for a subordinated promissory note in the principal amount of $5,000,000.

44. Additional terms and payments under the MoviePass SPA were predicated on MoviePass reaching certain milestones based on the number of MoviePass subscribers and whether MoviePass ultimately became listed on The Nasdaq Stock Market. Specifically, the terms provided that:

> At the closing of the MoviePass Transaction (the "Closing"), in exchange for the MoviePass Shares, Helios will issue MoviePass (i) 3,333,334 unregistered shares (the "HMNY Closing Shares") of HMNY's common stock, par value $.01 per share ("HMNY Common Stock"), for a total agreed upon value of approximately $10,000,000; and (ii) a promissory note in the principal amount of $10,000,000 (the "Helios Note"). Of the Helios Closing Shares, 666,667 shares shall be subject to forfeiture by MoviePass if MoviePass fails to achieve either of the following two milestones within the specified time frame: (A) within one year after the Closing, subscribers to MoviePass' MoviePass product shall have exceeded on at least one (1) day 100,000 subscribers (such number of subscribers to be determined based upon the number of registered accounts on the MoviePass server that have contracted with MoviePass (through a 3rd party or otherwise) to use the MoviePass product not including any account that has notified MoviePass that it desires to cancel its use of the MoviePass product), and (B) the Common Stock shall have been listed on The Nasdaq Stock Market ("Nasdaq") or New York Stock Exchange ("NYSE") by January 31, 2018 (unless such failure to be listed is remedied within sixty (60) calendar days thereafter).
>
> Pursuant to the Helios Note, Helios has agreed to (i) fund $5,000,000, plus all accrued interest thereon, on the 90th calendar day following the Closing and (ii) pay $5,000,000, plus all accrued interest thereon, on the later of the 180th calendar day following the Closing or when the MoviePass Common Stock becomes listed on Nasdaq or NYSE. If MoviePass is not listed on such an exchange on or before

> June 1, 2018 (the "Extended Listing Maturity Date"), then, within ten (10) business days thereafter, HMNY will redeem the outstanding principal (not to exceed $5,000,000) and accrued unpaid interest thereon as of the Extended Listing Maturity Date (the "Redemption Amount") in exchange for HMNY tendering to MoviePass for immediate cancellation such number of MoviePass Shares in consideration of the immediate and automatic cancellation of HMNY's obligation to repay any outstanding principle and accrued interest thereunder.
>
> In addition, at the Closing, the MoviePass Note will automatically be deemed satisfied in full pursuant to the issuance of the MoviePass Shares and will no longer be outstanding. To the extent the MoviePass Transaction is not consummated prior to the termination of the MoviePass SPA, then the MoviePass Note will remain outstanding in accordance with its terms.
>
> If MoviePass' subscription service exceeds 150,000 subscribers on at least one (1) day within 15 months after the Closing, then, in addition to the HMNY Closing Shares, HMNY will issue to MoviePass 666,667 additional unregistered shares of HMNY Common Stock for a total agreed upon value of $2,000,000 (the "HMNY Milestone Shares" and together with the HMNY Closing Shares, the "HMNY Shares") (the agreed upon value per share and number of shares are subject to appropriate adjustment in the event of any stock dividend, stock split, combination or similar recapitalization affecting the HMNY Common Stock). HMNY plans to issue the HMNY Shares described herein in reliance upon the exemption from registration afforded by Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act").

45. The terms of the agreement also provided for a lock-up agreement, whereby MoviePass and Helios could not sell Helios stock from the date of the lock-up agreement until the later of one year from the date thereof or six months after the date on which MoviePass shares begin trading on The Nasdaq Stock Market.

46. The MoviePass SPA further provided that defendant Mitch Lowe ("Lowe") would be CEO of MoviePass and Farnsworth would be CEO of Helios. Pursuant to a voting agreement (the "Voting Agreement") entered into by the parties, the CEO of Helios would designate two directors to the MoviePass board of directors, while the MoviePass CEO would designate the three other directors.

47. Despite becoming majority stockholder via the SPA, between October 2017 and March 2018, Helios continued to take actions to increase its stock ownership of MoviePass. By March 8, 2018, Helios owned 91.8% of MoviePass' outstanding stock.[1]

## III. DEFENDANTS SLASH MOVIEPASS TICKET PRICES WITH THE PROMISE OF GENERATING REVENUE THROUGH A NOVEL DATA COLLECTION AND MARKETING BUSINESS PLAN THAT HELIOS KNEW IT LACKED THE INFRASTRURE, KNOWLEDGE AND CAPABILITY TO IMPLEMENT OR SUSTAIN

48. Immediately upon acquiring a majority stake in MoviePass, Farnsworth implemented changes that were guaranteed to cost hundreds of millions of dollars without a chance for profit. As claimed by defendant Lowe, these changes—particularly the low prices—were necessary because MoviePass "had to be a low price to attract a mass market." As represented to investors, Helios' purported goal was that, once MoviePass increased its subscriber base, Helios would "derive revenue from sales of digital advertising and data analytics services to large movie studios."

49. Helios further claimed to investors that its purported goal was that MoviePass would "increase theater attendance, increase concession sales and drive subscribers to consumer movie content in the theaters rather than at home." Then, by "partnering with ride-share companies, malls, local retailers and restaurants" MoviePass would "offer customers discounted experiences (in addition to the movie ticket) built around a night at the cinema." MoviePass was purportedly aiming to use integrated application technology to connect and direct consumers to

---

[1] In January 2018, MoviePass Ventures was formed as a wholly-owned subsidiary of Helios. MoviePass Ventures purportedly "aims to collaborate with film distributors to share in waterfall profits and ancillary revenues while using the data analytics MoviePass offers for marketing and targeting services for MoviePass' paying subscribers using the platform."

exhibitors and drive theater attendance "by creating profitable partnerships." The data collected from MoviePass would not be sold; rather, it would be used to market film.

50. In other words, Defendants would purportedly use the MoviePass app to collect data on consumers' habits, including data on which movies people go to see, the genre of the movie, and the times of such movies. MoviePass would then use "artificial intelligence, algorithms, and machine learning" through its app, as well as emails, to advertise movies catered to each individual's viewing habits, thereby influencing consumers to view and attend movies that they otherwise would not. In turn, this would generate more ticket and concession sales for theaters from the increased theater attendance. Similarly, restaurants would receive an increase in business as a result of advertisements directing consumers to such restaurants. Defendants represented that they would be able to obtain agreements with theaters and restaurants to receive a cut of their sales as a result of this increased business.

51. According to Lowe, MoviePass' "bigger vision is to build a night at the movies whereby MoviePass would direct subscribers to places to have dinner before or after a screening, for instance, getting a cut from vendors." Additionally, Lowe outlined additional data that MoviePass was seeking to collect, stating:

> We get an enormous amount of information. Since we mail you the card, we know your home address, of course, we know the makeup of that household, the kids, the age groups, the income. It's all based on where you live. It's not that we ask that. You can extrapolate that. Then because you are being tracked in your GPS by the phone, our patent basically turns on and off our payment system by hooking that card to the device ID on your phone, so we watch how you drive from home to the movies. We watch where you go afterwards, and so we know the movies you watch. We know all about you. We don't sell that data. What we do is we use that data to market film.

52. Despite Defendants' claims to the contrary and their hyping of this supposed "plan" as the future of the movie industry, Defendants knew they did not have the money, knowledge, or

capabilities to execute a successful plan. Indeed, even if the goal were somehow attainable, the business model would still barely turn a profit.

### A. The Rapid Increase In Subscription Plans Cause Tens of Millions of Dollars In Losses Each Month That Could Not Be Sustained

53. The very first change to MoviePass was implemented immediately, on the same date the SPA was signed. Farnsworth cut the monthly MoviePass subscription from as much as $50 in the most expensive cities to a flat nationwide rate of $9.95. Consumers could now see a new movie *every day* in theaters nationwide for a monthly price of only $9.95. Meanwhile, however, Helios was paying the full price of the ticket to theaters each time a subscriber viewed a movie.

54. The drastic cuts were undoubtedly a hit among consumers, with MoviePass surpassing 150,000 subscribers after only two days, thereby achieving a subscriber milestone which, under the terms of the SPA, MoviePass had 15 months to achieve. At the time, Helios touted that theater seats filled by MoviePass for the six-day period leading up to August 20, 2017 increased in one theater chain by 2,000% and in a second theater chain by 884%. Subscriptions continued to grow exponentially, reaching over 400,000 monthly subscribers by September 24, 2017.

55. Despite this unprecedented growth, Defendants took the drastic cuts even further. Indeed, in a press release annexed to a Form 8-K Current Report signed by Farnsworth and filed by Helios with the SEC on November 11, 2017, the Company announced that it would be slashing MoviePass rates to just "$6.95 Per Month for a Limited Time Only" if customers were willing to sign up for a one-year subscription. The press release quoted Farnsworth as stating: "HMNY continues to be the biggest supporter of MoviePass™, as it outpaces any other movie theater

subscription service and continues to disrupt the movie theater industry . . . We look forward to helping MoviePass™ continue to broaden its reach and modernize the movie theater industry."

56. Further, for a limited time from December 2017 to February 2018, MoviePass offered a one-year subscription through Costco Wholesale Corporation for a flat fee of $70, which equates to a mere $5.83 per month.

57. Ultimately, within four months of MoviePass' announcement of its $9.95 per month subscription plan in August 2017, MoviePass had over 1 million total paying subscribers, including those on either monthly or annual plans. To put into perspective, other subscription-based services such as Spotify, Hulu, ClassPass, and Netflix achieved 1 million subscribers in 5, 10, 17, and 39 months, respectively. By January 2018 MoviePass had surpassed 1.5 million paying subscribers and by February 2018 these numbers had surpassed 2 million.

58. This practice of slashing pricing, while popular with consumers, was guaranteed to fail and result in substantial losses for MoviePass. According to the National Association of Theater Owners, the average cost of a single movie ticket in 2016 and 2017 was $8.65 and $8.97, respectively, and double that in major cities. MoviePass subscribers are allowed to see one movie per day, for 365 days of the year. Thus, anytime a customer used MoviePass more than once, MoviePass was guaranteed to lose money. On top of that, if a MoviePass customer used it in a major city, where ticket prices could be over $15 per ticket, MoviePass would lose money after a customer saw just one movie per month. Indeed, even if such customers saw one movie every two months Helios would still be at a loss in such instances.

59. Helios admitted that its business plan was bound to generate losses at first, stating that "MoviePass currently spends more to retain a subscriber than the revenue derived from that

subscriber and MoviePass currently does not have other sources of revenue. This results in a negative gross profit margin."

60. Indeed, the Company's independent auditors included an explanatory paragraph in its report for the year ended December 31, 2017, indicating that there was substantial doubt as to the Company's ability to continue as a going concern. These concerns were based on the significant net losses and working capital position of the Company. For the year ended December 31, 2017, Helios reported an accumulated deficit of $189,495,185 and a net loss of $150,824,842. This was an increase of $143,443,771 over the net loss of $7,381,071 reported for the year ended December 31, 2016.

61. Yet despite this seemingly unsustainable business plan, Farnsworth nevertheless assured investors otherwise, stating:

> Since day one, people have been saying we'll run out of money . . . ***I assure you that capital is not an issue. I'm sitting on hundreds of millions of dollars of dry powder, and I've got bankers and debt-financing companies calling me all the time***. They know they're looking at an Uber or an Airbnb. This is a unicorn company.

(Emphasis added).

62. Farnsworth also assured investors that "[u]sage was even lower than we anticipated" and that Helios "can be profitable on the subscription at $9.95." Thus, investors were led to believe that losses sustained were expected and were actually lower than anticipated, were part of the business plan, that Helios had cash on hand to cover such losses, and investors had no need to worry. As defendant Lowe explained, "[t]hough expensive for the company in the short-term, it's a significant benefit and more convenient for customers."

63. Helios reinforced this believe by proceeding to drop the monthly subscription price in March 2018 from $9.95 to $6.95 per month, paid annually. The already mounting losses would only worsen.

**B. Defendants Did Not Have the Technology or Capabilities to Gather Let Alone Analyze Data**

64. Despite its unsustainable business plan, Helios assured investors that the price of MoviePass was not where the real revenue would be made; rather, the money was in the data that it would collect and analyze. In truth, however, Helios lacked the skills, knowledge, and capability to do this.

65. First, neither Helios nor MoviePass have any experience or expertise in data mining. Prior to its acquisition of Zone, Helios provided IT services and solutions and did not participate in any data collection or analysis. In fact, when discussing Helios' data analytics experience, Farnsworth stated that "For many years, HMNY has been focused on data analytics, and ***in that capacity we own assets like Zone Technologies*** . . . ." (Emphasis added). Yet, Zone's only related experience is the use of RedZone Maps. RedZone Maps, a navigation app that generated routes using crime data from local police, government and users, was being developed as an application intended to operate on advertising revenue. This is a far cry from data mining millions of users' data. In fact, according to one Business Insider article, the RedZone Map app has not been updated since April 2018 and does not function as intended.[2] On top of that, Zone did not earn any revenue from advertising through this app.

66. Similarly, prior to being acquired by Helios, MoviePass offered movie subscriptions but never collected or mined consumer data. Aside from conclusively stating that Helios intended to collect and analyze consumer data, there is not a scintilla of evidence that Helios had the knowledge, tools, or capabilities to do what Defendants claimed.

---

[2] https://www.businessinsider.com/helios-matheson-to-spin-off-moviepass-into-separate-company-2018-10

67. Second, Defendants were not equipped to handle the unprecedented growth in subscriptions. When MoviePass prices were slashed, the program exploded from roughly 20,000 to more than 2 million subscribers. This caused technological issues which Defendants lacked the appropriate technology, staff and experience to handle.

68. This explosion in subscriptions laid bare the simple reality that MoviePass was not capable of handling so many subscribers. Indeed, a former Customer Experience Representative who worked at MoviePass' headquarters in New York City from October 2017 to March 2018 tasked with customer inquiries, including customer complaints, subscription cancellation requests, refunds, and any problems with the MoviePass card ("CW1") recounted numerous technological issues with the MoviePass app. As CW1 explained, MoviePass customers could communicate with MoviePass' customer service team by using a chat feature on the MoviePass application or by email. In January 2018, MoviePass added a phone number that customers could call; however, MoviePass' customer service functions for such calls were outsourced to a third party.

69. CW1 stated that there was only a total of twelve people employed at MoviePass on the customer service team to handle the incoming inquiries. On average, CW1 would work on 60 to 100 customer inquiries each day during its six to eight-hour shifts. CW1 further described the multiple issues that confronted the increase in subscribers and MoviePass' inability to handle the increase in the size of its subscriber base.

70. For instance, CW1 explained that MoviePass had a "huge" backlog of customer inquiries, especially emails, which made it difficult for MoviePass' customer service department to respond in a timely manner. Throughout the Class Period, many inquiries were months old before MoviePass was able to respond to them. When CW1 left in March 2018, the customer

service department was still addressing inquiries from December 2017. This backlog was a result of the volume of subscriptions.

71. CW1 also explained that MoviePass received inquiries regarding a number of problems with the MoviePass app. As the subscription rate substantially increased, "a lot" of the inquiries CW1 and its team received were from customers who had not received their MoviePass card. MoviePass used a third party to issue the cards and there were frequently problems with the delivery address. Even if there were no problems, CW1 explained that it would take up to two months for a consumer to receive the subscription. By the time CW1 left, CW1 reported the wait time had dropped to between ten days to two weeks. As explained below, the response time was so long that customers were forced to contact their credit card companies and banks or send multiple inquiries to MoviePass in hopes of receiving a response to their inquiries.

72. CW1 explained that inquiries regarding cancellations were common and became more common as time passed. CW1 explained that customers were supposed to be able to cancel their accounts within the MoviePass application, but that the application did not always work correctly, resulting in customers contacting customer service to cancel their account. However, because of the months long backlog of customer complaints, customers often were not able to communicate with anyone from MoviePass' customer service department for months, with the result that customers would sometimes dispute MoviePass charges with their credit card company or banks instead.

73. Even if a customer was able to successfully cancel his or her subscription, CW1 explained that customers were occasionally charged for one additional month because the payment system was not always properly synced with the cancellation feature in the MoviePass application.

74. According to CW1, customers would often send letters to cancel their accounts because there was such a delay in hearing from the customer service department. CW1 explained that customers thought the letters might receive more attention. CW1 explained that duplicative complaints by consumers often delayed the customer service team since the issue may have already been addressed by the time a representative was reading the second complaint.

75. CW1 further stated that MoviePass would accidently open multiple accounts for some customers and bill the customers separately for each account. CW1 explained that this was sometimes caused by problems with the MoviePass application. Occasionally, when a customer entered the incorrect data, such as a slightly incorrect email, the MoviePass application would create a "phantom" account for the same person. A phantom account could also be created if a customer hit the "submit" button more than once. MoviePass did not have a "real way" to track the phantom accounts, could not detect slight discrepancies in applications, and generally MoviePass would only address the issue when customers reached out to complain that they were being charged twice. In the case of one customer, eight accounts had inadvertently been created.

76. CW1 further explained that the app would experience outages. When this occurred, CW1 would receive a "significantly higher number of inquiries." Prior to CW1's employment with MoviePass, CW1 was informed that when the company first started offering $9.95 subscriptions the site crashed. During CW1's employment, there were additional "outages" where the MoviePass app did not work. For example, CW1 explained that app would not show movie times or money was not transferred to the customer's card when it should have been. This often resulted in customers purchasing their own movie tickets, which MoviePass then reimbursed as long as the customer sent a photo of the ticket stub. According to CW1, this was the most common reason customers requested refunds. CW1 noted that when it came to refunds, MoviePass was "cavalier"

and assigned no "urgency" to issuing them. CW1 was informed there was also an outage after CW1's departure in July 2018.

77. Due to these numerous issues, CW1 was originally told to report bugs to the "development team." CW1 recalls, however, that in January or February of 2018 its team was told to not "bother" with reporting bugs because the Head of Product was working on "something else."

**C. Movie Theaters Had No Incentive to Pay MoviePass**

78. Theaters and competitors had no incentive to pay MoviePass as Defendants promised. In fact, the CEO of AMC Entertainment Holdings, which holds the largest share of the American theater market, made it clear early on that AMC movie theaters would play no part in the MoviePass scheme. In a November 6, 2017 earnings call, CEO Adam Aron unequivocally stated:

> I would point out that [MoviePass is] charging $9.95 per month for an unlimited number of movies, one per day, I guess, that's the limit. But for one per day, a full month's worth of potential movies, and yet in September, MoviePass paid AMC, according to our records, $11.88 for each and every ticket that it purchased for our mutual guest. That's quite a gap, $9.95 a month versus $11.88 a visit. I must point out that's very gracious of them and we appreciate their business, but I think ***it's also important to make clear that despite claims they've made to the contrary, AMC has absolutely no intention, I repeat no intention, of sharing any – I repeat, any, of our admissions revenue or our concessions revenue with MoviePass.***

(emphasis added).

79. AMC was particularly hostile, dismissing MoviePass as a "fringe player" when MoviePass revised its prices. AMC even went so far as to ask Mastercard (MoviePass' debit card was associated with Mastercard) to determine whether MoviePass was in compliance with Mastercard's terms of service. While Regal Entertainment Group ("Regal") and Cinemark Holdings, Inc. ("Cinemark") were less openly hostile to MoviePass, they were clear that they were

unwilling to work with MoviePass. In fact, these theaters, as well as many others, already had their own loyalty programs that offered discounts to entice consumers.

80. For instance, AMC Stubs is a loyalty program offered by AMC Entertainment Holdings Inc. with approximately 10.8 million household members. Moviegoers can join the loyalty program as either a basic member for free or a premiere member for $15. The basic membership offers free popcorn refills, up to a $2 discount on tickets on Tuesdays, $5 rewards for every 5,000 points (points are earned at a rate of 20 points for every $1 spent), waived online ticket fees and free popcorn on the member's birthday. Premiere members receive a $5 discount on tickets on Tuesdays, earn 100 points for every $1 spent, and receive all the other benefits that come with the basic membership.

81. Regal also offers a loyalty program with approximately 14 million active members called the Regal Crown Club. The program only has one membership option and is free to join. Regal Crown Club members earn credits for every $1 they spend on movie tickets and at concession stands. Points can be redeemed for rewards via the use of a physical card or a virtual card with Regal's mobile application. Rewards include, but are not limited to, free concession items, merchandise, and movie tickets.

82. On December 5, 2017, Cinemark launched Movie Club. Movie Club is a monthly subscription plan that allows subscribers to buy one movie ticket a month for a discounted price of $8.99. Members of Movie Club can roll over unused tickets from month to month and receive a 20% discount on items bought at concession stands. Movie Club membership is only valid at Cinemark theaters.

83. Accordingly, theaters advised Defendants that they were unwilling to work with MoviePass and/or already had their own loyalty programs.

## IV. DEFENDANTS ENGAGED IN DILUTIVE STOCK SALES TO COVER THEIR MASSIVE LOSSES

84. In order to raise the necessary funds to acquire MoviePass, Helios issued multiple, highly dilutive senior secured convertible promissory notes.

85. On August 16, 2017, the Company issued three Senior Secured Convertible Notes in the aggregate principal amount of $10,300,000 and a 5-year warrant for the purchase of 1,892,972 shares of the Company's common stock at an exercise price of $3.25 per share to the Investor for consideration consisting of a secured promissory note payable by the Investor to the Company (the "August 2017 Investor Note") in the principal amount of $8,800,000 and $220,000 which offsets the August 2017 Notes of the same amount.

86. The August 2017 Notes carried a maturity date of April 16, 2018 and the Investor Warrant an expiration date of April 16, 2022

87. Further, immediately prior to the closing of the Financing, the Investor prepaid (i) $5,000,000 of a certain promissory note of the Investor (the "February Investor Note") issued as payment of the purchase price of the secured senior convertible notes issued by Helios to the Investor (the "February Notes") pursuant to a Securities Purchase Agreement dated February 7, 2017 (the "February SPA") and (ii) $230,000 of a certain promissory note of the Investor (the "December Investor Note") issued as payment of the purchase price of the secured convertible notes issued by HMNY to the Investor (the "December Notes") pursuant to a Securities Purchase Agreement dated December 1, 2016 (the "December SPA").

88. Each of these agreements with the Investor worked in concert to ensure that the Company had on hand the $5 million it had agreed to pay to MoviePass within 90 calendar days of the closing of the transaction as part of the Helios Note

89. On November 7, 2017, the Company issued two Senior Secured Convertible Notes (the "November 2017 Notes") in the aggregate principal amount of $100,000,000 (collectively, the "November 2017 Notes") to institutional investors (the "Investors").

90. The November Notes consist of a Senior Secured Convertible Note in the amount of $5,000,000 (the "November Initial Note") and a Senior Secured Convertible Note in the amount of $95,000,000 (the "November Additional Note") in exchange for an upfront cash payment of $5,000,000 and a senior secured promissory note of $95,000,000 (the "November 2017 Investor Note") to aid in the funding of the acquisition of the MoviePass Shares.

91. In January 2018, pursuant to a securities purchase agreement entered into by the Company and the Investor, Helios sold and issued senior convertible notes in the aggregate principal amount of $60,000,000, consisting of (i) a Series A-1 Senior Bridge Subordinated Convertible Note in the aggregate principal amount of $25,000,000 and (ii) a Series B-1 Senior Secured Bridge Convertible Note in the aggregate principal amount of $35,000,000 for consideration consisting of (i) a cash payment in the aggregate amount of $25,000,000, and (ii) a secured promissory note payable by the Investor to the Company in the aggregate principal amount of $35,000,000.

92. The funds received by the Company from this note were, first and foremost, earmarked for increasing the Company's ownership interest in MoviePass.

93. Like the notes before it, the January 2018 Senior Convertible Notes provided the buyer the option to convert the debt into shares of the Company's common stock at any time after the Company received approval of its stockholders for the issuance of the shares at a conversion price of 411.44 per share.

## V. DEFENDANTS ANNOUNCE A SPIN-OFF OF ZONE IN ORDER TO REPEAT ITS FRAUDULENT PATTERN

94. In a press release appended to a Form 8-K Current Report signed by Farnsworth and filed with the SEC on March 15, 2018, Helios disclosed that its Board had approved a plan to spin-off Zone, its wholly owned subsidiary that had been acquired less than one and a half years prior, into an independent publicly traded company that Helios expected would also be listed on The Nasdaq Stock Market. As of now, the Zone spin-off has not occurred.

95. Defendants represented that the goal was to spin off Zone so that Zone and Helios "each of which can focus on its own strengths and operational plans . . . [and] will be better equipped to pursue partnerships and other strategies that are more closely aligned with their respective business models."

96. In other words, Defendants are seeking to repeat their perpetual fraudulent scheme by acquiring companies or segments of business, reaping financial awards, and then dumping the company once the losses are too high to recover. In fact, Farnsworth has a history of similar behavior as evidenced by numerous lawsuits and complaints alleging this exact pattern.

97. For instance, over the past three decades, Farnsworth has registered over 50 different companies with the state of Florida, only four of which, including Zone, are active as of June 2018. Three companies went public, namely: XStream Beverage Network Inc., Purple Beverage Co., and vitamin marketing firm LTS Nutraceuticals Inc. Similar to Helios, Farnsworth made promises and talked up each of these companies to get investor support, but the companies ultimately saw the value of their shares fall 99%, below $1 per share, within three years of going public.

98. Since 2010, Farnsworth and his affiliated companies have been sued at least 8 times, with each lawsuit alleging either breach of contract or violation of the terms of settlement agreements. Five lawsuits have ended with the court entering judgment against Farnsworth.

99. Accordingly, by spinning off Zone, Defendants have started creating false hype around a business that has not succeeded in the past and is doomed for failure in the future.

## VI. HELIOS' FRAUD RESULTS IN RESIGNATIONS AND AN INVESTIGATION BY THE NEW YORK ATTORNEY GENERAL

100. On July 27, 2018, Helios filed a Form 8-K with the SEC announcing that it issued a demand note in the principal amount of $6.2 million because it was not able to make required payments to its merchants and fulfillment processors, leading to a service interruption. In addition to causing Helios' stock to plummet over 70%, it caused a number of investigations and resignations that chastised Helios for its fraudulent behavior.

101. For instance, on August 25, 2018, Carl J. Schramm resigned from Helios' board of directors (the "Board"), stating his resignation was due to Helios' management withholding material information from the Board. In a letter of resignation, Schramm recounted his unsuccessful attempts to obtain information about the Company's financial status and operations as well as explanations regarding its strategy. After learning that "management withheld material information from the Board for several months," Schramm resigned.

102. On October 18, 2018, the New York Attorney General was equally concerned with Helios' fraud and lack of transparency and opened an official securities fraud investigation into Helios regarding whether the company misled investors regarding the Company's finances.

103. Days later, two members of MoviePass' board of directors, Christopher Kelly and Maria Stipp, resigned while similarly expressing "their belief that they had not received sufficient access to information" regarding decisions made by the Company.

104. Suspiciously, on November 17, 2018, the entire two-person human resources department of MoviePass was suddenly fired. Further, on January 4, 2019, Eric Jeng, a former product manager at MoviePass, quit and sent a "'scathing' 704-word letter" to all MoviePass employees regarding the toxic work environment endured over the past year.

**DEFENDANTS' MATERIAL CLASS PERIOD**
**MISREPRESENTATIONS AND OMISSIONS**

105. In order to conceal the Company's true financial condition from investors throughout the Class Period, Defendants issued a series of material misstatements and omitted material facts in the Company's public filings, press releases and other documents. These material misstatements and omissions created the false impression that Helios had the skills, systems, technology and capabilities to successfully mine MoviePass subscriber data that it could use to generate business for movie theatres and restaurants in exchange for a cut of those business' profits, that Helios would not run out of cash to fund its business plan and that movie theatres and restaurants were ready and willing to engage in partnerships with Helios.

106. Throughout the Class Period, Defendants materially misstated and omitted facts concerning: (1) Helios' data mining capability and technology and ability to profit from partnerships; (2) the purported high level of interest from movie theatres to partner with Helios and MoviePass; (3) the MoviePass business model's ability to remain profitable at the low $9.95 per month subscriber fee; (4) Helios' ability to generate revenue from the MoviePass; and (5) Helios' liquidity and cash available to fund operations.

107. The alleged material false and misleading statements and omissions are bolded and underlined below. Nonbolded statements are included for context.

## I. FALSE AND MISLEADING STATEMENTS IN THE AUGUST 15, 2017 PRESS RELEASE

108. The Class Period begins on August 15, 2017, when Helios issued a press release, also attached as exhibit 99.1 to a Form 8-K filed with the SEC that same day, signed by defendant Benson, announcing it would acquire a majority stake in MoviePass and introduce a new, unprofitably low $9.95 flat no-contract monthly fee. The August 15 Press Release also misleadingly touted Helios' purported technology and artificial intelligence platforms that would purportedly "**bring a significant technological advantage to MoviePass**:"

> **Helios and Matheson Analytics Inc. To Acquire Majority Stake in MoviePassTM, Today's #1 Movie Theater Subscription Service**
>
> **MIAMI & NEW YORK (August 15, 2017)—** Helios and Matheson Analytics Inc. (Nasdaq: HMNY) announced today that is has entered into a definitive agreement to acquire a majority stake of movie subscription technology company MoviePass Inc. HMNY's innovative growth strategy through the expansion into industries with opportunities for big data and artificial intelligence innovations seeks to increase shareholder value.
>
> * * *
>
> "MoviePass was founded to make it easier for passionate moviegoers and casual fans to see films the way they're meant to be seen — in the theater," said Mitch Lowe, CEO of MoviePass. "Our vision has always been to make the moviegoing experience more affordable and enjoyable for our subscribers. We are changing the way consumers think about going to the movies by making it possible to experience a broader array of films — from the latest summer blockbuster to a critically-acclaimed documentary — through a subscription model. **Today's acquisition by Helios & Matheson is a huge step towards making our vision a reality by allowing us to introduce a new $9.95 nationwide subscription service that completely disrupts the movie industry in the same way that Netflix and Redbox have done in years past**."
>
> * * *
>
> "**I believe the technology platforms that Helios and Matheson has built over the years are a perfect fit for the MoviePass family**," said Ted Farnsworth, Helios and Matheson's Chairman and CEO. "**With our big data and artificial intelligence platforms and other technologies that we own, we will be able to bring a significant technological advantage to MoviePass**. Our mission at HMNY is to continuously be innovating, and this blending is a natural fit to take us up to the next level and beyond."

109. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for

unlimited movies was not sustainable because the Company's expenses to retain subscribers admittedly exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (v) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## II. FALSE AND MISLEADING STATEMENTS IN THE AUGUST 17, 2017 INTERVIEW WITH VARIETY MAGAZINE

110. On August 17, 2017, Helios filed a Schedule 14A with the SEC containing a "copy of a news article published online on August 16, 2017 by Variety.com" that included quotes from an interview that Farnsworth and Lowe gave to Variety.com. In the August 17 Variety.com interview, defendants Farnsworth and Lowe, again, touted Helios and MoviePass' technology for data mining and assured investors that the current business model was sustainable, even without partnerships with movie theaters and restaurants, because Helios had "enough money" to continue investing in the subscriber base and had "dozens of streams of revenue" outside of such partnerships:

[Variety:] Why do you want to go public?

> Farnsworth: You go to the public markets to raise more money for growth, either to build your business here or if you're looking at international expansion.
>
> Lowe: As we think about growing this business, **the company has some really great advantages in that the technology is mostly there**, but what we do need to do is acquire subscribers and in acquiring subscribers we have two costs — we have the immediate costs of attracting them and then we have to subsidize them for a time. We know we're going to have to raise money over time if we're going to grow this to millions and millions of subscribers. We're preparing in advance for that. We think being a well-loved and well-valued service in the entertainment space bodes well for the public market.
>
> * * *
>
> [Variety:] You are operating at a loss and subsidizing the tickets your customers buy. AMC claims that at some point you will have to raise your prices or you'll go out of business. Are they correct?
>
> Lowe: **The answer is no. They don't understand our business model. At Redbox we held a dollar a night [rental] for eight years. Raising it was the last thing we ever wanted to do, but labor goes up, Walmart wanted more money for the discs, all those things. We surveyed and tested every price down to $14.95. Even active moviegoers had to think is $14.95 really worth it? At $9.95, even people who rarely go say I'd be crazy not to do that. We need to offset costs in Manhattan and L.A. by getting a lot of people in Kansas City and Omaha and places where the average ticket price is five or six bucks to sign up.**
>
> [Variety:] You've said that you hope that after MoviePass proves it value, studios and theater owners will cut you in on the profits. Is this a sustainable business if that never happens?
>
> Lowe: **Yes, there's dozens of streams of revenue. We have enough money through this investment to build a materially big subscriber base who we think will love the service. When that happens, we can leverage that in all kinds of ways.**

(Emphasis added).

111. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers admittedly exceeded the revenue generated for such subscribers, resulting in a negative profit

margin; (ii) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (v) Helios and MoviePass did not have any other "streams of revenue" to allow the Company to continue building a larger subscriber base that would offset the significant losses the Company was incurring from the admittedly unprofitable business model of charging only $9.95/month per subscriber; (vi) as a result of the foregoing, Helios would soon run out of cash and certainly did not have "enough money" to continue building its highly unprofitable subscriber base; and, thus, (vii) Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## III. FALSE AND MISLEADING STATEMENTS IN THE AUGUST 17, 2018 INTERVIEW WITH WIRED.COM

112. On August 17, 2017, Helios filed a Schedule 14A with the SEC containing an article published by Wired.com that included quotes from an interview that Farnsworth and Lowe gave to Wired.com in which they, again, touted the Company's data mining capabilities that would allow Helios to partner with restaurants, theaters and other businesses to generate significant revenue:

**Big Ticket Data**

The first thing to understand about how MoviePass makes money: It doesn't. The previous pricing system didn't turn a profit. And while making everything cheaper will draw more users, each user represents additional potential losses, assuming they go to more than one movie per month. This seems, to put it kindly, unsustainable.

And yet! MoviePass sees a path not just to sustainability, but to total ownership of a night on the town, in same the way that Netflix owns a weekend on the couch. It's going to do that with your data.

Specifically, it sold a majority stake of itself this week to Helios and Matheson Analytics, a big data company that sees big potential in the type of information it can glean from MoviePass members.

**"If you get a trailer right now for Spiderman on Facebook, Facebook can't tell if you ever actually go to the movie. We can**," says Ted Farnsworth, Helios and Matheson CEO. "**We can tell if you look at Spiderman and look at Wonder Woman and Mission: Impossible, we can tell you exactly what movie you went to out of all three trailers.**"

Both Lowe and Farnsworth say that they have no plans to sell user data to outside parties. They do, though, see enormous potential in their ability to target movie promotion to their users that provides a tangible lift at the box office. With 20,000 members that may not amount to much, but with a few million the value proposition makes much more sense.

"**We can get people into opening night seats for a movie that a studio cannot justify spending big bucks on mass media**," Lowe says. **"By using our data and our relationship with the customer—and this isn't meaningful unless we have millions of subscribers—but when we have millions of subscribers we can help studios turn a movie that is a hit or a miss into a hit. We can get the right people into the theater.**"

You might not be willing to risk $12 on a movie that scored 50 percent on Rotten Tomatoes. But if it feels effectively free? Sure, take a flier on Valerian. And once you're there, you may be more willing to buy popcorn and a soda, something that benefits the theater chain given the sky-high margins they make on concessions. In fact, Lowe says, MoviePass increases snack spending by 123 percent on average.

Go ahead and think bigger. Movies pair great with dinner, after all, or a post-flick ice cream stop. **With Helios's data chops and enough partnerships with restaurants and TCBYs**, a MoviePass subscription could one day cover every part of date night.

**"Helios's mapping of the area around the theater, and all the different things you might encounter in that area, will allow us to do much more than we currently do. Here's a great place to park, here's a great restaurant across the street**," Lowe says. "**You're going to be able to pay for your concessions, pick**

**your seats, and probably be able to pay for things at adjacent businesses and get one monthly bill.**"

(Emphasis added).

113. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iii) representations that the Company was already successfully mining subscriber data were false because, in reality, Helios did not have the ability to do so, certainly not on any larger scale; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (v) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## IV. FALSE AND MISLEADING STATEMENTS IN THE SEPTEMBER 14, 2017 PRESS RELEASE

114. On September 14, 2017, after the market closed, Helios issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC that same day, which was signed by defendant Farnsworth. In the September 14 Press Release, Defendants continued to misrepresent Helios purported data mining technology and capabilities, claiming Helios was already successfully mining such data that formed the basis for its purported "**sustainable business model**:"

MIAMI & NEW YORK -- (BUSINESS WIRE) -- **Helios and Matheson Analytics Inc. (NASDAQ: HMNY)** — MoviePass Inc., a company that Helios and Matheson has agreed to buy majority stake in, announced today it has surpassed over 400,000 paying monthly subscribers in the past 30 days and achieved outstanding movie theater attendance. Up from less than 20,000 subscribers on August 14, 2017, the viral subscriber growth is due in part by the innovative and disruptive technology MoviePass and Helios & Matheson offer in combination with massive interest for the new $9.95 per month subscription plan. To test the success of the MoviePass product, 30,000 new MoviePass subscribers were surveyed. We were thrilled to find that 75.3% asserted the only reason they went to the movies was the result of being a MoviePass subscriber. Furthermore, participating theaters have reported back with increased attendance by over 400% from MoviePass subscribers.

* * *

**Additionally, MoviePass projects that it will acquire at least 2.5 million additional paying subscribers during the next twelve months, and expects to retain at least 2.1 million of those additional paying subscribers at the end of that period.**

**Using the Helios and Matheson Analytics resources, MoviePass Inc. analyzes consumer trends, patterns and activities to engage subscribers with movie related merchandise, advertising, and concessions relevant to their MoviePass experiences. Helios and Matheson believes its technology stack combined with the MoviePass business model will transform the movie going experience and create great value for both companies.**

"MoviePass is the 'all-you-can-eat' movie theater experience," said Mitch Lowe, co-founder of Netflix Inc. (NASDAQ: NFLX), former president of RedBox, and current CEO of MoviePass. "Though expensive for the company in the short-term, it's a significant benefit and more convenient for customers. With MoviePass, there's no movie ticket prices to think about -- going to the movies will become an everyday experience rather than an occasional treat."

**Helios and Matheson's technology learns individual moviegoer's tastes and makes recommendations based on recorded preferences for specific genres, actors and even the opinions of friends with similar likings.** There currently is no end-to-end consumer analysis from the moment someone sees a movie ad on Facebook to the moment they take their seat at the movie theater. **MoviePass is bridging that gap, which should prove to be of tremendous value to production studios.**

**"This explains our sustainable business model: Helios and Matheson is incorporating advertising models with the MoviePass application using artificial intelligence, algorithms, and machine learning so we can provide studios with more precise data for their advertising efforts. We want to**

> **understand the data generated by the movie goers and cater directly to their needs. For example, MoviePass will understand their genre choice films: horror, action-thrillers, drama, comedy, romance, animation, etc. Through testing, we found viewership is up 18% on films we choose to market more heavily in the MoviePass app**," said Ted Farnsworth, Chairman/CEO of Helios and Matheson, **about the strategic investment being made by Helios and Matheson in MoviePass.** "We will seek to sell our advertising to the studios, channeling MoviePass subscribers to see certain movies. **Also, we plan to use the viewing history and habit information of each user to guide them to select upcoming movies that appeal to their interests.** Our goal is to serve the interests of moviegoers, movie studios and movie theaters alike," Mr. Farnsworth concluded.

(Emphasis Added).

115. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iii) representations that the Company was already successfully mining subscriber data were false because, in reality, Helios did not have the ability to do so, certainly not on any larger scale; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (v) Helios and MoviePass would be unable to increase the subscriber base to 2.5 million subscribers during the next year because the Company had insufficient cash to continue funding operations under the current unprofitable business model; and (vi) as a result of the foregoing, Defendants'

statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## V. FALSE AND MISLEADING STATEMENTS IN THE SEPTEMBER 25, 2017 ARTICLE

116. On September 25, 2017, Helios filed a Schedule 14A with the SEC containing an article published by Pipeline Data, LLC that included quotes from an interview that Farnsworth and Lowe gave to Pipeline in which they falsely claimed that Helios could and would be profitable under its $9.95/month per subscriber model due to access from "additional revenue sources" and its data mining capabilities:

> **Mark Gomes:** Last month you made a deal to acquire 51% of MoviePass for $27 million. Can you review the upcoming payments required for this acquisition?
>
> **Ted Farnsworth**: Sure. The next payment is for $5 million. That's due in the December timeframe, about 30 days after we do the audit and complete the deal. Ideally, we'll get it done sooner. We want to keep the momentum rolling. Then, the third $5 million doesn't come until we're ready to go public with MoviePass early next year.
>
> **Mark Gomes**: How is the $9.95 pricing going to work within your business model?
>
> **Ted Farnsworth**: MoviePass has been around for 5 years, so we have a wealth of historical data. At $39, the average customer would go to 4 movies a month. At $29, the average dropped to 3 movies a month. When MoviePass went to $19, the average customer went to 2 movies a month. **So we think we can be profitable on the subscriptions at $9.95 and then make the real money from the additional revenue sources. The size of our customer base will give us a lot of leverage.**
>
> * * *
>
> **Mark Gomes**: So, you think you can break even on the subscriptions alone?
>
> **Ted Farnsworth**: **I'm confident that we will. We already see it in our first 30 days at $9.95. Usage was even lower than we anticipated.**
>
> **Mark Gomes**: What's the issue with AMC?
>
> **Ted Farnsworth**: AMC is upset because they were coming out with a subscription service in the fall for $29, but only for AMC theaters.

**Mark Gomes**: I hear that they're thinking about blocking MoviePass from working at their theaters. If you guys are successful, that's not going to work.

**Ted Farnsworth**: Right, but the actual MoviePass is a MasterCard debit card. They can't block us. They'd have to stop taking all Master Cards. That's why they're upset. The day we announced $9.95, AMC, Cinemark, and Regal were all down that day. CNBC Closing Bell attributed it to us.

**But I think we're going to bring a lot of business to the cinema operators**. But we actually want people to go. **We fill empty seats and more than double their concession revenues. Once the operators see how much revenue we're bringing to the table, it will only mean good things for us**.

* * *

**Mark Gomes**: Tell me more about the data MoviePass has collected over the past five years.

**Ted Farnsworth**: **As the CEO of a data analytics company, I can tell you that the data is incredible. MoviePass is able to influence which movies their customers go to see. They can also influence where they go to see it… and when. It's brilliant.**

**Mark Gomes**: So, you're able to influence which movies people attend and optimize the filling of cinema seats?

**Ted Farnsworth**: **Exactly**. So we've been approached by many of the major studios in L.A. We'll be out there for a series of meetings in early October.

**Mark Gomes**: What else can you see with the data?

**Ted Farnsworth**: **We can see how much impact we have on ticket sales. When researching the investment, I saw that MoviePass can increase a theater's attendance by several hundred percent or more. When I saw that, I knew I wanted a stake in the company. In Texas, their influence pushed Studio Movie Grill from being the area's #10 cinema to #1 in just one month… and that was before we went viral.**

**With the data, we can also see whether they drive past other theaters to go to the ones we recommend, among other things.**

**Between this, our customer base, and our patented buying system, we have a great barrier to entry. Soon we'll be able to see how much they spend on concessions**.

**Mark Gomes**: So this is how you'll be able to be profitable at $9.95? You'll get money from the cinemas and studios?

**Ted Farnsworth**: **We'll generate revenue from many sources. Tickets, concessions, advertisements… We already have deals in place. We can also sell soundtracks, posters, and other movie-related products, right from their phones. As soon as they're walking out of the theater, we'll contact them. We tested it and 5-8% of people buy product from us.**

* * *

**Mark Gomes**: With 400,000+ subscribers, MoviePass has to be on a $50 million run rate. Your reported revenues are going to multiply.

**Ted Farnsworth**: **Right, exactly**.

(Emphasis added).

117. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers admittedly exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) Helios and MoviePass did not have any other "additional revenue sources" to allow the Company to continue building a larger subscriber base that would offset the significant losses the Company was incurring from the admittedly unprofitable business model of charging only $9.95/month per subscriber; (iii) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (v) representations that the Company was already successfully mining subscriber data were false

because, in reality, Helios did not have the ability to do so, certainly not on any larger scale; (vi) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (vii) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## VI. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 11, 2017 PRESS RELEASE

118. On October 11, 2017, Helios issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC that same day, which was signed by Benson. Therein, defendant Lowe falsely represented that Helios had seamlessly "scaled operations" and that with investment from Helios, the MoviePass business would be able to scale further:

> NEW YORK (October 12, 2017) — Helios and Matheson Analytics Inc. (NASDAQ: HMNY) ("HMNY") announced today that, since August 15, 2017, it has received aggregate gross cash proceeds of approximately $12.8 million from the holder of its senior secured convertible notes, thereby satisfying the $10 million financing condition to HMNY's pending acquisition of a majority stake in MoviePass Inc. ("MoviePass"), which was announced in August 2017. HMNY also announced that it has agreed to increase the purchase price for its stake in MoviePass from $27 million to $28.5 million, which will increase its ownership stake in MoviePass from 53% to 53.71% upon the closing of the transaction. HMNY agreed to make the additional $1.5 million investment in MoviePass for an additional 0.71% ownership stake based on an agreed $210 million pre-money valuation of MoviePass. In conjunction with the additional investment, MoviePass also granted HMNY an option to purchase additional shares of MoviePass common stock for $20 million in cash based on the agreed $210 million pre-money valuation of MoviePass, pursuant to an option agreement, which, if exercised in full, would amount to an additional 8.7% ownership stake in MoviePass as of the date of the option agreement. If HMNY were to exercise the option in full prior to the closing of the transaction, its total ownership stake in MoviePass would be 62.41% as of the date of the option agreement.
>
> * * *
>
> "I believe we are witnessing a major disruption in the movie industry," said Ted Farnsworth, Chairman and CEO of HMNY. "The marketplace has responded, and we could not be more thrilled with the new subscriber results of MoviePass."

> **"There is much that MoviePass needs to do to make the customer experience enjoyable and seamless," said MoviePass CEO Mitch Lowe. "We have scaled our operations beyond expectation and with further investment from Helios and Matheson, we believe we can scale even further.** We are focused on innovating the movie theater experience so that movie-goers, exhibitors, and the entire industry can thrive beyond its current challenges. We are aiming to create a new era of movie-going where independent films and blockbusters alike can enjoy large and eager audiences in every theater, especially for entertainment consumers who value subscription. This is not innovation for innovation sake, we want to bring the film industry into a new golden age."

(Emphasis Added).

119. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers admittedly exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; and, thus, (iii) Helios and MoviePass had not been able to scale the MoviePass business and lacked the knowledge, technology or capability to do so any time in the near future.

## VII. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 13, 2017 ARTICLE

120. On October 13, 2017, Helios filed a Schedule 14A with the SEC containing an article published by Marketwatch.com that included quotes from an interview that Farnsworth and Lowe gave to Marketwatch.com:

> **MoviePass plans to make money by selling your data to Uber, eateries and Hollywood studios**

By Trey Williams
Published: Oct 13, 2017 1:55 p.m. ET

*MoviePass owner Helios & Matheson's shares have gained nearly 692% since it bought its majority stake*

At less than $10 a month, MoviePass is a bargain for customers, but how will the movie-theater subscription company that is subsidizing its members' expensive film-going habits turn a profit?

"**It's about the data**," said Ted Farnsworth, chief executive of Helios & Matheson Analytics Inc. HMNY, +16.59% which owns a majority stake in MoviePass.

Helios & Matheson shares have been on a tear since it acquired that stake in August. The company's shares have rocketed about 692% since the acquisition, climbing to a peak of $38.86 on Wednesday from $2.95 on August 15.

The stock has been volatile in the last two sessions and was last down about 10%.

Some critics of the business are concerned the company won't be able to make money and will flame out, or will have to raise subscription prices and drive users away.

Short seller Andrew Left warned retail investors that Helios & Matheson shares would fall back to $20, and that MoviePass would never be a $1 billion company. The stock was last trading below $20.

**Citron Research**

@CitronResearch

"$hmny stock to trade back to $20 Retail investors are warned. You might like product but $1+ bill it isn't. Giving away $1 for .90 no biz"

9:41 AM - Oct 11, 2017

"I'm not worried about it," Farnsworth told MarketWatch. "He's a short seller so he's got to cover his squeeze. But the bottle will stand on its own."

When Helios & Matheson acquired MoviePass, the company also cut the price from as much as $50 a month to $9.95. But it is still shelling out the full price of tickets to studios and movie theaters.

According to the National Association of Theater Owners, the average cost of a single movie ticket was $8.65 last year, and that number is doubled in some major U.S. cities.

> "The deal from our side and why we're excited is we still get paid the full price of admission. If this succeeds in driving attendance it will pay for itself," said Chris Aronson, head of distribution at 20th Century Fox FOXA, +1.53% "And they've made no secret that their goal is to mine data from subscribers. We'd be very interested in that."
>
> That's exactly what Farnsworth and MoviePass Chief Executive Mitch Lowe are banking on.
>
> "**Making money putting people in the theater is fine, but also think about the advertising side**," Farnsworth said. "**We're the only company out there that can tell companies exactly who and when people are going to the movies.**"
>
> If MoviePass is able to prove that it can drive incremental box office revenue to studios and cinemas, Lowe said the company can strike deals to share in the revenue from those sales, as well as from concessions.
>
> That could then lead to studios paying MoviePass to promote films to its users. MoviePass has experimented with this already and Farnsworth said 18% of users go to movies when prompted by the MoviePass app.
>
> Farnsworth and Lowe said they want to partner with restaurants close to cinemas and possibly even with Uber to get users a ride to the theater. It's all about capitalizing on a night out at the movies, Farnsworth said.
>
> "**It's so much easier than people think**," Farnsworth said. "**There are so many areas for revenue streams.** Will we need to raise more capital in the future? Sure. But right now we're focusing on growing the company and doing deals with companies already out there."

(Emphasis added).

121. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers admittedly exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to

gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iv) representations that the Company was already successfully mining subscriber data were false because, in reality, Helios did not have the ability to do so, certainly not on any larger scale; (v) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (vi) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## VIII. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 24, 2017 PRESS RELEASE

122. On October 24, 2017, Helios issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC that same day, which was signed by Farnsworth, announcing more than 600,000 monthly subscribers to MoviePass. Therein, Helios falsely claimed, among other things, that the customer service and satisfaction was purportedly improving when, in fact, it was getting worse as Helios and MoviePass did not have the experience and technology in place to handle the subscriber growth from Helios' unsustainable business model:

> **New York, NY (October 24, 2017)** —Helios and Matheson Analytics Inc. (NASDAQ:HMNY) announced today that MoviePass Inc., the movie theater subscription service that HMNY has agreed to buy a majority stake in, has surpassed over 600,000 paying monthly subscribers as of October 18, 2017, up from approximately 20,000 as of August 14, 2017, the day before MoviePass announced its new $9.95 per month subscription price. The continued growth trajectory exceeded MoviePass' initial projections, **<u>and now MoviePass projects that it will acquire at least 3.1 million additional paying subscribers through August 18, 2018, exceeding its previous estimate of 2.5 million subscribers.</u>** HMNY also announced that MoviePass had a subscriber churn rate of 4.2% for month 1 and 2.4% for month 2 after announcing its new $9.95 per month subscription price. Based on current churn rates, monthly subscriber retention is above 96% and average paying monthly subscriber life expectancy is 46.8 months.

> "Month after month we aim to improve our service with faster card delivery, improved application updates, and an easier-to-use web site. **We believe our strategy is paying off in terms of increased satisfaction, reduced churn, and faster growth**," said Mitch Lowe, CEO of MoviePass. **"I believe our ongoing investments in customer experience, usability and convenience have steadily improved customer satisfaction and retention**."
>
> Following HMNY's purchase of a majority stake in MoviePass, which remains subject to the approval of HMNY's stockholders, HMNY plans to further integrate its data analytics capabilities with the MoviePass service to analyze moviegoer's behaviors and preferences, with the goal of helping the film industry better understand what audiences want. **With HMNY's capabilities, HMNY believes that MoviePass can bridge an intelligence gap for the movie theater industry so the entire film ecosystem can better serve audiences in areas ranging from production to advertising.**
>
> ***"When you apply computer science and machine learning to an industry that we believe has lacked significant innovation, useful patterns start to emerge***," said Ted Farnsworth, Chairman and CEO of HMNY. "More subscribers mean more data. **Together, I believe HMNY and MoviePass can offer important analytics to movie studios and exhibitors while serving the interests of moviegoers in the process.**"

(Emphasis added).

123. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iii) according to CW1, MoviePass was unable to handle the volume of new subscriber questions and complaints and was, in fact, backed up on responding to customers ***by months*** and, thus, customer satisfaction was decreasing and the

customer experience as progressively getting worse as subscriber numbers increased; (iv) Helios and MoviePass would be unable to increase the subscriber base to 3.1 million subscribers by August 2018 because the Company had insufficient cash to continue funding operations under the current unprofitable business model; and (v) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## IX. FALSE AND MISLEADING STATEMENTS IN THE DECEMBER 14, 2017 PROSPECTUS SUPPLEMENT

124. On December 14, 2017, Helios filed a Prospectus Supplement with the SEC in connection with its offering of units and offerings. Therein, Helios stated in relevant part:

> MoviePass is led by Mitch Lowe, its Chief Executive Officer, Stacy Spikes, its co-founder and Chief Operating Officer, Sanjay Puri, its Chief Strategy Officer, and Chris Kelly, its Chairman. The Company intends to strengthen our management team and combine its data and artificial intelligence technology with MoviePass' technology. **With our big data and artificial intelligence platforms and other technologies that we own, we believe we will be able to bring a significant technological advantage to MoviePass.**

125. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iii) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs;

and (iv) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## X. FALSE AND MISLEADING STATEMENTS IN THE FEBRUARY 14, 2018 PROSPECTUS SUPPLEMENT

126. On February 14, 2018, Helios filed a Prospectus Supplement with the SEC in connection with its offering of units and offerings. In it, Helios repeated the same false statements that it made in the December 14, 2017 Prospectus Supplement. The February 14 Prospectus Supplement further stated:

> MoviePass is led by Mitch Lowe, its Chief Executive Officer, Sanjay Puri, its Chief Strategy Officer, Bernadette McCabe, its Senior Vice President of Exhibitor Relations, Khalid Itum, Vice President of Business Development and Chris Kelly, its Chairman. The Company intends to combine its data and artificial intelligence technology with MoviePass' technology. **<u>With our big data and artificial intelligence platforms and other technologies that we own, we believe we will be able to bring a significant technological advantage to MoviePass</u>.**

127. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iii) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (iv) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XI. FALSE AND MISLEADING STATEMENTS IN THE MARCH 23, 2018 PRESS RELEASE

128. On March 23, 2018, Helios issued a press release, entitled "MoviePass™ Lowers price to $6.95 per Month." In the March 23 Press Release, Helios stated:

> MoviePass™, the nation's premier movie theater subscription service and a majority-owned subsidiary of Helios and Matheson Analytics Inc. (Nasdaq: HMNY), today announced that, for a limited time, it is offering its annual subscription to new subscribers for $6.95/month.
>
> **MoviePass has gained momentum in diversifying its revenue streams due to a series of marketing agreements with studios and distributors, as well as partnerships with a number of theater exhibitors. This recent success in forming relationships with studios, exhibitors, and marketing partners has encouraged MoviePass to offer an even more attractive deal to consumers.**
>
> The annual $6.95/month plan is available for new MoviePass subscribers only, and gives new subscribers the ability to attend up to one new movie per day in theaters for a whole year. MoviePass works at over 91% of theaters in America. MoviePass, with over two million subscribers, contributed during recent opening weekends 17% of box office to Paramount Picture's Annihilation, 10% of box office to Orion Picture's Every Day, and 9% of box office to Fox Studio's Love, Simon.
>
> "Our vision has always been to make the movie going experience easy and affordable for anyone, anywhere," said MoviePass CEO Mitch Lowe. ***"With the current growth and support that we've seen within the last several months, our studio and exhibitor revenues and other marketing partnerships have motivated us to lower the price once again, offering movie lovers greater access to MoviePass."***
>
> MoviePass is currently 81% owned by HMNY. MoviePass first introduced its landmark $9.95 per month subscription plan in August 2017. MoviePass has recently expanded its executive team and increased its profile across the entertainment industry through initiatives like its involvement in the SXSW film festival, the Sundance Film Festival, and HMNY's formation of MoviePass Ventures, a wholly-owned subsidiary of HMNY founded to acquire rights in films with film distributors.
>
> ***"We believe our business will succeed by granting the public greater access to see movies how they were originally intended to be seen – in theaters,"*** said HMNY's Chairman and CEO Ted Farnsworth. "As the leading movie theater subscription company, we want to bring better value to our MoviePass fans. With this new annual plan, MoviePass is bringing cinema back to the masses."

129. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $6.95 or $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers admittedly exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; and (iv) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XII. FALSE AND MISLEADING STATEMENTS IN THE APRIL 17, 2018 ANNUAL REPORT

130. On April 3, 2018, Helios filed with the SEC a Form 12b-25 executed by Benson in which it indicated that it would be delaying the filing of its annual report. According to this filing, Helios "was unable to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 within the prescribed period due to the Company requiring additional time to work internally with its staff and externally with its outside auditors to prepare and finalize the Annual Report."

131. On April 17, 2018, Helios filed its Annual Report on Form 10-K with the SEC for the fiscal year ended December 31, 2017 (the "2017 Form 10-K"). The 2017 Form 10-K was signed and certified by Farnsworth and Benson. In relevant part, Helios stated:

MoviePass believes it is in a unique position to benefit movie exhibitors and theaters and to address the challenges they have faced in recent years. Specifically, theater trends have pointed to stagnant sales, higher prices, lower attendance, consolidation and limited customer engagement. The trends have been driven in part by a significant increase in in-home content. With its large and growing subscriber base, **MoviePass believes it is in a position to increase theater attendance, increase concession sales and drive subscribers to consume movie content in the theaters rather than at home.** MoviePass' ability to drive theater attendance can benefit theaters across the country, as MoviePass is currently available in over 91% of U.S. movie theaters.

**Through written agreements with various exhibitors throughout the U.S., MoviePass has put together a strategy to lift theater attendance through Application Program Interface (API) integration and rigorous survey and statistical data.** These arrangements with exhibitors have ranged historically from short term trial programs to formal agreements spanning more than 8 months. MoviePass' agreements with exhibitors typically create revenue opportunities for MoviePass by (a) allowing MoviePass to purchase movie tickets directly from the exhibitor at discounts, or (b) allowing MoviePass to receive rebates from exhibitors off tickets purchased at face value. MoviePass works with the exhibitors to make up the discounted amount in MoviePass' ticket prices by targeting its subscribers to effect concession sales from such exhibitor partners to net the cost of the exhibitor ticket discount.

MoviePass is also currently working on additional planned features in conjunction with its exhibitor partners. These include "family and friends" offerings, VIP lines, promotions and incentives for specific films which utilize surveys and other interactive engagement tools with exhibitor patrons, distribution of vendor content within the application and a "night out at the movies" program, in which MoviePass participates in revenue from its national brand partnerships. Through its "night out at the movies" program, MoviePass also believes it can create unique out-of-home experiences for its subscribers built around movie-going. By partnering with ride-share companies, malls, local retailers and restaurants, MoviePass hopes to offer customers discounted experiences (in addition to the movie ticket) built around a night at the cinema. **MoviePass aims to use its integrated application technology to connect and direct consumers to exhibitors and to drive theater attendance by creating profitable partnerships.**

**MoviePass Ventures aims to leverage the Company's and MoviePass' ability to increase movie theater attendance for select films through their advanced marketing efforts and working directly with distributors to drive consumers toward select independent films and share in the economic performance of those films.**

**The Company intends to combine its data and artificial intelligence technology with MoviePass' technology. With our big data and artificial intelligence platforms and other technologies that we own, we believe we will be able to**

> **bring a significant technological advantage to MoviePass and MoviePass Ventures.**
>
> *Studios and Distributors*
>
> **Through its user-friendly mobile application and its targeted efforts to engage its growing list of subscribers, MoviePass has shown an ability to drive its subscribers to see movies that they would not have otherwise seen. As a result, MoviePass has been pursuing numerous opportunities with studios and independent distributors. MoviePass has closed several paid opportunities with different studios and independent distributors to promote a variety of movies from limited releases to wide release blockbusters.**
>
> * * *
>
> The agreements typically have terms of effectiveness until the select title is no longer in theaters. The distributor agreements state that MoviePass owns all rights to the data that is collected by MoviePass resulting from subscriber use of the MoviePass application, **including performance and statistical data that it collects based upon subscriber attendance and behavior, surveys conducted, structured data, and visual representation of data.**
>
> *Consumers*
>
> MoviePass' core business model rests largely on its ability to continue to improve the consumer experience. MoviePass aims to do this by targeting a consumer experience that is mobile first, with features such as its "search & discovery" and "transact and enjoy" tools in the MoviePass mobile application. The movie going experience for MoviePass subscribers is a simple process, by which the subscriber first signs up for a monthly membership plan, for as low as $6.95 per month, and receives a MoviePass debit card in the mail. The subscriber then uses the MoviePass application to, sequentially, choose a movie, choose a theater, choose a show time and finally "check in." The aim of MoviePass' low cost and straightforward process is to create an experience for consumers to see more movies, save money, and reduce regret of the movie going experience. **MoviePass believes that the simplicity of the process and the ability to engage with consumers through the various steps of the check-in process through the app creates an opportunity to drive consumers to theaters more often and for select films. It also allows MoviePass to derive data insights on interests, activities or spending.**

132. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising

on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iii) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (iv) as a result of the foregoing, Helios would soon run out of cash and certainly did not have sufficient cash to continue building its highly unprofitable subscriber base; and, thus (v) Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XIII. FALSE AND MISLEADING STATEMENTS IN APRIL 2018 VARIETY.COM ARTICLE

133. On or about April 17, 2018, Variety.com published an article entitled, The Great Disruptor: MoviePass Upends the Movie Business, but Can It Survive?" In the April 2018 Variety.com article, defendant Farnsworth falsely assured investors that Helios was in no danger of running out of money and that "capital is not an issue:"

> "Since day one, people have been saying we'll run out of money," says Farnsworth. "**I assure you that capital is not an issue. I'm sitting on hundreds of millions of dollars of dry powder**, and I've got bankers and debt-financing companies calling me all the time. They know they're looking at an Uber or an Airbnb. This is a unicorn company."

134. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers admittedly exceeded the revenue generated for such subscribers, resulting in a negative profit

margin; (ii) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (v) as a result of the foregoing, Helios would soon run out of cash and certainly was not "sitting on hundreds of millions of dollars" as defendant Farnsworth false represented; and, thus, (vi) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XIV. FALSE AND MISLEADING STATEMENTS IN THE APRIL 18, 2018 AND APRIL 20, 2018 PROSPECTUS SUPPLEMENTS

135. On April 18, 2018, Helios filed a preliminary Prospectus Supplement with the SEC. Therein, Helios stated in relevant part:

> MoviePass is led by Mitch Lowe, its Chief Executive Officer, Stacy Spikes, its co-founder and Chief Operating Officer, Sanjay Puri, its Chief Strategy Officer, and Chris Kelly, its Chairman. **The Company intends to strengthen our management team and combine its data and artificial intelligence technology with MoviePass' technology. With our big data and artificial intelligence platforms and other technologies that we own, we believe we will be able to bring a significant technological advantage to MoviePass.**

136. On April 20, 2018, Helios filed a Prospectus Supplement with the SEC. In it, Helios repeated the same statements that it made in its April 18, 2018 Prospectus Supplement.

137. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iii) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (iv) as a result of the foregoing, Helios would soon run out of cash and certainly did not have sufficient cash to continue building its highly unprofitable subscriber base; and, thus (v) Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XV. FALSE AND MISLEADING STATEMENTS IN THE MAY 15, 2018 QUARTERLY REPORT ON FORM 10-Q

138. On May 15, 2018, Helios filed its Quarterly Report on Form 10-Q with the SEC for the first quarter-ended March 31, 2018. The First Quarter Form 10-Q, signed and certified by defendants Farnsworth and Benson, alluded to the fact the Company's internal technology and systems were insufficient and had resulted in user fraud and an increased cash burn, while continuing to tout Helios and MoviePass' superior data mining capabilities:

> **By the end of April 2018, we implemented certain measures to promote the fair use of our MoviePass subscription product, which we believe should improve our cash flow significantly.**
>
> These measures include a technological enhancement allowing subscribers to log in on only one mobile device, which prevents MoviePass subscribers from sharing

> their accounts with non-subscribers, *in order to prevent unauthorized account access. The Company has also instituted a policy allowing subscribers to see a movie title only once per subscriber using the MoviePass subscription which, coupled with its new ticket verification software, has reduced usage significantly by eliminating suspected fraud and reselling of tickets*.
>
> Where users decide to pay separately outside the MoviePass service to view a particular movie title again, they still received value from their MoviePass subscription and will have demonstrated their willingness to go outside of the subscription to spend further on box office for that title, in a manner that benefits multiple parties (the studio, exhibitor, consumer, and MoviePass).
>
> **Based on early results from these implementations, we believe these enhancements will help to reduce usage and our ticket costs.**
>
> In addition, by returning to our $9.95 per month unlimited MoviePass subscription, enabling subscribers to see up to one new movie title per day, we believe our subscriber acquisitions will continue to increase for the foreseeable future.
>
> **At the same time, our offering of a 4-movies-per-month capped plan as part of a special, limited time offer with one of our strategic partners; and our current offering alongside our unlimited offering of a 3-movies-per-month capped plan allows us to obtain statistically large sample sizes to create short- and long-term analyses about consumption and usage and ticket spend for each of the various cohorts, which enables the Company to continue to make data-driven decisions.**

(Emphasis added).

139. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iv) as a result of the foregoing, Helios would soon

run out of cash and certainly did not have enough money to continue building its highly unprofitable subscriber base and, thus, defendants knew cash flow would get worse, not better; and (vii) Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XVI. DEFENDANT LOWE'S JUNE 28, 2018 REDDIT "AS ME ANYTHING"

140. On June 28, 2018, right before the truth began to emerge, defendant Lowe did a Reddit "as me anything" on MoviePass where he had the following exchange assuring investors that Helios would break even by the end of the year and be profitable in the near future:

> **StarDestinyGuy**: "What would you say to people who are concerned about the long-term viability of MoviePass, people who believe that the business model is not financial sustainable?"
>
> **MoviePassMitch**: "It takes a lot of investment and significant losses in order to build a multibillion dollar entertainment company. . . **In our case, we plan to break even on our subscription model by the end of the year**. Our plan is not to make money off the subscriptions – our plan is to break even. **In the future, or path to profit will be by selling ads, engaging in brand partnerships and creating our own content**."[3]

141. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers admittedly exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits through data mining of MoviePass subscriber information that would generate business for restaurants and movie theatres through advertising on the MoviePass app in exchange for a cut of their profits was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple

---

[3] *See* https://www.reddit.com/r/movies/comments/8u00y3/im_mitch_lowe_ceo_of_moviepass_ama/, lasted visited on January 4, 2018.

accounts for one subscriber and other issues; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (v) as a result of the foregoing, Helios would soon run out of cash and was nowhere near turning a profit by the end of 2018; and, thus, (vi) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

142. On July 25, 2018, Helios executed a 1 for 250 reserve stock split in order to remain listed on the NASDAQ and in a vain attempt to cover up the fraud it perpetuated throughout the Class Period. The reverse stock split was disastrous for shareholder equity and caused tremendous damages to shareholders. On an adjusted basis (*i.e.* adjusting the closing price of Helios stock prior to July 25, 2018 to account for the 1 for 250 reverse stock split) the price of the Company's common stock declined $11.90, or 52.88%, from a closing price of $22.50 per share on July 24, 2018 to a closing price of $10.60 per share on July 25, 2018. The Company's stock continued to decline to $6.83 per share on July 26, 2018—a two day drop of 69.64%.

143. Two days later, on July 27, 2018, Helios filed a Form 8-K ("July 2018 Form 8-K") with the SEC announcing that it had issued a demand note in the principal amount of $6.2 million because it was not able to make required payments to its merchants and fulfillment processors, leading to a service interruption. The July 2018 Form 8-K stated, in relevant part:

> **Demand Note**
>
> On July 27, 2018, the Company issued a demand note (the "Demand Note") to the Holder in the principal amount of $6,200,000, which includes $5.0 million in cash borrowed by the Company from the Holder and $1.2 million of original issue discount. No additional interest will accrue under the Demand Note aside from any Late Charges (as defined in the Demand Note) upon the failure to pay outstanding amounts under the Demand Note. The Holder may make a demand for full payment of the Demand Note from and after (x) with respect to up to $3,100,000 of the

> principal outstanding under the Demand Note (the "Initial Principal"), August 1, 2018 or (y) with respect to any other amounts then outstanding under the Demand Note, August 5, 2018. Upon demand, the Company is also required to pay to the Holder any sum required to cover the costs and expenses incurred by the Holder in connection with the drafting and negotiation of the Demand Note as well as all costs and expenses of any enforcement or collection of the Demand Note, including, without limitation, reasonable attorneys' fees, expenses and disbursements. All proceeds received by the Company on or after July 31, 2018 from sales of common stock under its outstanding at-the-market offering (the "ATM Offering") pursuant to the Equity Distribution Agreement, dated as of April 18, 2018 (the "Equity Distribution Agreement") between the Company and Canaccord Genuity LLC, must be applied against any Initial Principal until no Initial Principal remains outstanding, and thereafter, against any remaining amounts due under the Demand Note. The Demand Note's principal, together with accrued and unpaid Late Charges may be prepaid by the Company without penalty. With the agreement of the Holder, principal and accrued and unpaid Late Charges on the Demand Note may be applied to all, or any part, of the purchase price of securities to be issued upon the consummation, after July 27, 2018, of an offering of securities by the Company to the Holder. Any amount of principal or other amounts due which is not paid when due (a "Payment Default") will result in a late charge being incurred and payable by the Company to the Holder in an amount equal to interest on such amount as the rate of 15% per year from the date such amount was due until the same is paid in full. If a Payment Default remains outstanding for a period of 48 hours, Holder may require the Company to redeem all or a portion of the Demand Note at a redemption price of 130%.
>
> ***The $5.0 million cash proceeds received from the Demand Note will be used by the Company to pay the Company's merchant and fulfillment processors. If the Company is unable to make required payments to its merchant and fulfillment processors, the merchant and fulfillment processors may cease processing payments for MoviePass, Inc. ("MoviePass"), which would cause a MoviePass service interruption. Such a service interruption occurred on July 26, 2018***. Such service interruptions could have a material adverse effect on MoviePass' ability to retain its subscribers. This would have an adverse effect on the Company's financial position and results of operations.
>
> MoviePass will execute a guaranty (the "MoviePass Demand Note Guaranty") pursuant to which MoviePass guarantees the punctual payment of the Demand Note, including, without limitation, all principal, interest and other amounts that accrue after the commencement of any insolvency proceeding of the Company or MoviePass, whether or not the payment of such interest and/or other amounts are enforceable or are allowable and agrees to pay any and all costs and expenses (including counsel fees and expenses) incurred by the Holder in enforcing any rights under the MoviePass Demand Note Guaranty or the Demand Note.

(Emphasis added).

144. On this news, the price of the Company's common stock declined $4.83, or ***70.72%***, from a closing price of $6.83 per share on July 26, 2018 to a closing price of $2.00 per share on July 27, 2018.

145. In the course of the following trading days, the Company's common stock continued to decline another $1.76 to close at $0.228 per share on August 1, 2018, ***an overall drop from July 24, 2018 of approximately 98.98%.***

## POST CLASS PERIOD EVENTS

### I. THE PRECIPITOUS DECLINE IN HELIOS STOCK RESULTS IN NASDAQ NON-COMPLIANCE AND COMMENCEMENT OF THE DELISTING PROCESS

146. On June 21, 2018, Helios received a deficiency letter from the Nasdaq Listing Qualifications Department notifying the Company that Helios stock had closed below the minimum $1.00 per share price necessary to remain listed on the NASDAQ for 30 prior consecutive business days pursuant to NASDAQ Listing Rule 5550(a)(2) ("Rule 5550(a)(2)"). Rule 5550(a)(2) is NASDAQ's lowest tier for so-called "small cap" companies and has certain minimum requirements that companies must satisfy—and remain in compliance with—to avoid delisting.

147. Pursuant to NASDAQ Listing Rule 5810(b), the Company was given 180 calendar days, or until December 18, 2018, to regain compliance with Rule 5550(a)(2). If Helios was unable to meet the $1.00 per share price minimum, but was able to meet the remaining listing requirements, the Company could have been afforded a second period of 180 calendar days to achieve full compliance.

148. On December 19, 2018, the Company received written notice from the Nasdaq Listing Qualifications Department that Helios had not regained compliance with Rule 5550(a)(2) and was not eligible for a second 180-day period because the Listing Qualifications

Department had determined that "***it does not appear that it is possible for the Company to cure the deficiency***"; *i.e.*, increase its stock price to above $1.00 per share of Company stock. (Emphasis added).

149. According to a Form 8-K that Helios filed with the SEC on December 21, 2018, the December 19, 2018, the Nasdaq Listing Qualifications Department also made its determination based on:

> [T]he low price of the Company's common stock, the significant issuances of common stock over the past year from an Equity Distribution Agreement and the conversion of future priced securities (primarily Senior Secured Convertible Notes issued on November 7, 2017 and January 23, 2018), the Company's stated need to issue additional shares to fund its operations, the failure of a prior reverse-stock split in July 2018 to result in compliance with Rule 5550(a)(2), and the Company's inability to obtain approval for a proposed reverse stock split at a special meeting in November 2018.

150. As a result of these deficiencies, NASDAQ determined that unless Helios appeals this determination, its stock would be delisted from NASDAQ and suspended at the opening of business on December 28, 2018, and a Form 25-NSE would be filed with the SEC which would result in removal of Helios stock from listing and registration on NASDAQ.

151. In the December 21, 2018 Form 8-K, Helios asserted its intention to appeal the determination and seek continued listing, which would automatically stay the delisting pending review. Helios further asserted its expectation that NASDAQ would hear the appeal within 45 days after it was made, pursuant to NASDAQ's Listing Rules. Finally, Helios asserted its intention to reveal its plans to NASDAQ to regain compliance with Rule 5550(a)(2) at or before the time the appeal is heard, and also request an extension of time so that Helios' officers and directors might effect a reverse stock split to increase Helios' price per share.

## II. BOARD MEMBERS RESIGN AMID TURMOIL CITING "CONCERNS" REGARDING HELIOS' MANAGEMENTS' LACK OF TRANSPARENCY AND WITHHOLDING OF INFORMATION FROM THE BOARD

152. On August 25, 2018, Carl J. Schramm ("Schramm"), resigned as a director of Helios. In a letter that he sent to defendant Farnsworth, Schramm stated that his resignation was due to Helios' management withholding material information from the Board. Specifically, Schramm wrote:

> As you know, for several months now, I have raised questions and expressed concerns about the corporate governance of Helios and Matheson Analytics, Inc. (the "Company"). ***I have sought, often unsuccessfully, information about the Company's financial status and operations, and explanations of Company strategy***. I have objected to the manner in which a number of business decisions have been presented to the Board of Directors by management, without sufficient time for the Board to examine complex documents, to review significant transactions, or to discuss how the proposed actions fit into the Company's strategic plan.
>
> These concerns have increased substantially over the past eight weeks as management apparently has made a number of important corporate decisions and executed significant transactions ***either without Board knowledge or approval***, or in Board meetings initiated with only a few hours of advance notice by email (at least one of which I did not even know had been called until the meeting had concluded). Just last week, I learned that ***management withheld material information from the Board for several months***.
>
> These and other actions have interfered with my ability to exercise my responsibilities as a board member. Taken together, they confirm that, despite my best efforts, my ability to effectively dis charge my duties as a director has been compromised beyond repair.

(Emphasis added).

153. Then on October 24, 2018, Christopher Kelly, who served as chairman of the MoviePass board since June 24, 2014 ("Kelly"), and Maria Stipp, who had served as a director of MoviePass since January of 2018 ("Stipp"), resigned in a similar manner to Schramm. According to Helios' Quarterly Report on Form 10-Q for the third quarter-ended September 30, 2018, both

Kelly and Stipp resigned while expressing "their belief that they had not received sufficient access to information" regarding decisions made by the Company.

## III. THE NEW YORK AG ANNOUNCES INVESTIGATION INTO WHETHER HELIOS DEFRAUDED INVESTORS

154. On October 18, 2018, the New York Attorney General's Office confirmed in a tweet that the then New York Attorney General Barbara G. Underwood had opened an official securities fraud investigation into Helios and its actions surrounding MoviePass and whether the Company misled investors. The tweet read:

> We've launched a securities fraud investigation into @MoviePass' parent company. My office is committed to protecting New York investors and the integrity of our financial markets.

155. The investigation is being conducted under New York's Martin Act, a powerful anti-fraud law enacted in 1921 and available to the New York Attorney General's Office to combat fraud and recover civil damages or impose criminal fines. The investigation was spurned, at least in part, by the widespread sentiment that investors were misled by the Company. According to Business Insider, "numerous investors…felt misled about the financial situation of MoviePass both by Helios and Matheson management and by the 'buy' analyst ratings of two Wall Street firms whose banks made fees selling the stock (both have since suspended coverage)."

156. One investors told Business Insider that "I think the New York Attorney General launching an investigation into the matter is a very good thing. Thousands of people lost a great deal of money in this financial gimmickry, and it should be investigated."

157. The investigation is ongoing.

## IV. HELIOS IS FORCED TO SPIN-OFF OF THE MOVIEPASS™ BUSINESS

158. On October 23, 2018, Helios announced that it had preliminarily approved a plan to spin off MoviePass and related assets into a subsidiary called MoviePass Entertainment Holdings Inc. In the October 23, 2018 press release, defendant Farnsworth stated the following:

> For many years, HMNY has been focused on data analytics, and in that capacity we own assets like Zone Technologies which provides a safety and navigation app for iOS and Android users and a global security concierge service. Since we acquired control of MoviePass in December 2017, HMNY largely has become synonymous with MoviePass in the public's eye, leading us to believe that our shareholders and the market perception of HMNY might benefit from separating our movie-related assets from the rest of our company

159. The Company has not completed the spin off to date and noted in the press release that the preliminary plan may not even be permitted under Delaware law.

## V. KEY HELIOS PERSONNEL ARE FIRED OR ABANDON THE SINKING SHIP

160. After the close of the Class Period, the Company lost much of its key personnel due to being fired or quitting MoviePass. On November 17, 2018, Business Insider reported that two individuals who made up the entirety of MoviePass' human resources department had been fired. In addition, Business Insider's source reported that Lowe "had not been on an all-hands call in two months, which the source said was a sign of his lack of involvement in the day-to-day operations of the company." The firing of the human resources department exacerbated the already perilous situation that MoviePass employees were forced to work in.

161. Once the human resources department was fired, things went from bad to worse at MoviePass. According to a January 4, 2019, article from cnbc.com, Eric Jeng ("Jeng"), a former product manager at MoviePass quit and sent a "'scathing' 704-word letter" to all MoviePass employees before leaving. According to Jeng and other sources, for at least the entirety of 2018, a toxic work environment existed at MoviePass. Bob Ellis, a MoviePass marketing consultant ("Ellis"), was repeatedly accused of inappropriate behavior towards women. In fact, according to

a December 19, 2018 article from Business Insider, fifteen MoviePass employees had been fired or quit since Ellis started consulting, seven of them were women. Seven women leaving was a disparate amount, according to the same article, as women make up a much smaller percentage of MoviePass—roughly 35% despite accounting for 47% of the fifteen departures. According to the same cnbc.com article that cited Jeng's email, many high-ranking executives threatened to quit MoviePass if Ellis (a close personal friend of Farnsworth) was not removed. Lowe told employees that Ellis had been let go, but then MoviePass' human resources department was fired, and Ellis continued to attend events and meetings.

162. In his resignation email, Jeng reportedly referenced a photo on Instagram that showed Ellis and "several MoviePass and Helios executives" lounging on a yacht in Miami. Jeng wrote that the photo was "not only completely thoughtless, but also incredibly tone deaf. Our employees are working late hours, or sometimes until 1 a.m. and on holidays to build, develop and release new MoviePass features and products, ***while fearful of the financial future and stability of the Company***." (Emphasis added).

**ADDITIONAL ALLEGATIONS OF SCIENTER**

163. As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

164. The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of

Helios and/or MoviePass and, thus, controlled the information disseminated to the investing public in the Company's press releases, SEC filings and interviews. As a result, each could falsify the information that reached the public about the Company's business and performance.

165. Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes herein to inflate the Company's stock price. The Individual Defendants' scienter may be imputed to Helios as the Individual Defendants were among the Company's most senior management and were acting within the scope of their employment.

## I. THE INDIVIDUAL DEFENDANTS KNOWINGLY AND/OR RECKLESSLY MADE MATERIAL MISSTATEMENTS AND/OR OMITTED MATERIAL FACTS

166. As discussed below, the Individual Defendants knew that Helios' low price subscription business model was not sustainable and would never be profitable and that the Company's purported plans to offset its unprofitable subscription business through advertisements and partnerships was not viable because Helios and MoviePass did not have, and never had, the systems, technology, skill or capabilities to gather or analyze subscriber data as evidenced by: (A) a former employee's (CW1) account that Helios and MoviePass lacked the technology, capability and knowledge to mine subscription data sufficient to carry out its business plan in part, including its current systems' inability to handle the massive subscription growth; (B) several Board members' resignations as a direct result of Helios' managements intentional deception and/or failure to provide them with material information about Helios' business operations and strategy; (C) the New York Attorney General's investigation into Helios' alleged intentional deception of investors; (D) the fact that MoviePass was Helios' core business; and (E) the Individual Defendants' history of defrauding investors and business partners.

**A. Helios and MoviePass' Inadequate Technology, Systems, Knowledge and Experience to Handle and Mine Subscription Data Supports A Strong Inference of Scienter**

167. Defendants Benson and Farnsworth would have conducted or were reckless in not conducting due diligence on MoviePass prior to acquiring a majority stake in the business. Accordingly, they knew or recklessly disregarded that MoviePass lacked the technology, capability, and knowledge to handle the massive increase in subscriptions that would result from slashing the monthly price of MoviePass subscriptions to $9.95 per month. Indeed, according to CW1, MoviePass lacked sufficient staffing to handle the hundreds of customer inquiries and complaints that came in on a daily basis, resulting in a backlog of customer issues and complaints going back months.

168. CW1 also recalled numerous problems with the MoviePass app resulting in the improper creation of multiple and/or phantom accounts. Even if there were no problems, customers had to wait up to two months to receive their MoviePass card.

169. Furthermore, Defendants Benson and Farnsworth were well aware that Helios, a Company specializing in IT services, had no experience or ability to conduct data collection, mining or analysis.

170. Accordingly, Defendants were aware that MoviePass lacked the capability to track or mine data to enable Helios to be able to profit from third-party partnerships.

**B. Board Member Resignations as a Direct Result of the Individual Defendants' Deception and Lack of Transparency Supports A Strong Inference of Scienter**

171. As discussed above, one of Helios' four directors (Schramm) and two of MoviePass' directors (Kelly and Stipp) resigned abruptly on August 25, 2018 and October 24, 2018, respectively, as a direct result of seeking "unsuccessfully, information about the Company's financial status and operations, and explanations of Company strategy" from management and

management "execut[ing] significant transactions either without Board knowledge or approval . . . ."

172. On November 17, 2018, the entire two-person human resources department of MoviePass was suddenly fired. Further, on January 4, 2019, Eric Jeng, a former product manager at MoviePass, quit and sent a "'scathing' 704-word letter" to all MoviePass employees regarding the toxic work environment endured over the past year.

173. The suspicious timing of their resignations just days after the truth about Helios' cash problems and the New York AG investigation was announced implicating express concerns regarding management's lack of transparency and failure to get Board approval on major business transactions and strategy, supports a strong inference of scienter.

### C. The New York Attorney General Investigation Into Allegations that Helios Management Intentionally Mislead Investors Supports A Strong Inference of Scienter

174. On October 18, 2018, the New York Attorney General was equally concerned with Helios' fraud and lack of transparency and opened an official securities fraud investigation into Helios regarding whether the company misled investors regarding the Company's finances under the Martin Act.

175. The investigation was prompted by numerous concerned investors. The then New York Attorney General, Underwood, vowed to get to the bottom of it:

> We've launched a securities fraud investigation into @MoviePass' parent company. My office is committed to protecting New York investors and the integrity of our financial markets.

176. While the investigation is ongoing, the specific nature of the investigation relating to Defendants' lack of transparency and alleged misleading of investors supports scienter.

**D. MoviePass Was Helios' Core Business Supports Scienter**

177. Defendants repeatedly touted the MoviePass business as Helios' most important driver of the Company's future revenues and growth. Indeed, in Helios' Form 10-K filed with the SEC on April 17, 2018, Helios states that its "primary business' is "the integration and development of MoviePass."

178. Throughout the Class Period, Helios repeatedly touted the Company's rapid growth in its MoviePass subscriber base, including, e.g.:

- The MoviePass SPA was contingent on the Company achieving an agreed upon number of subscribers.
- Helios' purported goal was that MoviePass would "increase theater attendance, increase concession sales and drive subscribers to consumer movie content in the theaters rather than at home."
- September 24, 2017 – reporting 400,000 monthly subscribers.
- August 2017 – reporting over 1 million total paying subscribers.
- January 2018 - reporting MoviePass had surpassed 1.5 million paying subscribers.
- February 2018 – reporting more than 2 million subscribers.

179. The fact that Helios' cash flow issues ultimately resulting in the Company having to rid itself of the unprofitable MoviePass business concerned its core assets and business strategies and Defendants' high-level positions and numerous statements regarding such matters, all support Defendants' knowledge of and reckless disregard of such operational and financial matters.

**E. The Individual Defendants' History of Defrauding Investors and Business Partners Supports Scienter**

180. As discussed above, Farnsworth and members of his management team have a history of defrauding investors, including:

- June 2014–HMIT ceased paying its debts, leading to civil lawsuits, investigations by police and regulators in India, and the arrest of three of HMIT's officers, including HMIT's co-founder, CEO and majority shareholder who was also a consultant for Helios during the Class Period. In 2016, an Indian court ordered HMIT liquidated and slammed HMIT for making a "deliberate attempt to hoodwink" court orders.

- Farnsworth has registered over 50 different companies with the state of Florida, only four of which, including Zone, are active as of June 2018. Three companies went public, namely: XStream Beverage Network Inc., Purple Beverage Co., and vitamin marketing firm LTS Nutraceuticals Inc. Similar to Helios, Farnsworth made promises and talked up each of these companies to get investor support, but the companies ultimately saw the value of their shares fall 99%, below $1 per share, within three years of going public.

- Since 2010, Farnsworth and his affiliated companies have been sued at least 8 times, with each lawsuit alleging either breach of contract or violation of the terms of settlement agreements. Five lawsuits have ended with the court entering judgment against Farnsworth.

- 2017–2018–Farnsworth defrauded investors of Helios into believing the MoviePass business would be profitable through its unique ability to collect and mine customer data and use advertising to various theatres and restaurants to generate revenues.

181. Furthermore, Helios appointed HMIT officers as its consultants, executives, and directors, ensuring that those associated with defrauding investors at HMIT remained associated with Helios.

182. For example, Parthasarathy (Pat) Krishnan ("Krishnan") was initially appointed as Helios' CEO before he was replaced by Farnsworth. He is currently the Chief Innovation Officer of Helios. He was affiliated with HMIT for years and previously served as HMIT's Chief Technology Officer. He first became affiliated with HMIT in 2005, when HMIT bought his California-based consulting firm, Maruthi Consulting Inc. ("Maruthi Consulting"). Though Maruthi Consulting is based in the US, the State Bank of India accused HMIT of using Maruthi Consulting to siphon money out of India with the "evil intention of defrauding our bank." The

bank alleged that by doing so, HMIT committed the offenses of "cheating, criminal conspiracy, forgery, criminal breach of trust, etc."

183. In addition, Muralikrishna Gadiyaram, HMIT's co-founder, CEO, and majority shareholder, is a Helios director and entered into a consulting agreement with Helios in October of 2017. Gadiyaram's involvement with Helios is particularly concerning given that in March of 2018, police froze Gadiyaram's bank account due to the fraud accusations involving HMIT. He also was previously arrested because of his actions at HMIT. Gadiyaram initially began providing consulting services to Zone acquisition in November of 2016. In October 2017, this arrangement was formalized in a signed contract, pursuant to which Helios pays Gadiyaram consulting fees of $18,750 per month in cash. In 2017, Gadiyaram also received $7.25 million in stock awards. Combined with his consulting fees, he received total compensation of approximately $7.46 million in 2017. Gadiyaram remains a substantial Helios stockholder, holding 4.4% of Helios outstanding common stock as of March 2018.

184. Lest there be any doubt regarding the truthfulness of those running Helios, in response to press inquiries made in mid-2018, Farnsworth claimed that: "I don't deal with HMIT at all . . . Don't even know all the players of it. Never met them. . . . Not HMIT, no. I can't even pronounce all their names." As demonstrated, not only does Farnsworth certainly know those associated with HMIT, but he even works first-hand with them.

185. Defendants' perpetual and pervasive fraud over the course of the last decade further support scienter.

## II. THE INDIVIDUAL DEFENDANTS WERE MOTIVATED TO COMMIT THE FRAUD ALLEGED HEREIN

### A. The Individual Defendants and Other Company Insiders Profited from Exorbitant Compensation Packages

186. While Helios proceeded to incur hundreds of millions of dollars in net losses, the Individual Defendants and Helios' other named executive made sure to award themselves handsome compensation packages.

187. According to the Company's Annual Report for 2017, Farnsworth received nearly $9 million in compensation, Krishnan received nearly $3 million, and Benson received $235,000 for the year ended December 31, 2017. This was a drastic increase from the previous year, in which Farnsworth, Krishnan, and Benson received $208,900, $131,250, and $22,052, respectively. Their compensation was reported as follows:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Theodore Farnsworth | 2017 | 225,000 | 1,350,000 | 7,250,000 | 76,050 | 8,901,050 |
| Chief Executive Officer | 2016 | 32,500 | | | 176,400 | 208,900 |
| Parthasarathy Krishnan | 2017 | 225,000 | 500 | 2,685,000 | 7,244 | 2,917,744 |
| Chief Innovation Officer | 2016 | 131,250 | - | - | - | 131,250 |
| Stuart Benson | 2017 | 200,000 | 35,500 | - | - | 235,500 |
| Chief Financial Officer | 2016 | 22,052 | - | - | - | 22,052 |

188. Pursuant to the employment agreement entered into by Helios and Farnsworth on December 11, 2017 ("Farnsworth Employment Agreement"), Farnsworth is entitled to a base

salary of $325,000 per year, which is to be increased on each anniversary in an amount to be determined by the Board, but in no event by less than $15,000.

189. In 2017, Farnsworth also received a year-end cash bonus of $350,000 and award of 53,255 shares of Helios common stock worth $450,000 and set to vest on February 15, 2019. Farnsworth also received a one-time bonus of $1 million "for his efforts in bringing capital sources that have been critical to the Company's needs during 2017." Under its terms, for each subsequent year, Farnsworth was supposed to receive an annual bonus of cash and common stock in an amount to be determined by the board of directors. However, the annual cash target bonus is required to be 25% of Farnsworth's base salary and the annual award of shares is required to have a value equal to 200% of his base salary.

190. In addition, on March 15, 2018, the Board granted Farnsworth a one-time cash bonus of $1,500,000 purportedly "in recognition of recent extraordinary efforts on behalf of the Company, including his role in the Company's completed offerings of its securities for a total of $190,000,000 in gross proceeds since December 15, 2017 and his ongoing role in the acquisition of MoviePass and the integration of the MoviePass business with the Company."

191. In addition, Farnsworth is entitled to a stock bonus based upon the Company's achievement of certain market capitalization milestones. Each award of common stock pursuant to a market capitalization milestone was to vest upon the later of February 15, 2019 and the end of the applicable three-month period following the applicable date of the grant. The market capitalization milestones were as follows:

| Company Market Capitalization Milestone | Percentage |
|---|---|
| $100,000,000 | 3% |
| $150,000,000 | 3% |
| $200,000,000 | 4% |
| $250,000,000 | 4% |

| | |
|---|---|
| $300,000,000 | 5% |
| $350,000,000 | 5% |
| $400,000,000 | 7% |
| $450,000,000 | 7% |
| $500,000,000 | 9% |
| every additional $100,000,000 thereafter (cumulated with the applicable immediately preceding milestone) | 10% |

192. Pursuant to Benson's employment agreement, Benson is entitled to a base salary of $275,000 per year, which is to be increased every year in an amount no less than 7% of his base salary. For 2017, Benson received a performance bonus of $150,000 in cash, 300,000 shares of Helios stock for "extraordinary services related to the Company's acquisition of a majority stake in MoviePass Inc.," and 100,000 shares of Helios stock for "outstanding performance of his general duties in 2017."

193. Benson's Helios stock shares will vest in their entirety on February 15, 2019. For each subsequent term, Benson may receive an annual bonus of cash and common stock as determined by the board of directors and based on the board's assessment of the Company and his individual performance. The annual cash target is 50% of Benson's base salary and the following annual award of shares: (i) 300,000 shares for services in 2018; (ii) 325,000 shares for services performed in 2019; and 400,000 for services in 2020.

194. Prior to the acquisition of MoviePass, the Company agreed to grant Benson an award of 600,000 shares of common stock

> On January 20, 2017, Farnsworth, Krishnan, and Gadiyaram each received a bonus of 250,000 unregistered shares of common stock as a bonus for "exceptional services provided in connection with the Company's merger transaction with Zone." These shares could not be sold for a period of 24 months.

195. On December 31, 2018, the Company reported in a Form 8-K that "[t]he proposal to approve, on an advisory basis, the 2017 compensation of the Company's named executive officers, ***was not approved***."

### B. The Individual Defendants Were Motivated to Inflate the Company's Stock Price in Order yo Secure Desperately Needed Proceeds from the Various Class Period Note Issuances and Conceal the Company's Ailing Cash Position and Financial Losses

196. With no ability to monetize the data it was receiving from its rising subscriber base, and increasing losses based on those same subscribers, the Company sought to leverage its inflated stock price in several convoluted Class Period capital raises.

#### 1. The August 2017 Notes and Investor Warrant

197. On August 16, 2017, and in order to finance its acquisition of MoviePass, the Company issued three Senior Secured Convertible Notes (the "August 2017 Notes") in the aggregate principal amount of $10,300,000 and a 5-year warrant for the purchase of 1,892,972 shares of the Company's common stock at an exercise price of $3.25 per share (the "Investor Warrant") to the Investor for consideration consisting of a secured promissory note payable by the Investor to the Company (the "August 2017 Investor Note") in the principal amount of $8,800,000 and $220,000 which offsets the August 2017 Notes of the same amount.

198. The August 2017 Notes carried a maturity date of April 16, 2018 and the Investor Warrant an expiration date of April 16, 2022.

199. Further, immediately prior to the closing of the Financing, the Investor prepaid (i) $5,000,000 of a certain promissory note of the Investor (the "February Investor Note") issued as payment of the purchase price of the secured senior convertible notes issued by Helios to the Investor (the "February Notes") pursuant to a Securities Purchase Agreement dated February 7, 2017 (the "February SPA") and (ii) $230,000 of a certain promissory note of the Investor (the

"December Investor Note") issued as payment of the purchase price of the secured convertible notes issued by HMNY to the Investor (the "December Notes") pursuant to a Securities Purchase Agreement dated December 1, 2016 (the "December SPA").

200. Each of these agreements with the Investor worked in concert to ensure that the Company had on hand the $5 million it had agreed to pay to MoviePass within 90 calendar days of the closing of the transaction as part of the Helios Note

201. At the time the Company had agreed to purchase the majority of shares in MoviePass for $27 million, Helios maintained just $1.43 million in cash and cash equivalents on hand as of June 30, 2017 and just $2.5 million in total current assets (as compared to nearly $2.1 million in total current liabilities for the same period).

202. Without being able to leverage the value proposition of the Company's future stock price vis-à-vis the warrants and convertible feature of the note, the Company would have been unable to finance the MoviePass purchase, an acquisition essential to the perpetuation of the fraud.

**2. The November 2017 Senior Secured Convertible Notes**

203. On November 7, 2017, the Company issued two Senior Secured Convertible Notes (the "November 2017 Notes") in the aggregate principal amount of $100,000,000 (collectively, the "November 2017 Notes") to institutional investors (the "Investors").

204. The November Notes consist of a Senior Secured Convertible Note in the amount of $5,000,000 (the "November Initial Note") and a Senior Secured Convertible Note in the amount of $95,000,000 (the "November Additional Note") in exchange for an upfront cash payment of $5,000,000 and a senior secured promissory note of $95,000,000 (the "November 2017 Investor Note") to aid in the funding of the acquisition of the MoviePass Shares.

205. As stated by the Company, proceeds from the November 2017 Secured Convertible Notes issuance were used to purchase $3 million in additional shares of MoviePass common stock as the Company sought to tighten its grip on the MoviePass acquisition even before it was fully approved by shareholders of either company.

206. Like the August Notes that preceded it, the November 2017 Notes were necessary because the Company maintained just $1.6 million in cash and cash equivalents on its balance sheet as of September 30, 2017.

207. Given that the November 2017 Notes were underpinned by their convertibility, the Individual Defendants were motivated to artificially inflate the Company's stock price to make it appear to be a more attractive investment opportunity for the Investors and to secure the funds necessary to push forward with the MoviePass takeover.

**3. The January 2018 Senior Convertible Notes**

208. In January 2018, pursuant to a securities purchase agreement entered into by the Company and the Investor, Helios sold and issued senior convertible notes in the aggregate principal amount of $60,000,000, consisting of (i) a Series A-1 Senior Bridge Subordinated Convertible Note in the aggregate principal amount of $25,000,000 and (ii) a Series B-1 Senior Secured Bridge Convertible Note in the aggregate principal amount of $35,000,000 for consideration consisting of (i) a cash payment in the aggregate amount of $25,000,000, and (ii) a secured promissory note payable by the Investor to the Company in the aggregate principal amount of $35,000,000.

209. The funds received by the Company from this note were, first and foremost, earmarked for increasing the Company's ownership interest in MoviePass.

210. Like the notes before it, the January 2018 Senior Convertible Notes provided the buyer the option to convert the debt into shares of the Company's common stock at any time after the Company received approval of its stockholders for the issuance of the shares at a conversion price of 411.44 per share.

#### 4. The Company Uses its Stock as Currency to Pay its Placement Agent in the Various Note Offerings

211. Both prior to and during the Class Period, the Company used its stock as currency to pay Palladium Capital Advisors, LLC ("Palladium") for acting as its placement agent or financial advisor in the various note offerings – services the Company would not have otherwise been able to afford because of its cash deficiencies and lack of profitability.

212. *The September 2016 Placement Note and Warrants.* With respect to payment for its services related to the placement of certain notes in September 2016, the Company issued to Palladium a note in the principal amount of $80,000 as payment for the cash portion of its commission in that amount owed by the Company. Palladium also received a 5-year warrant for the purchase of the Company's common stock, with Palladium exercises that warrant during 2016 to purchase more than 48,000 shares at an exercise price ranging from $4.54 per share to $9.36 per share, before determining on October 2, 2017 to exercise the warrant in full in a cashless exercise, and receiving an additional 22,578 shares, which had a market value on that day of more than $293,000.

213. *The December 2016 Placement Warrants.* Palladium subsequently assisted Helios in the placement of certain senior convertible notes during December 2016 for which it again accepted a 5-year warrant as partial payment for its services, allowing for Palladium to purchase 22,000 shares at an exercise price of $4.54 per share, with the issuance of additional warrants based on cash payments received by the Company pursuant to the placed notes. On October 6, 2017,

84,735 shares were issued to Palladium in a cashless exercise, carrying a market value on that day of $1.33 million.

214. *The February 2017 Placement Warrants.* Palladium again accepted a 5-year warrant from the Company in exchange for its assistance in the placement of certain notes during February 2017. The February 2017 warrant allowed Palladium to purchase up to 8% of the number of shares of the Company's common stock into which the unrestricted principal of the February 2017 Notes may be converted. Through the first nine months of 2017 the Company received $5,000,000 of cash payments for the February 2017 Notes, resulting in the issuance of an additional February Placement Agent Warrants for the purchase of 133,334 shares of common stock at an exercise price of $3.00 per share.

215. *The August 2017 Placement Warrants.* In August 2017, the Company again used its inflated stock as currency in providing to Palladium a 5-year warrant to purchase Company shares in exchange for its services related to the August 2017 Notes and Investor warrant. Palladium's August 2017 placement warrant provided for the purchase of shares based on the amount of cash payments received by the Company from the August 2017 Notes, resulting in the issuance of 176,000 of warrants for the purchase of shares of common stock at exercise prices of $3.00 and $14.27 per share as of December 31, 2017.

216. *The November 2017 Placement Warrants*. In connection with acting as the financial advisor for the Company with respect to the November 2017 Senior Secured Convertible Notes, Palladium received a 5-year warrant. Palladium's November 2017 placement warrant provided for the purchase of shares based on the amount of cash payments received by the Company from the November 2017 Notes, resulting in the issuance of 75,618 warrants for the

purchase of shares of common stock at an exercise price of 412.06 per share as of December 31, 2017.

### C. The Individual Defendants Were Motivated to Inflate the Company's Common Stock To Raise Capital in the Follow-On Public Offerings

217. Seeking to capitalize on the Company's inflated stock price, the Individual Defendants were motivated to engage in the fraud alleged herein in order to complete various follow on offerings necessary to fund the Company's operations.

218. On December 12, 2017, Helios announced that it had commenced a public offering to issue and sell shares of its common stock and warrants to purchase shares (the "December 2017 Offering").

219. On December 13, 2017, the Company announced the pricing for its offering of an aggregate of 8,261,539 Series A units (the "Series A Units"), each consisting of one share of the Company's common stock and one Series A Warrant to purchase one share of common stock; and 969,230 series B units (the "Series B Units") consisting of one pre-funded Series B warrant to purchase one share of common stock and one Series A warrant.

220. The units were offered at a price of $6.50 per unit and were purportedly expected to raise nearly $60 million for the Company, exclusive of underwriting discounts and commissions.

221. On January 25, 2018, the Company filed with the SEC a Form S-3 Registration Statement, seeking to register for sale a combination of common stock, preferred stock, warrants, units, and subscription rights valued up to $400 million.

222. The registration statement was declared effective by the SEC on February 9, 2018 and the Company completed the follow-on offering of common stock and warrants on February 13, 2018, receiving net proceeds of $96.9 million (the "February 2018 Offering").

223. Desperate for cash and needing to squeeze every last penny out of shareholders, in April 2018 the Company again conducted an offering (the "April 2018 Offering"), this time receiving net proceeds of approximately $27.7 million for sale of $30 million worth of Helios stock units, each consisting of:

> (A) 10,500,000 Series A-2 units (the "Series A-2 Units"), with each Series A-2 Unit consisting of (i) 0.004 (one pre-split) share (an "April Share") of the Company's common stock, and (ii) 0.004 (one pre-split) Series A-2 warrant to purchase 0.004 (one pre-split) share of common stock (the "Series A-2 Warrants"); and (B) for those purchasers whose purchase of Series A-2 Units would result in the purchaser, together with its affiliates and certain related parties, beneficially owning more than 9.99% of the Company's outstanding common stock following the consummation of the April 2018 Offering, 500,000 Series B-2 units (the "Series B-2 Units"), consisting of (i) 0.004 (one pre-split) pre-funded Series B-2 warrant to purchase 0.004 (one pre-split) share of common stock (the "Series B-2 Warrants", and together with the Series A-2 Warrants, the "April Warrants") and (ii) 0.004 (one pre-split) Series A-2 Warrant.

224. Without the Defendants' misrepresentations, the December 2017 Offering, February 2018 Offering, and April 2018 Offering would have been significantly less successful given the true nature of the Company's business prospects. Indeed, the Defendants purposefully masked the true condition and financial viability of its core asset while misrepresenting the purpose of the SPO—all in order to exploit investors

### D. Defendants' Motive to Inflate Helios' Stock Price to Use Helios Stock As Currency to Make Acquisitions

225. Throughout the Class Period, Helios was highly leveraged and incurred significant losses due to its acquisition and operation of MoviePass. Accordingly, the Company was unable to fund operations or expand organically. Thus, the Defendants used the Company's common stock as currency to position Helios to grow inorganically through the acquisition of assets.

226. Helios's equity was essential to the Defendants efforts to acquire additional assets during the Class Period, using artificially-inflated stock as currency. On April 4, 2018, (when

Helios's stock price closed at $2.98 per share and pre-reverse stock split) the Company announced it had entered into an Asset Purchase Agreement with Oath Inc. pursuant to which Helios acquired certain products, rights, technologies, contracts, data and other assets related to the Moviefone brand ("Moviefone"). The purchase price included a major equity component as Helios paid only $1.0 million in cash and issued 2,550,154 (pre-reverse stock split) shares valued at $7.6 million and issued warrants to purchase an additional 2,550,154 (pre-reverse stock split) shares at an exercise price of $5.50 per share.

227. As a company with few prospects for organic growth, these acquisitions provided a much-needed lifeline and the Defendants use of stock, rather than cash to pay for said assets, provided additional motivation for them to defraud the investing public or to conceal any information that might otherwise shake investor confidence and decrease the price of Helios's common stock.

## LOSS CAUSATION

228. During the Class Period, and as detailed herein, the Defendants materially misled the investing public, thereby inflating the price of Helios' common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their own statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Helios' business, operations, and prospects as alleged herein.

229. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, the Defendants made or caused to be made a series of materially false and/or

misleading statements about the prospects and success of MoviePass and its impact on the business of Helios. Specifically, the Defendants' statements were false and misleading in that: (i) MoviePass' business model was not sustainable, as Helios and MoviePass would run out of cash (ii) MoviePass' business model was not viable, as Helios and MoviePass did not have the technology or capabilities to gather and analyze data; (iii) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass; and (iv) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times.

230. The materially false and/or misleading statements made by the Defendants during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

231. During the Class Period, as detailed herein, the Defendants engaged in a scheme to deceive the market and perpetuate a course of conduct that caused the price of Helios shares to be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed herein. As the Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of Helios shares was removed, and the price of Helios shares fell. From a Class Period high of $27.89 per share on October 10, 2017, Helios' stock price has declined by over 99% to $0.228 per share on August 1, 2018.

232. The truth was partially revealed to the investing public with the announcement of a reverse stock split. On July 24, 2018, Helios announced that it would implement a 1 for 250 reverse

stock split to be effectuated at 4:01 p.m. Eastern Time on Tuesday July 24, 2018. According to Farnsworth, the 1 for 250 reverse was approved to "facilitate our access to capital over the next several years and enable us to implement our growth plans for MoviePass." In response to announcement of the reverse split and the news that the Company was desperate for capital, the price of Helios common stock declined $11.90, or 52.88%, from a closing price of $22.50 per share on July 24, 2018 to a closing price of $10.60 per share on July 25, 2018 on an adjusted basis. The Company's stock price continued to decline to $6.83 per share on July 26, 2018

233. On July 27, 2018, the truth was fully revealed when the Company disclosed that it had issued a demand note in the principal amount of $6.2 million because it was not able to make required payments to its merchants and fulfillment processors, leading to a service interruption. This announcement caused the Company's common stock to decline $4.83, or 70.72%, from a closing price of $6.83 per share on July 26, 2018 to a closing price of $2.00 per share on July 27, 2018. The price of the Company's common stock continued to decline over the next few days, falling another $1.76 to close at $0.228 per share on August 1, 2018, an overall drop from July 24, 2018 of approximately 98.98%.

234. As a result of their purchases of Helios shares during the Class Period at artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The timing and magnitude of the price decline in Helios shares negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## CLASS ACTION ALLEGATIONS

235. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Helios

publicly traded securities between August 15, 2017 and July 26, 2018, inclusive, seeking to pursue remedies under the Exchange Act. Excluded from the Class are Helios and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

236. Because Helios securities were actively traded on the NASDAQ, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by Helios or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

237. Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.

238. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

a. Whether Defendants violated the federal securities laws as alleged herein;

b. Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Helios' business and operations;

c. Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether the Individual Defendants caused Helios to issue false and misleading SEC filings and public statements during the Class Period;

e. Whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f. Whether the prices of Helios securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g. Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

239. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**PRESUMPTION OF RELIANCE**

240. Plaintiffs are presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for the Company's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

a. Helios' common stock was actively traded on the NASDAQ;

b. The market price of Helios common stock reacted promptly to the dissemination of public information regarding the Company;

c. The Company's stock was followed by financial analysts, including those cited in this Complaint;

d. The average weekly trading volume for Helios stock during the Class Period was approximately 334,000 shares;

e. As a regulated issuer, Helios filed with the SEC periodic public reports during the Class Period;

f. Helios regularly communicated with pubic investors via established market communication mechanisms; and

g. During the Class Period, the Company's market capitalization was over $232,000,000 on October 11, 2017 and the Company had over 421 million shares outstanding prior to the 1 for 250 reverse stock split effectuated on July 25, 2018.

241. Throughout the Class Period, the Company was consistently followed by the market, including securities analysts. The market relies upon the Company's financial results and management to accurately present the Company's financial results. During this period, Helios and the Individual Defendants continued to pump materially false and misleading information into the marketplace regarding the Company and the status and success of MoviePass. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of the Company's securities.

242. As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for Helios' common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-

market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

243. Plaintiffs and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Helios' common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

244. Plaintiffs and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

245. Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have purchased Helios' common stock at artificially inflated prices.

## NO STATUTORY SAFE HARBOR

246. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

247. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

248. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Helios who knew that the statement was false when made.

## CLAIMS FOR RELIEF

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5

***Against All Defendants***

249. Plaintiffs reallege each allegation as if fully set forth herein.

250. This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

251. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Helios stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Helios stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

252. During the Class Period, Defendants, by the use of means and instrumentalities of interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made

not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, all in an effort to maintain artificially high market prices for Helios stock in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants acted individually and in concert in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

253. During the Class Period, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

254. As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly

traded securities would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

255. The Individual Defendants, who are the senior officers and/or directors of the Company and/or MoviePass, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

256. As a result of the foregoing, the market price of Helios securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements and knowing and/or reckless inability to effectuate their purported business plans, Plaintiffs and the other members of the Class relied on the statements and business plans described above and/or the integrity of the market price of Helios securities during the Class Period in purchasing Helios securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

257. Had Plaintiffs and the other members of the Class been aware that the market price of Helios securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Helios securities at the artificially inflated prices that they did, or at all.

258. As a result of the wrongful conduct alleged herein, Plaintiffs and the other members of the Class have suffered damages in an amount to be established at trial. Plaintiffs and the Class' losses were proximately caused by Defendants' scheme to defraud the investing public by, among

other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiffs and other members of the Class purchased Helios stock in reliance on the integrity of the market price of that stock, and Defendants manipulated the price of Helios stock through their misconduct as described herein. Plaintiffs' and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of, among other things, Defendants' knowing and/or reckless inability to carry out their purported business plans, notwithstanding affirmative representations to the contrary.

259. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Helios securities during the Class Period.

**Count II**

**For Violations of Section 20(a) of the Exchange Act**

***Against the Individual Defendants***

260. Plaintiffs reallege each allegation as if fully set forth herein.

261. This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

262. Helios and the Individual Defendants are liable as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

263. the Individual Defendants acted as controlling persons of Helios within the meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual Defendants had the power and authority to cause Helios and MoviePass to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

264. Specifically, the Individual Defendants, by reason of their status as senior executive officers and/or directors of Helios and/or MoviePass, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of §20(a) of the Exchange Act. The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases and interviews with various news sources cited herein related to Plaintiffs' and the Class' investments in Helios securities within the meaning of §20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

265. the Individual Defendants controlled and had the authority to control the content of the Company's SEC statements, press releases and other public statements. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

266. the Individual Defendants knew or recklessly disregarded the fact that Helios' representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

267. By virtue of their high-level positions and their participation in and awareness of Helios' operations and public statements, the Individual Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

268. The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

269. As set forth herein, the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are further liable pursuant to §20(a) of the Exchange Act.

270. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of Helios securities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such equitable/injunctive or other relief in Plaintiffs' favor as the Court may deem just and proper.

## JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

DATED: January 4, 2019 Respectfully submitted,

**LEVI & KORSINSKY, LLP**

By: *__/s/Shannon L. Hopkins__*

Eduard Korsinsky (EK-8989)
ek@zlk.com
William J. Fields (*admission pending*)
wfields@zlk.com
Christopher J. Kupka (CK-9010)
ckupka@zlk.com
55 Broadway, 10th Floor
New York, New York 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

Shannon L. Hopkins (SH-1887)
shopkins@zlk.com
Stephanie A. Barone (Pro Hac Vice forthcoming)
sbartone@zlk.com
733 Summer Street, Suite 304
Stamford, CT 06901
Telephone: (203) 992-4523
Facsimile: (212) 363-7171

*Counsel for Lead Plaintiff and Lead Counsel for the Class*