**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE HELIOS AND MATHESON ANALYTICS, INC. SECURITIES LITIGATION** | No. 1:18-CV-06965-JGK<br><br>**CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

# SECOND AMENDED CLASS ACTION COMPLAINT

Dated: April 3, 2019


**LEVI & KORSINSKY, LLP**

Shannon L. Hopkins (SH-1887)
shopkins@zlk.com
Stephanie A. Bartone
sbartone@zlk.com (admitted *Pro Hac Vice*)
Gregory M. Potrepka (GP-1275)
gpotrepka@zlk.com
Andrew Rocco (*Pro Hac Vice* forthcoming)
arocco@zlk.com
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

# TABLE OF CONTENTS


SUMMARY OF THE ACTION ........ 2

JURISDICTION AND VENUE ........ 7

PARTIES ........ 7

I. PLAINTIFFS ........ 7

II. DEFENDANTS ........ 9

STATEMENT OF FACTS ........ 12

I. COMPANY BACKGROUND ........ 12

II. PRIOR TO THE CLASS PERIOD HELIOS INCURS MOUNTING LOSSES ........ 14

III. A STALE AND CASH-STRAPPED HELIOS PIVOTS IN A NEW DIRECTION BY OBTAINING A MAJORITY INTEREST IN MOVIEPASS ........ 16

IV. IMMEDIATELY FOLLOWING THE MOVIEPASS MERGER DEFENDANTS SLASH USER FEES IN A NO HOLDS BARRED EFFORT TO ENTICE NEW USERS ........ 19

V. DEFENDANTS FALSELY PORTRAY THE MOVIEPASS TRANSACTION AS A BOON WHILE WITHOLDING VITAL INFORMATION FROM THE MARKET IN VIOLATION OF SEC RULES TO DRUM UP INVESTMENT ........ 22

VI. DEFENDANTS PROMISE REVENUE GENERATION THROUGH A NOVEL DATA COLLECTION AND MARKET BUSINESS PLAN THAT HELIOS KNEW IT LACKED THE INFRASTRUCTURE, KNOWLEDGE, AND CAPABILITY TO IMPLEMENT OR SUSTAIN ........ 28

VII. DEFENDANTS' PURPORTED BUSINESS MODEL COULD NOT BE SUCCESSFUL BECAUSE THE COMPANY WAS SUFFERING EXORBITANT LOSSES AND LACKED THE INFRASTRUCTURE TO ACTUALLY IMPLEMENT SUCH A PLAN ........ 29

A. The Rapid Increase In Subscription Plans Cause Tens of Millions of Dollars In Losses Each Month That, Despite Defendants False Statements to the Contrary, Could Not Be Sustained ........ 29

B. Defendants Did Not Have the Technology or Capabilities to Gather, Let Alone Analyze Data ........ 32

1. Defendants Did Not Have Expertise to Mine Data Profitably ........ 32

2. Defendants Did Not Have the Infrastructure to Mine Data Profitably ........ 34

C. Movie Theaters Had No Incentive to Pay MoviePass ........ 39

VIII. DEFENDANTS ENGAGED IN DILUTIVE STOCK AND WARRANT SALES TO PAY FOR THE COMPANY'S MASSIVE LOSSES ........ 41

IX. DEFENDANTS ANNOUNCE A SPIN-OFF OF ZONE IN ORDER TO REPEAT THEIR FRAUDULENT PATTERN ........ 49

DEFENDANTS' MATERIAL CLASS PERIOD MISREPRESENTATIONS AND OMISSIONS ........ 50

I. FALSE AND MISLEADING STATEMENTS IN AUGUST 15, 2017 PRESS RELEASE ........ 50

II. FALSE AND MISLEADING STATEMENTS IN AN AUGUST 16, 2017 INTERVIEW ON FOX BUSINESS CHANNEL ........ 53

III. FALSE AND MISLEADING STATEMENTS IN AN AUGUST 16, 2017 INTERVIEW ON CHEDDAR.COM ........ 55

IV. FALSE AND MISLEADING STATEMENTS IN THE AUGUST 16, 2017 INTERVIEW WITH VARIETY MAGAZINE FILED ON FORM DEFA14A WITH THE SEC ON AUGUST 17, 2017 ........ 56

V. FALSE AND MISLEADING STATEMENTS IN THE AUGUST 17, 2018 INTERVIEW WITH WIRED.COM FILED ON FORM DEFA14A WITH THE SEC ........ 58

VI. FALSE AND MISLEADING STATEMENTS IN THE AUGUST 23, 2017 PRESS RELEASE ........ 59

VII. FALSE AND MISLEADING STATEMENTS IN THE SEPTEMBER 14, 2017 PRESS RELEASE ........ 61

VIII. FALSE AND MISLEADING STATEMENTS IN THE SEPTEMBER 15, 2017 REGISTRATION STATEMENT AND PROSPECTUS ........ 62

IX. FALSE AND MISLEADING STATEMENTS IN THE FORM DEFA14A FILED WITH THE SEC ON SEPTEMBER 25, 2017 ........ 65

X. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 11, 2017 8-K68

XI. FALSE AND MISLEADING STATEMENTS IN THE CNBC VIDEO INTERVIEW EMBEDDED IN THE OCTOBER 13, 2017 CNBC ARTICLE ...... 70

XII. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 13, 2017 MARKETWATCH.COM ARTICLE ........ 71

XIII. FALSE AND MISLEADING STATEMENTS IN AN OCTOBER 16, 2017 INTERVIEW ON FOX BUSINESS CHANNEL ........ 73

XIV. FALSE AND MISLEADING STATEMENTS IN AN OCTOBER 16, 2017 INTERVIEW ON BLOOMBERG TELEVISION ........ 74

XV. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 24, 2017 PRESS RELEASE ........ 75

XVI. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 30, 2017 BLOOMBERG ARTICLE ........ 77

XVII. FALSE AND MISLEADING STATEMENTS IN A NOVEMBER 13, 2017 INTERVIEW ON CNBC .......... 78

XVIII. FALSE AND MISLEADING STATEMENTS IN THE NOVEMBER 14, 2017 10-Q .......... 78

XIX. FALSE AND MISLEADING STATEMENTS IN AN NOVEMBER 24, 2017 INTERVIEW ON CHEDDAR.COM .......... 87

XX. FALSE AND MISLEADING STATEMENTS IN THE DECEMBER 5, 2017 PROSPECTUS .......... 89

XXI. FALSE AND MISLEADING STATEMENTS IN THE DECEMBER 12, 2017 PROSPECTUS SUPPLEMENT .......... 90

XXII. FALSE AND MISLEADING STATEMENTS IN THE DECEMBER 14, 2017 PROSPECTUS SUPPLEMENT .......... 93

XXIII. FALSE AND MISLEADING STATEMENTS IN THE JANUARY 9, 2018 YAHOO! FINANCE INTERVIEW .......... 94

XXIV. FALSE AND MISLEADING STATEMENTS IN THE JANUARY 9, 2018 FOX BUSINESS ARTICLE .......... 96

XXV. FALSE AND MISLEADING STATEMENTS IN THE JANUARY 22, 2018 WASHINGTON POST ARTICLE .......... 97

XXVI. FALSE AND MISLEADING STATEMENTS IN THE JANUARY 25, 2018 REGISTRATION STATEMENT AND PROSPECTUS .......... 98

XXVII. FALSE AND MISLEADING STATEMENTS IN THE FEBRUARY 12, 2018 PROSPECTUS SUPPLEMENT .......... 100

XXVIII. FALSE AND MISLEADING STATEMENTS IN THE FEBRUARY 14, 2018 PROSPECTUS SUPPLEMENT .......... 102

XXIX. FALSE AND MISLEADING STATEMENTS IN THE FEBRUARY 16, 2018 PRESS RELEASE .......... 104

XXX. FALSE AND MISLEADING STATEMENTS IN PODCAST TRANSCRIPT POSTED BY RECODE Media ON FEBRUARY 18, 2018 .......... 105

XXXI. FALSE AND MISLEADING STATEMENTS IN THE INTERVIEW CONTAINED IN A FEBRUARY 22, 2018 SEEKING ALPHA ARTICLE And EXPANDED UPON in A SECOND SEEKING APLHA ARTICLE DATED APRIL 4, 2018 .......... 106

XXXII. FALSE AND MISLEADING STATEMENTS IN THE FEBRUARY 26, 2018 PRESS RELEASE .......... 108

XXXIII. FALSE AND MISLEADING STATEMENTS FALSE AND MISLEADING STATEMENTS IN MARCH 2, 2018 Mediaplaynews ARTICLE .......... 109

XXXIV. FALSE AND MISLEADING STATEMENTS IN THE MARCH 23, 2018 PRESS RELEASE ........ 111

XXXV. FALSE AND MISLEADING STATEMENTS IN INTERVIEW QUOTED IN MARCH 27, 2018 THE WRAP ARTICLE ........ 113

XXXVI. FALSE AND MISLEADING STATEMENTS IN THE APRIL 6, 2018 BENZINGA ARTICLE ........ 114

XXXVII. FALSE AND MISLEADING STATEMENTS IN THE VIDEO EMBEDDED IN THE APRIL 6, 2018 CHEDDAR ARTICLE ........ 115

XXXVIII. FALSE AND MISLEADING STATEMENTS IN THE APRIL 12, 2018 YAHOO! FINANCE INTERVIEW ........ 116

XXXIX. FALSE AND MISLEADING STATEMENTS IN THE APRIL 17, 2018 ANNUAL REPORT ........ 117

XL. FALSE AND MISLEADING STATEMENTS IN APRIL 17, 2018 *VARIETY* ARTICLE ........ 121

XLI. FALSE AND MISLEADING STATEMENTS IN APRIL 26, 2018 NEW YORK TIMES ARTICLE ........ 123

XLII. FALSE AND MISLEADING STATEMENTS IN THE MAY 8, 2018 *NEW YORK POST* ARTILE ........ 124

XLIII. FALSE AND MISLEADING STATEMENTS IN THE MAY 9, 2018 *VARIETY* ARTICLE ........ 125

XLIV. FALSE AND MISLEADING STATEMENTS IN THE MAY 13, 2018 *VARIETY* ARTICLE ........ 126

XLV. FALSE AND MISLEADING STATEMENTS IN THE MAY 14, 2018 *BUSINESS INSIDER* ARTICLE ........ 128

XLVI. FALSE AND MISLEADING STATEMENTS IN THE MAY 15, 2018 10-Q ........ 129

XLVII. FALSE AND MISLEADING STATEMENTS IN THE MAY 16, 2018 *NEW YORK TIMES* ARTICLE ........ 131

XLVIII. FALSE AND MISLEADING STATEMENTS IN THE JUNE 12, 2018 *VICE* INTERVIEW ........ 132

XLIX. FALSE AND MISLEADING STATEMENTS IN DEFENDANT LOWE'S JUNE 28, 2018 REDDIT "ASK ME ANYTHING" ........ 134

L. FALSE AND MISLEADING STATEMENTS IN THE CNN BUSINESS ARTICLE ........ 135

THE TRUTH EMERGES THROUGH A SERIES OF CORRECTIVE DISCLOSURES AND MATERIALIZATION OF UNDISCLOSED RISK ........ 137

I. HELIOS RELEASES DIRE RISK DISCLOSURES TWO MONTHS AFTER ANNOUNCING THE MOVIEPASS TRANSACTION AND CONTINUES TOUTING THE COMPANY'S PROSPECTS ...... 137

II. THE SEC REVEALS DEFENDANTS' FAILURE TO TIMELY FILE MOVIEPASS' FINANCIAL STATEMENTS AND THE TRUTH REGARDING MOVIEPASS' FINANCES CAUSING HELIOS STOCK TO PLUNGE...... 140

III. DEFENDANT LOWE ADMITS MAKING FALSE STATEMENTS RELATED TO THE TRACKING AND SALE OF SUBSCRIBER DATA AND HELIOS' STOCK DROPS AS A RESULT ...... 141

IV. AFTER MAKING MATERIALLY FALSE AND MISLEADING STATEMENTS REASSURING SHAREHOLDERS THAT HELIOS WAS FINANCIALLY STABLE AND HAD ADEQUATE ACCESS TO CAPITAL, THE CONCEALED RISK MATERIALIZES IN A SERIES OF DISCLOSURES AND EVENTS...... 142

POST CLASS PERIOD EVENTS ...... 152

I. THE PRECIPITOUS DECLINE IN HELIOS STOCK RESULTS IN NASDAQ NON-COMPLIANCE AND DELISTING...... 152

II. BOARD MEMBERS RESIGN AMID TURMOIL CITING "CONCERNS" REGARDING HELIOS' MANAGEMENTS' LACK OF TRANSPARENCY AND WITHHOLDING OF INFORMATION FROM THE BOARD...... 154

III. THE NEW YORK ATTORNEY GENERAL ANNOUNCES INVESTIGATION INTO WHETHER HELIOS DEFRAUDED INVESTORS...... 155

IV. HELIOS TAKES A MASSIVE IMPAIRMENT CHARGE ON THE MOVIEPASS™ BUSINESS...... 155

V. HELIOS IS FORCED TO SPIN-OFF THE MOVIEPASS™ BUSINESS...... 156

VI. KEY HELIOS PERSONNEL ARE FIRED OR ABANDON THE SINKING SHIP AND DEFENDANTS RECYCLE THEIR FAILED UNLIMITED PLAN...... 157

VII. HELIOS IS FORCED TO RESTATE ITS FINANCIAL STATEMENTS CITING "MATERIAL WEAKNESSES" IN FINANCIAL REPORTING AND DELAYS FILING ITS 2018 FORM 10-K...... 158

ADDITIONAL ALLEGATIONS OF SCIENTER...... 159

I. THE INDIVIDUAL DEFENDANTS KNOWINGLY AND/OR RECKLESSLY MADE MATERIAL MISSTATEMENTS AND/OR OMITTED MATERIAL FACTS ...... 159

A. Farnsworth Admits He Knew From Day One That Helios Planned to Be Successful By Creating Its Own Content and Not Through Subscriptions or Operationalizing Helios' Purported Data Capabilities...... 161

B. Helios and MoviePass' Inadequate Technology, Systems, Knowledge and Experience to Handle and Mine Subscription Data and Defendants' Direct Admissions Support a Strong Inference of Scienter ..... 162

C. Board Member and Management Resignations as a Direct Result of the Individual Defendants' Deception and Lack of Transparency Supports A Strong Inference of Scienter ..... 164

D. The New York Attorney General Investigation Into Allegations that Helios Management Intentionally Mislead Investors Supports A Strong Inference of Scienter ..... 165

E. Defendants' Identical Regulation S-X Violations, Multiple Impairment Charges, Restatements, and Admissions of Material Weaknesses Related to Internal Controls Supports A Strong Inference of Scienter ..... 165

F. That MoviePass Was Helios' Core Business Supports Scienter ..... 168

G. The Individual Defendants' History of Defrauding Investors and Business Partners Supports Scienter ..... 169

II. THE INDIVIDUAL DEFENDANTS WERE MOTIVATED TO COMMIT THE FRAUD ALLEGED HEREIN ..... 171

A. The Individual Defendants and Other Company Insiders Profited from Exorbitant Compensation Packages ..... 171

B. The Individual Defendants Were Motivated to Inflate the Company's Stock Price To Secure Desperately Needed Proceeds from the Various Class Period Note Issuances and Conceal the Company's Ailing Cash Position and Financial Losses ..... 174

1. The August 2017 Notes and Investor Warrant ..... 174

2. The November 2017 Senior Secured Convertible Notes ..... 175

3. The January 2018 Senior Convertible Notes ..... 175

4. The June 2018 Senior Convertible Notes and Preferred Shares ..... 176

5. The Company Uses its Stock as Currency to Pay its Placement Agent in the Various Note Offerings ..... 177

C. The Individual Defendants Were Motivated to Inflate the Company's Common Stock To Raise Capital in the Follow-On Public Offerings ..... 179

D. Defendants' Motive to Inflate Helios' Stock Price to Inflate Helios' Stock Price to Make Acquisitions and Acquire Rights to Films ..... 180

LOSS CAUSATION ..... 184

CLASS ACTION ALLEGATIONS ..... 190

PRESUMPTION OF RELIANCE ..... 192

NO STATUTORY SAFE HARBOR ..... 194

CLAIMS FOR RELIEF .......... 195
PRAYER FOR RELIEF .......... 200
JURY DEMAND .......... 200

The Helios and Matheson Investor Group ("Lead Plaintiff"), comprised of George Hurst, Marcus Washington, Daniel Mercer, Juan Taveras, and Amit Katiyar ("Plaintiffs"), bring this action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. §240.10b-5 ("Rule 10b-5") promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), on behalf of themselves and all persons and entities other than Defendants (defined below) who purchased or otherwise acquired shares of the common stock of Helios and Matheson Analytics Inc. ("Helios" or the "Company") between August 15, 2017 and July 26, 2018, inclusive (the "Class Period").

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and beliefs are based on the investigation of their undersigned attorneys ("Lead Counsel"), which included, among other things: (i) review and analysis of Helios' public filings with the SEC; (ii) review and analysis of Helios' other public statements, including press releases and interviews with various news sources; (iii) discussions with an industry expert; (iv) interviews with individuals who are former employees of Helios; (v) review and analysis of reports of securities and financial analysts, news articles, and other commentary and analysis concerning Helios and the industry in which it operates; and (vi) review of pertinent court filings. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1. This action presents a paradigm example of a securities fraud scheme that wiped out essentially all shareholder value. From a record breaking high stock price during the Class Period of $32.90 per share, today Helios shares trade at less than a penny.

2. Since 1983, Helios has purported to provide "high quality IT services and solutions to Fortune 1000 companies and other large organizations." Despite its longevity, Helios suffered from significant financial troubles that led to the threat of being delisted from the Nasdaq Stock Market ("NASDAQ") in late 2016 (prior to the Class Period). In fact, for the years ended December 31, 2016 and 2015, Helios reported growing net losses of $7,381,071 and $2,110,117, respectively.

3. As a means of temporarily evading a NASDAQ delisting, in January 2017, the Company maneuvered to acquire a firm called Zone Technologies, Inc. ("Zone"), which was led by Defendant Theodore "Ted" Farnsworth ("Farnsworth"). Thereafter, Farnsworth was named CEO of Helios, a position he would hold throughout the Class Period and still maintains. However, the Zone acquisition did not cure Helios' problems. Zone's only product was a mobile navigation-based app called RedZone Maps ("Redzone") which, in theory, allowed users to crowd-source data regarding local crime and safety threats into the app (visible to other users), and collect revenue through advertising. That theory did not pan out because in practice, as Helios would admit in its Annual Report for the year ended December 31, 2017 (when it simultaneously took an impairment to goodwill related to Zone), the RedZone app was still being "develop[ed]" and never generated ***any*** advertising revenue.

4. Rather, after mounting additional losses, and needing to pivot into a new line of business to kick-start enthusiasm among investors, on August 15, 2017 (the beginning of the Class Period), Helios announced that it was acquiring a majority position in MoviePass Inc.

("MoviePass"), a subscription service for moviegoers. Throughout the Class Period, MoviePass operations were run by Defendant Mitch Lowe ("Lowe"), and MoviePass was the Company's primary asset.

5. In connection with the MoviePass acquisition, Helios announced a new nationwide pricing model whereby subscribers would only pay $9.95 per month for the ability to see one movie every day. This price was reduced even further to $6.95 per month, and as low as $5.83 per month. Meanwhile, Helios would foot the bill for every movie subscribers saw. This was a significant departure from MoviePass' pre-merger business model which centered on charging customers as much as $50 per month. Most significantly, this price reduction came at a time when (as Lowe would concede after the Class Period had ended), MoviePass was on the cusp of "***going out of business***."[1] Indeed, prior to the announcement of the merger, MoviePass had always operated at a loss. Thus, in order to keep MoviePass running, Helios would have to raise astronomical amounts of capital through new share issuances.

6. Helios did not disclose any of these risks to shareholders. Instead, as evidenced by the very press release announcing the MoviePass transaction, Helios directed investors who wanted to know about the risks of acquiring MoviePass to its previous Annual Report for the year ended 2016—a report that was useless because it was filed with the SEC almost four months prior to the MoviePass merger. Moreover, under Rule 8-04 of Regulation S-X the Company was required to provide investors with "target and pro forma financial statements in connection with [Helios'] acquisition of MoviePass Inc. . . ." Defendants chose not to do to. They chose not to in spite having gone through ***the exact same process with the Company's acquisition of Zone*** and

---

[1] Unless otherwise indicated, all emphasis is added and all internal quotations and citations are omitted.

similarly having been reprimanded by the SEC for failing to timely file ***the same financial statements with respect to Zone***.

7. Instead of apprising investors of the risks Defendants knew would materialize from a scheme where Helios was paying for its subscribers to see movies every day, throughout the Class Period, Defendants touted the Company as a "multibillion dollar entertainment company" or a "unicorn company" that, as early as September 25, 2017, Defendants falsely stated could "***be profitable on the subscriptions***" alone. Moreover, Defendants continually assured investors that Helios could become "***self-sustaining***" without having to raise additional capital. For example, in April 2018 Farnsworth told reporters "***I assure you that capital is not an issue. I'm sitting on hundreds of millions of dollars of dry powder***[.]" Defendants repeated variations of these falsehoods throughout the Class Period.

8. The first chink in the armor occurred on October 11, 2017 when Helios, for the first time, disclosed several risks of the MoviePass transaction. This partial disclosure caused Helios' stock to sink from $32.90 per share as of market close on October 11, 2017, to a closing price of $20.50 on October 12, 2017, ***a 37.7% decline***. Investors would suffer an additional 11.5% reduction in share value on November 30, 2017 when Helios finally filed its (inaccurate) financial statements required by Rule 8-04, which provided a more fulsome picture of MoviePass' losses prior to the Class Period. Defendants would amend these financial statements in February 2018, restating goodwill downward by ***12.8%*** and total liabilities upward ***39%***.

9. Defendants explained these risks away by proposing a novel operating strategy. According to Defendants the real money would be made through the Company's purported proprietary technology (i.e. Zone), "big data," and artificial intelligence platforms used to "analyze[] consumer trends, patterns and activities" that would bring "a significant technological

advantage to MoviePass and "completely disrupt[] the movie industry in the same way that Netflix and Redbox have done in years past." Helios purportedly would be able to "learn[] individual moviegoer's tastes and make[] recommendations based on recorded preferences for specific genres, actors and even the opinions of friends with similar likings."

10. Unbeknownst to investors, Defendants lacked the resources, knowledge, capabilities, and infrastructure to monetize data obtained from the MoviePass app. Prior to the merger, Lowe's business model for MoviePass focused exclusively on subscriber revenue. Likewise, Farnsworth and Benson had no experience in deriving revenue from data. Describing the Zone acquisition, *InvestorPlace* observed that "Turning subjective data into a useful, objective crime-fighting map is an art as much as it as a science, ***and it's an art HMNY hasn't practiced much***." Moreover, according to a former employee, MoviePass could not handle the exponential subscriber growth caused by the $9.95 per month fee. Due to the influx of customers, Helios had issues such as, among others: an inability to respond to customer inquiry emails (sometime falling months behand), allowing up to "two months" to pass before issuing customers their MoviePass card, an inability to process customer cancellations, and the creation of "phantom" MoviePass accounts that did not exist.

11. Helios also proposed to "attract a mass market," at which point the Company would be so large, and could wield such influence, that it could supposedly exact a percentage of movie exhibitors' ticket and concession sales. This Fyre Festival-esque "if you build it, they will come" business design was described by at least one analyst as "giving away dollars for quarters."[2]

---

[2] Available at, https://www.marketwatch.com/story/the-spectacular-rise-and-fall-of-moviepass-2018-07-09-101033943 (last visited April 3, 2018).

Defendants failed to disclose to shareholders that all of the major exhibitors already had implemented, or had plans to implement during the Class Period, their own subscription service—and thus, had no incentive or desire to partner with MoviePass. Accordingly, the Company's business plan was never viable, and statements Defendants made during the Class Period regarding their ability to cut deals with exhibitor partners were false and misleading.

12. Eventually, to pay for MoviePass operations, and despite Farnsworth's and Lowe's repeated assurances that the Company did not need to issue new equity, Helios would institute three best efforts offerings of common stock and warrants, as well as an At-The-Market offering in April 2018. Each time, the truth about Helios' cash burn was more fully revealed to the market and, thus, the Company's stock plummeted. The Class Period closed on July 27, 2018 when Helios announced that it had to issue an emergency demand note in the principal amount of $6.2 million because it was not able to make required payments to its merchants and processors, which led to a service interruption. This final partial disclosure left the Helios' share price trading at just $2.00 per share, ***post 250 for 1 reverse split***, down from a Company high of $32.90 on October 11, 2017. Accounting for a reverse split, most Class Period shares were worth less than a penny.

13. Plaintiffs' claims are also supported by other classic indicia of securities fraud including, but not limited to: three reductions to goodwill encompassing the Class Period (at least one specifically related to MoviePass), two separate restatements of financial records; an admission that the Company " did not maintain effective internal control over financial reporting . . .due to the existence of [a] material weakness" in its "accounting resources" for the period ending December 31, 2017; an investigation by the New York Attorney General; the curiously timed departure of insiders including one director and Defendant Benson; Defendants' prior

involvement with fraudulent schemes; and well-pled allegations regarding Defendants' excessive compensation.

14. Defendants caused Plaintiffs to lose essentially everything they invested in the Company as a result of their fraudulent conduct. Plaintiffs now seek damages.

## JURISDICTION AND VENUE

15. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, codified at 15 U.S.C. §78aa ("Section 27"). In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications, and the facilities of national securities exchanges. Helios trades in an efficient market on the NASDAQ.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Exchange Act Section 27 because many of the false and misleading statements were made in or issued from the Southern District of New York. Defendants conduct business and maintain offices in this District, and Helios is headquartered in this District, with its principal place of business located at 350 Fifth Avenue, New York, New York 10118.

## PARTIES

### I. PLAINTIFFS

18. Plaintiffs are members of the Helios and Matheson Investor Group, which was appointed Lead Plaintiff by the Court pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(3), on November 11, 2018.

19. Plaintiff George Hurst, as previously set forth in his certification supporting the Motion of the Helios and Matheson Investor Group for Consolidation of the Actions, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel, incorporated by reference herein, purchased Helios securities at artificially-inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

20. Plaintiff Marcus Washington, as previously set forth in his certification supporting the Motion of the Helios and Matheson Investor Group for Consolidation of the Actions, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel, incorporated by reference herein, purchased Helios securities at artificially-inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

21. Plaintiff Daniel Mercer, as previously set forth in his certification supporting the Motion of the Helios and Matheson Investor Group for Consolidation of the Actions, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel, incorporated by reference herein, purchased Helios securities at artificially-inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22. Plaintiff Juan Taveras, as previously set forth in his certification supporting the Motion of the Helios and Matheson Investor Group for Consolidation of the Actions, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel, incorporated by reference herein, purchased Helios securities at artificially-inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

23. Plaintiff Amit Katiyar, as previously set forth in his certification supporting the Motion of the Helios and Matheson Investor Group for Consolidation of the Actions, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel, incorporated by reference herein,

purchased Helios securities at artificially-inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

## II. DEFENDANTS

24. Defendant Helios is incorporated in Delaware and maintains its principal offices at the Empire State Building, 350 Fifth Avenue, New York, NY 10118. Helios' common stock trades or traded on the NASDAQ under the ticker symbol "HMNY." Helios describes itself as providing "high quality information technology, or IT, services and solutions including a range of technology platforms focusing on big data, business intelligence, and consumer-centric technology."

25. Defendant Farnsworth ("Farnsworth") has been the Company's Chief Executive Officer ("CEO") since January 20, 2017. Farnsworth joined the Company following Helios's merger with Zone Technologies, Inc. ("Zone"), now a wholly owned subsidiary. Farnsworth was the founder and CEO of Zone. After the merger, Farnsworth owned 29.7% of Helios' shares outstanding, and the Company's parent Helios and Matheson Information Technology Limited ("HMIT"), along with Muralikrishna Gadiyaram ("Gadiyaram") (co-founder and majority shareholder of HMIT), owned another 29.7%. Thus, together Farnsworth and Gadiyaram exerted total control over Helios.

26. Prior to Farnsworth's involvement with Helios, he racked up a notorious string of failed businesses that harmed consumers, creditors, and investors alike. In the 1990s, Farnsworth founded the "Psychic Discovery Network," which touted a nationwide network of psychics in TV advertisements, charging callers through a 900 number. A 1998 bulletin from the Federal Trade Commission warned about abusive pay-per-call services and listed the Psychic Discovery Network as one that had received more than fifty complaints. Three other ventures — XStream Beverage Network Inc., Purple Beverage Co., and vitamin marketing firm LTS (or "Live The Source") Nutraceuticals Inc. — went public while associated with Farnsworth. In each case, like here, share

values fell 99 percent within three years, rendering the value of each at less than $1 per share. Farnsworth was the CEO of XStream and Purple Beverage and the chairman of LTS.

27. In a 2001 lawsuit brought by a Florida man named Leonard Fellez against Farnsworth for unlawfully misappropriating Fellez's investment funds, Farnsworth misled Fellez into settling the litigation by offering shares in XStream which Farnsworth had touted as a thriving company positioned to capitalize on "the growing health and fitness craze." In fact, Farnsworth knew that XStream was not thriving and that it had a history of losses, an accumulated deficit and would incur significant future expenses. XStream shares' value eventually evaporated and Fellez was forced to abandon further pursuit of the action because financial hardship—caused by Farnsworth—had cost him his ability to pay his lawyers.

28. During the Class Period, Farnsworth made materially false and misleading statements and omissions in, *inter alia*, press releases, interviews, and executed documents filed by Helios with the SEC. Keeping to form with his previous ventures, such misstatements and omissions came at investors' expense.

29. Defendant Stuart Benson ("Benson") was the Company's Chief Financial Officer ("CFO") throughout the Class Period. Benson previously provided consulting services to the Company from September 2016 to November 2016. During the Class Period, Benson executed documents filed by Helios with the SEC containing false and misleading statements and omissions. On March 15, 2019, Helios announced that Defendant Benson resigned effective March 13, 2019.

30. Defendant Mitch Lowe ("Lowe") has been the CEO of MoviePass since June 2016. During the Class Period, Lowe made materially false and misleading statements and omissions, in *inter alia*, interviews and press releases. Lowe worked in step with Farnsworth throughout the Class Period. According to Farnsworth, "Mitch [Lowe] and I work together literally 24-7. We are

constantly in contact with each other every day. I handle the marketing and the financing side. Mitch handles all of the day to day operations and relationships with theatres." Previously, Lowe worked as an executive at Netflix, McDonald's, Redbox, and Quarterly Co.

31. Defendants Farnsworth, Benson and Lowe are collectively referred to as the "Individual Defendants."

32. The Individual Defendants, by virtue of their high-level positions at Helios, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at its highest levels. As such, they were privy to confidential, proprietary information concerning the Company and its business operations, growth, and financial condition. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

33. As senior executives at a publicly-held company with common stock registered with the SEC and traded on the NASDAQ, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Helios' publicly traded common stock would be based on accurate information. Each Individual Defendant violated these requirements and obligations during the Class Period.

34. As a result of their positions of control and authority as senior executives, the Individual Defendants were able to and did control the content of the SEC filings, press releases, and other public statements issued by Helios during the Class Period. Each Individual Defendant had the ability to correct the statements or prevent them from being released into the public sphere.

Accordingly, the Individual Defendants are responsible for the accuracy of the public statements detailed in this Complaint.

35. As a result of their positions of control and authority as senior executives, the Individual Defendants had access to adverse, undisclosed information about Helios' business, operations, financial statements, and internal controls through their access to internal corporate documents and conversations with other corporate officers and employees. The Individual Defendants knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Helios materially false and misleading.

36. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Helios' common stock by disseminating materially false and misleading statements and/or concealing adverse facts as alleged herein. This deception caused Plaintiffs and members of the Class to purchase Helios' common stock at artificially inflated prices.

## STATEMENT OF FACTS

### I. COMPANY BACKGROUND

37. Originally incorporated in 1983 under the name Software Ben-Tov, Inc., Helios describes itself as providing high-quality IT, services, and solutions, including a range of technology platforms focusing on big data, business intelligence, and consumer-centric technology. In reality, the Company mostly lacks substance. In 2017, when asked by Bloomberg to describe Helios' operations, Farnsworth could only offer that "they do . . . . ummm . . . oh gosh, I don't even know how to explain it to you. Big data. Crunching data." The Company is headquartered in New York City and has an office in Bangalore, India. Helios also purportedly has an office in Miami, Florida; however, Plaintiffs' investigation has been unable to find any evidence that such office exists.

38. One of the Company's principal investors is HMIT. Between 2001 and 2007, HMIT purchased five companies in the United States and India, one of which was the Company. HMIT acquired the Company in 2006 when it was known as The A Consulting Team, Inc. On January 30, 2017, Helios announced that it was to be renamed Helios and Matheson Analytics Inc., which is the name it presently uses.

39. HMIT started as a purported information technology service company in India. HMIT raised money by issuing "fixed deposits," pursuant to which depositors would lend HMIT money in exchange for HMIT issuing the depositors postdated checks, in an amount reflecting the sum lent by each depositor plus interest, that was meant to be cashed when the fixed deposit reached maturity.

40. In June 2014, however, HMIT simply stopped paying its debts, leading to civil lawsuits, investigations by police and regulators in India, and the arrest of three of HMIT's officers, including Gadiyaram (HMIT's co-founder, CEO, and majority shareholder) who was also a board member and "consultant" for Helios throughout the Class Period.

41. In October 2017, Gadiyaram and Helios formalized this dubious consultancy, pursuant to which Helios pays Gadiyaram fees of $18,750 per month in cash. According to the Company's Quarterly Report for the period ending September 30, 2017 filed on Form 10-Q, and the Annual Report for the year ending December 31, 2017 filed on Form 10-K, Gadiyaram's primary responsibilities were to provide "guidance to the Company and Zone relating to the further development of their respective businesses and technologies . . . ." However, as shown below, Zone would never derive ***any*** advertising revenue, and as a consequence Helios was forced to make an impairment to goodwill. Thus, Zone was not be "develop[ed]" and Gadiyaram's consultancy was a sham.

42. Another Helios employee involved in HMIT, Parthasarathy Krishnan ("Krishnan"), was affiliated with that entity for years and previously served as its Chief Technology Officer. He first became affiliated with HMIT in 2005, when HMIT bought his California-based consulting firm, Maruthi Consulting Inc. ("Maruthi Consulting"). Though Maruthi Consulting is based in the U.S., the State Bank of India accused HMIT of using Maruthi Consulting to siphon money out of India with the "evil intention of defrauding our bank." Krishnan was initially appointed as Helios's CEO before he was replaced by Farnsworth, in 2017. Krishnan is currently as the Company's Chief Innovation Officer.

43. In 2016, an Indian court ordered HMIT liquidated and slammed HMIT for making a "deliberate attempt to hoodwink" court orders. At the time the company was ordered liquidated, HMIT was the beneficial owner of over 75% of Helios' outstanding common stock. In May of 2018, HMIT was delisted from both of India's stock exchanges.

## II. PRIOR TO THE CLASS PERIOD HELIOS INCURS MOUNTING LOSSES

44. At the same time HMIT was facing the repercussions of defrauding its investors, Helios was itself poorly performing.

45. In November 2015 Helios temporarily faced delisting from the NASDAQ for failing to meet the minimum stockholders' equity required under NASDAQ Listing Rules.

46. Moreover, for the years ended December 31, 2016 and 2015, Helios reported growing net losses of $7,381,071 and $2,110,117, respectively. These losses were in no small part due to the Company's dwindling sales.

| Year | Sales | Earnings Per Share |
|---|---|---|
| 2013 | $13,291,095 | $0.06 |
| 2014 | $10,641,681 | $-0.08 |
| 2015 | $9,736,541 | $-0.91 |
| 2016 | $6,759,700 | $-2.74 |

47. For the fifty-two weeks ending August 4, 2017, Helios stock price was down 74.5% to $2.65 per share. As Wright Investors' Service, a prominent financial advisory firm, succinctly stated in a report dated August 7, 2017, "in recent years, this stock has performed terribly."

48. With a fraudulent parent company, a failing business, and the threat of being delisted, in July 2016, Helios signed a definitive agreement and plan of merger with Zone, a technology company being run by Farnsworth out of Florida. Zone, however, only added to Helios' financial troubles.

49. Specifically, at the time of the merger, Zone's primary business was developing RedZone Maps, "a real-time crime and navigation map application." While Zone was "fully functioning," it earned no advertising revenue from RedZone Maps and had $1.5 million in expenses from the start of 2016 until the acquisition. Nevertheless, on November 9, 2016, Helios completed its acquisition of Zone, which enabled Helios to satisfy certain NASDAQ listing requirements that allowed it to continue trading.

50. Following the Company's merger with Zone, Gadiyaram/HMIT and Farnsworth each controlled approximately 30% of Helios. While on the surface the merger with Zone gave the appearance that Helios was rebounding, in reality it was still floundering.

## III. A STALE AND CASH-STRAPPED HELIOS PIVOTS IN A NEW DIRECTION BY OBTAINING A MAJORITY INTEREST IN MOVIEPASS

51. By June 30, 2017, Helios had an accumulated deficit of $54,980,789, which included a net loss of $11,719,371 for the six months ended June 30, 2017 alone. To sustain the Company, on August 15, 2017, Helios entered into a Securities Purchase Agreement with MoviePass (the "MoviePass SPA"), pursuant to which Helios agreed to purchase 51% of MoviePass' common stock for an aggregate purchase price of up to $27,000,000. Upon the close of the MoviePass SPA, Helios had the option to purchase an additional 2% stake in MoviePass pursuant to certain convertible notes.

52. MoviePass is a Delaware corporation whose primary product offering is a movie theater subscription service in the United States that, at the time the MoviePass SPA was announced, allowed subscribers to see a new movie every day in theaters nationwide for a fixed monthly price. Once customers sign up for MoviePass online, they are prompted to download the MoviePass application on their smart phones and are then mailed a MoviePass debit card. Subscribers could purchase up to one movie ticket per day at ***any*** movie theater by swiping their debit card, or, where accepted, by using the MoviePass application.

53. Helios and MoviePass, at the same time that the two firms entered into the MoviePass SPA, also entered into a Second Amended and Restated Subordinated Convertible Note Purchase Agreement (the "NPA"), pursuant to which Helios would loan MoviePass $4,950,000 in cash in exchange for a subordinated promissory note in the principal amount of $5,000,000.

54. Additional terms (including payments by Helios) under the MoviePass SPA were predicated on MoviePass reaching certain milestones. Such terms include that:

- The Company would issue 3,333,334 Helios shares, worth $10,000,000, to MoviePass in connection with the closing of the transaction, 666,667 of which (twenty percent) were subject to forfeiture if: (i) MoviePass failed to have at least one day with 100,000 subscribers in the year following the closing; or (ii)

MoviePass failed to become listed on the NASDAQ or the New York Stock Exchange ("NYSE").

- The Company would issue MoviePass a promissory note in the principal amount of $10,000,000 funded by Helios in two installments of $5,000,000. The first installment would be paid by Helios on the 90th day following the Closing, and the second installment would be paid on the 180th day following the listing of MoviePass stock on the NASDAQ or the NYSE.

- If MoviePass subscriptions exceeded 150,000 on at least one day within fifteen months after the close of the transaction, then Helios would issue an additional 666,667 unregistered shares of Helios common stock for a total agreed upon value of $2,000,000.

55. In connection with the transaction, the parties also entered into a lock-up agreement, whereby MoviePass and Helios could not sell Helios stock from the date of the lock-up agreement until the later of one year from the date thereof or six months after the date on which MoviePass shares begin trading on the NASDAQ—an event that would never materialize.

56. Additionally, the MoviePass SPA provided that Lowe would be CEO of MoviePass and Farnsworth would be CEO of Helios. Further, Lowe would also be named as a member of Helios' board of directors.

57. Pursuant to a voting agreement (the "Voting Agreement") entered into by the parties in connection with the MoviePass SPA, the CEO of Helios would designate two directors to the MoviePass board of directors, while the MoviePass CEO would designate the three other directors. Although the Voting Agreement gave the veneer that MoviePass could operate somewhat independently of Helios, such was not the case due to terms in the MoviePass Inc. Investors' Rights Agreement (the "Investors' Rights Agreement") which was entered into at the same as the MoviePass SPA and the Voting Agreement.

58. The Investors' Rights Agreement was an agreement between Helios, MoviePass, and individuals or entities that had invested in MoviePass prior to the signing of the MoviePass

SPA. Pursuant to the Investors' Rights Agreement, MoviePass was not permitted, absent approval by Helios, to take certain actions, including:

- Altering provisions of its Certificate of Incorporation or bylaws
- Altering the authorized number of its shares of common or preferred stock
- Authorizing any new class of equity securities
- Hiring, terminating, or changing the compensation of any MoviePass executive officers
- Changing MoviePass' principal business, entering any new lines of business, or exiting any existing lines of business
- Entering into transactions valued in excess of $500,000

59. Despite becoming majority stockholder of MoviePass via the MoviePass SPA, between October 2017 and March 2018, Helios continued to take actions to increase its stock ownership of MoviePass. By March 8, 2018, Helios owned 91.8% of MoviePass' outstanding stock.[3]

60. Additionally, Defendants repeatedly told investors that the consummation of the MoviePass acquisition was contingent upon "[Helios'] stockholders['] [] approv[al] [of] the MoviePass Transaction." Indeed, the SPA stated that the following was a condition to closing the SPA: "Helios shall have held the Stockholders Meeting and the stockholders of Helios shall have approved the transactions contemplated by this Agreement . . . ." Following the announcement of the SPA, Helios filed many Schedule 14As with the SEC that stated "[t]his document relates to the MoviePass Transaction, which will become the subject of a proxy statement to be filed . . . ." In fact, Defendant Farnsworth falsely stated the following, in response to a question about whether

---

[3] In January 2018, MoviePass Ventures was formed as a wholly-owned subsidiary of Helios. MoviePass Ventures purportedly "aims to collaborate with film distributors to share in waterfall profits and ancillary revenues while using the data analytics MoviePass offers for marketing and targeting services for MoviePass' paying subscribers using the platform."

"the deal can fall through": "We already have that approved on both sides. We have to do the proxy, but we already have written consent from the majority of the shareholders. The attorneys already have it." Helios would correct Defendant Farnsworth's false statement, stating as follows:

> The last statement from Mr. Ted Farnsworth incorrectly said that HMNY has already received the written consent from the majority of the shareholders of HMNY. Rather, shareholders holding 49% of the outstanding shares of HMNY common stock as of August 15, 2017 agreed to vote in favor of the transaction with MoviePass. ***As of September 25, 2017, such shareholders hold approximately 37% of the outstanding shares of HMNY common stock as a result of subsequent issuances***.

61. As late as November 6, 2017, Helios stated in a press release that "The closing of the MoviePass Purchase Agreement remains subject to approval by HMNY's stockholders." Contrary to the Company's prior statements, ***Helios would never hold a shareholder vote on the MoviePass acquisition*** that closed on December 11, 2017. Helios, ostensibly, did not hold a shareholder vote knowing that they could never receive the requisite support in favor of acquiring a struggling MoviePass, which had been operated at a net loss in the years leading up to the acquisition, and then engaging in a nonsensical business strategy of subsidizing movie tickets for subscribers.

## IV. IMMEDIATELY FOLLOWING THE MOVIEPASS MERGER DEFENDANTS SLASH USER FEES IN A NO HOLDS BARRED EFFORT TO ENTICE NEW USERS

62. Immediately upon acquiring a majority stake in MoviePass, Defendants implemented changes that were guaranteed to cost the Company hundreds of millions of dollars. Helios cut the monthly MoviePass subscription from as much as $50 in the most expensive cities to a flat nationwide rate of $9.95. Consumers could now see a new movie *every day* in theaters nationwide for a monthly price of only $9.95—about $0.33 per film.

63. As claimed by Lowe, these changes—particularly, lowering the price of monthly subscription plans—were necessary because MoviePass "had to be a low price to attract a mass market."

64. Meanwhile, Helios was paying the full price of the ticket to theaters each time a subscriber viewed a movie. At the same time, the average price of a movie ticket nationally was approximately $9.00, and that figure grew to about $16.00 in denser population areas. According to the New York Times, in August 2017 movie tickets cost more than $23.00 in Manhattan. Thus, if subscribers in these areas saw just one movie every two months, Helios would still lose money.

65. The drastic cuts were a hit among consumers, with MoviePass surpassing 150,000 subscribers after only two days, thereby achieving a subscriber milestone which, under the terms of the MoviePass SPA, MoviePass had 15 months to achieve. At the time, Helios touted that theater seats filled by MoviePass for the six-day period leading up to August 20, 2017 increased in one theater chain by 2,000% and in a second theater chain by 884%.

66. After MoviePass dropped its monthly fee, the number of subscribers exploded. On December 20, 2017, MoviePass announced that it had increased its subscriber base by over 6500% since the introduction of its $9.95 per month pricing model in August 2017 and had surpassed over one million subscribers.

67. Over the next few months, MoviePass kept trumpeting its increasing subscriber base, announcing, in January 2018, that it had over 1.5 million subscribers, in February 2018, that it had over 2 million subscribers, and in June 2018, that MoviePass had surpassed 3 million subscribers.

68. Despite this unprecedented growth, Defendants took the drastic cuts even further. Indeed, in a press release annexed to a Form 8-K Current Report signed by Farnsworth and filed

by Helios with the SEC on November 17, 2017, the Company announced that it would be slashing MoviePass rates to just "$6.95 Per Month for a Limited Time Only" if customers were willing to sign up for a one-year subscription. The press release quoted Farnsworth as stating: "HMNY continues to be the biggest supporter of MoviePass™, as it outpaces any other movie theater subscription service and continues to disrupt the movie theater industry . . . We look forward to helping MoviePass™ continue to broaden its reach and modernize the movie theater industry."

69. Further, for a limited time from December 2017 to February 2018, MoviePass offered a one-year subscription through Costco Wholesale Corporation for a flat fee of $70, which equates to a mere $5.83 per month.

70. On March 23, 2018, Helios reintroduced its $6.95 per month promotion, claiming as inspiration that "MoviePass has gained momentum in diversifying its revenue streams . . . ." Despite the fact that MoviePass lacked enough "revenue streams" to even come close to breaking even at a $9.95 per month subscriber fee, Defendants reintroduced to $6.95 fee to artificially aggrandize the perception of Helios' operations and prospects.

71. As stated above, within four months of MoviePass' announcement of its $9.95 per month subscription plan in August 2017, MoviePass had over 1 million total paying subscribers, including those on either monthly or annual plans. To put this into perspective, other subscription-based services such as Spotify, Hulu, ClassPass, and Netflix achieved 1 million subscribers in 5, 10, 17, and 39 months, respectively.

72. This practice of slashing pricing, while quickly building a massive subscriber base, was guaranteed to fail and result in the substantial losses that MoviePass ultimately incurred.

## V. DEFENDANTS FALSELY PORTRAY THE MOVIEPASS TRANSACTION AS A BOON WHILE WITHOLDING VITAL INFORMATION FROM THE MARKET IN VIOLATION OF SEC RULES TO DRUM UP INVESTMENT

73. Although the decision to drop prices to $9.95 while offering subscribers a buffet of unlimited movies was an untenable disaster for shareholders, Lowe and Farnsworth repeatedly assured investors throughout the Class Period that they would profit from MoviePass subscription revenue alone, or, at worst break even.

74. For example, on August 15, 2017, after the MoviePass SPA was announced, Farnsworth and Lowe appeared on the "Mornings with Maria" show on Fox Business Channel hosted by Maria Bartiromo. Farnsworth effusively praised the Company's acquisition of MoviePass' management team, including Lowe, which he described as "building shareholder value" for Helios.

75. On August 16, 2017, Farnsworth and Lowe appeared on Fox Business Channel to be interviewed by anchor Gerri Willis and promote the transaction. Lowe touted the $9.95 price point Defendants had implemented as follows:

> **Lowe:** We have figured out a way to give people a deal they cannot believe we can even afford to give.
>
> **Willis:** Ya, because you lose money.
>
> **Lowe:** Ya—No, ***we actually don't***.
>
> **Willis:** How do you not lose money?
> (-- Farnsworth laughing --)
>
> **Lowe:** We have built a system that attracts a price point, that attracts people that only go three to six times a year. When they become a MoviePass subscriber they go to twice as many films –
>
> **Willis:** But that's still not very many.
>
> **Lowe:** -- than they did before. But it's, but it's the majority of the United States goes less often than six times a year.

76. Likewise on September 22, 2017, Farnsworth sat for an interview with Mark Gomes, a stock analyst who was doing business as Pipeline Data, LLC. The transcript of the interview was first published on the website Seeking Alpha. Farnsworth reiterated the Company line that subscriptions alone could turn a profit for Helios:

> **Mark Gomes:** How is the $9.95 pricing going to work within your business model?
>
> **Ted Farnsworth:** MoviePass has been around for 5 years, so we have a wealth of historical data. At $39, the average customer would go to 4 movies a month. At $29, the average dropped to 3 movies a month. When MoviePass went to $19, the average customer went to 2 movies a month. ***So we think we can be profitable on the subscriptions at $9.95*** . . .
>
> **Mark Gomes:** Talk to me about your market potential. 250 million people in the U.S. and Canada have been to a movie in the past year. About 27 million of those are frequent movie goers.
>
> **Ted Farnsworth:** Right. And about 60 million are "infrequent" movie goers. That will be our sweet spot. They go to the movies three to six times a year. Even if they double their consumption, ***we'll be profitable without all of our other revenue sources***.

77. While Defendants repeatedly misled investors into believing that acquiring MoviePass would be additive, or at worst cost-neutral, they simultaneously withheld known risks about MoviePass' operations and the prospects of the combined company so that the market would absorb their rosy misinformation. As Lowe would later admit in a post-Class Period February 6, 2019 interview with *The Ringer*: prior to the acquisition by Helios "***we [MoviePass] were going out of business***." This did not prevent Defendants from deceiving the public into thinking otherwise, and fraudulently disclosing MoviePass' dire financial condition for the first time ***months*** after the MoviePass SPA was first announced.

78. For example, Helios issued a false and misleading press release on August 15, 2017, in connection with the announcement of the MoviePass. In the press release, the Company purports that "[r]isk factors and other material information concerning HMNY" should be looked

for in the Company's "Annual Report on Form 10-K for the fiscal year ended December 31, 2016[.]" However, that Annual Report was filed with the SEC on April 14, 2017—***four months prior*** to the announcement of the MoviePass SPA—and does not speak about the transaction, or MoviePass' previous financial condition, whatsoever. Thus, the August 15, 2017 press release statements do not provide investors with all necessary risk factors and other information that would be material to them (in particular, that Helios had acquired a bankrupt company that it was going to have to bail out).

79. Moreover, the Company's insufficient disclosure was also noticed by the SEC during the Class Period. On October 3, 2017 the SEC filed a letter directed to Farnsworth inquiring about certain issues relating to the Registration Statement on Form S-3 the Company filed on September 15, 2017. Among these issues, the SEC noted that Defendants were in violation of Rule 8-04 of Regulation S-X as they had failed to provide investors with "target and pro forma financial statements in connection with [Helios'] acquisition of MoviePass Inc. in this registration statement." This was a part of pattern for the Defendants, as on July 27, 2016, the SEC had sent Helios a similar letter for violating Regulation S-X by failing to file financial statements for Zone in connection with the Company's acquisition of Zone. At the time Zone was acquired, Farnsworth was Zone's CEO and Benson was providing reporting services to Helios—thus, Defendants were aware of SEC rules at the time they announced the MoviePass SPA.

80. After close of business on October 11, 2017, when the Company's stock was trading at a record high, Helios filed a Current Report on Form 8-K with the SEC releasing additional (and incomplete) risk factors for the first time that sent the stock into free fall. Rather than claiming MoviePass would be profitable, Helios admitted that "MoviePass has incurred losses since its inception" and that it has "present need for additional funding." Although the 8-K did

not announce the extent of those losses, it went on to admit that "[t]hese factors raise substantial doubt about MoviePass' ability to continue as a going concern." Helios' stock wilted from $32.90 per share at close of business on October 11, 2017 to $20.50 per share at close of business on October 12, 2017, as 37.7% decline.

81. On October 12, 2017, after filing risk factors the day before, the Company, through Farnsworth, filed correspondence responding to the SEC's letter dated October 3, 2017. In its response, Helios tacitly admitted its failure to file appropriate financial statements with its Registration Statement. Thereafter, on November 30, 2017, the Company filed: audited financial statements of MoviePass Inc., as of December 31, 2016 and December 31, 2015; unaudited financial statements of MoviePass Inc as of September 30, 2017 and for the nine months ended September 30, 2017 and September 30, 2016; and unaudited pro forma condensed combined financial statements of Helios and Matheson Analytics, Inc., and MoviePass Inc.

82. According to the November 30, 2017 financial statements, MoviePass operated at losses of $4.2 million and $4.9 million for the entire years ended December 31, 2015 and 2016 respectively. Yet, for the nine months ended September 30, 2017, MoviePass was already operating at a net loss of $11.7 million—driven primarily by Defendants' reckless $9.95 per month pricing scheme.

83. Moreover, contrary to what Defendants would tell investors, MoviePass' revenue was not driven in any way by its technology, infrastructure, or vendor contracts. Rather, MoviePass' financial statements made plain that "[r]evenue is principally derived from subscription services." After these financial statements were finally released, informing investors that MoviePass' financial condition was far worse than represented, Helios' stock dropped 11.5%

from a closing price of $13.62 on November 30, 2017 to $12.06 at close of business on December 1, 2017.

84. On December 22, 2017, subsequent to the close of the MoviePass SPA on December 11, 2017, the SEC filed a letter directed to Benson addressing additional deficiencies with the financial statements that Helios filed on November 30, 2017. The December 22, 2017 letter specifically asked Benson to address the effect of the close of the MoviePass SPA on goodwill.

85. On February 9, 2018, the Company filed an amendment on Form 8-K/A to its Unaudited Pro Forma Condensed Combined Balance Sheet as of September 30, 2017 that Helios had originally filed (belatedly) on November 30, 2017. The amendment, among other corrections, ***restated*** the Company's goodwill from $92,558,842 downward to $80,710,226—a reduction of $11,848,616 or 12.8%. The amendment also ***restated*** its total liabilities upward from $87,883,924 to $122,575,121, a difference of almost $35 million and a change of over 39%.

86. That Defendants violated so many SEC rules and regulations was an inevitable consequence of the way that Helios was structured. On April 17, 2018 the Company filed its Annual Report, signed by Farnsworth and Benson, for the year ended December 31, 2017 on Form 10-K ("2017 Form 10-K") with the SEC. In the 2017 Form 10-K, Helios admitted that it "did not maintain effective internal control over financial reporting as of the period ended December 31, 2017" due to a lack of "accounting resources."

87. According to the 2017 Form 10-K, Defendants admittedly insufficient "accounting resources" involved issues related to: (i) insufficient full time senior level accounting personnel to provide proper monitoring and accounting oversight within the Company; (ii) insufficient full time senior level accounting personnel to monitor and provide accounting oversight for MoviePass

related transactions and activity; (iii) insufficient advice from third-party subject matter experts to aid Helios in identifying and applying Generally Accepted Accounting Principles rules; (iv) improper or nonexistent internal controls and policies to ensure compliance with established accounting policies; and (v) insufficient or nonexistent systems and technologies to ensure timeliness and reliability of financial data within the organization.

88. Helios' lack of "accounting resources" was admittedly related to "the acquisition of MoviePass Inc and the related financing arrangements." The Company further conceded that it "had inadequate monitoring controls in place related to its financial reporting, debt and equity related transactions and other management oversight procedures[.]"

89. The foregoing accounting improprieties and general managerial incompetence is the subject of a recently-filed action captioned *Dash v. Farnsworth et al.*, Case No. 1:19-cv-02863-JGK (filed on March 29, 2019). In that action, plaintiff alleges Defendants Farnsworth and Benson (and the remainder of the Company's board of directors) engaged in an unlawful scheme and course of conduct by which they:

> (i) caused H&M to issue materially false and misleading statements to its shareholders and the investment community about its true business metrics and financial prospects; (ii) caused H&M to operate with materially-defective accounting and reporting controls; (iii) thereby caused H&M common stock to trade at artificially inflated prices, exposing the Company to hundreds of millions of dollars in potential civil, regulatory and criminal liability to investors and regulators; (iv) caused H&M to severely dilute its common stock and to waste millions of dollars raising capital through improvident financial transactions calculated to facilitate Defendants' scheme to acquire and then fund the operations of H&M's majority-owned subsidiary MoviePass, Inc. ("MoviePass"), to the detriment of H&M, with the approval of its shareholders as suborned by Defendants through several false and misleading proxy statements; (v) ultimately required H&M to restate previously-issued financial results and to write down the value of MoviePass by tens of millions of dollars that has and will continue to damage its standing and credibility in the investment community for years, increasing its costs of capital; (vi) exposed H&M to tens of millions of dollars in legal and accounting fees to investigate this misconduct and to defend the Company in expensive to defend regulatory investigations and shareholder litigation; and (vii) caused H&M

to lose its public stock listing which erased all of all of [*sic*] its market capitalization.

## VI. DEFENDANTS PROMISE REVENUE GENERATION THROUGH A NOVEL DATA COLLECTION AND MARKET BUSINESS PLAN THAT HELIOS KNEW IT LACKED THE INFRASTRUCTURE, KNOWLEDGE, AND CAPABILITY TO IMPLEMENT OR SUSTAIN

90. In the 2017 Form 10-K, Helios' stated that its purported goal was that, once MoviePass increased its subscriber base, Helios would "deriv[e] revenue from sales of digital advertising and data analytics services to large movie studios."

91. Helios further claimed to investors that its purported goal was that MoviePass would "increase theater attendance, increase concession sales and drive subscribers to consume movie content in the theaters rather than at home." Then, by "partnering with ride-share companies, malls, local retailers and restaurants" MoviePass would "offer customers discounted experiences (in addition to the movie ticket) built around a night at the cinema." According to a September 14, 2017 Helios press release issued after close of business, "Helios and Matheson believes its technology stack combined with the MoviePass business model will transform the movie going experience and ***create great value*** for both companies."

92. MoviePass was also purportedly aiming to use integrated application technology to connect and direct consumers to exhibitors and drive theater attendance "by creating profitable partnerships." These "partnerships" would theoretically consist of profit-sharing deals on items like tickets and concessions that Helios would coerce exhibitors to agree to, because once MoviePass' subscriber base was large enough, Helios could drive customers to such exhibitor's theaters (or their competitors') by leveraging the Company's data and technology.

93. In other words, Defendants would purportedly use the MoviePass app to collect data on consumers' habits, including data on which movies people go to see, the genre of the movie, and the times of such movies. MoviePass would then use "artificial intelligence,

algorithms, and machine learning" through its app, as well as emails, to advertise movies catered to each individual's viewing habits, thereby influencing consumers to view and attend movies that they otherwise would not. In turn, this would generate more ticket and concession sales for theaters from the increased theater attendance. Similarly, restaurants would receive an increase in business as a result of advertisements directing consumers to such restaurants. Defendants represented that they would be able to obtain agreements with theaters and restaurants to receive a cut of their sales as a result of this increased business.

94. According to Lowe, MoviePass' "bigger vision is to build a night at the movies" whereby MoviePass would direct subscribers to places to have dinner before or after a screening, for instance, getting a cut from vendors. Additionally, Lowe outlined additional data that MoviePass was seeking to collect, stating:

> We get an enormous amount of information. Since we mail you the card, we know your home address, of course, we know the makeup of that household, the kids, the age groups, the income. It's all based on where you live. It's not that we ask that. You can extrapolate that. Then because you are being tracked in your GPS by the phone, our patent basically turns on and off our payment system by hooking that card to the device ID on your phone, so we watch how you drive from home to the movies. We watch where you go afterwards, and so we know the movies you watch. We know all about you. We don't sell that data. What we do is we use that data to market film.

95. As shown below, this purported business plan was never possible.

## VII. DEFENDANTS' PURPORTED BUSINESS MODEL COULD NOT BE SUCCESSFUL BECAUSE THE COMPANY WAS SUFFERING EXORBITANT LOSSES AND LACKED THE INFRASTRUCTURE TO ACTUALLY IMPLEMENT SUCH A PLAN

### A. The Rapid Increase In Subscription Plans Cause Tens of Millions of Dollars In Losses Each Month That, Despite Defendants False Statements to the Contrary, Could Not Be Sustained

96. Despite Defendants' claims to the contrary and their hyping of this supposed "plan" as the future of the movie industry, Defendants knew they did not have the money, knowledge, or

capabilities to execute a successful plan. Indeed, even if the goal were somehow attainable (it was not), the business model would still barely turn a profit.

97. Indeed, the Company's independent auditors included an explanatory paragraph in its Annual Report for the year ended December 31, 2017, indicating that there was substantial doubt as to the Company's ability to continue as a going concern. These concerns were based on the significant net losses and working capital position of the Company.

98. For the year ended December 31, 2017, Helios reported an accumulated deficit of $189,495,185 and a net loss of $150,824,842. This was an increase of $143,443,771 over the net loss of $7,381,071 that Helios reported for the year ended December 31, 2016. Helios' 2017 performance was even more staggering considering that MoviePass' net loss for the year ended December 31, 2016 was only $4,916,326.

99. Yet despite this unsustainable business plan, Defendants Lowe and Farnsworth repeatedly contradicted themselves and statements made by Helios and its auditors, in an effort to tout an unrealistically rosy outlook for the Company.

100. On January 9, 2018, Farnsworth and Lowe were interviewed on Yahoo! Finance Live: The Final Round. During the show Farnsworth promised viewers that MoviePass would be profitable by March 2018, stating as follows:

> **Farnsworth:** We're thrilled because MoviePass within the next sixty days should be self-sufficient on its own.
>
> **Host:** Wait. Sixty days it's going to be cash flow neutral?
>
> **Farnsworth:** Ya, like self-sufficient where you are not going through cash flow.
>
> **Host:** Like, they're [MoviePass] not going to be going through cash in sixty days?
>
> **Farnsworth:** Right.

101. In April 2018, Farnsworth assured investors that:

> Since day one, people have been saying we'll run out of money . . . ***I assure you that capital is not an issue. I'm sitting on hundreds of millions of dollars of dry powder, and I've got bankers and debt-financing companies calling me all the time***. They know they're looking at an Uber or an Airbnb. ***This is a unicorn company***.

102. Farnsworth also assured investors that "[u]sage was even lower than we anticipated" and that Helios "can be profitable on the subscriptions at $9.95." Thus, investors were led to believe that losses sustained were expected and were actually lower than anticipated, were part of the business plan, that Helios had cash on hand to cover such losses, and investors had no need to worry.

103. On March 23, 2018, Helios reinforced this belief by dropping the monthly subscription price in November 2017 and March 2018 from $9.95 to $6.95 per month, paid annually. The already mounting losses from subscriptions would only worsen. However, the Individual Defendants routinely reassured investors that customer usage would not negatively affect the Company negatively.

104. For example, on October 13, 2017, Lowe appeared on the CNBC program "Power Lunch" and claimed that "we're not in the gym membership type business. We actually want you to go a lot to the movies." Lowe returned to the same program on January 16, 2018. When asked if Helios wanted subscribers in large metropolitan areas like New York, where tickets are more than $9.95 a month, to see less than one movie per month he responded "not at all. We want people to go ***at least*** once a month." As set forth below, April 12, 2018 Lowe told Yahoo! Finance reporter David Pogue that heavy users were "more valuable" to Helios than infrequent users:

> **"Pogue:** But I'm confused about that, because every time someone goes to a movie, you're losing more money. Don't you secretly prefer people who *don't* use the card as often?
>
> **Lowe:** They [the people who see a lot of movies] become more valuable to us."

(Emphasis in original).

105. Eventually, Defendants would take certain actions evidencing that these statements were simply not true. For example, on April 13, 2018 Helios announced that it was raising its monthly price to $29.95 and only offering subscribers the ability to see four movies a month (albeit with a complimentary three-month access to iHeartRadio)—completely abandoning the all-you-can-eat $9.95 plan. When asked by The Hollywood Reporter whether the movie-per-day-plan would return Lowe replied, "I don't know."

106. After the close of the Class Period on July 31, 2018, the Company announced a return to the unlimited plan but raised the price to $14.95 and restricted access to movies that were at least two weeks old. Given the close proximity between Defendants' corrective actions and their prior statements to investors touting the $9.95 unlimited plan's additive value, it is obvious that such prior statements were false when made.

### B. Defendants Did Not Have the Technology or Capabilities to Gather, Let Alone Analyze Data

#### 1. Defendants Did Not Have Expertise to Mine Data Profitably

107. Despite its unsustainable business plan, Helios assured investors that the price of MoviePass was not where the real revenue would be made; rather, the money was in the data that it would collect and analyze. In truth, however, Helios lacked the skills, knowledge, experience, and capability to do this.

108. Critically, neither Helios nor MoviePass had any pre-merger experience or expertise in data mining. Prior to its acquisition of Zone, Helios provided IT services and solutions and did not participate in any data collection or analysis. In fact, when discussing Helios' data analytics experience, Farnsworth stated that "For many years, HMNY has been focused on data analytics, and ***in that capacity we own assets like Zone Technologies*** . . . ."

109. Yet, Zone's only related experience is the use of RedZone Maps. RedZone Maps, a navigation app that generated routes using crime data from local police, government and users, was being developed as an application intended to operate on advertising revenue. The RedZone app, itself, was a rip-off of a now defunct app called SketchFactor.[4] This is a far cry from data mining millions of users' data. In fact, as reported by *Business Insider*, the RedZone app has not been updated since April 2018 and does not function as intended.[5] On top of that, Zone did not earn ***any*** revenue from advertising through the RedZone app.

110. Even before the Zone acquisition was complete, on June 8, 2016, an analyst writing for *InvestorPlace* released an article titled "Helios and Matheson Analytics Inc: A Two-Day Ten-Bagger or Mirage?" This article questioned the motivation behind the Zone acquisition stating "a ***near-delisted*** [Helios] needed Zone Technologies ***a lot more*** than Zone Technologies needed Helios." The article went on to highlight that Helios had ***no experience*** in analyzing data stating:

> Be that as it may, even in the unlikely event the merger will cost Helios and Matheson little more than a song, ***this is still brand-new territory for the company***. ***Turning subjective data into a useful, objective crime-fighting map is an art as much as it as a science, and it's an art HMNY hasn't practiced much***.

111. Indeed, on April 17, 2018, the Company announced a $6.3 million impairment to goodwill—with $4.6 million ascribed to the lack of revenues derived from the RedZone app and Helios' inability "to secure contracts with customers," and the remainder ascribed to the "net book value of trademarks and broker relationships associated with the Zone acquisition."

---

[4] Available at, https://www.newsweek.com/new-app-identifying-crime-hotspots-will-come-uk-444493 (last visited April 3, 2019).

[5] Available at, https://www.businessinsider.com/helios-matheson-to-spin-off-moviepass-into-separate-company-2018-10 (last visited April 3, 2019).

112. Moreover, Defendants' own statements during the Class Period misleadingly suggest (without explicitly informing investors one way or the other) that RedZone Maps was still in the design phase, and not operational. For example, in the Registration Statement that Helios filed on the SEC on September 15, 2017, and signed by Farnsworth, the Company stated that, "[w]e believe that the technology ***we are developing*** for Zone, including facial recognition and mapping, can enhance the MoviePass business model." Further, as of its 2017 Form 10-K, Helios warned that it would still have to invest "significant amount of time and money in developing and monetizing the RedZone app." Thus, despite its representations to the contrary, Helios had no history or ability to generate revenue from the use of data.

113. MoviePass similarly lacked the ability to collect or mine consumer data. Prior to being acquired by Helios, MoviePass' sole business strategy was to sell subscriptions to its service. Aside from conclusively stating that Helios intended to collect and analyze consumer data, there is not a scintilla of evidence that Helios or MoviePass had the knowledge, tools, or capabilities to do what Defendants claimed.

**2. Defendants Did Not Have the Infrastructure to Mine Data Profitably**

114. Contrary to Defendants public statements and unbeknownst to investors, Defendants were not equipped to handle the unprecedented growth in subscriptions. When MoviePass prices were slashed, the program exploded from roughly 20,000 to more than 3 million subscribers. This caused technological issues which Defendants lacked the appropriate technology, staff and experience to handle. In fact, on the day that the MoviePass SPA was announced, MoviePass' website crashed and was inaccessible to users. As early as December 2017 MoviePass was rated "F" by the Better Business Bureau due to hundreds of complaints that the business rating service had received from customers dissatisfied with MoviePass' service. As

of the filing of this pleading, that "F" rating has not changed and the amount of complaints sent to the Better Business Bureau regarding MoviePass has exceeded 3,000.

115. The explosion in subscriptions after the announcement of the MoviePass SPA laid bare the simple reality that MoviePass was not capable of handling so many subscribers, let alone mining and analyzing their data. Indeed, a former Customer Experience Representative who worked at MoviePass' headquarters in New York City from October 2017 to March 2018 tasked with customer inquiries, including customer complaints, subscription cancellation requests, refunds, and any problems with the MoviePass card ("CW1") recounted numerous technological issues with the MoviePass app.

116. As CW1 explained, MoviePass customers could communicate with MoviePass' customer service team by using a chat feature on the MoviePass application or by email. In January 2018, MoviePass added a phone number that customers could call; however, MoviePass' customer service functions for such calls were outsourced to a third party.

117. CW1 stated that there was only a total of twelve people employed at MoviePass on the customer service team to handle the incoming inquiries. On average, CW1 worked on 60 to 100 customer inquiries each day during its six to eight-hour shifts. CW1 further described the multiple issues that confronted the increase in subscribers and MoviePass' inability to handle the increase in the size of its subscriber base.

118. For instance, CW1 explained that MoviePass had a "huge" backlog of customer inquiries, especially emails, which made it difficult for MoviePass' customer service department to respond in a timely manner. Throughout the Class Period, many inquiries were months old before MoviePass was able to respond to them. When CW1 left in March 2018, the customer

service department was still addressing inquiries from December 2017. This backlog was a result of the volume of subscriptions.

119. CW1 also explained that MoviePass received inquiries regarding a number of problems with the MoviePass app. As the subscription rate substantially increased, "a lot" of the inquiries CW1 and CW1's team received were from customers who had not received their MoviePass card. These problems were corroborated by independent reporting outlets such as Forbes.[6] MoviePass used a third party to issue the cards and there were frequently problems with the delivery address.

120. Even if there were no problems, CW1 explained that it would take up to two months for a consumer to receive the subscription. This figure was far in excess of the "2-3 week delay in card delivery" that MoviePass told subscribers to expect. Although the delay would ebb some, by the time CW1 left, CW1 reported the wait time was still carrying on for about ten days to two weeks. As explained below, the response time was so long that customers were forced to contact their credit card companies and banks or send multiple inquiries to MoviePass in hopes of receiving a response to their inquiries.

121. CW1 explained that inquiries regarding cancellations were also common and, in fact, became more common as time passed. CW1 explained that customers were supposed to be able to cancel their accounts within the MoviePass application, but that the application did not always work correctly, resulting in customers contacting customer service to cancel their account.

---

[6] *See* Forbes, *MoviePass Bungles Its First Big Test With Subscribers to Its $9.95/Month Service*, available at https://www.cinemablend.com/news/2310651/moviepass-is-apparently-having-some-serious-customer-service-problems (last visited April 3, 2019).

However, because of the months-long backlog of customer complaints, customers often were not able to communicate with anyone from MoviePass' customer service department for months, with the result that customers would sometimes dispute MoviePass charges with their credit card company or banks instead.

122. Even if a customer was able to successfully cancel his or her subscription, CW1 explained that customers were occasionally charged for one additional month because the payment system was not always properly synced with the cancellation feature in the MoviePass application.

123. According to CW1, customers would often send letters to cancel their accounts because there was such a delay in hearing from the customer service department. CW1 explained that customers thought the letters might receive more attention. CW1 explained that duplicative complaints by consumers often delayed the customer service team since the issue may have already been addressed by the time a representative was reading the second complaint.

124. CW1 further stated that MoviePass would accidently open multiple accounts for some customers and bill the customers separately for each account. CW1 explained that this was sometimes caused by problems with the MoviePass application. Occasionally, when a customer entered the incorrect data, such as a slightly incorrect email, the MoviePass application would create a "phantom" account for the same person. A phantom account could also be created if a customer hit the "submit" button more than once. MoviePass did not have a "real way" to track the phantom accounts, could not detect slight discrepancies in applications, and generally MoviePass would only address the issue when customers reached out to complain that they were being charged twice. In the case of one customer, eight accounts had inadvertently been created.

125. CW1 further explained that the app would experience outages. When this occurred, CW1 would receive a "significantly higher number of inquiries." Prior to CW1's employment

with MoviePass, CW1 was informed that when the company first started offering $9.95 subscriptions the site crashed. During CW1's employment, there were additional "outages" where the MoviePass app did not work. For example, CW1 explained that app would not show movie times or money was not transferred to the customer's card when it should have been. This often resulted in customers purchasing their own movie tickets, which MoviePass then reimbursed as long as the customer sent a photo of the ticket stub. According to CW1, this was the most common reason customers requested refunds. CW1 noted that when it came to refunds, MoviePass was "cavalier" and assigned no "urgency" to issuing them. CW1 was informed there was also an outage after CW1's departure in July 2018.

126. Due to these numerous issues, CW1 was originally told to report bugs to the "development team." CW1 recalls, however, that in January or February of 2018, CW1's team was told to not "bother" with reporting bugs because the Head of Product was working on "something else."

127. The foregoing deficiencies with MoviePass has culminated in two consumer class action complaints—one filed in this District, captioned *Weinberger et al., v. MoviePass Inc.*, Case No. 1:19-cv-01039-DAB (the "*Weinberger* Action") and the second filed in the Northern District of California, captioned *Tabas et al., v. MoviePass Inc., et al.*, Case No. 3:18-cv-7087-DMR (the "*Tabas* Action"). The Class Action Complaint filed in the *Weinberger* Action alleges that MoviePass engaged in a deceitful "bait-and-switch scheme" to the detriment of its subscribers. The *Tabas* Action alleges, *inter alia*, that Helios "made it virtually impossible for consumers to resolve any concerns" and that MoviePass "fails to make itself available by any means to resolve consumer complaints and either ignores them or waits some time before responding, at which point the response is generic saying nothing responsive to the particular complaint at hand and giving

no hint as to what a consumer should do next to resolve the issue." *See Tabas* Action, Dkt. No. 30 at ¶18.

**C. Movie Theaters Had No Incentive to Pay MoviePass**

128. Theaters and competitors had no incentive to pay MoviePass as Defendants promised. In fact, the CEO of AMC Entertainment Holdings ("AMC"), which holds the largest share of the American theater market, made it clear early on that AMC movie theaters would play no part in the MoviePass scheme. On August 15, 2017, the very same day Defendants announced the MoviePass SPA, AMC issued a press release announcing that MoviePass customers were "Not Welcome Here" and that it was "consulting with its attorneys" to see if there was possible action that could be taken to prevent MoviePass from being used at AMC theaters. The AMC release further announced that "AMC will not be able to offer discounts to MoviePass in the future, which seems to be among their aims."

129. Further, in a November 6, 2017 earnings call, AMC CEO Adam Aron unequivocally stated:

> I would point out that [MoviePass is] charging $9.95 per month for an unlimited number of movies, one per day, I guess, that's the limit. But for one per day, a full month's worth of potential movies, and yet in September, MoviePass paid AMC, according to our records, $11.88 for each and every ticket that it purchased for our mutual guest. That's quite a gap, $9.95 a month versus $11.88 a visit. I must point out that's very gracious of them and we appreciate their business, but I think ***it's also important to make clear that despite claims they've made to the contrary, AMC has absolutely no intention, I repeat no intention, of sharing any – I repeat, any, of our admissions revenue or our concessions revenue with MoviePass.***

130. AMC was particularly hostile, dismissing MoviePass as a "fringe player" when MoviePass revised its prices. AMC even went so far as to ask Mastercard (MoviePass' debit card was associated with Mastercard) to determine whether MoviePass was in compliance with Mastercard's terms of service. While Regal Entertainment Group ("Regal") and Cinemark Holdings, Inc. ("Cinemark") were less openly hostile to MoviePass, they were clear that they were

unwilling to work with MoviePass. In fact, these theaters, as well as many others, already had their own loyalty programs that offered discounts to entice consumers.

131. For instance, AMC Stubs is a loyalty program offered by AMC Entertainment Holdings Inc. with approximately 10.8 million household members. AMC Stubs was launched in July 2016, long before Helios decided to acquire MoviePass. Through AMC Stubs, moviegoers can join either as a basic member for free or a premiere member for $15. The basic membership offers free popcorn refills, up to a $2 discount on tickets on Tuesdays, $5 rewards for every 5,000 points (points are earned at a rate of 20 points for every $1 spent), waived online ticket fees and free popcorn on the member's birthday. Premiere members receive a $5 discount on tickets on Tuesdays, earn 100 points for every $1 spent, and receive all the other benefits that come with the basic membership.

132. Regal also offers a loyalty program with approximately 14 million active members called the Regal Crown Club. The program only has one membership option and is free to join. Regal Crown Club members earn credits for every $1 they spend on movie tickets and at concession stands. Points can be redeemed for rewards via the use of a physical card or a virtual card with Regal's mobile application. Rewards include, but are not limited to, free concession items, merchandise, and movie tickets.

133. On December 5, 2017, Cinemark launched Movie Club. Movie Club is a monthly subscription plan that allows subscribers to buy one movie ticket a month for a discounted price of $8.99. Members of Movie Club can roll over unused tickets from month to month and receive a 20% discount on items bought at concession stands. Movie Club membership is only valid at Cinemark theaters.

134. Accordingly, theaters advised Defendants that they were unwilling to work with MoviePass and/or already had their own loyalty programs.

## VIII. DEFENDANTS ENGAGED IN DILUTIVE STOCK AND WARRANT SALES TO PAY FOR THE COMPANY'S MASSIVE LOSSES

135. Because MoviePass' "business plan" was not viable and simply burned cash, Helios and MoviePass repeatedly had to hunt for new sources of funding. To that end, despite Defendants' assurances to the market that the Company would be "profitable" or "cash flow neutral" on subscription sales alone, Helios was forced to turn to the stock market and started issuing a tremendous amount of stock to raise additional funds. As demonstrated in the chart below, between September 25, 2017 and August 14, 2018 (i.e., the majority of the Class Period), Helios saw its outstanding shares increase 6685%:

| **Shares Outstanding** | |
|---|---|
| **Date** | **Number of Outstanding Shares** |
| September 25, 2017 | 9,385,795 |
| January 9, 2018 | 23,981,253 |
| April 11, 2018 | 52,996,631 |
| June 29, 2018 | 249,870,588 |
| August 14, 2018 | 636,867,521 |

136. On August 16, 2017, the Company issued three Senior Secured Convertible Notes (the "August 2017 Notes") in the aggregate principal amount of $10,300,000 and a 5-year warrant for the purchase of 1,892,972 shares of the Company's common stock at an exercise price of $3.25 per share to an unknown investor for consideration consisting of $220,000 cash and a secured promissory note payable by the investor to the Company in the principal amount of $8,800,000.

137. The August 2017 Notes carried a maturity date of April 16, 2018 and the Investor Warrant an expiration date of April 16, 2022.

138. Further, immediately prior to the closing of the transaction, the investor prepaid (i) $5,000,000 issued as payment with respect to the purchase price of certain secured senior convertible notes issued by Helios to the investor pursuant to a Securities Purchase Agreement dated February 7, 2017, and (ii) $230,000 issued as payment with respect to the purchase price of certain secured convertible notes issued by Helios to the investor pursuant to a Securities Purchase Agreement dated December 1, 2016.

139. Each of these agreements with the investor worked in concert to ensure that the Company had on hand the $5 million it had agreed to pay to MoviePass within 90 calendar days of the closing of the transaction.

140. On November 6, 2017, the Company issued two Senior Secured Convertible Notes (the "November 2017 Notes") in the aggregate principal amount of $100,000,000 to certain unnamed institutional investors.

141. The November 2017 Notes consist of a Senior Secured Convertible Note in the amount of $5,000,000 and a Series B Senior Secured Convertible Note in the amount of $95,000,000 in exchange for an upfront cash payment of $5,000,000 and a senior secured promissory note of $95,000,000 to aid in the funding of the acquisition of the MoviePass shares.

142. On December 12, 2017, the Company announced that it commenced a best efforts public offering of common stock and warrants (the "December 2017 Offering"). On December 13, 2017, the Company disclosed the terms and pricing of the December 2017 Offering, including that Helios intended to use the proceeds to, among other things, "support the MoviePass operations."

143. In the December 2017 Offering, Helios offered an aggregate of 8,261,539 Series A units, with each Series A Unit consisting of (i) one share of the Company's common stock, and

(ii) one Series A Warrant to purchase one share of Common Stock; and (B) 969,230 Series B units, with each Series B Unit consisting of (i) one pre-funded Series B Warrant to purchase one share of Common Stock and (ii) one Series A Warrant, with anticipated gross proceeds of approximately $60 million, before deducting underwriting discounts and commissions and estimated offering expenses payable by the Company.

144. Helios offered the Series A and Series B Units at a price of $6.50 per Unit. The shares of common stock and the Warrants were issued separately. The Series A Warrants will be initially exercisable on the first trading day following the one-year anniversary of the date of issuance and will expire five years from the date such Series A Warrants are first exercisable at an exercise price of $7.25 per share. The Series B Warrant will be exercisable at any time on or after the issuance date until the five-year anniversary of the date of issuance at an exercise price of $6.50 per share.

145. The December 2017 Offering was made pursuant to a shelf registration statement filed on Form S-3, which was declared effective by the SEC on September 30, 2016 and the related registration statement filed on December 13, 2017 in accordance with Rule 462(b) of the Securities Act of 1933, as amended. A preliminary prospectus supplement and the accompanying prospectus relating to the December 2017 Offering was filed with the SEC on December 12, 2017, and a final prospectus supplement and the accompanying prospectus relating the Offering was filed with the SEC on or about December 13, 2017.

146. On January 11, 2018, pursuant to a securities purchase agreement entered into by the Company and an unspecified investor, Helios sold and issued senior convertible notes in the aggregate principal amount of $60,000,000, consisting of (i) a Series A-1 Senior Bridge Subordinated Convertible Note in the aggregate principal amount of $25,000,000 and (ii) a Series

B-1 Senior Secured Bridge Convertible Note in the aggregate principal amount of $35,000,000 for consideration consisting of (i) a cash payment in the aggregate amount of $25,000,000, and (ii) a secured promissory note payable by the investor to the Company in the aggregate principal amount of $35,000,000.

147. The funds received by the Company from this note were, first and foremost, earmarked for increasing the Company's ownership interest in MoviePass.

148. Like the notes before it, the January 2018 Senior Convertible Notes provided the buyer the option to convert the debt into shares of the Company's common stock at any time after the Company received approval of its stockholders for the issuance of the shares at a conversion price of 411.44 per share.

149. On February 12, 2018, the Company announced that it commenced a best efforts public offering of common stock and warrants (the "February 2018 Offering"). On February 13, 2018, the Company disclosed the terms and pricing of the February 2018 Offering, including that Helios intended to use the proceeds for certain purposes, including "to support the operations of MoviePass or MoviePass Ventures, LLC[.]"

150. The February 2018 Offering was made pursuant to the Company's Registration Statement filed on January 25, 2018 on Form S-3, which was declared effective by the SEC on February 9, 2018. A preliminary prospectus supplement and the accompanying prospectus relating to the February 2018 offering was filed with the SEC on February 12, 2018, and a final prospectus supplement and the accompanying prospectus relating the February 2018 Offering was filed with the SEC on February 14, 2018.

151. In the February 2018 Offering, Helios offered an aggregate of 7,425,000 Series A-1 units, with each Series A-1 Unit consisting of (i) one share of the Company's common stock,

and (ii) one Series A-1 Warrant to purchase one share of Helios common stock; and 11,675,000 Series B-1 units, with each Series B-1 Unit consisting of (i) one pre-funded Series B-1 Warrant to purchase one share of common stock and (ii) one Series A-1 Warrant, with anticipated gross proceeds of approximately $105 million, before deducting underwriting discounts and commissions and estimated offering expenses payable by the Company.

152. Helios offered the Series A-1 and Series B-1 Units at a price of $5.50 per Unit. The shares of common stock and Warrants were issued separately. The Warrants were exercisable at any time on or after the issuance date until the five-year anniversary of the issuance date. Each Series A-1 Warrant was exercisable at a price of $6.50 per share of common stock. Each Series B-1 Warrant had an aggregate exercise price of $5.50 per share of common stock.

153. On April 18, 2018, the Company announced an At-The-Market (ATM) common stock offering that would severely dilute share value (the "April 2018 ATM Offering"). Pursuant to the April 2018 ATM Offering, Helios would offer and sell shares of its common stock having an aggregate value of up to $150 million for purposes including "to support the operations of MoviePass or MoviePass Ventures, LLC[.]"

154. Under the ATM equity offering sales agreement, the Company was permitted to sell common stock by means of ordinary brokers' transactions, in privately negotiated transactions, or otherwise, at market prices prevailing at the time of sales, prices related to prevailing market prices, or negotiated prices. Five percent of all sales were paid to the Company's sales agent—Canaccord Genuity LLC.

155. Thus, in addition to pressure from sellers and short positions, Helios itself created selling pressure by actively diluting its own stock. The lower the price dipped, the more shares

the Company sold to maintain levels of proceeds necessary to offset bleeding losses, which only diluted Helios' stock faster.

156. The April 2018 ATM Offering was made pursuant to the Company's Registration Statement filed on January 25, 2018 on Form S-3, which was declared effective by the SEC on February 9, 2018.

157. On April 18, 2018, the Company also announced that it commenced a best efforts public offering of common stock and warrants (the "April 2018 Best Efforts Offering"). On April 19, 2018, the Company disclosed the terms and pricing of the April 2018 Offering, including that Helios intended to use the proceeds for purposes including "to support the operations of MoviePass or MoviePass Ventures, LLC[.]"

158. The April 2018 Best Efforts Offering was made pursuant to the Company's Registration Statement filed on January 25, 2018 on Form S-3, which was declared effective by the SEC on February 9, 2018. A preliminary prospectus supplement and the accompanying prospectus relating to the Offering was filed with the SEC on April 18, 2018, and a final prospectus supplement and the accompanying prospectus relating the Offering was filed with the SEC on April 20, 2018.

159. In the April 2018 Best Efforts Offering, Helios offered an aggregate of 10,500,000 Series A-2 units, with each Series A-2 Unit consisting of (i) one share of the Company's common stock, and (ii) one Series A-2 Warrant to purchase one share of common stock; and 500,000 Series B-2 units, with each Series B-2 Unit consisting of (i) one pre-funded Series B-2 Warrant to purchase one share of common stock and (ii) one Series A-2 Warrant, with anticipated gross proceeds of approximately $30 million, before deducting underwriting discounts and commissions and estimated offering expenses payable by Helios.

160. The Company offered the Series A-2 and Series B-2 Units at a price of $2.75 per Unit. The shares of common stock and Warrants were issued separately. The Warrants were exercisable at any time on or after the issuance date until the five-year anniversary of the issuance date. Each Series A-2 Warrant was exercisable at a price of $3.00 per share of common stock. Each Series B-2 Warrant had an aggregate exercise price of $2.75 per share of common stock.

161. By May 2018 the Company was growing desperate for funds. Indeed, on May 8, 2018, Helios filed a Current Report on Form 8-K stating, "we will need proceeds" from its stock offerings "starting in May 2018." Despite this state of affairs, Farnsworth reported on or about May 13, 2018 that he was "not worried at all" about the company's cash situation and boasted that Helios had "become a serious threat" to AMC Theaters. He stated that Helios had "$300 million" available from an "equity line of credit" and that "we've got 17 months' worth of cash without further raises of capital." The Company's share price rose from $0.65 at close of business on May 11, 2018, to $0.68 at market close on May 14, 2018 on heavy trading volume.

162. Lowe, on behalf of the Company, would subsequently concede that Farnsworth had misrepresented Helios' financing options. On or about May 24, 2018, Lowe told *Business Insider* that what Farnsworth referred to as an "equity line of credit" was in fact an ATM offering.

163. Farnsworth's misrepresentation was notable due to a number of irregularities it posed. First, prior to his comments on May 13, 2018, the only ATM offering the Company had announced was the April 2018 ATM Offering which was limited to selling shares of common stock with aggregate value of up to $150 million. Thus, Farnsworth's "$300 million" figure apparently signaled a desire by Helios to extend the size of its ATM offering—even though the Company had not previously disclosed that desire to investors.

164. Second, according to Lowe, the $300 million figure represented the remainder of the $400 million shelf offering declared effective by the SEC on February 9, 2018. However, as of April only $265 million remained available from the $400 million shelf offering. Thus, when Farnsworth spoke, he either overstated the Company's fundraising capability or deceptively omitted to tell investors that Helios had plans to seek registration of additional stock, or both.

165. Third, an "equity line of credit" is not the same as an ATM offering. In an equity line of credit, the issuer agrees with a buyer to a fixed price at which the issuer has the right (but not the obligation) to sell shares. In an ATM offering, the issuer opens to the offering to whole market, but is, therefore, only capable of selling its securities for the prevailing price that the market is willing to pay. Where, like here, the Company was continually issuing new shares—because it was necessarily dependent on capital from such new shares—such issuances continue to drive down the share price through dilution, and an ATM offering would be expected to make less money for the Company than an equity line of credit. Thus, Farnsworth's characterization of the fundraising as an "equity line of credit" was false and misleading and an attempt to conceal from investors the magnitude of the Company's cash flow crisis.

166. On June 21, 2018, the Company announced that it entered into a securities purchase agreement with certain anonymous investors for Helios to issue convertible notes in the aggregate principal amount of $164 million and 20,500 shares of preferred stock. The net proceeds from the issuance of the notes and the preferred stock was to be used for "general corporate purposes," i.e., buying customers' movie tickets.

167. According to the terms of June 21, 2018 securities purchase agreement, the notes were convertible into shares of common stock, at the option of the holder, at a conversion price of $1.00, subject to adjustment. The preferred stock was not convertible into common stock.

However, each share of preferred stock was entitled to 3,205 votes per share of common stock, which gave holders of such preferred stock an outsized vote in the reverse stock split proxy that was planned by the Company to occur imminently.

## IX. DEFENDANTS ANNOUNCE A SPIN-OFF OF ZONE IN ORDER TO REPEAT THEIR FRAUDULENT PATTERN

168. In a press release appended to a Form 8-K Current Report signed by Farnsworth and filed with the SEC on March 15, 2018, Helios disclosed that its Board had approved a plan to spin-off Zone, its wholly owned subsidiary that had been acquired less than one and a half years prior, into an independent publicly traded company that Helios expected would also be listed on the NASDAQ. As of the filing of this complaint, the Zone spin-off has not occurred.

169. Defendants represented that the goal was to spin-off Zone so that Zone and Helios "each . . . can focus on its own strengths and operational plans . . . [and] will be better equipped to pursue partnerships and other strategies that are more closely aligned with their respective business models."

170. In other words, Defendants are seeking to repeat their perpetual fraudulent scheme by acquiring companies or segments of business, reaping financial awards, and then dumping the company once the losses are too high to recover. In fact, Farnsworth has a history of similar behavior as evidenced by numerous lawsuits and complaints alleging this exact pattern.

171. For instance, over the past three decades, Farnsworth has registered over 50 different companies with the state of Florida, only four of which, including Zone, were active as of June 2018. As alleged above, Farnsworth, like here, decimated shareholder value at his other publicly traded companies—XStream Beverage Network Inc., Purple Beverage Co., and LTS Nutraceuticals Inc. Each saw the value of their shares fall 99%, below $1 per share, within three years of going public.

172. Since 2010, Farnsworth and his affiliated companies have been sued at least eight times, with each lawsuit alleging either breach of contract or violation of the terms of settlement agreements. Five lawsuits have ended with the court entering judgment against Farnsworth.

173. Accordingly, by spinning off Zone, Defendants have started creating false hype around a business that has not succeeded in the past and is doomed for failure in the future.

**DEFENDANTS' MATERIAL CLASS PERIOD**
**MISREPRESENTATIONS AND OMISSIONS**

174. In order to conceal the Company's true financial condition from investors throughout the Class Period, Defendants issued a series of material misstatements and omitted material facts in the Company's public filings, press releases and other documents. These material misstatements and omissions created the false impression that the acquisition of MoviePass was additive to shareholder value, that Helios had the skills, systems, technology and capabilities to successfully mine MoviePass subscriber data that it could use to generate business for movie theatres and restaurants in exchange for a cut of those businesses' profits, that Helios would not run out of cash to fund its business plan, and that movie theatres and restaurants were ready and willing to engage in partnerships with Helios.

175. Plaintiffs assert that all statements set forth below that were made by Defendants were false and misleading when made for the reasons set forth therein. Further, all emphasis is designated by bold and italicized font, unless otherwise indicated.

## I. FALSE AND MISLEADING STATEMENTS IN AUGUST 15, 2017 PRESS RELEASE

176. The Class Period begins on August 15, 2017, when Helios filed a Current Report with the SEC on Form 8-K, signed by Defendant Benson. Attached to that Current Report as Exhibit 99.1 was a press release which was concurrently published in Business Wire, a widely circulated national wire service.

177. The press release announced that Helios would acquire a majority stake in MoviePass and introduce a new, unprofitably low $9.95 flat no-contract monthly fee. The August 15, 2017 Press Release also misleadingly touted Helios' purported technology and artificial intelligence platforms that would purportedly "bring a significant technological advantage to MoviePass:"

> HMNY's innovative growth strategy through the expansion into industries with opportunities for big data and artificial intelligence innovations seeks to ***increase shareholder value***.

178. Further, in the August 15, 2017 press release Lowe announced that the Company's disastrous $9.95 nationwide subscription service "completely disrupts the movie industry in the same way that Netflix and Redbox have done in years past." The press release continued:

> "I believe the ***technology platforms*** that Helios and Matheson has built over the years are a perfect fit for the MoviePass family," said Ted Farnsworth, Helios and Matheson's Chairman and CEO. "With our big data and artificial intelligence platforms and other technologies that we own, we will be able to bring a significant technological advantage to MoviePass. Our mission at HMNY is to continuously be innovating, and this blending is a natural fit to take us up to the next level and beyond."

179. Further, the August 15, 2017 press release reaffirmed the statements made by individuals quoted therein. Specifically, it states that "the parties believe that the assumptions made" in their statements and the "expectations represented by such statements ***are reasonable***[.]"

180. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies was not sustainable and could not "increase shareholder value" because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) Defendants knew, but failed to disclose, known risks of the MoviePass transaction, including, but not limited to: MoviePass' history of losses since its inception, that MoviePass never turned a profit and was on the verge of bankruptcy, and the amount

of capital Helios would need to cover MoviePass' expenses (and the corresponding dilution that would occur); (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable, let alone a "significant technological advantage" because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (v) Defendants' "assumptions made" in their statements and the "expectations represented by such statements" could not be, and were not, "reasonable" because of the foregoing and because Defendants admit that they "did not maintain effective internal control over financial reporting as of the period ended December 31, 2017[;]" and (vi) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

181. Moreover, the risk disclosures in the August 15, 2017 press release were incomplete, obsolete, and misleading. The press release stated that "Risk factors and other material information concerning HMNY are described in its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 and other filings, including subsequent current and periodic reports, information statements and registration statements filed with the U.S. Securities and Exchange Commission." The Company directed investors "to review such reports and other filings" in connection with the MoviePass acquisition.

182. As of August 15, 2017, the Company's most recent recitation of risk factors was set forth in the Form 10-K Annual Report for the fiscal year ended December 31, 2016 which the Company filed with the SEC on April 14, 2017 (the "2016 10-K")—well ***before*** the MoviePass acquisition. Such statements rendered the purported "Risk factors and other material information

concerning HMNY" in the August 15, 2017 press release materially false and misleading because they did not adequately disclose the risk that investors faced, including that: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) Defendants knew, but failed to disclose, known risks of the MoviePass transaction, including, but not limited to: MoviePass' history of losses since its inception, that MoviePass never turned a profit and was on the verge of bankruptcy, and the amount of capital Helios would need to cover MoviePass' expenses (and the corresponding dilution that would occur); (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (vi) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## II. FALSE AND MISLEADING STATEMENTS IN AN AUGUST 16, 2017 INTERVIEW ON FOX BUSINESS CHANNEL

183. On August 16, 2017, Farnsworth and Lowe were interviewed on Fox Business Channel by anchor Gerri Willis to promote Helios' acquisition of MoviePass. During the interview Defendants stated, in pertinent part:

> **Farnsworth:** ***The technology that we've developed*** along the way to take it to the next level, for us with MoviePass was just a no brainer for doing a deal with them.
>
> * * *
>
> **Lowe:** We have figured out a way to give people a deal they cannot believe we can even afford to give.

**Gerri Willis:** ***Ya, because you lose money***.

**Lowe:** Ya—***No, we actually don't***.

**Gerri Willis:** How do you not lose money?
(-- Farnsworth laughing --)

184. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies was not sustainable, and, contrary to Lowe's explicit statements, the Company **<u>was</u>** "los[ing] money," because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) Defendants knew, but failed to disclose, known risks of the MoviePass transaction, including, but not limited to: MoviePass' history of losses since its inception, that MoviePass never turned a profit and was on the verge of bankruptcy, and the amount of capital Helios would need to cover MoviePass' expenses (and the corresponding dilution that would occur); (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers (i.e., the "technology that [Helios] developed")—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (v) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## III. FALSE AND MISLEADING STATEMENTS IN AN AUGUST 16, 2017 INTERVIEW ON CHEDDAR.COM

185. On August 16, 2017, Farnsworth and Lowe were interviewed on Cheddar.com, a live streaming financial news network available on a host of video platforms including Amazon Prime, the Cheddar app, Facebook live, Sling TV, Pluto TV, and YouTube. Farnsworth and Lowe were interviewed by anchors Baker Machado and Alyssa Julya Smith to promote Helios' acquisition of MoviePass. During the interview Lowe stated, in pertinent part:

> **Lowe:** Today we have, and this is what the infusion from of cash from uh, the Helios acquisition has done. It gives us the ability to grow, to be a material size and for us to build upon the technology that they've built so that we can better serve our customers from their ***mapping technology***.

186. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers (i.e., Helios' "technology")—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) Defendants knew, but failed to disclose, known risks of the MoviePass transaction, including, but not limited to: MoviePass' history of losses since its inception, that MoviePass never turned a profit and was on the verge of bankruptcy, and the amount of capital Helios would need to cover MoviePass' expenses (and the corresponding dilution that would occur); (iii) Helios' only "mapping technology" (i.e., Zone) could not in practice, let alone profitably, "better serve [MoviePass] customers" (i.e., third party entities seeking access to data) because Zone was not receiving updates, did not function as intended, and, as Helios would later admit in the 2017 Form 10-K, Helios did not have the ability to raise revenue from its mapping technology or the ability "to secure contracts with customers;" (iv) as a result of the foregoing, Defendants' statements about

Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## IV. FALSE AND MISLEADING STATEMENTS IN THE AUGUST 16, 2017 INTERVIEW WITH VARIETY MAGAZINE FILED ON FORM DEFA14A WITH THE SEC ON AUGUST 17, 2017

187. On August 17, 2017, after market close, Helios filed Soliciting Material pursuant to 17 C.F.R. § 240.14a-12 with the SEC on Form DEFA14A containing a "copy of a news article published online on August 16, 2017 by Variety.com" that included quotes from an interview of Farnsworth and Lowe (the "August 17 Variety DEFA14A"). The article was originally published on Variety.com at 3:06pm on August 16, 2017—only fifty-four minutes prior to market close. In the interview, Farnsworth and Lowe, stated, in pertinent part:

> **Lowe**: As we think about growing this business***, the company has some really great advantages in that the technology is mostly there***, but what we do need to do is acquire subscribers . . . .
>
> *    *    *
>
> [**Variety**:] You are operating at a loss and subsidizing the tickets your customers buy. AMC claims that at some point you will have to raise your prices or you'll go out of business. Are they correct?
>
> **Lowe**: ***The answer is no.*** They don't understand our business model . . . .
>
> [**Variety**:] You've said that you hope that after MoviePass proves it value, studios and theater owners will cut you in on the profits. Is this a sustainable business if that never happens?
>
> **Lowe**: Yes, there's dozens of streams of revenue. We have enough money through this investment to build a materially big subscriber base who we think will love the service. When that happens, we can leverage that in all kinds of ways.

188. Further, the August 17 Variety DEFA14A reaffirmed the statements made by individuals quoted therein. Specifically, it states that "management of HMNY believes that the assumptions made" in their statements and the "expectations represented by such statements ***are reasonable***[.]"

189. On this news, Helios stock increased from a closing price of $2.55 per share on August 16, 2017 to a closing price of $2.77 per share on August 17, 2017 (an 8.6% day-over-day increase), to a closing price of $3.13 per share on August 18, 2017 (a 13% day-over-day increase, and a cumulative 22.7% increase for the two-day period).

190. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers admittedly exceeded the revenue generated for such subscribers, resulting in a negative profit margin, and ultimately prices would have to be raised; (ii) Defendants knew, but failed to disclose, known risks of the MoviePass transaction, including, but not limited to: MoviePass' history of losses since its inception, that MoviePass never turned a profit and was on the verge of bankruptcy, and the amount of capital Helios would need to cover MoviePass' expenses (and the corresponding dilution that would occur); (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable, let alone a "really great advantage[]" because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (v) Helios and MoviePass did not have any other "streams of revenue" to allow the Company to continue building a larger subscriber base that would offset the significant losses the Company was incurring from the admittedly unprofitable business model of charging only $9.95/month per subscriber; (vi) as a result of the foregoing, Helios would soon run out of cash and certainly did not have "enough money" to continue building its highly unprofitable subscriber base, as evidenced by numerous

subsequent securities offering; (vii) Defendants' "assumptions made" in their statements and the "expectations represented by such statements" could not be, and were not, "reasonable" because of the foregoing and because Defendants admit that they "did not maintain effective internal control over financial reporting as of the period ended December 31, 2017[;]" thus, (ix) Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## V. FALSE AND MISLEADING STATEMENTS IN THE AUGUST 17, 2018 INTERVIEW WITH WIRED.COM FILED ON FORM DEFA14A WITH THE SEC

191. On August 17, 2017, Helios filed Soliciting Material pursuant to 17 C.F.R. § 240.14a-12 with the SEC on Form DEFA14A containing an article published by Wired.com that included quotes from Farnsworth and Lowe (the "August 17 Wired DEFA14A"). The August 17 Wired DEFA14A stated, in pertinent part:

> [Lowe:] "By using our data and our relationship with the customer—and this isn't meaningful unless we have millions of subscribers—but when we have millions of subscribers ***we can help studios turn a movie that is a hit or a miss into a hit***. We can get the right people into the theater."
>
> * * *
>
> "Helios's ***mapping of the area around the theater***, and all the different things you might encounter in that area, ***will allow us to do much more than we currently do***. Here's a great place to park, here's a great restaurant across the street," Lowe says.

192. Further, the August 17 Wired DEFA14A reaffirmed the statements made by individuals quoted therein. Specifically, it states that "management of HMNY believes that the assumptions made" in their statements and the "expectations represented by such statements ***are reasonable***[.]"

193. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was

not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) Defendants knew, but failed to disclose, known risks of the MoviePass transaction, including, but not limited to: MoviePass' history of losses since its inception, that MoviePass never turned a profit and was on the verge of bankruptcy, and the amount of capital Helios would need to cover MoviePass' expenses (and the corresponding dilution that would occur); (iii) Helios' only "mapping" technology (i.e., Zone) could not in practice, let alone profitably, "allow [MoviePass] to do much more" because Zone was not receiving updates, did not function as intended, and, as Helios would later admit in the 2017 Form 10-K, Helios did not have the ability to raise revenue from its mapping technology or the ability "to secure contracts with customers;" (iv) Defendants' "assumptions made" in their statements and the "expectations represented by such statements" could not be, and were not, "reasonable" because of the foregoing and because Defendants admit that they "did not maintain effective internal control over financial reporting as of the period ended December 31, 2017[;]" thus, (v) Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## VI. FALSE AND MISLEADING STATEMENTS IN THE AUGUST 23, 2017 PRESS RELEASE

194. On August 23, 2017, Helios issued a press release announcing MoviePass obtained 150,000 subscribers and thus, that the Company was "set to revitalize movie theater industry." In the press release Farnsworth offered the following quote about that subscriber milestone: "The fact that this has occurred in a few days after announcing the $9.95 per month pricing model reinforces our belief that we will disrupt the motion picture industry as we know it."

195. Further, the press release reaffirmed the statements made by Farnsworth quoted therein. Specifically, it states that "the parties believe that the assumptions made" in their statements and the "expectations represented by such statements ***are reasonable***[.]"

196. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies was not sustainable and could not "revitalize" or "disrupt" the motion picture industry because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) Defendants knew, but failed to disclose, known risks of the MoviePass transaction, including, but not limited to: MoviePass' history of losses since its inception, that MoviePass never turned a profit and was on the verge of bankruptcy, and the amount of capital Helios would need to cover MoviePass' expenses (and the corresponding dilution that would occur); (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (v) Defendants' "assumptions made" in their statements and the "expectations represented by such statements" could not be, and were not, "reasonable" because Defendants admit that they "did not maintain effective internal control over financial reporting as of the period ended December 31, 2017[;]" and (vi) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## VII. FALSE AND MISLEADING STATEMENTS IN THE SEPTEMBER 14, 2017 PRESS RELEASE

197. Helios issued a press release On September 14, 2017, after the market closed. The Company concurrently filed the press release with the SEC twice—first as Exhibit 99.1 to a Current Report on Form 8-K, and second as Soliciting Material pursuant to 17 C.F.R. § 240.14a-12 with the SEC on Form DEFA14A. Both of the filings were signed by Farnsworth. The press release stated, in pertinent part:

> Using the Helios and Matheson Analytics resources, MoviePass Inc. analyzes consumer trends, patterns and activities to engage subscribers with movie related merchandise, advertising, and concessions relevant to their MoviePass experiences. Helios and Matheson believes ***its technology stack*** combined with the MoviePass business model will transform the movie going experience and create great value for both companies**.**
>
> * * *
>
> Helios and Matheson's technology learns individual moviegoer's tastes and makes recommendations based on recorded preferences for specific genres, actors and even the opinions of friends with similar likings. . . . MoviePass is bridging that gap, which should prove to be of tremendous value to production studios.
>
> "This explains ***our sustainable business model***: Helios and Matheson is incorporating advertising models with the MoviePass application using artificial intelligence, algorithms, and machine learning so we can provide studios with more precise data for their advertising efforts . . . ." said Ted Farnsworth, Chairman/CEO of Helios and Matheson . . . .

198. Further, the press release reaffirmed the statements made by individuals quoted therein. Specifically, it states that "the parties believe that the assumptions made" in their statements and the "expectations represented by such statements ***are reasonable***[.]"

199. On this news, the Company's stock price increased 40% from a close of $2.63 on September 14, 2017 to a close of $3.67 on September 15, 2017.

200. The above statements were materially false and misleading when made because: (i) MoviePass' "business model" of charging subscribing customers a flat $9.95 per month fee for

unlimited movies was not "sustainable" because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) Defendants knew, but failed to disclose, known risks of the MoviePass transaction, including, but not limited to: MoviePass' history of losses since its inception, that MoviePass never turned a profit and was on the verge of bankruptcy, and the amount of capital Helios would need to cover MoviePass' expenses (and the corresponding dilution that would occur); (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers (i.e., its "technology stack")—was not viable, let alone capable of producing "tremendous value to production studios" because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (v) Defendants' "assumptions made" in their statements and the "expectations represented by such statements" could not be, and were not, "reasonable" because of the foregoing and because Defendants admit that they "did not maintain effective internal control over financial reporting as of the period ended December 31, 2017[;]" and (vi) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## VIII. FALSE AND MISLEADING STATEMENTS IN THE SEPTEMBER 15, 2017 REGISTRATION STATEMENT AND PROSPECTUS

201. On September 15, 2017, the Company filed a Registration Statement under the Securities Act of 1933 on Form S-3 and an accompanying Prospectus with the SEC which was signed by Farnsworth.

202. The Prospectus falsely and/or misleadingly described the prospects of the MoviePass transaction stating, in pertinent part:

> *Agreement to Acquire 51% Equity Interest in MoviePass Inc.* . . . We believe that the technology ***we are developing*** for Zone, including facial recognition and mapping, can enhance the MoviePass business model.

203. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers (i.e., Helios' "technology")—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) Helios' Zone "mapping" technology could not in practice, let alone profitably, "enhance the MoviePass business model" because Zone was not receiving updates, did not function as intended, and, as Helios would later admit in the 2017 Form 10-K, Helios did not have the ability to raise revenue from its mapping technology or the ability "to secure contracts with customers;" (iii) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

204. Further, the Prospectus also contained false, misleading, and woefully incomplete risk disclosures with respect to investing in Helios which state, in pertinent part:

> ***Please see the risk factors set forth in Part I, Item 1A of our most recent Annual Report on Form 10-K and in Part II, Item 1A of our Quarterly Reports on Form 10-Q and other filings we make with the SEC, which are incorporated by reference in this prospectus.*** . . . ***The risks and uncertainties we have described are not the only ones we face. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also affect our business operations.*** These risks ***could*** materially affect our business, results of operations or financial condition and cause the value of our securities to decline.
>
> ***Risks Related to this Offering and our Common Stock***
>
> * * *

> ***MoviePass may not become profitable.***
>
> MoviePass is **<u>not currently</u>** profitable. **<u>If</u>** MoviePass does not become profitable or otherwise is unable obtain access to capital as and when needed, the MoviePass business may be seriously harmed. **<u>If</u>** the MoviePass business is not successful, we risk losing all or a substantial portion of our investment in MoviePass.
>
> * * *
>
> ***The price of our common stock <u>may be</u> volatile, and the market price of our common stock <u>may decrease</u>.***
>
> The per share price of our common stock **<u>may vary</u>** from time to time . . . The factors that may cause the market price of our common stock to fluctuate include, but are not limited to:
>
> . . .
>
> - our ability to derive financial benefits from our investment in MoviePass;
> - changes in the perception of investors and securities analysts regarding the risks to our business or the condition of our business;

(Italicized emphasis in original; underlined emphasis added).

205. The above statements were materially false and misleading when made because: (i) Defendants asserted that other risks were either "not presently known" or that Helios "currently deem[s]" such risks to be "immaterial[,]" but this was not true because Defendants knew, but failed to disclose, known material risks of the MoviePass transaction, including, but not limited to: MoviePass' history of losses ***since its inception*** (not simply that MoviePass was "currently" unprofitable), that MoviePass never turned a profit and was on the verge of bankruptcy, and the amount of capital Helios would need to cover MoviePass' expenses (and the corresponding dilution that would occur); (ii) Defendants' reference to the risk factors in the 2016 10-K would not apprise investors of any material risks because such disclosures were filed with the SEC four months before the announcement of the MoviePass SPA and therefore did not incorporate the presently known risks described above; (iii) Defendants failed to accompany the Registration Statement with accurate financial statements for MoviePass documenting the full extent of its pre-merger financial performance—which Helios was required to, pursuant to Regulation S-X and the

Exchange Act, but did not, disclose; (iv) Defendants' assert that MoviePass "***may*** not become profitable," and generally characterize MoviePass' impending demise as contingent or potential, yet, MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies was not sustainable and negated even the potentiality that Helios could "derive financial benefits from [its] investment in MoviePass" because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (v) Defendants assert that Helios' stock price "may be volatile," "may decrease," "may vary," and that investors' perception of the Company's "risks" and "condition" ***may*** change, yet, Defendants knew that the stock price ***would*** decrease and investors' perceptions ***would*** change because Defendants knew (as evidenced by their disclosure of risk factors less than one month later, which Defendants knew would cause Helios' stock price to "decrease"), but failed to disclose, known risks of the MoviePass transaction as described above; and (vi) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## IX. FALSE AND MISLEADING STATEMENTS IN THE FORM DEFA14A FILED WITH THE SEC ON SEPTEMBER 25, 2017

206. On September 25, 2017, prior to market open, Helios filed Soliciting Material pursuant to 17 C.F.R. § 240.14a-12 with the SEC on Form DEFA14A containing an article published by Pipeline Data, LLC (the "September 25 DEFA14A"). The article was first published on the investment website Seeking Alpha on September 22, 2017 at 9:47am and included the transcript of an interview of Farnsworth by Pipeline Data founder Mark Gomes.

207. The September 25 DEFA14A stated, in pertinent part:

> **Mark Gomes**: How is the $9.95 pricing going to work within your business model?
>
> **Ted Farnsworth**: MoviePass has been around for 5 years, so we have a wealth of historical data. At $39, the average customer would go to 4 movies a month. At

$29, the average dropped to 3 movies a month. When MoviePass went to $19, the average customer went to 2 movies a month. ***So we think we can be profitable on the subscriptions at $9.95 and then make the real money from the additional revenue sources***.

* * *

**Mark Gomes**: ***So, you think you can break even on the subscriptions alone***?

**Ted Farnsworth**: ***I'm confident that we will. We already see it in our first 30 days at $9.95***

* * *

**Mark Gomes**: I hear that [AMC is] thinking about blocking MoviePass from working at their theaters. If you guys are successful, that's not going to work.

**Ted Farnsworth**: . . . Once the operators see how much revenue we're bringing to the table, it will only mean good things for us.

* * *

**Mark Gomes**: Tell me more about the data MoviePass has collected over the past five years.

**Ted Farnsworth**: As the CEO of a data analytics company, I can tell you that the data is incredible. ***MoviePass*** is able to influence which movies their customers go to see. ***They*** can also influence where they go to see it… and when. It's brilliant.

**Mark Gomes**: ***So, you're able to influence which movies people attend and optimize the filling of cinema seats***?

**Ted Farnsworth**: ***Exactly***.

* * *

**Mark Gomes**: So this is how you'll be able to be profitable at $9.95? You'll get money from the cinemas and studios?

**Ted Farnsworth**: ***We'll generate revenue from many sources. Tickets***, concessions, advertisements . . .

* * *

**Mark Gomes**: With 400,000+ subscribers, MoviePass has to be on a $50 million run rate. Your reported revenues are going to multiply.

**Ted Farnsworth**: Right, exactly.

* * *

**Mark Gomes:** Talk to me about your market potential. 250 million people in the U.S. and Canada have been to a movie in the past year. About 27 million of those are frequent movie goers.

**Ted Farnsworth:** Right. And about 60 million are "infrequent" movie goers. That will be our sweet spot. They go to the movies three to six times a year. Even if they double their consumption, ***we'll be profitable without all of our other revenue sources***.

208. Further the September 25 DEFA14A reaffirmed the statements made by individuals quoted therein. Specifically, it states that "management of HMNY believes that the assumptions made" in their statements and the "expectations represented by such statements ***are reasonable***[.]"

209. On this news, Helios stock increased from a closing price of $5.86 per share on September 21, 2017 to a closing price of $6.97 per share on September 22, 2017 (a nearly 19% day-over-day increase), to a closing price of $8.30 per share on September 25, 2017 (another 19% day-over-day increase, and a cumulative 41.6% increase for the two-day period).

210. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies (i.e., "generat[ing] revenue from . . . tickets") was not sustainable and could not be "profitable" on "subscriptions alone" because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) although Helios was required to, pursuant to Regulation S-X and the Exchange Act, disclose accurate financial statements for MoviePass documenting the full extent of MoviePass' pre-merger financial performance, to make the Company's other statements not misleading, it had failed to do so; (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology,

skill or capabilities to gather or analyze subscriber data; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (v) MoviePass had no experience in data analytics at all, in fact, prior to the acquisition its primary business strategy was creating revenue through subscription fees—thus, MoviePass had no ability to "influence" subscribers; (vi) Defendants' "assumptions made" in their statements and the "expectations represented by such statements" could not be, and were not, "reasonable" because of the foregoing and because Defendants admit that they "did not maintain effective internal control over financial reporting as of the period ended December 31, 2017[;]" and (vii) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## X. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 11, 2017 8-K

211. On October 11, 2017, the Company filed a Current Report with the SEC on Form 8-K which was signed by Benson. In the 8-K, the Company certain asserted certain risk factors. The risk factors, in their entirety, were false and misleading because although Helios was required to, pursuant to Regulation S-X and the Exchange Act, disclose accurate financial statements for MoviePass documenting the full extent of MoviePass' pre-merger financial performance, to make the Company's other statements not misleading, it had failed to do so.

212. Further, the October 11, 2017 8-K contained this specific risk factor which was false and misleading when made:

> ***MoviePass may not gain acceptance from large national exhibitors (movie theater chains), which could have a material adverse effect on MoviePass' financial condition and results of operations.***
>
> . . . However, **<u>if MoviePass is unable to partner</u>** with large national exhibitors, (i) MoviePass likely will continue to be required to pay full price per movie ticket each time a MoviePass subscriber attends a movie theater operated by a large national exhibitor, (ii) MoviePass would be unlikely to share in concession sales to its subscribers attending those theaters, and (iii) MoviePass may not be able to sell

> digital advertising or data analytics services to those large national exhibitors. ***If MoviePass is unable to negotiate discounted ticket prices from, share in concession sales with or sell digital advertising or data analytics services to large national exhibitors***, MoviePass' financial condition and results of operations ***may be*** materially and adversely affected, MoviePass may not become profitable and MoviePass may not be able to sustain its operations.

(Italicized emphasis in original; underlined emphasis added).

213. The above statements were materially false and misleading when made because Defendants assert that MoviePass "may not" be able to partner with national exhibitors, yet they fail to disclose that their business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs and, in the case of AMC, had openly disclosed their intention not to work with MoviePass.

214. Further, the October 11, 2017 8-K contained this specific risk factor which was false and misleading when made:

> ***If MoviePass is not able to manage its growth, its business could be affected adversely.***
> MoviePass' subscriber base has expanded rapidly since August 15, 2017, when it announced its new subscription price of $9.95 per month. **MoviePass may not be able, for many reasons, including lack of financing or adequate personnel resources, to meet the demand to timely deliver MoviePass cards to its subscribers or otherwise service its business.** As a result, MoviePass could experience a significant slowdown or stoppage as it attempts to serve the expanding subscriber base.

(Italicized emphasis in original; underlined emphasis added).

215. The above statements were materially false and misleading when made because: (i) MoviePass was already failing to meet demand to timely deliver MoviePass cards to its subscribers (ii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; and (iii) as a result of the foregoing, Defendants' statements about

Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XI. FALSE AND MISLEADING STATEMENTS IN THE CNBC VIDEO INTERVIEW EMBEDDED IN THE OCTOBER 13, 2017 CNBC ARTICLE

216. On October 13, 2017, CNBC.com published an article with five imbedded videos featuring interviews with Defendant Lowe.[7] In the video titled "MoviePass CEO: We actually want you to go to the movies a lot" starting at approximately 1:00 minute, the following exchange took place:

> **Host**: How do you make money on this? Is the idea here sort of like a health club...?
>
> Lowe: It has some similarities, we're not in the gym membership-type business. ***We actually want you to go a lot to the movies***. In fact, the whole reason we launched this $9.95…
>
> **Host**: But don't you lose money if they go more?
>
> Lowe: The whole ecosystem makes so much more money that what we will do, ***what we're doing now*** is we're putting our money where are mouth is, ***proving that we can re-energize the movie business…and then we're going to share***…
>
> **Host**: But you don't get a slice…
>
> **Lowe**: ***We will***.

217. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber

---

[7] Available at, https://www.hmny.com/in-the-news/2017/10/15/cnbc-moviepass-ceo-we-actually-want-you-to-go-to-the-movies-a-lot (last visited April 3, 2019).

information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (v) as a result of the foregoing, Defendant Lowe's statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XII. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 13, 2017 MARKETWATCH.COM ARTICLE

218. On October 13, 2017, Helios filed Soliciting Material pursuant to 17 C.F.R. § 240.14a-12 with the SEC on Form DEFA14A containing an article published by Marketwatch.com that included quotes from an interview that Farnsworth and Lowe gave to Marketwatch.com (the "October 13 DEFA14A"). The October 13 DEFA14A stated, in pertinent part:

> At less than $10 a month, MoviePass is a bargain for customers, but how will the movie-theater subscription company that is subsidizing its members' expensive film-going habits turn a profit?
>
> "***It's about the data***," said Ted Farnsworth . . . .
>
> * * *
>
> "***It's so much easier than people think***," Farnsworth said. "***There are so many areas for revenue streams.***"

219. Further, the October 13 DEFA14A reaffirmed the statements made by individuals quoted therein. Specifically, it states that "the parties believe that the assumptions made" in their statements and the "expectations represented by such statements ***are reasonable***[.]"

220. The above statements were materially false and misleading when made because: (i) Helios and MoviePass did not have any viable "revenue streams" to allow the Company to continue building a larger subscriber base that would offset the significant losses the Company was incurring from the admittedly unprofitable business model of charging only $9.95/month per subscriber; (ii) although Helios was required to, pursuant to Regulation S-X and the Exchange Act, disclose accurate financial statements for MoviePass documenting the full extent of MoviePass' pre-merger financial performance, to make the Company's other statements not misleading, it had failed to do so; (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable, let alone a "easier than people think" because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (v) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (vi) Defendants' "assumptions made" in their statements and the "expectations represented by such statements" could not be, and were not, "reasonable" because of the foregoing and because Defendants admit that they "did not maintain effective internal control over financial reporting as of the period ended December 31, 2017[;]" and (vii) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XIII. FALSE AND MISLEADING STATEMENTS IN AN OCTOBER 16, 2017 INTERVIEW ON FOX BUSINESS CHANNEL

221. On August 16, 2017, Lowe was interviewed on Fox Business Channel by anchor Maria Bartiromo to promote Helios' acquisition of MoviePass. During the interview Defendants stated, in pertinent part:

> **Lowe**: Going to the movies, there's much more to it than going straight to the movie theater. You go to dinner. You might have drinks**. *You might use Uber or Lyft.*** So we're going to help our subscriber get to all those businesses and get discounts and benefits.
>
> **Maria Bartiromo**: So will Uber pay for that information? Do the Hollywood restaurants? Are they paying for that data?
>
> **Lowe**: ***They will. As we drive more and more of our subscribers to their businesses, we'll take a share of the incremental profit***.

222. The above statements were materially false and misleading when made because: (i) Helios and MoviePass did not have any viable plans for obtaining "incremental profit" that could allow the Company to continue building a larger subscriber base that would offset the significant losses the Company was incurring from the admittedly unprofitable business model of charging only $9.95/month per subscriber; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (v) Lowe's declaration that MoviePass had revenue deals with restaurants, Uber, and Lyft was not true; and

(vi) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XIV. FALSE AND MISLEADING STATEMENTS IN AN OCTOBER 16, 2017 INTERVIEW ON BLOOMBERG TELEVISION

223. On August 16, 2017, Lowe was interviewed on the Bloomberg Television show "Bloomberg Markets" to promote Helios' acquisition of MoviePass. During the interview, Lowe misrepresented that the Company was currently deriving revenue from restaurant promotion and from Uber, in pertinent part:

> **Host**: Are you going into ads? Are you going into the popcorn business? ***Are you doing anything on the sides***?
>
> **Lowe**: ***Yes. Yes . . . We also get them to go to the nearby restaurants. Use Uber.***

224. Later within the same interview, when asked how he would defend MoviePass' business model from critics, Lowe stated, in pertinent part:

> **Lowe**: It's all about technology and data behind your retail business, uh, to drive ***more profit*** and more growth.
>
> **Host**: How much time do you need for that though exactly?
>
> **Lowe**: We need . . . Ya know, probably about six months.

225. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable, and certainly not within "***six months***," because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) Lowe's declaration that MoviePass had revenue deals with restaurants and Uber was not true; (iii) MoviePass had never been profitable, so it could not become "more" profitable; (iv) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from

the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; thus, (v) Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XV. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 24, 2017 PRESS RELEASE

226. On October 24, 2017, Helios filed a Current Report signed by Farnsworth with the SEC on From 8-K. Defendants concurrently issued a press release that was attached to the 8-K as Exhibit 99.1, thereto. The press release announced, among other items that MoviePass obtained more than 600,000 monthly subscribers. The press release stated, in pertinent part:

> With HMNY's capabilities, HMNY believes that MoviePass can bridge an intelligence gap for the movie theater industry so the entire film ecosystem can better serve audiences in areas ranging from production to advertising.
>
> "When you apply computer science and machine learning to an industry that we believe has lacked significant innovation, useful patterns start to emerge," said Ted Farnsworth, Chairman and CEO of HMNY. "More subscribers mean more data. Together, I believe HMNY and MoviePass can offer important analytics to movie studios and exhibitors while serving the interests of moviegoers in the process."

227. Further the press release and the 8-K both reaffirmed the statements made by individuals quoted therein. Specifically, the press release and the 8-K state that "management of HMNY believes that the assumptions made" in their statements and the "expectations represented by such statements ***are reasonable***[.]"

228. Further, Defendant Lowe was quoted in the press release boasting that "I believe our ongoing investments in customer experience, usability and convenience have steadily improved customer satisfaction and retention."

229. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass

subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) although Helios was required to, pursuant to Regulation S-X and the Exchange Act, disclose accurate financial statements for MoviePass documenting the full extent of MoviePass' pre-merger financial performance, to make the Company's other statements not misleading, it had failed to do so; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iv) according to CW1, MoviePass was unable to handle the volume of new subscriber questions and complaints and was, in fact, backed up on responding to customers ***by months*** and, thus, customer satisfaction was decreasing and the customer experience as progressively getting worse as subscriber numbers increased; (v) Helios and MoviePass would be unable to increase the subscriber base to 3.1 million subscribers by August 2018 because the Company had insufficient cash to continue funding operations under the current unprofitable business model; (vi) Defendants' "assumptions made" in their statements and the "expectations represented by such statements" could not be, and were not, "reasonable" because of the foregoing and because Defendants admit that they "did not maintain effective internal control over financial reporting as of the period ended December 31, 2017[;]" and (vii) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XVI. FALSE AND MISLEADING STATEMENTS IN THE OCTOBER 30, 2017 BLOOMBERG ARTICLE

230. On October 30, 2017, Bloomberg.com published a news article containing quotes from Farnsworth and Lowe.[8] In the article, Lowe was quoted as follows:

> "The long-term vision for MoviePass is to build out a 'Night at the Movies' concept that integrates all those activities a subscriber does before and after seeing a film, such as dinner, parking or getting an Uber/Lyft to the cinema," Lowe said. "Helios' ***mapping technology and data analytics***, facial recognition and other assets will help us build that out."

231. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable, because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) Helios' only "mapping technology" (i.e., Zone) could not in practice, let alone profitably, "help . . . build . . . out" MoviePass' long term data-centric plan because Zone was not receiving updates, did not function as intended, and, as Helios would later admit in the 2017 Form 10-K, Helios did not have the ability to raise revenue from its mapping technology or the ability "to secure contracts with customers;" (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; thus, (iv) Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

---

[8] Available at, https://www.bloomberg.com/news/articles/2017-10-30/man-behind-1-151-stock-rally-has-overseen-99-wipeouts-in-past (last visited April 3, 2019).

## XVII. FALSE AND MISLEADING STATEMENTS IN A NOVEMBER 13, 2017 INTERVIEW ON CNBC

232. On November 13, 2017, Lowe was interviewed on the CNBC show "Closing Bell." During the interview Lowe stated, in pertinent part:

> **Lowe**: With our partnership with HMNY, we've got this big data platform to be able to build out a whole night at the movies. And that's where it really starts to become valuable is people are going to the movies and then doing lots of other things.

233. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a flat $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues—thus, Helios' "data platform" was of no use MoviePass; (iv) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XVIII. FALSE AND MISLEADING STATEMENTS IN THE NOVEMBER 14, 2017 10-Q

234. On November 14, 2017, Helios filed its Quarterly Report for the period ending September 30, 2017 with the SEC on Form 10-Q. The 10-Q was signed by Farnsworth and Benson.

235. The financial statements in the 10-Q, in their entirety, were false and misleading. While Defendants purported to provide interim financial information for the period ending September 30, 2017, they failed to incorporate MoviePass operations into such statements. Moreover, although Helios was required to, pursuant to Regulation S-X and the Exchange Act, disclose accurate financial statements for MoviePass documenting the full extent of MoviePass' pre-merger financial performance, to make the Company's other statements not misleading, it had failed to do so. Specifically, Defendants had a duty, but failed to include audited financial statements of MoviePass, Inc., as of December 31, 2016 and December 31, 2015; unaudited financial statements of MoviePass, Inc as of September 30, 2017 and for the nine months ended September 30, 2017 and September 30, 2016; and unaudited pro forma condensed combined financial statements of Helios and Matheson Analytics, Inc., and MoviePass, Inc.

236. Further, Helios claimed in the 10-Q that "[t]he Company's most significant operating cost ***is its personnel cost***, which is included in cost of revenues." This statement was false and misleading when made because Defendants failed to incorporate operating costs from Helios' MoviePass operations into the Company's financial statements— the largest of which was movie ticket purchases. According to the November 14, 2017 10-Q, Helios' "cost of revenues" for the nine months ended September 30, 2017, totaled $2,969,357. Conversely, pursuant to the Unaudited Pro Forma Condensed Combined Financial Information filed by Helios on November 30, 2017, MoviePass' "cost of sales" (a term which Helios used interchangeably with "cost of revenues") was $9,592,336. Thus, Defendants' assertion in its Quarterly Report that its "most significant cost is personnel cost" was false.

237. Further, Helios included the following false and misleading statements in the 10-Q regarding its internal controls:

> **Item 4. Controls and Procedures**
>
> Evaluation of disclosure controls and procedures. As of September 30, 2017, the Company carried out an evaluation, under the supervision of and with the participation of our Principal Executive Officer and our Principal Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")). Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Principal Executive Officer and Principal Financial Officer, to allow timely decisions regarding required disclosures. ***Based on that evaluation, our Principal Executive Officer and Principal Financial Officer have concluded that, as of September 30, 2017, our disclosure controls and procedures were effective.***

238. Relatedly, Farnsworth and Benson both signed nearly identical certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, falsely certifying as follows:

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**

I, Theodore Farnsworth, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Helios and Matheson Analytics Inc.;

2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3. Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in annual report***;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

   a) ***designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the***

***registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;

b) ***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;

c) ***evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation***; and

d) ***disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting***; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) ***all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

b) ***any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

Dated: November 14, 2017

/s/ Theodore Farnsworth
Name: Theodore Farnsworth
Title: Chief Executive Officer
(Principal Executive Officer)

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**

I, Stuart Benson, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Helios and Matheson Analytics Inc.;

2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3. Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in annual report***;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

   a) ***designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;

   b) ***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;

   c) ***evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation***; and

   d) ***disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting***; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) ***all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

b) ***any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

Dated: November 14, 2017

/s/ Stuart Benson
Name: Stuart Benson
Title: Chief Financial and Accounting Officer
(Principal Financial and Accounting Officer)

239. Defendants Farnsworth and Benson also both signed nearly identical certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, falsely certifying as follows:

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350**

In connection with the accompanying Quarterly Report on Form 10-Q of Helios and Matheson Analytics Inc. for the quarter ended September 30, 2017, I, Theodore Farnsworth, the Principal Executive Officer of Helios and Matheson Analytics Inc., hereby certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

(1) such Annual Report on Form 10-K for the year ended December 31, 2017 ***fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934***; and

(2) the information contained in such Annual Report on Form 10-K for the year ended December 31, 2017 fairly presents, ***in all material respects, the financial condition and results of operations of Helios and Matheson Analytics Inc., on a consolidated basis***.

Dated: November 14, 2017

/s/ Theodore Farnsworth

Name: Theodore Farnsworth
Title: Chief Executive Officer
(Principal Executive Officer)

A signed original of this written statement required by §906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request. The foregoing certification is being furnished solely pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 62 of title 18, United States code) and is not being filed as part of the Form 10-Q or as a separate disclosure document.

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350**

In connection with the accompanying Quarterly Report on Form 10-Q of Helios and Matheson Analytics Inc. for the quarter ended September 30, 2017, I, Stuart Benson, the Principal Financial Officer of Helios and Matheson Analytics Inc., hereby certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

(1) such Annual Report on Form 10-K for the year ended December 31, 2017 ***fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934***; and

(2) the information contained in such Annual Report on Form 10-K for the year ended December 31, 2017 fairly presents, ***in all material respects, the financial condition and results of operations of Helios and Matheson Analytics Inc., on a consolidated basis***.

Dated: November 14, 2017

/s/ Stuart Benson
Name: Stuart Benson
Title: Chief Financial Officer
(Principal Financial And Accounting Officer)

A signed original of this written statement required by §906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request. The foregoing certification is being furnished solely pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 62 of title 18, United States code) and is not being filed as part of the Form 10-Q or as a separate disclosure document.

240. The foregoing statements were false and misleading when made because: (i) although Helios was required to, pursuant to Regulation S-X and the Exchange Act, disclose accurate financial statements for MoviePass documenting the full extent of MoviePass' pre-merger financial performance, to make the Company's other statements not misleading, it had failed to do so; (ii) Defendants' would admit in the 2017 Form 10-K that it "did not maintain effective internal control over financial reporting as of the period ended December 31, 2017" due to a lack of accounting resources, and that the lack of accounting resources was admittedly related to "the acquisition of MoviePass Inc and the related financing arrangements. The Company further conceded that it "had inadequate monitoring controls in place related to its financial reporting, debt and equity related transactions and other management oversight procedures[;]" (iii) Defendants' would announce two subsequent impairments to goodwill for periods incorporating the nine months ended September 30, 2017—the first in a Form 8-K/A filed with the SEC on February 9, 2018, and the second in the 2017 Form 10-K filed on April ; and, thus (iv) Defendants' statements about their compliance with internal controls, were false and misleading and/or lacked a reasonable basis.

241. Further, the November 14, 2017 10-Q contained this specific risk factor which was false and misleading when made:

> ***MoviePass may not gain acceptance from large national exhibitors (movie theater chains), which could have a material adverse effect on MoviePass' financial condition and results of operations.***
>
> . . . However, **<u>if MoviePass is unable to partner</u>** with large national exhibitors, (i) MoviePass likely will continue to be required to pay full price per movie ticket each time a MoviePass subscriber attends a movie theater operated by a large national exhibitor, (ii) MoviePass would be unlikely to share in concession sales to its subscribers attending those theaters, and (iii) MoviePass may not be able to sell digital advertising or data analytics services to those large national exhibitors. ***<u>If MoviePass is unable to negotiate discounted ticket prices from, share in concession sales with or sell digital advertising or data analytics services to large</u>***

> ***national exhibitors***, MoviePass' financial condition and results of operations ***may be*** materially and adversely affected, MoviePass may not become profitable and MoviePass may not be able to sustain its operations.

(Italicized emphasis in original; underlined emphasis added).

242. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—could not be viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) Defendants assert that MoviePass "may not" be able to partner with national exhibitors, yet they fail to disclose that their business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (iii) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

243. Additionally, the November 14, 2017 10-Q contained this specific risk factor which was false and misleading when made:

> ***If MoviePass is not able to manage its growth, its business could be affected adversely.***
> MoviePass' subscriber base has expanded rapidly since August 15, 2017, when it announced its new subscription price of $9.95 per month. **MoviePass may not be able, for many reasons, including lack of financing or adequate personnel resources, to meet the demand to timely deliver MoviePass cards to its subscribers or otherwise service its business.** As a result, MoviePass could experience a significant slowdown or stoppage as it attempts to serve the expanding subscriber base.

(Italicized emphasis in original; underlined emphasis added).

244. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—could not be viable because Helios and MoviePass did not have and never had the systems, technology,

skill or capabilities to gather or analyze subscriber data profitably; (ii) MoviePass was already failing to meet demand to timely deliver MoviePass cards to its subscribers (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; and (iv) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XIX. FALSE AND MISLEADING STATEMENTS IN AN NOVEMBER 24, 2017 INTERVIEW ON CHEDDAR.COM

245. On November 24, 2017, Cheddar.com posted a video of an interview of Farnsworth taken by anchors J.D. Durkin and Brad Smith. During the interview, Farnsworth stated, in pertinent part:

> **Brad Smith**: Now you recently dropped your price per month for the subscription to below $7, for a limited time that is. So, uh, that's less than an individual movie ticket in most places, thank God. How were you able to do this while maintaining a sustainable business model?
>
> **Farnsworth**: . . . So we're doing deals right now with the studios in Hollywood that want to understand that data. So that's, that's really where you make your money, is on the data side of it. ***And doing other things, with companies like Uber or Lyft or whoever it is—a night out at the movies. So it is a very sustainable model. That's, that's not our issue at all. That's why we lowered the price.***
>
> * * *
>
> **Farnsworth:** And with my partner, with Mitch Lowe, ya know, being with Netflix and Redbox, you know, he understands, totally the disruption of this whole model. ***So it really, it really is doing well. It's doing extremely well.***

246. The above statements were materially false and misleading when made because: (i) MoviePass' "business model" of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not "sustainable" or doing "extremely well" because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a

negative profit margin; (ii) although Helios was required to, pursuant to Regulation S-X and the Exchange Act, disclose accurate financial statements for MoviePass documenting the full extent of MoviePass' pre-merger financial performance, to make the Company's other statements not misleading, it had failed to do so; (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (v) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (vi) Farnsworth's declaration that MoviePass had revenue deals with Uber and Lyft was not true; and (vii) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

247. In addition to the affirmative false and misleading statements detailed above, Defendants also violated Item 303 by failing to disclose known trends and uncertainties in the November 14, 2017 10-Q. Specifically, at the time of filing, Defendants knew, but did not disclose that: (1) MoviePass was not viable and that from the Company's inability to introduce additional revenue streams, Helios would soon run out of cash necessary to continue building its highly unprofitable subscriber base; (2) MoviePass' absurd strategy of slashing subscription prices resulted in: (a) MoviePass being unable to satisfy the increased demand in shipping MoviePass cards and processing subscriptions; (b) MoviePass's inability to respond to customer inquiries,

customer complaints, cancellation requests, and refunds; and (c) MoviePass app outages, the creation of "phantom" MoviePass accounts, and the backlogging of duplicative customer complaints.

## XX. FALSE AND MISLEADING STATEMENTS IN THE DECEMBER 5, 2017 PROSPECTUS

248. On December 5, 2017, Helios filed a Prospectus with the SEC on Form 424B3 in connection with the Senior Secured Convertible Notes issued in connection with the MoviePass SPA on August 16, 2017. Therein, Helios stated in relevant part:

> *Agreement to Acquire a Majority Equity Interest in MoviePass Inc.* . . . We believe that the technology we are developing for Zone, including facial recognition and mapping, can enhance the MoviePass business model.

249. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers (i.e., Helios' "technology")—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) Helios' Zone "mapping" technology could not in practice, let alone profitably, "enhance the MoviePass business model" because Zone was not receiving updates, did not function as intended, and, as Helios would later admit in the 2017 Form 10-K, Helios did not have the ability to raise revenue from its mapping technology or the ability "to secure contracts with customers;" (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues, thus, any "enhancements" through "facial recognition" or "mapping" would be moot; (iv) as a result of the

foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

250. Furthermore, the Prospectus incorporated by reference the following items which, as alleged above were false or misleading when made: (i) the Quarterly Report filed on Form 10-Q, for the period ending September 30, 2017, filed by Helios on November 14, 2017; and (ii) the Current Reports filed on Form 8-K, dated August 15, 2017, September 14, 2017, and October 11, 2017. The Company specifically stated:

> The SEC and applicable law permits us to "incorporate by reference" into this prospectus information that we have or may in the future file with or furnish to the SEC. This means that we can disclose important information by referring you to those documents. You should read carefully the information incorporated herein by reference because it is an important part of this prospectus. We hereby incorporate by reference the following documents into this prospectus:
>
> . . .
>
> - Our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017, June 30, 2017 and September 30, 2017, as filed with the SEC on May 19, 2017, August 11, 2017 and November 14, 2017;
>
> - our Current Reports on Form 8-K filed with the SEC . . . August 15, 2017 (other than the portions of the filing that were furnished rather than filed), . . . September 14, 2017 . . . October 11, 2017 . . . .

251. Accordingly, by incorporating such statements by reference, and therefore, making such statements a part of the December 5, 2017 Prospectus, the Prospectus was materially false and misleading in the same manner and for the same reasons as all of the statements enumerated above that are contained in the September 30, 2017 10-Q, the August 15, 2017 8-K, the September 14, 2017 8-K, and the October 11, 2017 8-K.

## XXI. FALSE AND MISLEADING STATEMENTS IN THE DECEMBER 12, 2017 PROSPECTUS SUPPLEMENT

252. On December 12, 2017, Helios filed a Prospectus Supplement on form 424B5 with the SEC in connection with its offering of certain "Units" of common stock and warrants. Therein, Helios stated in relevant part:

> The Company intends to strengthen our management team and combine its data and artificial intelligence technology with MoviePass' technology. With our big data and artificial intelligence platforms and other technologies that we own, we believe we will be able to bring a significant technological advantage to MoviePass.
>
> *Market Opportunity*
>
> . . . MoviePass intends to encourage increased attendance at movie theaters with the subscription model by targeting the casual movie goer (those who attend less than once a month) who represent 85% of the total movie going market.

253. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies, while "encouraging increased attendance," was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues—thus, Helios' "big data and artificial intelligence platforms" were of no use MoviePass; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (v) as a result of the

foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

254. Furthermore, the December 12, 2017 Prospectus Supplement incorporated by reference the following items which, as alleged above were false or misleading when made: (i) the Quarterly Report filed on Form 10-Q, for the period ending September 30, 2017, filed by Helios on November 14, 2017; and (ii) the Current Reports filed on Form 8-K, dated August 15, 2017, September 14, 2017, and October 11, 2017. The Company specifically stated:

> The SEC and applicable law permits us to "incorporate by reference" into this prospectus supplement information that we have or may in the future file with or furnish to the SEC. This means that we can disclose important information by referring you to those documents. You should read carefully the information incorporated herein by reference because it is an important part of this prospectus supplement. We hereby incorporate by reference the following documents into this prospectus supplement:
>
> . . .
>
> - Our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017, June 30, 2017 and September 30, 2017, as filed with the SEC on May 19, 2017, August 11, 2017 and November 14, 2017;
>
> - our Current Reports on Form 8-K filed with the SEC . . . August 15, 2017 (other than the portions of the filing that were furnished rather than filed), . . . September 14, 2017 . . . October 11, 2017 . . . .

255. Accordingly, by incorporating such statements by reference, and therefore, making such statements a part of the December 12, 2017 Prospectus Supplement, the Prospectus Supplement was materially false and misleading in the same manner and for the same reasons as all of the statements enumerated above that are contained in the September 30, 2017 10-Q, the August 15, 2017 8-K, the September 14, 2017 8-K, and the October 11, 2017 8-K.

## XXII. FALSE AND MISLEADING STATEMENTS IN THE DECEMBER 14, 2017 PROSPECTUS SUPPLEMENT

256. On December 14, 2017, Helios filed a Prospectus Supplement on form 424B5 with the SEC in connection with its offering of certain "Units" of common stock and warrants. Therein, Helios stated in relevant part:

> The Company intends to strengthen our management team and combine its data and artificial intelligence technology with MoviePass' technology. With our big data and artificial intelligence platforms and other technologies that we own, we believe we will be able to bring a significant technological advantage to MoviePass.
>
> *Market Opportunity*
>
> . . . MoviePass intends to encourage increased attendance at movie theaters with the subscription model by targeting the casual movie goer (those who attend less than once a month) who represent 85% of the total movie going market.

257. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies, while "encouraging increased attendance," was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues—thus, Helios' "big data and artificial intelligence platforms" were of no use MoviePass; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (v) as a result of the

foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

258. Furthermore, the December 14, 2017 Prospectus Supplement incorporated by reference the following items which, as alleged above were false or misleading when made: (i) the Quarterly Report filed on Form 10-Q, for the period ending September 30, 2017, filed by Helios on November 14, 2017; and (ii) the Current Reports filed on Form 8-K, dated August 15, 2017, September 14, 2017, and October 11, 2017. The Company specifically stated:

> The SEC and applicable law permits us to "incorporate by reference" into this prospectus supplement information that we have or may in the future file with or furnish to the SEC. This means that we can disclose important information by referring you to those documents. You should read carefully the information incorporated herein by reference because it is an important part of this prospectus supplement. We hereby incorporate by reference the following documents into this prospectus supplement:
>
> . . .
>
> - Our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017, June 30, 2017 and September 30, 2017, as filed with the SEC on May 19, 2017, August 11, 2017 and November 14, 2017;
>
> - our Current Reports on Form 8-K filed with the SEC . . . August 15, 2017 (other than the portions of the filing that were furnished rather than filed), . . . September 14, 2017 . . . October 11, 2017 . . . .

259. Accordingly, by incorporating such statements by reference, and therefore, making such statements a part of the December 14, 2017 Prospectus Supplement, the Prospectus Supplement was materially false and misleading in the same manner and for the same reasons as all of the statements enumerated above that are contained in the September 30, 2017 10-Q, the August 15, 2017 8-K, the September 14, 2017 8-K, and the October 11, 2017 8-K.

## XXIII. FALSE AND MISLEADING STATEMENTS IN THE JANUARY 9, 2018 YAHOO! FINANCE INTERVIEW

260. On January 9, 2018, Farnsworth and Lowe were interviewed on the Yahoo! Finance Live show "The Final Round." During the interview Defendants stated, in pertinent part:

**Host:** So as you look at this incredible growth that you've had for MoviePass, uh, do you think that it just validates the fact that people get so much value out of having their MoviePass, that it's really not working -- the math? Because I can get this for $9.95, but so many people are rushing to it because they get so much more value out of it than $9.95. How are you possibly making money?

**Farnsworth:** Sure. Well I think, people ask us that all the time. And we've known from day one, Helios is, you know, an analytics company. ***So we I first got together with Mitch, and we looked at all the data, the analytics, what it was, that's what really made us make the decision to invest in MoviePass.***

* * *

**Farnsworth:** But Helios is really a data analytics company, which really made the perfect marriage of MoviePass in the data analytics of how we're driving the revenues of the company right now. And we're, ***we're thrilled because MoviePass within the next sixty days should be self-sufficient on its own.***

**Host:** Wait. Sixty days it's going to be cash flow neutral?

**Farnsworth:** ***Ya, like self-sufficient where you are not going through cash flow***.

**Host:** Like, they're [MoviePass] not going to be going through cash in sixty days?

**Farnsworth:** ***Right***.

Host: And what is the revenue stream that makes that possible?
**Farnsworth**: ***Multiple revenue streams***.
*Farnsworth laughing*

**Lowe**: ***Multiple***.

261. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable or "self-sufficient" and MoviePass could not be "cash flow neutral" because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and

MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data profitably; (iii) MoviePass did not have "multiple revenue streams" that could make it possible to become cash flow neutral within sixty days; (iv) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (v) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (vi) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XXIV. FALSE AND MISLEADING STATEMENTS IN THE JANUARY 9, 2018 FOX BUSINESS ARTICLE

262. On January 9, 2018, FoxBusiness.com published a news article containing quotes from Farnsworth and Lowe, regarding an announcement by Helios that MoviePass had obtained 1.5 million subscribers.[9] With respect to MoviePass' influx of subscribers Farnsworth falsely and misleadingly stated, "With this kind of hypergrowth, ***we believe MoviePass will be self-sustaining, from a positive cash flow perspective, in the next 60 days*** – and we could not be happier."

263. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable and could not be "cash flow positive" because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers,

[9] Available at, https://www.foxbusiness.com/features/moviepass-keeps-breaking-subscriber-records-heres-why (last visited April 3, 2019).

resulting in a negative profit margin; (ii) in only ***34 days***, on February 12, 2018, Helios would announce another securities offering to generate additional capital to fuel MoviePass' cash burn; (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data profitably; (iv) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (v) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (vi) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XXV. FALSE AND MISLEADING STATEMENTS IN THE JANUARY 22, 2018 WASHINGTON POST ARTICLE

264. On January 22, 2018, the Washington Post published a news article containing quotes from Farnsworth and Lowe, regarding MoviePass.[10] The article stated in pertinent part:

> Because the more movies its subscribers see, the more data the company rakes in. And that's where the real dough is. "***The big money for us was always understanding the consumers habits and the data***, because no one's ever done that," Ted Farnsworth, CEO of Helios and Matheson, told The Washington Post . . . . Studios have noticed. "***In the short term, we're already using the data to***

[10] Available at, https://www.washingtonpost.com/news/morning-mix/wp/2018/01/22/the-moviepass-deal-for-less-than-120-a-year-you-can-see-365-movies-heres-the-catch/?noredirect=on&utm_term=.a3b56e5715b9 (last visited April 3, 2019).

> ***promote titles on behalf of the studios. Studios are paying us around two dollars per ticket we buy in exchange for us marketing their film***," Lowe said.

265. The above statements were materially false and misleading when made because: (i) MoviePass' of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable, and had not, nor could, make "big money," because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (v) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XXVI. FALSE AND MISLEADING STATEMENTS IN THE JANUARY 25, 2018 REGISTRATION STATEMENT AND PROSPECTUS

266. On January 25, 2018, the Company filed a Registration Statement under the Securities Act of 1933 on Form S-3 and an accompanying Prospectus with the SEC which was signed by Farnsworth. Therein, Helios stated in relevant part:

> The Company intends to strengthen our management team and combine its data and artificial intelligence technology with MoviePass' technology. With our big data and artificial intelligence platforms and other technologies that we own, we believe we will be able to bring a significant technological advantage to MoviePass.

> *Market Opportunity*
>
> . . . MoviePass intends to encourage increased attendance at movie theaters with the subscription model by targeting the casual movie goer (those who attend less than once a month) who represent 85% of the total movie going market.

267. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies, while "encouraging increased attendance," was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues—thus, Helios' "big data and artificial intelligence platforms" were of no use MoviePass; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (v) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

268. Furthermore, the January 25, 2019 Prospectus incorporated by reference the following items which, as alleged above were false or misleading when made: (i) the Quarterly Report filed on Form 10-Q, for the period ending September 30, 2017, filed by Helios on November 14, 2017; and (ii) the Current Reports filed on Form 8-K, dated August 15, 2017, September 14, 2017, and October 11, 2017. The Company specifically stated:

> The SEC and applicable law permits us to "incorporate by reference" into this prospectus supplement information that we have or may in the future file with or furnish to the SEC. This means that we can disclose important information by referring you to those documents. You should read carefully the information incorporated herein by reference because it is an important part of this prospectus supplement. We hereby incorporate by reference the following documents into this prospectus supplement:
>
> . . .
>
> - Our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017, June 30, 2017 and September 30, 2017, as filed with the SEC on May 19, 2017, August 11, 2017 and November 14, 2017;
>
> - our Current Reports on Form 8-K filed with the SEC . . . August 15, 2017 (other than the portions of the filing that were furnished rather than filed), . . . September 14, 2017 . . . October 11, 2017 . . . .

269. Accordingly, by incorporating such statements by reference, and therefore, making such statements a part of the January 25, 2018 Prospectus, the Prospectus was materially false and misleading in the same manner and for the same reasons as all of the statements enumerated above that are contained in the September 30, 2017 10-Q, the August 15, 2017 8-K, the September 14, 2017 8-K, and the October 11, 2017 8-K.

## XXVII. FALSE AND MISLEADING STATEMENTS IN THE FEBRUARY 12, 2018 PROSPECTUS SUPPLEMENT

270. On February 12, 2018, Helios filed a Prospectus Supplement on form 424B5 with the SEC in connection with its offering of certain "Units" of common stock and warrants. Therein, Helios stated in relevant part:

> The Company intends to strengthen our management team and combine its data and artificial intelligence technology with MoviePass' technology. With our big data and artificial intelligence platforms and other technologies that we own, we believe we will be able to bring a significant technological advantage to MoviePass.
>
> *Market Opportunity*
>
> . . . MoviePass intends to encourage increased attendance at movie theaters with the subscription model by targeting the casual movie goer (those who attend less than once a month) who represent 85% of the total movie going market.

271. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies, while "encouraging increased attendance," was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues—thus, Helios' "big data and artificial intelligence platforms" were of no use MoviePass; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (v) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

272. Furthermore, the February 12, 2018 Prospectus Supplement incorporated by reference the following items which, as alleged above were false or misleading when made: (i) the Quarterly Report filed on Form 10-Q, for the period ending September 30, 2017, filed by Helios on November 14, 2017; and (ii) the Current Reports filed on Form 8-K, dated August 15, 2017, September 14, 2017, and October 11, 2017. The Company specifically stated:

> The SEC and applicable law permits us to "incorporate by reference" into this prospectus supplement information that we have or may in the future file with or furnish to the SEC. This means that we can disclose important information by referring you to those documents. You should read carefully the information

> incorporated herein by reference because it is an important part of this prospectus supplement. We hereby incorporate by reference the following documents into this prospectus supplement:
>
> . . .
>
> - Our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017, June 30, 2017 and September 30, 2017, as filed with the SEC on May 19, 2017, August 11, 2017 and November 14, 2017;
>
> - our Current Reports on Form 8-K filed with the SEC . . . August 15, 2017 (other than the portions of the filing that were furnished rather than filed), . . . September 14, 2017 . . . October 11, 2017 . . . .

273. Accordingly, by incorporating such statements by reference, and therefore, making such statements a part of the February 12, 2018 Prospectus Supplement, the Prospectus Supplement was materially false and misleading in the same manner and for the same reasons as all of the statements enumerated above that are contained in the September 30, 2017 10-Q, the August 15, 2017 8-K, the September 14, 2017 8-K, and the October 11, 2017 8-K.

## XXVIII. FALSE AND MISLEADING STATEMENTS IN THE FEBRUARY 14, 2018 PROSPECTUS SUPPLEMENT

274. After trading hours on February 14, 2018, Helios filed a Prospectus Supplement with the SEC in connection with its "best-efforts" offering. The February 14 Prospectus Supplement further stated:

> The Company intends to strengthen our management team and combine its data and artificial intelligence technology with MoviePass' technology. With our big data and artificial intelligence platforms and other technologies that we own, we believe we will be able to bring a significant technological advantage to MoviePass.
>
> *Market Opportunity*
>
> . . . MoviePass intends to encourage increased attendance at movie theaters with the subscription model by targeting the casual movie goer (those who attend less than once a month) who represent 85% of the total movie going market.

275. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies, while "encouraging increased attendance," was not sustainable because the

Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues—thus, Helios' "big data and artificial intelligence platforms" were of no use MoviePass; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (v) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

276. Furthermore, the February 14, 2018 Prospectus Supplement incorporated by reference the following items which, as alleged above were false or misleading when made: (i) the Quarterly Report filed on Form 10-Q, for the period ending September 30, 2017, filed by Helios on November 14, 2017; and (ii) the Current Reports filed on Form 8-K, dated August 15, 2017, September 14, 2017, and October 11, 2017. The Company specifically stated:

> The SEC and applicable law permits us to "incorporate by reference" into this prospectus supplement information that we have or may in the future file with or furnish to the SEC. This means that we can disclose important information by referring you to those documents. You should read carefully the information incorporated herein by reference because it is an important part of this prospectus supplement. We hereby incorporate by reference the following documents into this prospectus supplement:
>
> . . .

- Our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017, June 30, 2017 and September 30, 2017, as filed with the SEC on May 19, 2017, August 11, 2017 and November 14, 2017;

- our Current Reports on Form 8-K filed with the SEC . . . August 15, 2017 (other than the portions of the filing that were furnished rather than filed), . . . September 14, 2017 . . . October 11, 2017 . . . .

277. Accordingly, by incorporating such statements by reference, and therefore, making such statements a part of the February 14, 2018 Prospectus Supplement, the Prospectus Supplement was materially false and misleading in the same manner and for the same reasons as all of the statements enumerated above that are contained in the September 30, 2017 10-Q, the August 15, 2017 8-K, the September 14, 2017 8-K, and the October 11, 2017 8-K.

## XXIX. FALSE AND MISLEADING STATEMENTS IN THE FEBRUARY 16, 2018 PRESS RELEASE

278. On February 16, 2018, Helios issued a press release, entitled "Helios and Matheson Acquires More MoviePass™." In the February 16, 2018 Press Release, Farnsworth was quoted as saying:

> "We could not be more thrilled to hold a bigger stake in MoviePass, as the MoviePass phenomenon has become a major disruption to the entertainment industry," said Ted Farnsworth, CEO of Helios and Matheson Analytics, Inc. "***The partnership continues to be a great benefit to both MoviePass and Helios and Matheson shareholders***."

279. Additionally, the February 16, 2018 Press Release reaffirmed the statements made by individuals quoted therein. Specifically, it states that "management of HMNY believes that the assumptions made" in their statements and the "expectations represented by such statements ***are reasonable***[.]"

280. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers

exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (v) Defendants' "assumptions made" in their statements and the "expectations represented by such statements" could not be, and were not, "reasonable" in light of the foregoing; and (vi) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XXX. FALSE AND MISLEADING STATEMENTS IN PODCAST TRANSCRIPT POSTED BY RECODE MEDIA ON FEBRUARY 18, 2018

281. On February 18, 2018, Recode Media published an interview transcript titled "MoviePass CEO Mitch Lowe on Recode Media." That transcript contained the following exchange between Defendant Lowe and the podcast host of the podcast:

> **Host**: Where of course you're going to go take the two-for-one deal, for one. That also doesn't seem sustainable.
>
> **Lowe**: Yeah. Well, if you think that there's not enough money to support the growth, then yes, you would think so, but most people didn't think we'd make it this far. Remember, if we're buying one in every 19 movie tickets and it's an $11 billion business, you can kind of calculate that's a lot of money. We have been incredibly well funded. We have a backer that is prepared to go ***all the way to get us to cash-flow positive, which isn't all that far in the future***.

282. The above statements were materially false and misleading when made because: (i) Helios was burning cash at an alarming rate and would be forced to shut down the MoviePass app in July, 2018 and take an emergency loan to pay for movie tickets; (ii) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable, let alone capable of becoming "cash-flow positive" because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (v) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (vi) as a result of the foregoing, Defendant Lowe's statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XXXI. FALSE AND MISLEADING STATEMENTS IN THE INTERVIEW CONTAINED IN A FEBRUARY 22, 2018 SEEKING ALPHA ARTICLE AND EXPANDED UPON IN A SECOND SEEKING APLHA ARTICLE DATED APRIL 4, 2018

283. During regular trading hours on February 22, 2018, Seeking Alpha released an article written by contributor Ben Rabizadeh ("Rabizadeh") titled "CEO Of HMNY, Ted Farnsworth, Responds To MoviePass Critics In Exclusive Interview" containing excerpts from an interview with Defendant Farnsworth. That article contained the following exchange:

> Ben Rabizadeh: Mitch [Lowe] has talked about this data in public comments, as the users age, they will watch less and less movies every month. The other important factor is that the mix of users will shift towards more casual users as the brand grows, whereas in the early stages, it was avid-user heavy. These are the two key data points everyone is looking for so we can figure out when you will be cash-flow positive.
>
> Farnsworth: ***The near term goal is to be cash-flow positive. Where we are not burning through the cash, not profitable, but not burning through. We plan to release more information on a lot of those things as soon as we can***.

284. In response to the false and misleading statements contained in the February 22, 2018 *Seeking Alpha* article, the price of Helios' common stock increased $0.41, from a close of $4.50 on February 21, 2018 to close at $4.91 on February 22, 2018—an increase of 9.11% on heavy volume.

285. Then, on April 4, 2018 during market hours, Rabizadeh released another article on *Seeking Alpha* titled "What's Really Going On With Helios And Matheson Analytics And MoviePass" where he wrote "[p]rior to publication, I contacted [Helios] to give them an opportunity to respond." Farnsworth provided the following statement in response to the April 4, 2018 article: "***[t]he internal metrics are tracking as planned which gives us continued confidence on our path of profitability***."

286. In response to the false and misleading statements contained in the April 4, 2018 *Seeking Alpha* article, the price of Helios' common stock increased $0.41, from a close of $2.57 on April 3, 2018 to close at $2.98 on April 4, 2018—an increase of 15.95% on heavy volume.

287. The above statements were materially false and misleading when made because: (i) Helios was burning cash at an alarming rate and would be forced to shut down the MoviePass app in July, 2018 and take an emergency loan to pay for movie tickets; (ii) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable, let alone capable of becoming "cash-flow positive" or "profitab[le,]"because the

Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (v) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (vi) as a result of the foregoing, Defendant Lowe's statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XXXII. FALSE AND MISLEADING STATEMENTS IN THE FEBRUARY 26, 2018 PRESS RELEASE

288. On February 26, 2018, Helios issued a press release, entitled "MoviePass™ CEO Mitch Lowe and HMNY CEO Ted Farnsworth to Keynote at Winston Baker's Entertainment Finance Forum on March 2, 2018." The February 26, 2018 Press Release stated, in relevant part, as follows:

> The forum topic, *Data is the New Oil: How Will MoviePass Monetize It?* Will feature a discussion with Lowe and Farnsworth ***as they share how MoviePass utilizes data, their growth-focused business model, and their plan to revitalize the movie industry.*** Co-Editor-in-Chief of Variety Andrew Wallenstein will serve as the discussion's moderator.
>
> * * *
>
> "***We have a real opportunity here to use data to inform the movie business about their audiences and, more importantly, to deliver real intelligence on what works and what doesn't***," said HMNY CEO Ted Farnsworth. "***We're rolling up our sleeves now and working closely with our data to understand the impact of films on audiences and to bring this intelligence to our partners in the industry***."

289. Additionally, the February 26, 2018 Press Release reaffirmed the statements made by individuals quoted therein. Specifically, it states that "HMNY's management believes that the assumptions made" in their statements and the "expectations represented by such statements ***are reasonable***[.]"

290. The above statements were materially false and misleading when made because: (i) Defendants, admittedly, lost more money as subscribers saw more movies, and thus was not "growth-focused" and Defendants could not make up for increased losses from increased subscriber activity; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; (v) Defendants' "assumptions made" in their statements and the "expectations represented by such statements" could not be, and were not, "reasonable" in light of the foregoing; and (vi) as a result of the foregoing, Defendant Lowe's statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XXXIII. FALSE AND MISLEADING STATEMENTS FALSE AND MISLEADING STATEMENTS IN MARCH 2, 2018 MEDIAPLAYNEWS ARTICLE

291. On March 2, 2018, *MediaPlayNews* released an article titled "CEO Mitch Lowe Says MoviePass Will Reach 5 Million Subs by End of Year." That article reported on statements

made by Defendant Lowe on March 2, 2018 while Lowe was being interviewed at the Entertainment Finance Forum. When discussion Helios' data analytics and its prospects for generating revenues, Lowe stated the following:

> We get an enormous amount of information. Since we mail you the card, we know your home address, of course, we know the makeup of that household, the kids, the age groups, the income. It's all based on where you live. It's not that we ask that. You can extrapolate that. ***Then because you are being tracked in your GPS by the phone, our patent basically turns on and off our payment system by hooking that card to the device ID on your phone, so we watch how you drive from home to the movies. We watch where you go afterwards, and so we know the movies you watch. We know all about you.***

292. As a result of these false and misleading statements, the price of Helios' common stock increased $0.15, from a close of $4.58 on March 1, 2018 to close at $4.73 on March 2, 2018—an increase of 3.27% on extremely heavy volume.

293. The above statements regarding tracking subscribers were materially false and misleading when made because Lowe would later admit that Helios does not track people, stating "I was just being in a funny mood and just said it sarcastically" and concluded with "[w]e are not tracking people".[11]

294. Further, the above statement regarding MoviePass' ability to use data to market film was materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and

---

[11] *See* Wired, *As MoviePass Explodes Its Growing Pains Hurt Subscribers*, available at, https://www.wired.com/story/moviepass-growing-pains/ (last visited April 3, 2019). *See also* The Verge, available at, https://www.theverge.com/2018/3/5/17083280/moviepass-location-based-user-tracking-data-privacy-app-policy-changes (last visited April 3, 2019).

MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; and (iii) as a result of the foregoing, Defendant Lowe's statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XXXIV. FALSE AND MISLEADING STATEMENTS IN THE MARCH 23, 2018 PRESS RELEASE

295. On March 23, 2018, Helios issued a press release, entitled "MoviePass™ Lowers price to $6.95 per Month." In the March 23 Press Release, Helios stated, in relevant part:

> ***MoviePass has gained momentum in diversifying its revenue streams*** due to a series of marketing agreements with studios and distributors, as well as partnerships with a number of theater exhibitors. This recent success in forming relationships with studios, exhibitors, and marketing partners has encouraged MoviePass to offer an even more attractive deal to consumers.
>
> * * *
>
> "With the current growth and support that we've seen within the last several months, our studio and exhibitor revenues and other marketing partnerships have motivated us to lower the price once again, offering movie lovers greater access to MoviePass." [said MoviePass CEO Mitch Lowe]
>
> * * *
>
> "***We believe our business will succeed*** by granting the public greater access to see movies how they were originally intended to be seen – in theaters," said HMNY's Chairman and CEO Ted Farnsworth.

296. Additionally, the March 23, 2018 Press Release reaffirmed the statements made by individuals quoted therein. Specifically, it states that "management of HMNY and MoviePass believe that the assumptions made" in their statements and the "expectations represented by such statements ***are reasonable***[.]"

297. The above statements were materially false and misleading when made because: (i) Defendants, admittedly, lost more money as subscribers saw more movies and Defendants could

not make up (let alone "succeed[,]") for the increased losses that they would incur by slashing subscriber fees to $6.95 per month; (ii) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (v) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs, who had already refused to work with MoviePass, and any "momentum" or "revenue" from recent deals were too insignificant to warrant a 30% reduction in subscriber fees. Rather, Defendants' false characterization of its recent deals as providing "growth and support" was a designed to falsely and misleadingly cast the Company in an unrealistically rosy light; (vi) Defendants' "assumptions made" in their statements and the "expectations represented by such statements" could not be, and were not, "reasonable" in light of the foregoing; and (vii) as a result of the foregoing, Defendant Lowe's statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XXXV. FALSE AND MISLEADING STATEMENTS IN INTERVIEW QUOTED IN MARCH 27, 2018 THE WRAP ARTICLE

298. On March 27, 2018, The Wrap published an article entitled "How MoviePass Plans to Profit While Selling Unlimited Movies for $6.95 a Month" featuring an interview with Defendant Lowe. During the interview, Lowe was asked how the Company could be profitable at the newly announced $6.95 per month plan. Lowe responded by stating: "the math works out — and that the company will also earn money by selling user data to studios, exhibitors and other businesses." In the same article, Defendant Farnsworth offered the flowing quote "studio advertising will also become a main source of revenue as studios use customer data to target customers more effectively" and was directly quoted as stating "[w]e think there's a lot of money to be made per subscriber."

299. The above statements were materially false and misleading when made because: (i) Defendants, admittedly, lost more money as subscribers saw more movies and Defendants could not make up for the increased losses that they would incur by slashing subscriber fees to $6.95 per month; (ii) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin (i.e. "the math" did not "work[] out"); (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one

subscriber and other issues; (v) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs, who had already refused to work with MoviePass; and (vi) as a result of the foregoing, Defendant Lowe's statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XXXVI. FALSE AND MISLEADING STATEMENTS IN THE APRIL 6, 2018 BENZINGA ARTICLE

300. On April 6, 2018 during trading hours, Benzinga released an article titled "Helios And Matheson CEO Projects 6 Million MoviePass Subscribers In 2018, Says 12% Are 'Overusers'" which contained statements from Defendant Farnsworth. In that article, Farnsworth was quoted as saying "We are thrilled with our current metrics in-house moving toward profitability, and ***we believe we will be profitable by the end of the year*** . . . ."

301. In response to the April 6, 2018 article, the price of Helios' common stock increased $0.06, from a close of $2.88 on April 5, 2018 to close at $2.94 on April 6, 2018. The price of Helios' common stock continued to increase from a close of $2.94 on April 6, 2018 to a close of $3.11 on April 9, 2018—a two-day increase of ***7.9%***.

302. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable, let alone capable for becoming "profitable[,]" because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data;

(iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs, who had already refused to work with MoviePass; and (v) as a result of the foregoing, Defendant Lowe's statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XXXVII. FALSE AND MISLEADING STATEMENTS IN THE VIDEO EMBEDDED IN THE APRIL 6, 2018 CHEDDAR ARTICLE

303. On April 6, 2018, Cheddar.com released an article entitled "A Call to Movie Lovers" that included an embedded video interview with Defendant Farnsworth. That video contained the following exchange:

> Host: What are the conversations like with some of these major theatre operators that might be concerned with the low price for some of those, heavy movie goers, right that, these theaters aren't getting the bang for their buck?
>
> Farnsworth: . . . ***But um, we see it where you're going to be seeing more and more theaters that we're signing up, as we go along, where they share revenues with us because we double consumption.***

304. The above statements made by Farnsworth were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business model was not viable, as the country's major movie theater operators had no incentive to pay MoviePass because they had their own loyalty programs; and

(iii) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XXXVIII. FALSE AND MISLEADING STATEMENTS IN THE APRIL 12, 2018 YAHOO! FINANCE INTERVIEW

305. On January 9, 2018, Farnsworth and Lowe were interviewed by Yahoo! Finance personality David Pogue. During the Interview Lowe stated as follows:

> "**Pogue:** But I'm confused about that, because every time someone goes to a movie, you're losing more money. Don't you secretly prefer people who *don't* use the card as often?
>
> **Lowe:** They [the people who see a lot of movies] become more valuable to us."

(Emphasis in original).

306. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin—thus, frequent MoviePass users were not "more" valuable to the Company; (ii) the Company would take action ***the next day***, April 13, 2018, to limit subscribers' attendance to only four movies per month—evidencing that frequent MoviePass users were not "more" valuable to the Company; (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (v) MoviePass'

business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs, who had already refused to work with MoviePass; (vi) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (vii) as a result of the foregoing, Defendant Lowe's statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XXXIX. FALSE AND MISLEADING STATEMENTS IN THE APRIL 17, 2018 ANNUAL REPORT

307. On April 3, 2018, Helios filed with the SEC a Form 12b-25 executed by Benson in which it indicated that it would be delaying the filing of its annual report. According to this filing, Helios "was unable to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 within the prescribed period due to the Company requiring additional time to work internally with its staff and externally with its outside auditors to prepare and finalize the Annual Report."

308. On April 17, 2018, Helios filed its Annual Report on Form 10-K with the SEC for the fiscal year ended December 31, 2017 (the "2017 Form 10-K"). The 2017 Form 10-K was signed and certified by Farnsworth and Benson. In relevant part, Helios stated:

> MoviePass Ventures aims to leverage the Company's and MoviePass' ability to increase movie theater attendance for select films through their advanced marketing efforts and working directly with distributors to drive consumers toward select independent films and share in the economic performance of those films.
>
> The Company intends to combine its data and artificial intelligence technology with MoviePass' technology. With our big data and artificial intelligence platforms and other technologies that we own, we believe we will be able to bring a significant technological advantage to MoviePass and MoviePass Ventures.
>
> * * *
>
> MoviePass' core business model rests largely on its ability to continue to improve the consumer experience. MoviePass aims to do this by targeting a consumer experience that is mobile first, with features such as its "search & discovery" and "transact and enjoy" tools in the MoviePass mobile application. The movie going experience for MoviePass subscribers is a simple process, by which the subscriber

> first signs up for a monthly membership plan, for as low as $6.95 per month, and receives a MoviePass debit card in the mail. The subscriber then uses the MoviePass application to, sequentially, choose a movie, choose a theater, choose a show time and finally "check in." The aim of MoviePass' low cost and straightforward process is to create an experience for consumers to see more movies, save money, and reduce regret of the movie going experience. MoviePass believes that the simplicity of the process and the ability to engage with consumers through the various steps of the check-in process through the app creates an opportunity to drive consumers to theaters more often and for select films. It also allows MoviePass to derive data insights on interests, activities or spending.

309. The above statements were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data profitably; (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (iv) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs, who had already refused to work with MoviePass; and (v) as a result of the foregoing, Defendant Lowe's statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

310. Further, the 2017 Form 10-K contained this specific risk factor which was false and misleading when made:

> ***MoviePass may not gain acceptance from large national exhibitors (movie theater chains), which could have a material adverse effect on MoviePass' financial condition and results of operations.***
>
> . . . However, **if MoviePass is unable to partner** with large national exhibitors, (i) MoviePass likely will continue to be required to pay full price per movie ticket each time a MoviePass subscriber attends a movie theater operated by a large national exhibitor, (ii) MoviePass would be unlikely to share in concession sales to its subscribers attending those theaters, and (iii) MoviePass may not be able to sell digital advertising or data analytics services to those large national exhibitors. ***If MoviePass is unable to negotiate discounted ticket prices from, share in concession sales with or sell digital advertising or data analytics services to large national exhibitors***, MoviePass' financial condition and results of operations ***may be*** materially and adversely affected, MoviePass may not become profitable and MoviePass may not be able to sustain its operations.

(Italicized emphasis in original; underlined emphasis added).

311. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—could not be viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) Defendants assert that MoviePass "may not" be able to partner with national exhibitors, yet they fail to disclose that their business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (iii) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

312. Additionally, the 2017 Form 10-K contained this specific risk factor which was false and misleading when made:

> ***If MoviePass is not able to manage its growth, its business could be affected adversely.***
> MoviePass' subscriber base has expanded rapidly since August 15, 2017, when it announced its new subscription price of $9.95 per month. **MoviePass may not be able, for many reasons, including lack of financing or adequate personnel resources, to meet the demand to timely deliver MoviePass cards to its**

> **subscribers or otherwise service its business.** As such, MoviePass could experience a significant slowdown or stoppage as it attempts to serve the expanding subscriber base.

(Italicized emphasis in original; underlined emphasis added).

313. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—could not be viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data profitably; (ii) MoviePass was already failing to meet demand to timely deliver MoviePass cards to its subscribers (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; and (iv) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

314. In addition to the affirmative false and misleading statements detailed above, Defendants also violated Item 303 by failing to disclose known trends and uncertainties in the 2017 Form 10-K. Specifically, at the time of filing, Defendants knew, but did not disclose that: (1) MoviePass was not viable and that from the Company's inability to introduce additional revenue streams, Helios would soon run out of cash necessary to continue building its highly unprofitable subscriber base; (2) MoviePass' absurd strategy of slashing subscription prices resulted in: (a) MoviePass being unable to satisfy the increased demand in shipping MoviePass cards and processing subscriptions; (b) MoviePass's inability to respond to customer inquiries, customer complaints, cancellation requests, and refunds; and (c) MoviePass app outages, the

creation of "phantom" MoviePass accounts, and the backlogging of duplicative customer complaints.

## XL. FALSE AND MISLEADING STATEMENTS IN APRIL 17, 2018 *VARIETY* ARTICLE

315. On or about April 17, 2018, *Variety* published an article entitled, "The Great Disruptor: MoviePass Upends the Movie Business, but Can It Survive?" In the April 17, 2018 *Variety* article, defendant Farnsworth falsely assured investors that Helios was in no danger of running out of money and that it had "secured ***a $375 million line of credit***"[12] and that "capital is not an issue:"

> Since day one, people have been saying we'll run out of money…. ***I assure you that capital is not an issue. I'm sitting on hundreds of millions of dollars of dry powder, and I've got bankers and debt-financing companies calling me all the time. They know they're looking at an Uber or an Airbnb. This is a unicorn company.***

316. The above statement regarding the "$375 million line of credit" was false and misleading when made because: (i) Helios did not have a "line of credit"; (ii) Farnsworth was misleadingly referring to the possibility of additional capital derived from potential future offerings pursuant to Helios' $400 million universal shelf registration statement the Company filed with the SEC on January 25, 2018; (iii) at the time Farnsworth made this statement to *Variety*, Helios had—at most—$295 million remaining on the shelf registration statement because, according to its Form 10-Q filed on May 15, 2018, it derived "$105.0 million" from an offering in

---

[12] *Business Insider* later confirmed in an article dated May 24, 2018, titled "MoviePass said a $300 million lifeline could sustain it for over a year, but that money could slip through its fingers" that the term "equity line of credit" was a term "he [Farnsworth] used in an email (via a spokesperson) to *Business Insider*. Articles on MoviePass by the *New York Times*, *Reuters*, and *Variety* have also mentioned it."

February 2018; (iv) at the time this statement was made, Helios had not even authorized the sale of $150 million worth of shares in the April 2018 ATM pursuant to its $400 million universal shelf registration statement; and (v) as a result of the foregoing, Defendant Farnsworth's statement about Helios' "$375 million line of credit" was false and misleading and/or lacked a reasonable basis.

317. The remaining above statements regarding Helios' sufficient access to capital and "sitting on hundreds of millions of dollars of dry powder" were materially false and misleading when made because: (i) at the time, Helios had, at most $295 million remaining on the shelf registration statement because, according to its Form 10-Q filed on May 15, 2018, it derived "105.0 million" from an offering in February 2018; (ii) Defendants intended to raise capital by siphoning off money from investors through best-efforts and an At The Market offering, rather than through a bank or debt-financing; (iii) Helios was burning cash at an alarming rate and would have to shut down the MoviePass app in July, 2018 and take an emergency loan to pay for movie tickets; (iv) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (v) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (vi) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (vii) MoviePass' business model was not viable, as movie theaters had no incentive to pay MoviePass because they

had their own loyalty programs, who had already refused to work with MoviePass; and (viii) as a result of the foregoing, Helios would soon run out of cash and certainly was not "sitting on hundreds of millions of dollars" as defendant Farnsworth false represented; and, thus, (ix) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XLI. FALSE AND MISLEADING STATEMENTS IN APRIL 26, 2018 NEW YORK TIMES ARTICLE

318. On April 26, 2018, *The New York Times* released an article on the Company and MoviePass. The article included direct quotes from Defendant Farnsworth. That article quoted Farnsworth as stating, "I'm not worried about the viability of MoviePass at all." In response to a question regarding Helios' auditors expressing concern about the ability for Helios to continue as a going concern, "[a] smiling Mr. Farnsworth, sitting in a suite at Caesars Palace, ***waved away that revelation as nothing more than routine, pro forma stuff***."

319. The above statements regarding the viability of MoviePass and the characterization of Helios' independent auditors' explanatory paragraph in the 2017 Form 10-K, indicating that there was substantial doubt as to the Company's ability to continue as a going concern as "pro forma" were materially false and misleading when made because: (i) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (ii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iii) according to CW1, Helios and MoviePass' systems were unable to

handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; and (iv) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XLII. FALSE AND MISLEADING STATEMENTS IN THE MAY 8, 2018 *NEW YORK POST* ARTILE

320. On May 8, 2018, the *New York Post* released an article titled "MoviePass owner says he's 'not worried' about dwindling cash." The May 8, 2018 included direct quotes from Defendant Farnsworth in response to questions about the Company's cash burn. Farnsworth stated "I'm not worried about the cash burn at all" and relayed to the *New York Post* that "***the company has registered to sell as much as $300 million in new stock to raise additional funds in the coming months***, ***and that it's exploring raising money through both debt and equity***."

321. The above statements concerning Helios' cash burn and ability to raise additional funding "through both debt and equity" were materially false and misleading when made because: (i) Helios was not authorized to issue $300 million in new stock; (ii) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (iii) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (iv) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge

backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; and (v) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XLIII. FALSE AND MISLEADING STATEMENTS IN THE MAY 9, 2018 *VARIETY* ARTICLE

322. On May 9, 2018, *Variety* released an article titled "MoviePass Parent's Stock Plunges Again Following Warning on Cash Burn" that included direct statements from Defendant Farnsworth. Farnsworth issues the following statement to *Variety* that was subsequently published in the article:

> We are not changing our guidance on 5 million subscribers by the end of this year, which ***should make us profitable/cash flow-positive*** according to our business model.
>
> ***We have access in capital markets to over $300 million*** . . . So there is plenty of cash available to sustain the subscriber growth and movie-going habits of our users.

323. The above statements were materially false and misleading when made because: (i) Helios was not authorized to issue $300 million in new stock; (ii) Helios could not "sustain the subscriber growth" as evidenced by the fact that it would continue to raise capital through the sale of securities, including approximately one month later on June 21, 2018; (iii) the Company was burning cash at an alarming rate and would have to shut down the MoviePass app in July, 2018 and take an emergency loan to pay for movie tickets; (iv) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (v) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did

not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (vi) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; and (vii) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XLIV. FALSE AND MISLEADING STATEMENTS IN THE MAY 13, 2018 *VARIETY* ARTICLE

324. On May 13, 2018, *Variety* released an article titled "MoviePass Owner Hits Back at Reports Service Is Dying" that included direct statements from Defendant Farnsworth. *Variety* reported that Farnsworth stated that Helios "has roughly ***$300 million*** available to it from an ***equity line of credit***."[13] Farnsworth added that, "We've got 17 months' worth of cash ***without further raises of capital***."

325. In response to the May 13, 2018 article, the price of Helios' common stock increased $0.03, from a close of $0.65 on May 11, 2018 to close at $0.68 on May 14, 2018—an increase of ***4.6%*** on unusually heavy volume.

326. The above statement concerning the $300 million "equity line of credit" was materially false and misleading when made because: (i) Helios did not have an "equity line of

[13] *Business Insider* later confirmed in an article dated May 24, 2018, titled "MoviePass said a $300 million lifeline could sustain it for over a year, but that money could slip through its fingers" that the term "equity line of credit" was a term "he [Farnsworth] used in an email (via a spokesperson) to Business Insider. Articles on MoviePass by the *New York Times*, *Reuters*, and *Variety* have also mentioned it."

credit," but was instead issuing shares pursuant to an At-The-Market offering; (ii) Helios was not authorized to issue $300 million in new stock; (iii) at the time Farnsworth made this statement, Helios had, at most $264.7 million remaining on the shelf registration statement because, according to its Form 10-Q filed on May 15, 2018, it received "$105.0 million" from an offering in February 2018 and "$30.3 million" from an offering in April 2018; (iv) and as a result of the foregoing, Defendant Farnsworth's statement about Helios' $300 million "equity line of credit" was false and misleading and/or lacked a reasonable basis.

327. The above statement concerning "17 months' worth of cash without further raises of capital" was false and misleading and/or lacked a reasonable basis because: (i) Helios was burning cash at an alarming rate and would have to shut down the MoviePass app in July, 2018 and take an emergency loan to pay for movie tickets; (ii) Helios would continue to raise capital through the sale of securities, including approximately one month later on June 21, 2018; (iii) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (iv) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (v) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; and (vi) as a

result of the foregoing, Defendant Farnsworth's statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XLV. FALSE AND MISLEADING STATEMENTS IN THE MAY 14, 2018 *BUSINESS INSIDER* ARTICLE

328. On May 14, 2018, *Business Insider* released an article titled "MoviePass Owner says it has a $300 million line of credit and could stay afloat for 17 months without raising more money" that included direct statements from Defendant Farnsworth. *Business Insider* reported that Farnsworth stated that he is "not worried at all" about the Company's dwindling cash and that Helios has "roughly ***$300 million*** available from an ***equity line of credit***."[14] Farnsworth added that, "We've got 17 months' worth of cash ***without further raises of capital***."

329. The above statement concerning the $300 million "equity line of credit" was materially false and misleading when made because: (i) Helios did not have an "equity line of credit," but was instead issuing shares pursuant to an At-The-Market offering; (ii) Helios was not authorized to issue $300 million in new stock; (iii) at the time Farnsworth made this statement, Helios had, at most $264.7 million remaining on the shelf registration statement because, according to its Form 10-Q filed on May 15, 2018, it received "$105.0 million" from an offering in February 2018 and "$30.3 million" from an offering in April 2018; (iv) and as a result of the foregoing, Defendant Farnsworth's statement about Helios' $300 million "equity line of credit" was false and misleading and/or lacked a reasonable basis.

---

[14] *Business Insider* later confirmed in an article dated May 24, 2018, titled "MoviePass said a $300 million lifeline could sustain it for over a year, but that money could slip through its fingers" that the term "equity line of credit" was a term "he [Farnsworth] used in an email (via a spokesperson) to Business Insider. Articles on MoviePass by the *New York Times*, *Reuters*, and *Variety* have also mentioned it.

330. The above statement concerning "17 months' worth of cash without further raises of capital" was false and misleading and/or lacked a reasonable basis because: (i) Helios was burning cash at an alarming rate and would have to shut down the MoviePass app in July, 2018 and take an emergency loan to pay for movie tickets; (ii) Helios would continue to raise capital through the sale of securities, including approximately one month later on June 21, 2018; (iii) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (iv) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (v) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; and (vi) as a result of the foregoing, Defendant Farnsworth's statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XLVI. FALSE AND MISLEADING STATEMENTS IN THE MAY 15, 2018 10-Q

331. On May 15, 2018, Helios filed with the SEC a Form 10-Q executed by Defendants Farnsworth and Benson. The May 15, 2018 10-Q incorporated by reference the "risk factors included under Item 1A. of our Annual Report on Form 10-K for the fiscal year ended December 31, 2017 that was filed with the SEC on April 17, 2018."

332. The 2017 Form 10-K (and, by reference, the May 15, 2018 10-Q) contained this specific risk factor which was false and misleading when made:

> ***MoviePass may not gain acceptance from large national exhibitors (movie theater chains), which could have a material adverse effect on MoviePass' financial condition and results of operations.***
>
> . . . However, **if MoviePass is unable to partner** with large national exhibitors, (i) MoviePass likely will continue to be required to pay full price per movie ticket each time a MoviePass subscriber attends a movie theater operated by a large national exhibitor, (ii) MoviePass would be unlikely to share in concession sales to its subscribers attending those theaters, and (iii) MoviePass may not be able to sell digital advertising or data analytics services to those large national exhibitors. ***If MoviePass is unable to negotiate discounted ticket prices from, share in concession sales with or sell digital advertising or data analytics services to large national exhibitors***, MoviePass' financial condition and results of operations ***may be*** materially and adversely affected, MoviePass may not become profitable and MoviePass may not be able to sustain its operations.

(Italicized emphasis in original; underlined emphasis added).

333. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—could not be viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) Defendants assert that MoviePass "may not" be able to partner with national exhibitors, yet they fail to disclose that their business model was not viable, as movie theaters had no incentive to pay MoviePass because they had their own loyalty programs; and (iii) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

334. Additionally, the 2017 Form 10-K (and, by reference, the May 15, 2018 10-Q) contained this specific risk factor which was false and misleading when made:

> ***If MoviePass is not able to manage its growth, its business could be affected adversely.***
>
> MoviePass' subscriber base has expanded rapidly since August 15, 2017, when it announced its new subscription price of $9.95 per month. **MoviePass may not be able, for many reasons, including lack of financing or adequate personnel**

> **resources, to meet the demand to timely deliver MoviePass cards to its subscribers or otherwise service its business.** As a result, MoviePass could experience a significant slowdown or stoppage as it attempts to serve the expanding subscriber base.

(Italicized emphasis in original; underlined emphasis added).

335. The above statements were materially false and misleading when made because: (i) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—could not be viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (ii) MoviePass was already failing to meet demand to timely deliver MoviePass cards to its subscribers (iii) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; and (iv) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XLVII. FALSE AND MISLEADING STATEMENTS IN THE MAY 16, 2018 *NEW YORK TIMES* ARTICLE

336. On May 16, 2018, *The New York Times* released an article regarding Helios and MoviePass. That article included statements that Defendant Lowe made to the article's author in a phone interview. Defendant Lowe stated that "***the company's financial troubles have been exaggerated. The company has access to a $300 million equity line of credit that will keep it***

***solvent*** . . . and blamed the company's competitors, such as large theater chains, for sowing the seeds of doubt."[15]

337. The above statement concerning the $300 million "equity line of credit" was materially false and misleading when made because: (i) Helios was burning cash at an alarming rate and would have to shut down the MoviePass app in July, 2018 and take an emergency loan to pay for movie tickets; (ii) Helios would continue to raise capital through the sale of securities, including approximately one month later on June 21, 2018; (iii) Helios did not have an "equity line of credit," but was instead issuing shares pursuant to an At-The-Market offering; (iv) Helios was not authorized at the time to issue $300 million in new stock; (v) at the time Farnsworth made this statement, Helios had, at most $264.7 million remaining on the shelf registration statement because, according to its Form 10-Q filed on May 15, 2018, it received "$105.0 million" from an offering in February 2018 and "$30.3 million" from an offering in April 2018; (vi) and as a result of the foregoing, Defendant Farnsworth's statement about Helios' $300 million "equity line of credit that will keep it solvent" was false and misleading and/or lacked a reasonable basis.

## XLVIII. FALSE AND MISLEADING STATEMENTS IN THE JUNE 12, 2018 *VICE* INTERVIEW

338. On June 12, 2018, *Vice* released an article regarding Helios and MoviePass that included a transcript of an interview with Defendant Farnsworth. The interview contained the

---

[15] *Business Insider* later confirmed in an article dated May 24, 2018, titled "MoviePass said a $300 million lifeline could sustain it for over a year, but that money could slip through its fingers" that the term "equity line of credit" was a term "he [Farnsworth] used in an email (via a spokesperson) to Business Insider. Articles on MoviePass by the *New York Times*, *Reuters*, and *Variety* have also mentioned it.

following exchange where Farnsworth assured investors that Helios had the capital to continue funding MoviePass:

> **Host**: A friend of mine hasn't bought MoviePass because they don't expect you'll be around next year. What reassurances do you have to potential customers?
>
> **Farnsworth**: The only thing I can say to them is we're doing $9.95 a month, and if you go to one movie, what's your exposure? Nothing. If we're not around next month, you're not paying nothing.
>
> ***We're so confident where we are, I'm not worried about that. The money side is the least of our worries***.

339. The above statement was false and misleading and/or lacked a reasonable basis because: (i) money was not "the least" of the Company's "worries" because Helios would continue to raise capital through the sale of securities ***only nine days later*** on June 21, 2018; (ii) Helios was burning cash at an alarming rate and would have to shut down the MoviePass app in July, 2018 and take an emergency loan to pay for movie tickets; (iii) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (iv) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (v) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; and (vi) as a result of the foregoing, Defendants' statements about

Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## XLIX. FALSE AND MISLEADING STATEMENTS IN DEFENDANT LOWE'S JUNE 28, 2018 REDDIT "ASK ME ANYTHING"

340. On June 28, 2018, defendant Lowe did a Reddit "ask me anything" on MoviePass where he had the following exchange assuring investors that Helios would break even by the end of the year and be profitable in the near future:

> **StarDestinyGuy**: "What would you say to people who are concerned about the long-term viability of MoviePass, people who believe that the business model is not financial sustainable?"
>
> **MoviePassMitch**: "It takes a lot of investment and significant losses in order to build a ***multibillion dollar entertainment company***. . . ***In our case, we plan to break even on our subscription model by the end of the year*** . . . Our plan is not to make money off the subscriptions – our plan is to break even. ***In the future, our path to profit will be by selling ads, engaging in brand partnerships and creating our own content***."[16]

341. The above statements were materially false and misleading when made because: (i) Helios' auditors had previously issued an opinion that the Company may not be able to continue as a going concern because of the direness of Helios' financial situation; (ii) Helios was burning cash at an alarming rate and would have to shut down the MoviePass app in July, 2018 and take an emergency loan to pay for movie tickets; (iii) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (iv) MoviePass' business plan to make up for

---

[16] Available at, https://www.reddit.com/r/movies/comments/8u00y3/im_mitch_lowe_ceo_of_moviepass_ama/ (lasted visited on April 3, 2019).

lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data profitably; (v) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; and (vi) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## L. FALSE AND MISLEADING STATEMENTS IN THE CNN BUSINESS ARTICLE

342. On July 12, 2018, *CNN Business* released an article titled "MoviePass stock is 19 cents but the boss says everything is fine" that included an interview transcript with Defendant Farnsworth. That interview transcript included, in relevant part, the following exchange:

> **Host:** How do you bring the market's confidence back to this company? It seems pretty clear that it's vanished over the last several months.
>
> **Farnsworth:** . . .
>
> ***I think Wall Street, the same as venture capitalists, they're used to seeing a model like this, similar to a Netflix (NFLX), where the company burns a significant amount of cash to get to profitability, but also to claim market share.***
>
> ***The timeline [for profitability] really is by the end of this year,*** when you hit around 5 million subscribers, is what our model shows.
>
> **Host:** What kind of data you are collecting from your customers? What privacy concerns are there? How do you hope to use that data?
>
> **Farnsworth:** What we do as the analytics company is, we sit there and we can tell the moviegoing habits. We know what time they go to the movies, what movies they like, what genre they like.

> When a studio comes out with a movie, and they want to use us for marketing, we have a very good idea of who's going to really play to that movie as we start to advertise out to our base.

343. The above statements were materially false and misleading when made because: (i) Helios' auditors had previously issued an opinion that the Company may not be able to continue as a going concern because of the direness of Helios' financial situation; (ii) Helios was burning cash at an alarming rate and would have to shut down the MoviePass app in July, 2018 and take an emergency loan to pay for movie tickets; (iii) MoviePass' business model of charging subscribing customers a $6.95 to $9.95 per month fee for unlimited movies was not sustainable, and could not be profitable, because the Company's expenses to retain subscribers exceeded the revenue generated for such subscribers, resulting in a negative profit margin; (iv) MoviePass' business plan to make up for lost profits—through data mining of MoviePass subscriber information that would purportedly generate business for third party customers—was not viable because Helios and MoviePass did not have and never had the systems, technology, skill or capabilities to gather or analyze subscriber data; (v) according to CW1, Helios and MoviePass' systems were unable to handle the massive increase in data from the significant growth in subscribers, resulting in a huge backlog of customer inquiries, lost data, cancellations, the creation of "phantom" and/or multiple accounts for one subscriber and other issues; (vi) according to the Company's March 12, 2019 8-K, Helios was ***improperly recognizing revenue and understating losses*** for the third quarter of 2018, and it admitted that its "press releases, earnings releases, and ***investor communications***" for the third quarter of 2018 "should no longer be relied on;" (vii) according to the Company's March 12, 2019 8-K, "the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of [the reporting periods ending] September 30, 2018 and December 31, 2018"; and (viii) as a result of the foregoing, Defendants'

statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES THROUGH A SERIES OF CORRECTIVE DISCLOSURES AND MATERIALIZATION OF UNDISCLOSED RISK[17]

### I. HELIOS RELEASES DIRE RISK DISCLOSURES TWO MONTHS AFTER ANNOUNCING THE MOVIEPASS TRANSACTION AND CONTINUES TOUTING THE COMPANY'S PROSPECTS

344. After trading hours on October 11, 2017, after nearly ***two months*** of touting the MoviePass acquisition to shareholders through a series of false and misleading and incomplete press releases, SEC filings, and public statements, Helios filed a Form 8-K with the SEC disclosing numerous previously undisclosed risk factors relating to the acquisition of MoviePass. As shown below, from the announcement of the MoviePass SPA through October 11, 2017, investors did not have access to MoviePass' financial statements for previous years, or the pro forma financial statements for the combined company at the time of the acquisition and were not meaningfully apprised of any risks relating to investing in Helios in a post-MoviePass era.

345. On October 11, 2017, Defendants instead released the following risk disclosures:

> ***MoviePass has a limited operating history and history of net losses, and it is likely that it will experience net losses for the foreseeable future.***
>
> You should consider MoviePass' business and prospects in light of the risks, expenses and difficulties encountered by companies in their early stage of development. It has ***experienced significant net losses since its inception and, given the significant operating and capital expenditures associated with its business plan, anticipates continuing net losses and significant negative cash flows for the foreseeable future***. If MoviePass ever does achieve profitability, of which no assurances can be given, MoviePass may be unable to sustain or increase such profitability.
>
> ***

[17] For the purposes of this section, all references to Helios stock price before the reverse stock split on July 24, 2018, will be presented in pre-split prices, i.e. the actual trading price at the time of the event.

> ***MoviePass has incurred losses since inception and has a present need for additional funding, which may be unavailable to it. As such, MoviePass expects it will receive a qualification on its audited financial statements for the fiscal years ended December 31, 2016 and 2015 from its independent registered public accounting firm expressing substantial doubt about its ability to continue as a going concern.***
>
> MoviePass has incurred losses since its inception and has a present need for additional funding. ***These factors raise substantial doubt about MoviePass' ability to continue as a going concern. For the foreseeable future, MoviePass expects to fund its operations from additional debt or equity offerings and increased revenue from subscribers. If MoviePass cannot raise additional short-term capital, it may consume all of its cash needed for operations***. There are no assurances that MoviePass will be able to raise capital on terms acceptable to it. If MoviePass is unable to obtain sufficient amounts of additional capital, it may be required to reduce the scope of its planned growth, which could harm its business, financial condition and operating results. As a result, MoviePass expects that its independent registered public accounting firm will include an explanatory paragraph in its audit report on MoviePass' financial statements for the years ended December 31, 2016 and 2015 with respect to the uncertainty of MoviePass' ability to continue as a going concern.
>
> ***
>
> ***If MoviePass is not able to manage its growth, its business could be affected adversely.***
>
> MoviePass' subscriber base has expanded rapidly since August 15, 2017, when it announced its new subscription price of $9.95 per month. ***MoviePass may not be able, for many reasons, including lack of financing or adequate personnel resources, to meet the demand to timely deliver MoviePass cards to its subscribers or otherwise service its business***. As a result, MoviePass could experience a significant slowdown or stoppage as it attempts to serve the expanding subscriber base.
>
> MoviePass anticipates that further expansion of its operations will be required to address any significant growth in its subscriber base and to take advantage of favorable market opportunities. Any future expansion will likely place significant demands on its managerial, operational, administrative and financial resources. If it is not able to respond effectively to new or increased demands that arise because of MoviePass' growth, or, if in responding, MoviePass' management is materially distracted from current operations, MoviePass' business may be affected adversely.

346. In response to these previously-undisclosed risk disclosures, Helios stock ***plummeted*** $12.40 from a close of $32.90 per share on October 11, 2017, to a close of $20.50 on

October 12, 2017—representing a one day drop of ***37.7%*** on heavy trading volume. For the five trading days following the October 11, 2017 disclosure, Helios common stock fell to a closing price of $16.32—a ***50.4%*** drop. For the ten trading days following the October 11, 2017 disclosure, Helios common stock fell to a closing price of $11.50—a ***65%*** drop.

347. The Company's belated risk disclosures also drew the attention of analysts covering the Company. For instance, on October 12, 2017 at 9:26am, *Seeking Alpha* released an article titled "What to make of MoviePass," noting that "[a] risk disclosure included in Helios and Matheson's filing (SEC Form 8-K) is something that warrants attention" quoting the following disclosure from the Company's October 11, 2017 disclosure:

> MoviePass has incurred losses since its inception and has a present need for additional funding. These factors raise substantial doubt about MoviePass' ability to continue as a going concern. For the foreseeable future, MoviePass expects to fund its operations from additional debt or equity offerings and increased revenue from subscribers

348. That *Seeking Alpha* article received heavy interaction from investors, garnering over eighty comments.

349. Also, on October 11, 2017 at 7:01pm, *Bloomberg* released an article entitled "MoviePass Backer Plunges After Warning Service May Not Make It" stating "the backer of the controversial $10 MoviePass subscription, fell as much as 21 percent after warning the money-losing cinema service may not make it."

350. Although the October 11, 2017 risk disclosures were partially corrective, as shown above and below, Defendants continued to mislead and omit material nonpublic information related to the MoviePass transaction throughout the Class Period, including by making false and misleading statements that directly contradicted the October 11, 2017 risk disclosures. *See e.g.*, ¶¶ 6, 8, 79-84, 234-244, 260-63, 281-87, 315-330, 336-343.

## II. THE SEC REVEALS DEFENDANTS' FAILURE TO TIMELY FILE MOVIEPASS' FINANCIAL STATEMENTS AND THE TRUTH REGARDING MOVIEPASS' FINANCES CAUSING HELIOS STOCK TO PLUNGE

351. On October 3, 2017, the SEC wrote a letter to Farnsworth (that was concurrently filed on EDGAR) addressing deficiencies in the Company's September 15, 2017 Registration Statement. The SEC requested Defendants address violations of SEC rules including, among other items, to provide the following information:

> We note you have not provided target and pro forma financial statements in connection with your acquisition of MoviePass Inc. in this registration statement. Provide us with your analysis as to why these financial statements are not required given the status of the proposed transaction, including the tests of significance for the acquisition and the probability of closing. Refer to Rule 8-04 of Regulation S-X.

352. On November 30, 2017, nearly four months after initially announcing the MoviePass acquisition, the Company released: (1) audited financial statements for MoviePass for the years ended December 31, 2016 and December 31, 2015; (2) unaudited financial statements of MoviePass as of September 30, 2017 and for the nine months ended September 30, 2017 and September 30, 2016; and (3) unaudited pro forma combined financial statements of Helios and MoviePass. MoviePass' Statement of Operations for 2015 and 2016.

353. According to such statements, MoviePass revealed for the first time it operated ***at a net loss for years 2015 and 2016 of $4,273,792 and $4,916,365***, respectively.

354. Helios also disclosed, for the first time, MoviePass' unaudited statement of operations for the nine months ending September 30, 2017. In that nine-month period, MoviePass more than ***doubled*** its net loss as compared to the ***entire prior 2016 calendar year***.

355. The market's reaction to this newly-disclosed information was swift and severe. Helios stock price fell $1.56 from a close of $13.62 on November 30, 2017, to close at $12.06 on December 1, 2017 on increased volume—representing a one-day drop of ***11.5%***. Helios common

stock continued to free fall in the days following the release of MoviePass' financial statements. For the five trading days following the November 30, 2017 disclosure, Helios common stock fell to $8.30—a ***39%*** drop. For the ten trading days following the November 30, 2017 disclosure, Helios common stock fell to close at $6.70 per share—a ***50.1%*** drop. On November 30, 2017, before the release of MoviePass' financial statements, Helios stock traded at only a 6,100 turnover volume. In the ten days following the release, this more than quadrupled with Helios stock trading at an average of 27,430 shares per day, including 2,600 more shares trading hands on December 1, 2017.

356. This disclosure was also widely covered by market analysts. *Seeking Alpha* released an article titled "Helios and Matheson release MoviePass financials" noting that "[f]or the nine months ending September 30, MoviePass reported nearly $5M in subscription revenues, $5.3M in operating expenses, and a $9.9M loss from operations," and "[c]ash flow from operating activities was -$12M, and MoviePass ended the period with $3.3M in net cash."

357. Although the November 30, 2017 financial statements were partially corrective, as shown above and below, Defendants continued to mislead and omit material nonpublic information throughout the Class Period related to the MoviePass transaction. *See e.g.*, ¶¶ 234-244, 260-63, 281-87, 315-330, 336-343.

## III. DEFENDANT LOWE ADMITS MAKING FALSE STATEMENTS RELATED TO THE TRACKING AND SALE OF SUBSCRIBER DATA AND HELIOS' STOCK DROPS AS A RESULT

358. On March 5, 2018 after trading hours, *The Verge* released an article titled "MoviePass says it's 'exploring' gathering location data on users, but it won't sell it" that corrected Defendant Lowe's prior March 2, 2018 misstatements. The March 5, 2018 article stated as follows:

> MoviePass responded late this evening to a number of reports calling into question the company's privacy policy after CEO Mitch Lowe publicly claimed the theater

> subscription service tracks its users' locations. A spokesperson for the company clarified that MoviePass has no intentions to sell this data, and the company at the moment is only "exploring" utilizing location-based marketing as a way to "enhance the overall experience by creating more opportunities" for subscribers to "enjoy all the various elements of a good movie night."

359. Relatedly, *Wired* released an article on March 7, 2018 during market hours titled "As MoviePass Explodes, Its Growing Pains Hurt Subscribers," where Lowe admit with respect to his prior misstatements that "I [Lowe] was just being in a funny mood and just said it sarcastically. We are not tracking people."

360. In response to the March 5, 2018 article and the March 7, 2018 article, correcting Defendant Lowe's March 2, 2018 misstatements, Helios stock sunk from a close of $4.73 on March 2, 2018 to close at $4.61 on March 6, 2018 and then to $4.59 on March 7, 2018.

## IV. AFTER MAKING MATERIALLY FALSE AND MISLEADING STATEMENTS REASSURING SHAREHOLDERS THAT HELIOS WAS FINANCIALLY STABLE AND HAD ADEQUATE ACCESS TO CAPITAL, THE CONCEALED RISK MATERIALIZES IN A SERIES OF DISCLOSURES AND EVENTS

361. On December 12, 2017 after close of business, Helios filed a Prospectus Supplement pursuant to Rule 424(b)(5) with the SEC announcing that the Company was selling an undisclosed amount of securities at an undisclosed price. On December 13, 2017 prior to the opening bell, Helios issued a press release disclosing the terms of such offering, including that the Company would offer certain common stock and warrants for anticipated gross proceeds of approximately $60 million.

362. According to the same press release, the Company needed to effectuate the December 12, 2017 Offering, in part, "to support [] MoviePass operations." The December 12, 2017 Offering was a materialization of the undisclosed risk of investing in Helios because not only did it reveal that the Company needed more cash to sustain the MoviePass business than previously represented, but it also diluted ownership of current Helios shareholders and offered new common

stock at a price below the prevailing market price at the time. In response to the December 12, 2017 Offering, Helios common stock fell $3.29 from a close of $10.08 on December 12, 2017, to close at $6.79 on December 13, 2017—a drop of ***32.6%***.

363. *Reuters* reported on December 12, 2017, on the initial announcement of the December 12, 2017 Offering stating "Helios [] said on Tuesday it would sell shares to raise funds to increase its stake in online ticketing service MoviePass, sending Helios' shares plunging 22 percent aftermarket[.]"

364. On February 12, 2018 after market close, the Company filed a Prospectus Supplement pursuant to Rule 425(b)(5) with the SEC announcing another offering of an undisclosed amount of securities at an undisclosed price. The following day, on February 13, 2018 at 5:30pm, Helios announced the terms of such offering, including that the Company would offer certain common stock and warrants for anticipated gross proceeds of approximately $105 million.

365. Again, according to the same press release, the February 12, 2018 offering was effectuated, in part, to "support the operations of MoviePass[.]" The February 12, 2018 offering served as a materialization of the undisclosed risk of investing in Helios because not only did it reveal that the Company needed more cash to sustain the MoviePass business, but it also diluted ownership of current Helios shareholders and offered new common stock at a price below the prevailing market price at the time. The February 12, 2018 offering also corrected Defendants' prior misstatements concerning a potential initial coin offering, which was teased to shareholders in early January 2018 to artificially inflate Helios' stock price. Upon this news, it became known to the public that Helios would continue to raise capital through equity securities offerings rather than through cryptocurrency offerings.

366. *MarketWatch* reporter Trey Williams published an article on February 13, 2018 at 8:55am titled "MoviePass owner Helios & Matheson shares plummet after company prices $105 million public equity offering" stating "Helios [] is offering the units at a price of $5.50 and warrants can be exercised at $6.50 per share. Helios [] shares closed at $7.99 on Monday." *Deadline Hollywood* also commented on the negative effect of the February 12, 2018 offering in a February 16, 2018 article released at 9:16am titled "MoviePass' Parent Company Helios and Matheson Ups Stake In Monthly Movie Ticket Service." The article stated the following:

> Earlier this week, HMNY offered a $105 million public equity offering which has been sending shares down. The offering included 7,425,000 Series A units, each made up of one common share and a warrant to buy an additional share. The offering also includes 11,675,000 Series B units, each including a Series B pre-funded warrant to by common share and a Series A warrant to buy shares. Helios and Matheson offered the units at a price of $5.50 and warrants can be exercised at $6.50 per share.

367. In response to the February 12, 2018 Offering, Helios common stock fell $2.56 from a close of $7.99 on February 12, 2018, to close at $5.43 on February 13, 2018—a drop of ***32%***.

368. On April 17, 2018 before market open, Helios filed its annual report with the SEC on a Form 10-K (the "2017 Annual Report"). The 2017 Annual Report disclosed a "***net loss of approximately $150.8 million or $17.46*** per basic and diluted share for the year ended December 31, 2017." The 2017 Annual Report also disclosed that Helios' independent auditors "have expressed substantial doubt about our ability to continue as a going concern" based on the Company's "significant net losses and our working capital position."

369. In response to the filing of the 2017 Annual Report, Helios common stock fell from a close of $4.21 on April 16, 2018, to close at $3.96 on April 17, 2018.

370. The 2017 Annual Report and its auditors' note were covered heavily by analysts and media alike. On April 17, 2018 at 3:30pm, *Business Insider* released an article titled "MoviePass' auditor says there's 'substantial doubt' about its ability to stay in business — as it reports a $150.8 million loss." In the article, *Business Insider* wrote "[Helios], faces 'substantial doubt' about its ability to stay in business — as the company continues to burn through cash — its auditor said on Tuesday in the company's long-awaited annual report." The article continued, "Farnsworth downplayed the significance of the 'going concern' warning to *Business Insider*, saying such a warning was in 'pretty much most' 10-K filings when a company is running at a loss." Thus, Defendants' pattern of making partial disclosures, while simultaneously (or shortly thereafter) making additional false and misleading statements to maintain the fraud premium within the stock price for as long as possible, persisted.

371. *Variety*, similarly, released an article on April 18, 2018 at 6:14am titled "MoviePass Auditor Raises 'Substantial Doubt' About Subscription Business[,]" stating that Helios' "independent auditor has raised 'substantial doubt' about MoviePass' ability to continue operating as 'a going concern'[.]" The article also mentioned a recent interview with Lowe where he "predicted the company will be profitable by 2019" and "Farnsworth also said he had sufficient financial resources at his disposal to tide MoviePass over until it is in the black." That article links to a previous *Variety* article from April 17, 2018, where Farnsworth told *Variety* that he has a "$375 million line of credit" and ensured the market "I ***assure you*** that capital is not an issue. I'm sitting on hundreds of billions of dry powder, and I've got ***bankers*** and ***debt-financing companies*** calling me all the time."

372. In response to the filing of the April 18, 2018 *Variety* article, Helios common stock fell from a close at $3.96 on April 17, 2018 to a close of $3.83 on April 18, 2018.

373. After close of business on April 18, 2018, the risks continued to materialize as Helios announced the sale of $150 million worth of Company stock pursuant to an at-the-market offering, as well as a best efforts offering of certain common stock and warrants. On April 19, 2018 before the market opened, Helios provided more details on the best efforts offering including that it was anticipated to provide gross proceeds of $30 million.

374. The announcement of the April 18, 2018 ATM and best efforts offerings partially corrected, among other statements, Farnsworth's prior misstatements concerning the Company's "$375 million line of credit" and the Company's ability to obtain financing through a bank or by issuing debt. Following the announcement and the pricing of the ATM offering, from a close of $3.83 per share on April 18, 2018, to close at $2.55 per share on April 19, 2018—a drop of ***33.4%***.

375. These partial corrective disclosures were widely publicized in the market and media. *Variety* released an article on April 19, 2018 at 6:46am titled "MoviePass Parent's Shares Crushed After Disclosing Pricing of Stock Sale" where it detailed the specifics of the transaction and the market's reaction. *The Motley Fool*, released a similar article titled "2 Big Reasons Helios and Matheson Is Raising $150 Million" stating "MoviePass' parent company is going through with a big secondary offering, sending the shares 35% lower at Thursday morning's open."

376. On May 8, 2018 before the opening bell, the Company announced in a Current Report filed on Form 8-K with the SEC that "[a]s of April 30, 2018, we had approximately $15.5 million in available cash and approximately $27.9 million on deposit with our merchant processors for a total of approximately $43.4 million"—revealing the Company's cash drain was much worse than expected. Following this disclosure, on May 8, 2018 at 12:39pm, *Bloomberg* released an article titled "MoviePass Owner's Cash Runs Low With $9.95 Monthly Deal Taking Toll" citing to the May 8, 2018 Current Report and stating that "[t]he revelation sent shares of the technology

company down 32 percent -- ***and sparked fresh concern about whether its MoviePass business can survive***." In the same article, *Bloomberg* cited to an interview with Farnsworth regarding the May 8, 2018 Current Report where he stated, in response to whether the Company would survive the month of May "***[o]h God, yes. May, June, July.***" *IndieWire* also reported on the May 8, 2018 Current Report in an article titled "MoviePass Business Model is 'Highly Uncertain' as the Company's Owner Releases Stark Financials." This *IndieWire* article referred back to another *IndieWire* article from "early February [2018]" where Lowe "dismissed claims that the company faced cash-flow problems," stating:

> We have a significant partner who ***has the ability to raise enough money to get to the profitability stage***. It always surprises me when people ask me this, like I just always wonder why no one asks AMC why they had to borrow $4.2 billion dollars to stay in business, why Netflix has to borrow $5 billion to stay in business? When you are building a business like this, you invest in content. Our content is buying tickets. You invest in building a subscriber base, and that's exactly what we're doing, so believe me, we have enough money to support the business and we're already way ahead of where we thought we would be at this time.

377. In response to the May 8, 2018 Current Report and related press, Helios stock dropped $0.66 from a close of $2.11 on May 7, 2018 to close at $1.45 on May 8, 2018, representing a one day drop of ***31.3%***—on extremely heavy and unusual volume. Helios stock continued to plummet in the following trading days, falling to $0.79 on May 9, 2019, down ***62.6%*** from May 7, 2018. Following the May 8, 2018 Current Report, Helios stock never rose back to $1.00 per share and continued to trade at depressed levels until July 25, 2018.

378. On May 24, 2018 before the opening bell, Business Insider released an article titled "MoviePass said a $300 million lifeline could sustain it for over a year, but that money could slip through its fingers." In that article, Defendant Lowe admitted for the first time that his and Farnsworth's prior statements touting their "equity line of credit" were false. Defendant Lowe corrected Defendants' prior misstatements by confirming for Business Insider that "the term

[equity line of credit] referred to the 'at-the-market'(ATM) sale of the remainder of a shelf offering certified by the SEC." Business Insider clarified for investors that "[w]hat Lowe is describing is an at-the-market offering, not what is usually considered to be an equity line of credit, according to several financial experts."

379. An equity line of credit is drastically different than an ATM offering. An equity line of credit implies that an investor agreed to buy shares at a guaranteed maximum offering price, while an ATM offering is priced based on the current bid/ask prices set by the market. Importantly, an ATM offering is not guaranteed and the proceeds can vary wildly depending on the offering company's stock price. Business Insider also disclosed that Defendants had—at most—"$265 million" remaining on Helios' entire shelf registration statement, correcting Defendants' prior claims of having between $375 and $300 million remaining—depending which figure Defendants chose to tout.

380. In response to the May 24, 2018 Business Insider article, partially correcting Defendants' prior misstatements, Helios stock dropped $0.03 from a close of $0.49 on May 23, 2018 to close at $0.46 on May 24, 2018, representing a one day drop of 6.1%—on extremely heavy and unusual volume.

381. On June 19, 2018 after market close, the Company filed a Schedule 14A Proxy Statement with the SEC seeking shareholder approval to, inter alia: (1) "approve an amendment to the Company's Certificate of Incorporation to increase the number of the Company's authorized common stock from 500 million (500,000,000) to 2 billion (2,000,000,000)"; and (2) "approve an amendment to the Company's Certificate of Incorporation to effect a one-time reverse stock split [] of common stock at a ratio of 1 share-for-2 shares up to a ratio of 1 share-for-250 shares, which ratio will be selected by the Company's Board of Directors". The reverse stock split was integral

to Defendants' vain attempt to remain listed on the NASDAQ to continue selling newly-issued shares and provide desperately-needed capital to continue perpetrating the fraud orchestrated throughout the Class Period. In response to the June 19, 2018 Schedule 14A Proxy Statement, Helios stock dropped $0.14 from a close of $0.45 on June 19, 2018 to close at $0.31 on June 20, 2018 representing a one day drop of 31.1%—on extremely heavy and unusual volume.

382. On July 24, 2018, Business Insider released an article titled "'It is a full blown war going on': The CEO of MoviePass' parent company wants to use its subscribers as an army against traditional theaters (HMNY)" that described the scene at the Helios shareholder meeting held on July 23, 2018. Helios shareholders expressed anger at the lack of transparency between the Company and the market and told Farnsworth that they felt as though they had been misled. One shareholder told Defendant Farnsworth "[a]s the stock price has plummeted, I've been concerned about the lack of communication from the company explaining what's going on…. There's never been any sort of formal communication to the shareholders explaining what you think is going on, what the problem is with the stock going down so much, and what steps you're going to take to fight that battle." In response to shareholders' concerns, Farnsworth—in an about-face to other statements about being profitable on subscribers—told investors that Helios' path to profitability was through MoviePass' "investments in movies like Gotti and American Animals." [18]

383. On July 25, 2018, after receiving the necessary shareholder votes, Helios executed a 1 for 250 reserve stock split in order to remain listed on the NASDAQ and in a vain attempt to

[18] "Gotti" was released on a $10 million budget and performed abysmally at the box office—bringing in approximately $6.8 million. "Gotti" also received a consensus 0% "Tomatometer" rating from the popular movie review site *Rotten Tomatoes*, available at, https://www.rottentomatoes.com/m/gotti_2018 (last visited April 3, 2019).

continue perpetrating the fraud Defendants orchestrated throughout the Class Period. The reverse stock split was disastrous for shareholder equity and caused tremendous damages to shareholders. On an adjusted basis (*i.e.* adjusting the closing price of Helios stock prior to July 25, 2018 to account for the 1 for 250 reverse stock split) the price of the Company's common stock declined $11.90, or 52.88%, from a closing price of $22.50 per share on July 24, 2018 to a closing price of $10.60 per share on July 25, 2018. The Company's stock continued to decline to $6.83 per share on July 26, 2018—a two day drop of ***69.64***%.

384. On July 25, 2018, CNN Business released an article titled "MoviePass boosts its stock with a reverse split -- and immediately plunges 50%." That article commented how "[o]ne day after the parent company of MoviePass announced a drastic effort to boost its stock price from 8 cents to $21, the price of the stock immediately tanked." In that article, CNN Business also noted that Defendant Farnsworth "in an interview with CNNMoney earlier this month [July 12, 2018]" touted that the Company "has been 'talking to several' of its institutional investors about providing additional money. Farnsworth said at the time that there is 'no shortage' of investors."

385. Two days later, on July 27, 2018 before market open, Helios filed a Form 8-K ("July 2018 Form 8-K") with the SEC announcing that it had issued a demand note in the principal amount of $6.2 million because it was not able to make required payments to its merchants and fulfillment processors, leading to a service interruption. The July 2018 Form 8-K stated, in relevant part:

> **Demand Note**
>
> On July 27, 2018, the Company issued a demand note (the "Demand Note") to the Holder in the principal amount of $6,200,000, which includes $5.0 million in cash borrowed by the Company from the Holder and $1.2 million of original issue discount. No additional interest will accrue under the Demand Note aside from any Late Charges (as defined in the Demand Note) upon the failure to pay outstanding amounts under the Demand Note. The Holder may make a demand for full payment of the Demand Note from and after (x) with respect to up to $3,100,000 of the

principal outstanding under the Demand Note (the "Initial Principal"), August 1, 2018 or (y) with respect to any other amounts then outstanding under the Demand Note, August 5, 2018. Upon demand, the Company is also required to pay to the Holder any sum required to cover the costs and expenses incurred by the Holder in connection with the drafting and negotiation of the Demand Note as well as all costs and expenses of any enforcement or collection of the Demand Note, including, without limitation, reasonable attorneys' fees, expenses and disbursements. All proceeds received by the Company on or after July 31, 2018 from sales of common stock under its outstanding at-the-market offering (the "ATM Offering") pursuant to the Equity Distribution Agreement, dated as of April 18, 2018 (the "Equity Distribution Agreement") between the Company and Canaccord Genuity LLC, must be applied against any Initial Principal until no Initial Principal remains outstanding, and thereafter, against any remaining amounts due under the Demand Note. The Demand Note's principal, together with accrued and unpaid Late Charges may be prepaid by the Company without penalty. With the agreement of the Holder, principal and accrued and unpaid Late Charges on the Demand Note may be applied to all, or any part, of the purchase price of securities to be issued upon the consummation, after July 27, 2018, of an offering of securities by the Company to the Holder. Any amount of principal or other amounts due which is not paid when due (a "Payment Default") will result in a late charge being incurred and payable by the Company to the Holder in an amount equal to interest on such amount as the rate of 15% per year from the date such amount was due until the same is paid in full. If a Payment Default remains outstanding for a period of 48 hours, Holder may require the Company to redeem all or a portion of the Demand Note at a redemption price of 130%.

***The $5.0 million cash proceeds received from the Demand Note will be used by the Company to pay the Company's merchant and fulfillment processors. If the Company is unable to make required payments to its merchant and fulfillment processors, the merchant and fulfillment processors may cease processing payments for MoviePass, Inc. ("MoviePass"), which would cause a MoviePass service interruption. Such a service interruption occurred on July 26, 2018***. Such service interruptions could have a material adverse effect on MoviePass' ability to retain its subscribers. This would have an adverse effect on the Company's financial position and results of operations.

MoviePass will execute a guaranty (the "MoviePass Demand Note Guaranty") pursuant to which MoviePass guarantees the punctual payment of the Demand Note, including, without limitation, all principal, interest and other amounts that accrue after the commencement of any insolvency proceeding of the Company or MoviePass, whether or not the payment of such interest and/or other amounts are enforceable or are allowable and agrees to pay any and all costs and expenses (including counsel fees and expenses) incurred by the Holder in enforcing any rights under the MoviePass Demand Note Guaranty or the Demand Note.

386. On this news, the price of the Company's common stock declined $4.83, or ***70.72%***, from a closing price of $6.83 per share on July 26, 2018 to a closing price of $2.00 per share on July 27, 2018.

387. In the course of the following trading days, the Company's common stock continued to decline another $1.76 to close at $0.23 per share on August 1, 2018, ***an overall drop from July 24, 2018 of approximately 98.98%***.

## POST CLASS PERIOD EVENTS

### I. THE PRECIPITOUS DECLINE IN HELIOS STOCK RESULTS IN NASDAQ NON-COMPLIANCE AND DELISTING

388. On June 21, 2018, Helios received a deficiency letter from the NASDAQ Listing Qualifications Department notifying the Company that Helios stock had closed below the minimum $1.00 per share price necessary to remain listed on the NASDAQ for 30 prior consecutive business days pursuant to NASDAQ Listing Rule 5550(a)(2) ("Rule 5550(a)(2)"). Rule 5550(a)(2) is NASDAQ's lowest tier for so-called "small cap" companies and has certain minimum requirements that companies must satisfy—and remain in compliance with—to avoid delisting.

389. Pursuant to NASDAQ Listing Rule 5810(b), the Company was given 180 calendar days, or until December 18, 2018, to regain compliance with Rule 5550(a)(2). If Helios was unable to meet the $1.00 per share price minimum, but was able to meet the remaining listing requirements, the Company could have been afforded a second period of 180 calendar days to achieve full compliance.

390. On December 19, 2018, the Company received written notice from the NASDAQ Listing Qualifications Department that Helios had not regained compliance with Rule 5550(a)(2) and was not eligible for a second 180-day period because the Listing Qualifications

Department had determined that "***it does not appear that it is possible for the Company to cure the deficiency***"; *i.e.*, increase its stock price to above $1.00 per share of Company stock.

391. According to a Form 8-K that Helios filed with the SEC on December 21, 2018, the NASDAQ Listing Qualifications Department also made its determination based on:

> [T]he low price of the Company's common stock, the significant issuances of common stock over the past year from an Equity Distribution Agreement and the conversion of future priced securities (primarily Senior Secured Convertible Notes issued on November 7, 2017 and January 23, 2018), the Company's stated need to issue additional shares to fund its operations, the failure of a prior reverse-stock split in July 2018 to result in compliance with Rule 5550(a)(2), and the Company's inability to obtain approval for a proposed reverse stock split at a special meeting in November 2018.

392. As a result of these deficiencies, NASDAQ determined that unless Helios appeals this determination, its stock would be delisted from NASDAQ and suspended at the opening of business on December 28, 2018, and a Form 25-NSE would be filed with the SEC which would result in removal of Helios stock from listing and registration on NASDAQ.

393. In the December 21, 2018 Form 8-K, Helios asserted its intention to appeal the determination and seek continued NASDAQ listing, which would automatically stay the delisting pending review. Helios further asserted its expectation that NASDAQ would hear the appeal within 45 days after it was made, pursuant to NASDAQ's Listing Rules. Finally, Helios asserted its intention to reveal its plans to NASDAQ to regain compliance with Rule 5550(a)(2) at or before the time the appeal is heard, and also request an extension of time so that Helios' officers and directors might affect a reverse stock split to increase Helios' price per share.

394. Then, on February 12, 2019, the Company filed a Form 8-K with the SEC, announcing that NASDAQ determined, effective February 13, 2019, that Helios stock would be delisted from the NASDAQ. Helios also announced that it would not appeal that determination and that instead, the Company would "be eligible to trade 'over-the-counter' in the OTC Markets

system effective with the open of business on February 13, 2019." As of this filing, Helios stock trades on the OTC markets at less than one penny per share.

## II. BOARD MEMBERS RESIGN AMID TURMOIL CITING "CONCERNS" REGARDING HELIOS' MANAGEMENTS' LACK OF TRANSPARENCY AND WITHHOLDING OF INFORMATION FROM THE BOARD

395. On August 25, 2018, Carl J. Schramm ("Schramm"), resigned as a director of Helios. In a letter that he sent to Farnsworth, Schramm stated that his resignation was due to Helios' management withholding material information from the Company's board of directors. Specifically, Schramm wrote:

> As you know, for several months now, I have raised questions and expressed concerns about the corporate governance of Helios and Matheson Analytics, Inc. (the "Company"). ***I have sought, often unsuccessfully, information about the Company's financial status and operations, and explanations of Company strategy***. I have objected to the manner in which a number of business decisions have been presented to the Board of Directors by management, without sufficient time for the Board to examine complex documents, to review significant transactions, or to discuss how the proposed actions fit into the Company's strategic plan.
>
> These concerns have increased substantially over the past eight weeks as management apparently has made a number of important corporate decisions and executed significant transactions ***either without Board knowledge or approval***, or in Board meetings initiated with only a few hours of advance notice by email (at least one of which I did not even know had been called until the meeting had concluded). Just last week, I learned that ***management withheld material information from the Board for several months***.
>
> These and other actions have interfered with my ability to exercise my responsibilities as a board member. Taken together, they confirm that, despite my best efforts, my ability to effectively dis charge my duties as a director has been compromised beyond repair.

396. Then on October 24, 2018, Christopher Kelly ("Kelly"), who served as chairman of the MoviePass board of directors since June 24, 2014, and Maria Stipp ("Stipp"), who had served as a director of MoviePass since January of 2018, resigned in a similar manner to Schramm. According to Helios' Quarterly Report on Form 10-Q for the third quarter-ended September 30,

2018, both Kelly and Stipp resigned while expressing "their belief that they had not received sufficient access to information" regarding decisions made by the Company.

## III. THE NEW YORK ATTORNEY GENERAL ANNOUNCES INVESTIGATION INTO WHETHER HELIOS DEFRAUDED INVESTORS

397. On October 18, 2018, the New York Attorney General's Office confirmed in a tweet that the then New York Attorney General Barbara G. Underwood had opened an official securities fraud investigation into Helios and its actions surrounding MoviePass and whether the Company misled investors. The tweet read:

> We've launched a securities fraud investigation into @MoviePass' parent company. My office is committed to protecting New York investors and the integrity of our financial markets.

398. The investigation is being conducted under New York's Martin Act, a powerful anti-fraud law enacted in 1921 and available to the New York Attorney General's Office to combat fraud and recover civil damages or impose criminal fines. The investigation was spurned, at least in part, by the widespread sentiment that investors were misled by the Company. According to Business Insider, "numerous investors…felt misled about the financial situation of MoviePass both by Helios and Matheson management and by the 'buy' analyst ratings of two Wall Street firms whose banks made fees selling the stock (both have since suspended coverage)."

399. One investor told *Business Insider* that "I think the New York Attorney General launching an investigation into the matter is a very good thing. Thousands of people lost a great deal of money in this financial gimmickry, and it should be investigated."

400. The investigation is ongoing.

## IV. HELIOS TAKES A MASSIVE IMPAIRMENT CHARGE ON THE MOVIEPASS™ BUSINESS

401. On November 15, 2018, the Company filed a Form 10-Q with the SEC and signed by Farnsworth and Benson, announcing its third quarter 2018 results including a recent goodwill

impairment analysis. Helios management stated the Company was prompted to perform a goodwill impairment analysis before its regularly scheduled date "due to a significant decline in MoviePass subscribers." The Company determined that the book value of MoviePass far exceeded its fair value "***resulting in an impairment charge of $38,524,016***." This impairment represented nearly ***44%*** of the Company's goodwill.

## V. HELIOS IS FORCED TO SPIN-OFF THE MOVIEPASS™ BUSINESS

402. On October 23, 2018, Helios announced that it had preliminarily approved a plan to spin-off MoviePass and related assets into a subsidiary called MoviePass Entertainment Holdings Inc. In the October 23, 2018 press release, Farnsworth stated the following:

> For many years, HMNY has been focused on data analytics, and in that capacity we own assets like Zone Technologies which provides a safety and navigation app for iOS and Android users and a global security concierge service. Since we acquired control of MoviePass in December 2017, HMNY largely has become synonymous with MoviePass in the public's eye, leading us to believe that our shareholders and the market perception of HMNY might benefit from separating our movie-related assets from the rest of our company

403. On March 6, 2019, the Company announced through a press release that MoviePass had developed a new strategy in connection with the planned spin-off. The press release stated, in relevant part:

> [W]e plan to focus on technological innovation and high-quality content production through our three key channels - MoviePass™ (theatrical subscription service); MoviePass Films (original content production company) and Moviefone™ (multimedia media information and advertising service).
>
> ***
>
> - Our new business model ***no longer depends on achieving revenues from studios or exhibitors to succeed***, but instead will prioritize the economic relationship among our MoviePass™ subscription service, MoviePass Films production business and Moviefone™ multimedia media information and advertising service.

404. The Company has not completed the spin-off to date and noted in the press release that the preliminary plan may not even be permitted under Delaware law.

## VI. KEY HELIOS PERSONNEL ARE FIRED OR ABANDON THE SINKING SHIP AND DEFENDANTS RECYCLE THEIR FAILED UNLIMITED PLAN

405. After the close of the Class Period, the Company lost much of its key personnel due to being fired or quitting MoviePass. On November 17, 2018, *Business Insider* reported that two individuals who made up the entirety of MoviePass' human resources department had been fired. In addition, *Business Insider*'s source reported that Lowe had "not been on an all-hands call in two months, which the source said was a sign of his lack of involvement in the day-to-day operations of the company." The firing of the human resources department exacerbated the already perilous situation that MoviePass employees were forced to work in.

406. On March 13, 2019, *Business Insider* reported that MoviePass' executive vice president Kalid Itum resigned citing "growing frustration about the direction of the company." Prior to his resignation, Itum had taken over running day-to-day operations from Lowe. Other MoviePass employees followed Itum and resigned at the same time, including Bernadette McCabe, senior vice president of exhibitor relations, Joey Adarkway, Chief Technology Officer, and Jake Petersen, senior vice president in charge of human resources.

407. According to a subsequent *Business Insider* report, the reason for this mass exodus was that MoviePass was inexplicably returning to its failed "unlimited" plan. On March 19, 2019, MoviePass launched a rebranded unlimited plan called "MoviePass Uncapped[.]" Whereas MoviePass previously allowed subscribers to see one movie per day, the Uncapped plan purports to even be stripped of that limitation, allowing users to see an unlimited number of movies, "subject only to managing network demand and availability[.]" MoviePass Uncapped was "[r]eintroduce[d]" at the $9.95 per month price point, with plans to increase to $14.95 per month.

408. On March 15, 2019, Helios announced that Defendant Benson also resigned on March 13, 2019. Benson left his position as CFO of the Company supposedly to "accept another employment opportunity."

## VII. HELIOS IS FORCED TO RESTATE ITS FINANCIAL STATEMENTS CITING "MATERIAL WEAKNESSES" IN FINANCIAL REPORTING AND DELAYS FILING ITS 2018 FORM 10-K

409. On March 12, 2019, Helios filed on Form 8-K with the SEC an announcement that its financial statements and "related press releases, earnings releases, and investor communications describing the Company's financial statements" for the third quarter of 2018 and the year-to-date as of September 30, 2018 "should no longer be relied on." The filing stated, in relevant part:

> The errors primarily relate to the overstatement of subscription revenues in the third quarter of 2018 due to (1) the erroneous recognition of up to approximately $0.7 million of revenue from MoviePass subscriptions that had been terminated through refunds of subscriptions by Costco Wholesale Corporation; and (2) the ***erroneous recognition of up to approximately $5.9 million of revenue from certain MoviePass subscriptions that were in a suspended state due to changes made to the MoviePass subscription service that had not yet been consented to by the applicable subscribers***. These errors resulted ***in an understatement of the net loss by approximately $6.6 million***. In addition, the Company identified a non-cash error related to the accounting for derivative securities, which resulted in an ***additional understatement of net loss of approximately $2.9 million***. The reversal of the derivative liability in the amount of $2.9 million resulting from a conversion in the second quarter was misclassified as a gain in the fair market value of a derivative security on the income statement, as opposed to correctly recording it as a credit to additional paid-in capital on the balance sheet.

410. In the same filing, Helios announced that the Company has a material weakness related to its subscription management and that "the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of September 30, 2018 and December 31, 2018."

411. Unsurprisingly, on March 18, 2019, Helios announced that it could not timely file its Form 10-K for 2018, stating the Company "require[d] additional time to provide our independent registered public accounting firm with the information and documentation regarding

our assessment of our internal control over financial reporting to enable our independent registered public accounting firm to provide the required attestation report."

## ADDITIONAL ALLEGATIONS OF SCIENTER

412. As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

413. The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Helios and/or MoviePass and, thus, controlled the information disseminated to the investing public in the Company's press releases, SEC filings and interviews. As a result, each could falsify the information that reached the public about the Company's business and performance.

414. Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes herein to inflate the Company's stock price. The Individual Defendants' scienter may be imputed to Helios as the Individual Defendants were among the Company's most senior management and were acting within the scope of their employment.

### I. THE INDIVIDUAL DEFENDANTS KNOWINGLY AND/OR RECKLESSLY MADE MATERIAL MISSTATEMENTS AND/OR OMITTED MATERIAL FACTS

415. As discussed below, the Individual Defendants knew that Helios' low price subscription business model was not sustainable and would never be profitable and that the

Company's purported plans to offset its unprofitable subscription business through data collection, advertisements, and partnerships would not stem the tide of losses because, in fact, Defendants ***admitted they knew at the outset they would never be profitable*** through these means. Instead, as conceded by Farnsworth himself after the close of the Class Period "we ***always knew from day one*** that the subscription side of the business would really break even or make a few dollars…***and it was to really drive content at the theatre side, so on theatrical side when your pushing people into the theatre you're going to be making more money on the movies that you own, you know like MoviePass Films***." Thus, after the Class Period, when Helios had already deceptively solicited millions of dollars from investors, Defendants disclosed that the true profit-driving vision that they had always secretly contemplated for MoviePass was as a movie production company—a vision that was at odds with the business strategy which Defendants had always fed to investors, and that the Individual Defendants lacked any experience in doing.

416. Further, Helios and MoviePass did not have, and never had, the systems, technology, skill or capabilities to gather or analyze subscriber data as evidenced by: (A) a former employee's (CW1) account that Helios and MoviePass lacked the technology, capability and knowledge to mine subscription data sufficient to carry out the business plan it sold to shareholders in part, including its current systems' inability to handle the massive subscription growth; (B) several Board members' resignations as a direct result of Helios' managements intentional deception and/or failure to provide them with material information about Helios' business operations and strategy; (C) management of both Helios and MoviePass resigning citing concerns with the direction of MoviePass or being unceremoniously fired; (D) the New York Attorney General's investigation into Helios' alleged intentional deception of investors; (E) the Company's goodwill impairment of MoviePass, announcement of a financial restatement, and admission of

material weakness in internal controls related to managing subscriber accounts; (F) the fact that MoviePass was Helios' core business; and (G) the Individual Defendants' history of defrauding investors and business partners.

### A. Farnsworth Admits He Knew From Day One That Helios Planned to Be Successful By Creating Its Own Content and Not Through Subscriptions or Operationalizing Helios' Purported Data Capabilities

417. Defendant Farnsworth knowingly misled investors by admitting that Helios and MoviePass planned to be successful by acquiring movie studios, creating MoviePass-branded content, and then driving MoviePass subscribers to see their own content. First, on July 24, 2018, at the shareholder meeting convened to vote on the reverse stock split and allow Helios the ability to issue 4.5 billion additional shares, Farnsworth was asked about the profitability of the Company from a concerned shareholder. In response, Farnsworth stated "[w]hat people don't realize, ***is it's not about making money on the subscribers***," but instead touted productions like Gotti and American Animals produced by MoviePass Films.[19] Farnsworth would later clarify his earlier admission in a video interview with *The Wrap*, stating "we ***always knew from day one*** that the subscription side of the business would really break even or make a few dollars…***and it was to really drive content at the theatre side, so on theatrical side when your pushing people into the theatre you're going to be making more money on the movies that you own, you know like MoviePass Films***."[20] Farnsworth would double down later in the interview and state now "it's just

---

[19]Available at, https://markets.businessinsider.com/news/stocks/moviepass-owner-hmny-stock-price-ceo-says-war-with-traditional-theaters-2018-7-1027393530 (last visited April 3, 2019).

[20] Available at, https://www.thewrap.com/moviepass-owner-rules-out-bankruptcy-68-million-new-funding-atom-tickets/ (last visited April 3, 2019).

proving out the model with MoviePass, MoviePass films and ***really driving our own content*** as well as the advertisements."

**B. Helios and MoviePass' Inadequate Technology, Systems, Knowledge and Experience to Handle and Mine Subscription Data and Defendants' Direct Admissions Support a Strong Inference of Scienter**

418. Defendants Benson and Farnsworth would have conducted or were reckless in not conducting due diligence on MoviePass prior to acquiring a majority stake in the business. Accordingly, they knew or recklessly disregarded that MoviePass lacked the technology, capability, and knowledge to handle the massive increase in subscriptions that would result from slashing the monthly price of MoviePass subscriptions to $9.95 per month. Indeed, according to CW1, MoviePass lacked sufficient staffing to handle the hundreds of customer inquiries and complaints that came in on a daily basis, resulting in a backlog of customer issues and complaints going back months.

419. CW1 also recalled numerous problems with the MoviePass app resulting in the improper creation of multiple and/or phantom accounts. Even if there were no problems, customers had to wait up to two months to receive their MoviePass card. In fact, Lowe later admitted in an interview with *The Ringer* that he discussed the increase in demand for MoviePass cards and had actual knowledge early in the Class Period that Helios could "only ship about 35,000 to 50,000 cards a week." Lowe asked the Chief Technology Officer if the Company could "call MasterCard and increase that? ***The answer was no***."[21] Moreover, on March 12, 2019, in connection with the Company's announcement that investors should no longer rely on its financial

---

[21] Available at, https://www.theringer.com/movies/2019/2/6/18212482/moviepass-mitch-lowe-khalid-itum-interview-2019 (last visited April 3, 2019)

reports, the Company ***admitted*** that a "material weakness related to subscription management existed in the Company's internal control over financial reporting" that resulted in, among other things, "the erroneous recognition of up to approximately $0.7 million of revenue from MoviePass subscriptions ***that had been terminated***."

420. Furthermore, Defendants Benson and Farnsworth were well aware that Helios, a Company specializing in IT services, had no experience or ability to conduct data collection, mining or analysis. According to an *InvestorPlace* report in June 2016: "***Turning subjective data into a useful, objective crime-fighting map is an art as much as it as a science, and it's an art HMNY hasn't practiced much***."

421. In fact, Helios's only other venture into data analytics, the RedZone app, was a monumental failure. On April 17, 2018, the Company announced a ***$6.3 million*** impairment to goodwill with $4.6 million ascribed to the lack of revenues derived from the RedZone app and Helios' inability "to secure contracts with customers," and the remainder ascribed to a decrease in value of the "net book value of trademarks and broker relationships associated with the Zone acquisition." Defendants, and specifically Defendants Farnsworth and Benson, knew that Helios had no history or ability to generate revenue from the use of data as demonstrated by the disastrous RedZone app. Indeed, despite Defendants' repeated assurances throughout the Class Period to investors that MoviePass would benefit financially by access to Zone's technology, Defendants Farnsworth and Benson signed Helios documents, such as the September 15, 2017 Registration Statement and the 2017 Form 10-K conceding that Zone was still being developed as of such dates.

422. Accordingly, Defendants knew that MoviePass lacked the capability to track or mine data to enable Helios to be able to profit from third-party partnerships and that MoviePass

was on the brink of collapse and was not capable of keeping up with the increase in subscribers due to lowering the subscription price to $9.95.

### C. Board Member and Management Resignations as a Direct Result of the Individual Defendants' Deception and Lack of Transparency Supports A Strong Inference of Scienter

423. As discussed above, one of Helios' four directors (Schramm) and two of MoviePass' directors (Kelly and Stipp) resigned abruptly on August 25, 2018 and October 24, 2018, respectively, as a direct result of seeking "unsuccessfully, information about the Company's financial status and operations, and explanations of Company strategy" from management and management "execut[ing] significant transactions either without Board knowledge or approval . . . ."

424. On November 16, 2018, the entire two-person human resources department of MoviePass was suddenly fired. Further, on January 4, 2019, Eric Jeng, a former product manager at MoviePass, quit and sent a "'scathing' 704-word letter" to all MoviePass employees regarding the toxic work environment he, and everyone else, endured over the past year.

425. The suspicious timing of their resignations just days after the truth about Helios' cash problems and the New York AG investigation was announced implicating express concerns regarding management's lack of transparency and failure to get Board approval on major business transactions and strategy, supports a strong inference of scienter.

426. Also discussed above, on March 13, 2019, both Itum and Defendant Benson resigned from MoviePass and Helios, respectively. According to *Business Insider*'s sources, Itum resigned citing "growing frustrations about the direction the company is head[ing]." Benson purportedly resigned to "accept another employment opportunity." In addition to Itum, McCabe, Adarkaway, and Petersen also resigned. The resignations followed the Company's announcement

of a restatement and a material weakness in financial reporting just two days earlier, and immediately preceding the Company's unveiling of its recycled and destined-for-failure unlimited plan. The suspicious timing of these additional resignations supports a strong inference of scienter.

**D. The New York Attorney General Investigation Into Allegations that Helios Management Intentionally Mislead Investors Supports A Strong Inference of Scienter**

427. On October 18, 2018, the New York Attorney General was equally concerned with Helios' fraud and lack of transparency and opened an official securities fraud investigation into Helios regarding whether the company misled investors regarding the Company's finances under the Martin Act.

428. The investigation was prompted by numerous concerned investors. The then New York Attorney General, Underwood, vowed to get to the bottom of it:

> We've launched a securities fraud investigation into @MoviePass' parent company. My office is committed to protecting New York investors and the integrity of our financial markets.

429. While the investigation is ongoing, the specific nature of the investigation relating to Defendants' lack of transparency and alleged misleading of investors supports scienter.

**E. Defendants' Identical Regulation S-X Violations, Multiple Impairment Charges, Restatements, and Admissions of Material Weaknesses Related to Internal Controls Supports A Strong Inference of Scienter**

430. On July 7, 2016, Helios announced the Zone merger. On July 27, 2016, the SEC wrote a letter to Helios (the "July 27, 2016 Letter") informing the Company that it had failed to provide the "financial statements" for Zone required to be filed pursuant to Regulation S-X. This request was ostensibly identical to the SEC's request on October 3, 2017 for MoviePass financial statement that the Company failed to timely disclose. At the time that the Company received the July 27, 2016 Letter Defendant Farnsworth was the CEO of Zone and Defendant Benson was

providing reporting services to Helios. Thus, Farnsworth, Benson, and Helios institutionally as an organization—***having already failed to comply roughly one year prior***—were all acutely aware of the application of Regulation S-X and its requirement that the Company timely file financial statements for target companies (such as Zone and MoviePass) to provide shareholders in connection with mergers.

431. Before the end of the Class Period, on February 9, 2018, and in response to an SEC letter dated December 22, 2017, the Company filed an amendment on Form 8-K/A to its Unaudited Pro Forma Condensed Combined Balance Sheet as of September 30, 2017. The amendment restated the Company's goodwill from $92,558,842 downward to $80,710,226 for a total reduction of ***$11,848,616*** or ***12.8***%. In addition to this massive impairment, the amendment also restated the Company's total liabilities to $122,575,121 from $87,883,924, an increase of nearly ***$35*** million or ***39%***.

432. In the 2017 Form 10-K, Defendants admitted that, from the start of the Class Period to at least December 31, 2017, "the Company did not maintain effective internal control over financial reporting…due to the existence of [a] material weakness." Defendants admitted:

> Due to the significant number of transactions that occurred during the 4th quarter of 2017 including but not limited to the acquisition of MoviePass Inc and the related financing arrangements, ***it was determined that the Company had inadequate monitoring controls in place related to its financial reporting, debt and equity related transactions and other management oversight procedures due to the lack of sufficient accounting resources to complete an effective review of the various complex and significant transactions***.

433. Through this disclosure, Defendants admitted that from the start of the Class Period they knew or were reckless in not knowing that the Company lacked management and financial oversight on its financial reporting including, *inter alia*: (1) the failure to timely file risk disclosures relating to the acquisition of MoviePass, instead misleadingly referring back to Helios' prior risk

disclosures that did not relate to MoviePass; and (2) the failure to timely file the required "target and pro formal financial statements" in connection with the MoviePass acquisition.

434. After the end of the Class Period, on November 15, 2018, Defendants announced in a Form 10-Q a ***massive*** write down on the goodwill of MoviePass. Defendants admitted that, due to many MoviePass subscribers canceling their subscriptions, they had previously overestimated the fair value of MoviePass as an asset "resulting in an impairment charge of $38,524,016." The goodwill related to the MoviePass acquisition was previously recorded at $79 million, meaning the third quarter 2018 impairment effectively wiped out ***over 48%*** of the book value of MoviePass.

435. Relatedly, on March 12, 2019, Helios announced that investors should no longer rely on its previous financial statements and "related press releases, earnings releases, and investor communications describing the Company's financial statements" for the third quarter of 2018 and the year-to-date as of September 30, 2018. Defendants admitted that they had both erroneously recognized $5.9 million in revenue from accounts "that were in a suspended state" and underestimated the Company's loss by $6.6 million. In the same announcement, Defendants also disclosed a material weakness related to Helios' internal controls and stated that "the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of September 30, 2018 and December 31, 2018."

436. To date, Helios has been unable to file its Form 10-K for calendar year 2018, stating in a Form 12b-25 filed with the SEC that "we require additional time to complete the 2018 Annual Report" in order to "to provide our independent registered public accounting firm with the information and documentation regarding our assessment of our internal control over financial reporting." The Company's goodwill impairment of MoviePass, its admission of materially false

statements in financial reports related to MoviePass, and its admission of material weakness in managing subscriber accounts supports a strong inference of scienter.

**F. That MoviePass Was Helios' Core Business Supports Scienter**

437. Defendants repeatedly touted the MoviePass business as Helios' most important driver of the Company's future revenues and growth. Indeed, in Helios' Form 10-K filed with the SEC on April 17, 2018, Helios stated that its "primary business" was "the integration and development of MoviePass."

438. Throughout the Class Period, Helios repeatedly touted the Company's rapid growth in its MoviePass subscriber base, including, e.g.:

- The MoviePass SPA was contingent on the Company achieving an agreed upon number of subscribers.
- Helios' purported goal was that MoviePass would "increase theater attendance, increase concession sales and drive subscribers to consumer movie content in the theaters rather than at home."
- September 24, 2017 – reporting 400,000 monthly subscribers.
- August 2017 – reporting over 1 million total paying subscribers.
- January 2018 - reporting MoviePass had surpassed 1.5 million paying subscribers.
- February 2018 – reporting more than 2 million subscribers.

439. The fact that Helios' cash flow issues ultimately resulting in the Company having to rid itself of the unprofitable MoviePass business concerned its core assets and business strategies and Defendants' high-level positions and numerous statements regarding such matters, all support Defendants' knowledge of and reckless disregard of such operational and financial matters.

### G. The Individual Defendants' History of Defrauding Investors and Business Partners Supports Scienter

440. As discussed above, Farnsworth and members of his management team have a history of defrauding investors, including:

- June 2014–HMIT ceased paying its debts, leading to civil lawsuits, investigations by police and regulators in India, and the arrest of three of HMIT's officers, including HMIT's co-founder, CEO and majority shareholder who was also a consultant for Helios during the Class Period. In 2016, an Indian court ordered HMIT liquidated and slammed HMIT for making a "deliberate attempt to hoodwink" court orders.

- Farnsworth has registered over 50 different companies with the state of Florida, only four of which, including Zone, are active as of June 2018. Three companies went public, namely: XStream Beverage Network Inc., Purple Beverage Co., and vitamin marketing firm LTS Nutraceuticals Inc. Similar to Helios, Farnsworth made promises and talked up each of these companies to get investor support, but the companies ultimately saw the value of their shares fall 99%, below $1 per share, within three years of going public.

- Since 2010, Farnsworth and his affiliated companies have been sued at least eight times, with each lawsuit alleging either breach of contract or violation of the terms of settlement agreements. Five lawsuits have ended with the court entering judgment against Farnsworth.

- 2017–2018–Farnsworth defrauded investors of Helios into believing the MoviePass business would be profitable through its unique ability to collect and mine customer data and use advertising to various theatres and restaurants to generate revenues.

441. Furthermore, Helios appointed HMIT officers as its consultants, executives, and directors, ensuring that those associated with defrauding investors at HMIT remained associated with Helios.

442. For example, Krishnan was initially appointed as Helios' CEO before he was replaced by Farnsworth. He is currently the Chief Innovation Officer of Helios. He was affiliated with HMIT for years and previously served as HMIT's Chief Technology Officer. He first became affiliated with HMIT in 2005, when HMIT bought his California-based consulting firm, Maruthi

Consulting Inc. ("Maruthi Consulting"). Though Maruthi Consulting is based in the US, the State Bank of India accused HMIT of using Maruthi Consulting to siphon money out of India with the "evil intention of defrauding our bank." The bank alleged that by doing so, HMIT committed the offenses of "cheating, criminal conspiracy, forgery, criminal breach of trust, etc."

443. In addition, Gadiyaram, HMIT's co-founder, CEO, and majority shareholder, is a Helios director and entered into a consulting agreement with Helios in October of 2017. Gadiyaram's involvement with Helios is particularly concerning given that in March of 2018, police froze Gadiyaram's bank account due to the fraud accusations involving HMIT. He also was previously arrested because of his actions at HMIT. Gadiyaram initially began providing consulting services to Zone acquisition in November of 2016. In October 2017, this arrangement was formalized in a signed contract, pursuant to which Helios pays Gadiyaram consulting fees of $18,750 per month in cash. In 2017, Gadiyaram also received $7.25 million in stock awards. Combined with his consulting fees, he received total compensation of approximately $7.46 million in 2017. Gadiyaram was a substantial Helios stockholder at the end of the Class Period, holding 4.4% of Helios outstanding common stock as of March 2018.

444. Lest there be any doubt regarding the truthfulness of those running Helios, in response to press inquiries made in mid-2018, Farnsworth claimed that: "I don't deal with HMIT at all . . . Don't even know all the players of it. Never met them. . . . Not HMIT, no. I can't even pronounce all their names." As demonstrated, not only does Farnsworth certainly know those associated with HMIT, but he even works first-hand with them.

445. Defendants' perpetual and pervasive fraud over the course of the last decade further supports scienter.

## II. THE INDIVIDUAL DEFENDANTS WERE MOTIVATED TO COMMIT THE FRAUD ALLEGED HEREIN

### A. The Individual Defendants and Other Company Insiders Profited from Exorbitant Compensation Packages

446. While Helios proceeded to incur hundreds of millions of dollars in net losses, the Individual Defendants and Helios' other named executive, Krishnan, made sure to award themselves handsome compensation packages.

447. According to the Company's Annual Report for 2017, Farnsworth received nearly $9 million in compensation, Krishnan received nearly $3 million, and Benson received $235,000 for the year ended December 31, 2017. This was a drastic increase from the previous year, in which Farnsworth, Krishnan, and Benson received $208,900, $131,250, and $22,052, respectively. Their compensation was reported as follows:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Theodore Farnsworth | 2017 | 225,000 | 1,350,000 | 7,250,000 | 76,050 | 8,901,050 |
| Chief Executive Officer | 2016 | 32,500 | | | 176,400 | 208,900 |
| Parthasarathy Krishnan | 2017 | 225,000 | 500 | 2,685,000 | 7,244 | 2,917,744 |
| Chief Innovation Officer | 2016 | 131,250 | - | - | - | 131,250 |
| Stuart Benson | 2017 | 200,000 | 35,500 | - | - | 235,500 |
| Chief Financial Officer | 2016 | 22,052 | - | - | - | 22,052 |

448. Pursuant to the employment agreement entered into by Helios and Farnsworth on December 11, 2017 ("Farnsworth Employment Agreement"), Farnsworth is entitled to a base

salary of $325,000 per year, which is to be increased on each anniversary in an amount to be determined by the Board, but in no event by less than $15,000.

449. In 2017, Farnsworth also received a year-end cash bonus of $350,000 and award of 53,255 shares of Helios common stock worth $450,000 and set to vest on February 15, 2019. Farnsworth also received a one-time bonus of $1 million "for his efforts in bringing capital sources that have been critical to the Company's needs during 2017." Under its terms, for each subsequent year, Farnsworth was supposed to receive an annual bonus of cash and common stock in an amount to be determined by the board of directors. However, the annual cash target bonus is required to be 25% of Farnsworth's base salary and the annual award of shares is required to have a value equal to 200% of his base salary.

450. In addition, on March 15, 2018, the Board granted Farnsworth a one-time cash bonus of $1,500,000 purportedly "in recognition of recent extraordinary efforts on behalf of the Company, including his role in the Company's completed offerings of its securities for a total of $190,000,000 in gross proceeds since December 15, 2017 and his ongoing role in the acquisition of MoviePass and the integration of the MoviePass business with the Company."

451. In addition, Farnsworth is entitled to a stock bonus based upon the Company's achievement of certain market capitalization milestones. Each award of common stock pursuant to a market capitalization milestone was to vest upon the later of February 15, 2019 and the end of the applicable three-month period following the applicable date of the grant. The market capitalization milestones were as follows:

| Company Market Capitalization Milestone | Percentage |
|---|---|
| $100,000,000 | 3% |
| $150,000,000 | 3% |
| $200,000,000 | 4% |
| $250,000,000 | 4% |

| | |
|---|---|
| $300,000,000 | 5% |
| $350,000,000 | 5% |
| $400,000,000 | 7% |
| $450,000,000 | 7% |
| $500,000,000 | 9% |
| every additional $100,000,000 thereafter (cumulated with the applicable immediately preceding milestone) | 10% |

452. Pursuant to Benson's employment agreement, Benson was entitled to a base salary of $275,000 per year, which is to be increased every year in an amount no less than 7% of his base salary. For 2017, Benson received a performance bonus of $150,000 in cash, 300,000 shares of Helios stock for "extraordinary services related to the Company's acquisition of a majority stake in MoviePass Inc.," and 100,000 shares of Helios stock for "outstanding performance of his general duties in 2017."

453. Benson's Helios stock shares vested in their entirety on February 15, 2019.

454. On January 18, 2018, the Company entered an employment agreement with Benson an award of 600,000 shares of common stock. Pursuant to the agreement, all of the shares vested on February 19, 2019.

455. Further, Farnsworth, Krishnan and Gadiyaram granted themselves lavish equity bonuses. According to an 8-K filed on January 23, 2017:

> On January 20, 2017 (the "Approval Date"), the Board of Directors (the "Board") of Helios and Matheson Analytics Inc. (the "Company") approved individual employee benefit plans (the "Executive Plans") for Theodore Farnsworth, Pat Krishnan and Muralikrishna Gadiyaram. Pursuant to the Executive Plans, which are subject to approval by the Company's shareholders, ***the Company will issue 250,000 unregistered shares of the Company's common stock to each of the above-named individuals as a bonus for exceptional services provided in connection with the Company's merger transaction with Zone Technologies, Inc. ("Zone").*** The Executive Plans each include a provision that prevents the sale or transfer of the shares, subject to exceptions for the transfer by gift, by will or intestate succession, or to a trust for the benefit of the individual or his family, for a period of 24 months from the date that shareholder approval is obtained.

456. Defendants' "services provided in connection with the Helios's merger transaction with Zone Technologies" was not exceptional, as Zone did not function and added no value to the Company.

### B. The Individual Defendants Were Motivated to Inflate the Company's Stock Price To Secure Desperately Needed Proceeds from the Various Class Period Note Issuances and Conceal the Company's Ailing Cash Position and Financial Losses

457. With no ability to monetize the data it was receiving from its rising subscriber base, and increasing losses based on those same subscribers, the Company sought to leverage its inflated stock price in several convoluted Class Period capital raises.

#### 1. The August 2017 Notes and Investor Warrant

458. On August 16, 2017, and in order to finance its acquisition of MoviePass, the Company issued three Senior Secured Convertible Notes in the aggregate principal amount of $10,300,000 and a 5-year warrant for the purchase of 1,892,972 shares of the Company's common stock at an exercise price of $3.25 per share to an undisclosed investor for consideration consisting of a secured promissory note payable by the investor to the Company in the principal amount of $8,800,000 and $220,000 which offsets the notes of the same amount.

459. Further, the investor prepaid (i) $5,000,000 with respect to notes issued by Helios to the investor on February 7, 2017 and (ii) $230,000 with respect to notes issued by Helios to the investor on December 1, 2016.

460. Each of these agreements with the investor worked in concert to ensure that the Company had on hand the $5 million it had agreed to pay to MoviePass within 90 calendar days of the closing of the transaction as part of the Helios Note

461. At the time the Company had agreed to purchase the majority of shares in MoviePass for $27 million, Helios maintained just $1.43 million in cash and cash equivalents on

hand as of June 30, 2017 and just $12.75 million in total current assets (as compared to nearly $2.1 million in total current liabilities for the same period).

462. Without being able to leverage the value proposition of the Company's future stock price vis-à-vis the warrants and convertible feature of the note, the Company would have been unable to finance the MoviePass purchase, an acquisition essential to the perpetuation of the fraud.

**2. The November 2017 Senior Secured Convertible Notes**

463. On November 7, 2017, the Company issued two Senior Secured Convertible Notes in the aggregate principal amount of $100,000,000 to certain unnamed institutional investors.

464. As stated by the Company, proceeds from these notes were used to purchase $3 million in additional shares of MoviePass common stock as the Company sought to tighten its grip on the MoviePass acquisition even before it was fully approved by shareholders of either company.

465. Like the August notes that preceded it, the November 2017 notes were necessary because the Company maintained just $1.6 million in cash and cash equivalents on its balance sheet as of September 30, 2017.

466. Given that the November 2017 notes were underpinned by their convertibility, the Individual Defendants were motivated to artificially inflate the Company's stock price to make it appear to be a more attractive investment opportunity for the Investors and to secure the funds necessary to push forward with the MoviePass takeover.

**3. The January 2018 Senior Convertible Notes**

467. In January 2018, pursuant to a securities purchase agreement entered into by the Company and an undisclosed investor, Helios sold and issued senior convertible notes in the aggregate principal amount of $60,000,000. The funds received by the Company from this note

were, first and foremost, earmarked for increasing the Company's ownership interest in MoviePass.

468. Like the notes before it, the January 2018 Senior Convertible Notes provided the buyer the option to convert the debt into shares of the Company's common stock at any time after the Company received approval of its stockholders for the issuance of the shares at a conversion price of $11.44 per share.

469. These notes, like those that came before them, were underpinned by their convertibility. Thus, Individual Defendants were motivated to artificially inflate the Company's stock price to make it appear to be a more attractive investment opportunity for the Investors and to secure the funds necessary to push forward with the MoviePass takeover.

#### 4. The June 2018 Senior Convertible Notes and Preferred Shares

470. In June 2018 pursuant to a securities purchase agreement with certain anonymous investors, Helios to issue convertible notes in the aggregate principal amount of $164 million and 20,500 shares of preferred stock. The net proceeds from the issuance of the notes and the preferred stock was to be used for "general corporate purposes," i.e., buying customers' movie tickets.

471. According to the terms of June 21, 2018 securities purchase agreement, the notes were convertible into shares of common stock, at the option of the holder, at a conversion price of $1.00, subject to adjustment. The convertibility of these notes, like those that came before them, motivated the Individual Defendants to artificially inflate the Company's stock price to make it appear to be a more attractive investment opportunity for the Investors and to secure the funds necessary to push forward with the MoviePass takeover.

### 5. The Company Uses its Stock as Currency to Pay its Placement Agent in the Various Note Offerings

472. Both prior to and during the Class Period, the Company used its stock as currency to pay Palladium Capital Advisors, LLC ("Palladium") for acting as its placement agent or financial advisor in the various note offerings – services the Company would not have otherwise been able to afford because of its cash deficiencies and lack of profitability.

473. *The September 2016 Placement Note and Warrants.* With respect to payment for its services related to the placement of certain notes in September 2016, the Company issued to Palladium a note in the principal amount of $80,000 as payment for the cash portion of its commission in that amount owed by the Company. Palladium also received a 5-year warrant for the purchase of the Company's common stock, with Palladium exercises that warrant during 2016 to purchase more than 48,000 shares at an exercise price ranging from $4.54 per share to $9.36 per share, before determining on October 2, 2017 to exercise the warrant in full in a cashless exercise, and receiving an additional 22,578 shares, which had a market value on that day of more than $293,000. Thus, by timing the October 11, 2017 risk disclosures to occur after the exercise date, Defendants benefitted their partner who would assist them perpetrate additional dilutive securities issuances.

474. *The December 2016 Placement Warrants.* Palladium subsequently assisted Helios in the placement of certain senior convertible notes during December 2016 for which it again accepted a 5-year warrant as partial payment for its services, allowing for Palladium to purchase 22,000 shares at an exercise price of $4.54 per share, with the issuance of additional warrants based on cash payments received by the Company pursuant to the placed notes. On October 6, 2017, 84,735 shares were issued to Palladium in a cashless exercise, carrying a market value on that day of $1.33 million. Thus, by timing the October 11, 2017 risk disclosures to occur after the exercise

date, Defendants benefitted their partner who would assist them perpetrate additional dilutive securities issuances.

475. *The February 2017 Placement Warrants.* Palladium again accepted a 5-year warrant from the Company in exchange for its assistance in the placement of certain notes during February 2017. The February 2017 warrant allowed Palladium to purchase up to 8% of the number of shares of the Company's common stock into which the unrestricted principal of the February 2017 Notes may be converted. Through the first nine months of 2017 the Company received $5,000,000 of cash payments for the February 2017 Notes, resulting in the issuance of an additional February Placement Agent Warrants for the purchase of 133,334 shares of common stock at an exercise price of $3.00 per share.

476. *The August 2017 Placement Warrants.* In August 2017, the Company again used its inflated stock as currency in providing to Palladium a 5-year warrant to purchase Company shares in exchange for its services related to the August 2017 Notes and Investor warrant. Palladium's August 2017 placement warrant provided for the purchase of shares based on the amount of cash payments received by the Company from the August 2017 Notes, resulting in the issuance of 176,000 of warrants for the purchase of shares of common stock at exercise prices of $3.00 and $14.27 per share as of December 31, 2017.

477. *The November 2017 Placement Warrants*. In connection with acting as the financial advisor for the Company with respect to the November 2017 Senior Secured Convertible Notes, Palladium received a 5-year warrant. Palladium's November 2017 placement warrant provided for the purchase of shares based on the amount of cash payments received by the Company from the November 2017 Notes, resulting in the issuance of 75,618 warrants for the

purchase of shares of common stock at an exercise price of 412.06 per share as of December 31, 2017.

**C. The Individual Defendants Were Motivated to Inflate the Company's Common Stock To Raise Capital in the Follow-On Public Offerings**

478. Seeking to capitalize on the Company's inflated stock price, the Individual Defendants were motivated to engage in the fraud alleged herein in order to complete various follow on offerings necessary to fund the Company's operations. All of the public offerings were principally motivated by a need to fund MoviePass' operating expenses, i.e., subscribers' ticket purchases.

479. On December 12, 2017, Helios announced that it had commenced the December 2017 Offering, which was open to the public. Helios offered to issue and sell shares of its common stock and warrants in the aggregate of $60 million, exclusive of underwriting discounts and commissions.

480. On January 25, 2018, the Company filed with the SEC a Form S-3 Registration Statement, seeking to register for sale a combination of common stock, preferred stock, warrants, units, and subscription rights valued up to $400 million.

481. The registration statement was declared effective by the SEC on February 9, 2018 and the Company completed the February 2018 Offering, receiving net proceeds of $96.9 million.

482. Desperate for cash and needing to squeeze every last penny out of shareholders, the Company thereafter conducted the April 2018 Best Efforts Offering. In the April 2018 Best Efforts Offering, Helios obtained net proceeds of approximately $27.5 million.

483. At the same time that the Company commenced the April 2018 Best Efforts Offering, it also announced the commencement of the April 2018 ATM Offering. As of September

30, 2018, Helios sold 627,933,083 shares and received net proceeds of approximately $119,423,879, pursuant to the April 2018 ATM Offering.

484. Without the Defendants' misrepresentations, the December 2017 Offering, February 2018 Offering, the April 2018 Best Efforts Offering, and the 2018 ATM Offering would have been significantly less successful given the true nature of the Company's business prospects. Indeed, the Defendants purposefully masked the true condition and financial viability of its core asset while misrepresenting the purpose of these offering—all in order to exploit investors.

### D. Defendants' Motive to Inflate Helios' Stock Price to Inflate Helios' Stock Price to Make Acquisitions and Acquire Rights to Films

485. Prior to the Class Period, Helios was struggling financially and on the verge of being delisted. Then Helios acquired MoviePass and Defendants issued a steady stream of false and misleading statements regarding the combined company's prospects in a scheme to artificially inflate the price of Helios' common stock. Defendants sought to inflate the Company's common stock to: (i) use it as currency; and (ii) to generate the greatest proceeds possible through the sale of securities to investors at artificially-inflated prices. Defendants then used both the proceeds from these offerings and Helios' artificially-inflated common stock to fund their personal projects, to purchase assets, and to support MoviePass operations—all of which they could not do without the artificial inflation in the price of Helios' stock. Thus, Defendants were motivated to make false statements to artificially inflate the price of the Company's common stock so that Farnsworth and Lowe could, *inter alia*, acquire the rights to distribute movies, acquire a movie studio, and grow Helios and MoviePass inorganically through the acquisition of other related assets.

486. On April 5, 2018, (Helios's stock price closed at $2.98 per share on April 4, 2018, pre-reverse stock split) the Company announced it had entered into an Asset Purchase Agreement with Oath Inc. pursuant to which Helios acquired certain products, rights, technologies, contracts,

data and other assets related to the Moviefone brand ("Moviefone"). The purchase price included a major equity component as Helios paid only $1.0 million in cash and issued 2,550,154 (pre-reverse stock split) shares valued at $7.6 million and issued warrants to purchase an additional 2,550,154 (pre-reverse stock split) shares at an exercise price of $5.50 per share.

487. As a company with few prospects for organic growth, these acquisitions provided a much-needed lifeline and the Defendants' use of stock, rather than cash to pay for said assets, provided additional motivation for them to defraud the investing public or to conceal any information that might otherwise shake investor confidence and decrease the price of Helios's common stock.

488. On April 25, 2018, Defendants announced that they had "acquired an equity stake in the motion picture "Gotti", starring John Travolta" for an undisclosed amount, representing their second foray into acquiring the rights to motion pictures. Once again, Defendants did not disclose the terms of the acquisition, only that the deal was "led by Ted Farnsworth . . . on behalf of MoviePass Ventures" and that both Lowe and Farnsworth were excited to work on such a project. Defendant Lowe was quoted as saying "'Gotti' is precisely the type of film we established MoviePass Ventures to support."

489. On May 30, 2018, (when Helios's stock price closed at $0.46 per share and pre-reverse stock split) the Company announced it formed MoviePass Films LLC ("MoviePass Films") with Emmett Furla Oasis Films ("EFO Films"), pursuant to which Helios would own 51% and EFO Films 49%. In connection with this transaction, EFO Films granted Helios "the exclusive option to acquire the entire film library and current production slate of EFO Films." Helios refused to disclose the terms of the transaction, simply stating "both parties agreed on a payment in the form of cash ***and stock***."

490. In the weeks leading up to the MoviePass Films acquisition, Defendants Lowe and Farnsworth embarked on a media tour falsely touting Helios' ability to fund MoviePass, downplaying capital funding concerns, and falsely representing the possession of a $300 million "equity line of credit." *See* ¶¶ 315-30, 336-37. In the Press Release announcing the acquisition of MoviePass Films, Defendant Farnsworth admitted that he and Lowe had "been looking for an opportunity to acquire and produce studio content" since the formation of MoviePass Ventures, on January 19, 2018. Thus, Defendants were motivated to artificially inflate the price of Helios common stock from late-January 2018, and the desire to acquire a studio was on the top of their minds as they falsely touted their purported "equity line of credit" in the weeks immediately prior to the formation of MoviePass Films.

491. At the start of the Class Period, Helios was a company with little to no cash and few prospects for organic growth. Defendants were motivated to make false statements in order to deceive the investing public and/or conceal any information that might otherwise shake investor confidence and decrease the price of Helios's common stock, thereby preventing the generation of cash through the sale of securities and the deflating the price of Helios' common stock (which would render less useful as currency).

492. Defendants then used the proceeds from the sale of artificially-inflated securities and Helios' artificially-inflated common stock to purchase Moviefone and MoviePass Films and to fund Defendants' personal projects (MoviePass Ventures, "Gotti", and "American Animals") all of which represented a significant departure from MoviePass' original business strategy—information that would have been material to investors. According to *Bloomberg Businessweek*, Defendant Lowe, in particular, was motivated during the Class Period to use proceeds from public offerings and Helios common stock to fund personal projects ancillary to subscription-based

revenue and data-related revenue. In January 2018, at the Sundance Film Festival, "Lowe rented a giant house on a mountain outside of town and spread the word that he wanted to finance a film. There was a party with a dance floor, four bars-one on each floor-and plenty of MoviePass stocking hats."[22] There, Defendants entered into an agreement to acquire certain rights to "American Animals." Lowe was "giddy talking about it." *Id*.

493. In fact, on March 6, 2019, Defendants admitted MoviePass was embarking on a "new business strategy" whereby "[MoviePass] and MoviePass Films plan to implement a new business model that ***prioritizes self-generated revenues without dependence on studios or exhibitors, to build more reliable revenue streams***." This dramatic shift from subscription-based revenue and utilizing customer data to become profitable to a strategy premised on film-generated revenue was—unbeknownst to Plaintiffs and the Class—the plan all along for Defendants.

494. On October 2, 2018, in an interview with *The Wrap*, Defendant Farnsworth admitted that he knew "all along" and "from day one" that Helios' plan was for MoviePass to create its own content, rather than be profitable from subscriptions and Helios' purported data capabilities:

> Host: So, why does it work?
>
> Farnsworth: Oh, you want me to explain?
>
> Host: Why the business model does work, yeah?
>
> Farnsworth: It's interesting when we started with MoviePass, when I first decided to acquire the company, it was really the data. What we saw, you know they had 12,000 subscribers, they were trying to raise money over the last year- year and a

---

[22] *See Bloomberg Businessweek*, "How 2 Million People Loved MoviePass Nearly to Death", available at https://www.bloomberg.com/news/features/2018-05-16/with-vultures-circling-moviepass-still-believes-in-a-happy-ending (last visited April 3, 2019).

> half- they weren't very successful at that, but I believe if the data was true they had on the 12,000 that they were testing getting 48% of them to go to another theatre of our choice, things like that, that would be a home run, especially if you can build it where you would have the leverage where you would build it to millions of subscribers so when we were going to $9.95 ***we always knew from day one that the subscription side of the business would really break even or make a few dollars***—not, it was never going to be where it was all—***it was more like your loss leader***, is how you would look at it. And then it was to really drive around content at the theater side, so on theatrical side ***when your pushing people into the theater you're going make more money on the movies that you own, you know like MoviePass Films*** where you're going to make it with Amazon, or Netflix, and Redbox and all the ancillary revenues. ***So that was really the whole plan all along to do it on that side***. And then also doing the advertising side with the studios.

## <u>LOSS CAUSATION</u>

495. During the Class Period, and as detailed herein, the Defendants materially misled the investing public, thereby inflating the price of Helios' common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their own statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Helios' business, operations, and prospects as alleged herein.

496. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, the Defendants made or caused to be made a series of materially false and/or misleading statements about the prospects and success of MoviePass and its impact on the business of Helios. Specifically, the Defendants' statements were false and misleading in that: (i) MoviePass' business model was not sustainable, as Helios and MoviePass would run out of cash (ii) MoviePass' business model was not viable, as Helios and MoviePass did not have the technology or capabilities to gather and analyze customer data; (iii) MoviePass' business model

was not viable, as movie theaters had no incentive to pay MoviePass; and (iv) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times.

497. The materially false and/or misleading statements made by the Defendants during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

498. During the Class Period, as detailed herein, the Defendants engaged in a scheme to deceive the market and perpetuate a course of conduct that caused the price of Helios shares to be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed herein. As the Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of Helios shares was removed, and the price of Helios shares fell. From a Class Period high of ***$32.90 per share*** on October 11, 2017, Helios' stock price declined by over ***99% to $0.23*** per share on August 1, 2018.

499. The truth was partially revealed on October 11, 2017 when Helios filed a Form 8-K with the SEC disclosing previously-unreleased risk factors relating to the MoviePass business, including its negative financial performance, that MoviePass was knocking on the door of insolvency, and the increased likelihood of dilution through future share issuances in order to pay for MoviePass' rabid cash burn. In response, Helios stock plummeted ***$12.40*** from a close of $32.90 on October 11, 2017, to a close of $20.50 on October 12, 2017—representing a one day drop of ***37.7***% on heavy trading volume. For the five trading days following the October 11, 2017

disclosure, Helios common stock fell to a closing price of $16.32—a ***50.4***% drop on heavy trading volume. For the ten trading days following the October 11, 2017 disclosure, Helios common stock fell to a closing price of $11.50—a ***65***% drop on continuous, heavy trading volume.

500. On November 30, 2017, the truth was further partially revealed to the public when Helios released the target and pro forma financial statements that it had failed to provide with the announcement of the MoviePass acquisition. The financial statements disclosed by Helios on November 30, 2017 demonstrated that MoviePass had operated at a net loss for years 2015 and 2016 of $4,273,792 and $4,916,365, respectively and already incurred a net loss of $11,696,861 for the nine months ended September 30, 2017. In response to the November 30, 2017 financial statements, Helios' stock price fell ***$1.56*** from a close of $13.62 on November 30, 2017, to close at $12.06 on December 1, 2017 on increased volume—representing a one-day drop of ***11.5%***. Helios common stock continued to free fall in the days following the release of MoviePass' financial statements. For the five trading days following the November 30, 2017 disclosure, Helios common stock fell to a closing price of $8.30—a ***39%*** drop. For the ten trading days following the November 30, 2017 disclosure, Helios common stock fell to a closing price of $6.70—a ***50.8%*** drop. On November 30, 2017, before the release of MoviePass' financial statements, Helios stock traded at just a 7,000 volume. In the ten days following the release, Helios stock traded at an average of 27,430 shares per day, including 2,600 more shares trading hands on December 1, 2017 immediately following the disclosure.

501. The truth was further partially revealed and the risk materialized when Helios announced the December 12, 2017 Offering, which revealed, among other items: color (although not full disclosure) on the rapid pace that the Company was burning through cash, and that comments made by Defendants—such as Farnsworth's statement on November 24, 2017, during

an interview with Cheddar that MoviePass' business had a "very sustainable model"—were false. In response to the December 12, 2017 Offering, Helios common stock fell ***$3.29*** from a close of $10.08 on December 12, 2017, to close at $6.79 on December 13, 2017—a drop of ***32.6%***.

502. The truth was further partially revealed and the risk materialized when Helios announced the February 12, 2018 Offering, which revealed, among other items: color (although not full disclosure) on the rapid pace that the Company was burning through cash, and that comments made by Defendants—such as Farnsworth's statement on January 9, 2018, during an interview with Yahoo! Finance Live that "MoviePass within the next sixty days should be ***self-sufficient on its own***"—were false. In response to the February 12, 2018 Offering, Helios common stock fell ***$2.56*** from a close of $7.99 on February 12, 2018, to close at $5.43 on February 13, 2018—a drop of ***32%***.

503. On March 5, 2018 after trading hours, The Verge released an article titled "MoviePass says it's 'exploring' gathering location data on users, but it won't sell it" that corrected Defendant Lowe's prior March 2, 2018 misstatement. Then, on March 7, 2018 during market hours, Wired released an article titled "As MoviePass Explodes, Its Growing Pains Hurt Subscribers," where Lowe admit with respect to his prior misstatements that "I [Lowe] was just being in a funny mood and just said it sarcastically. We are not tracking people."

504. In response to the March 5, 2018 article and the March 7, 2018 article, correcting Defendant Lowe's March 2, 2018 misstatements, Helios stock dropped a total of $0.14 from a close of $4.73 on March 2, 2018 to close at $4.61 on March 6, 2018 and then to $4.59 on March 7, 2018.

505. The truth was further partially revealed and the risk materialized when Helios announced the April 18, 2018 ATM and best efforts offerings, which revealed, among other items:

color (although not full disclosure) on the rapid pace that the Company was burning through cash, and that comments made by Defendants—such as Lowe's statement on February 18, 2018, on the Recode Media podcast that MoviePass' ability to become "***cash-flow positive***" wasn't "***all that far in the future***[,]" as well as his statements on March 27, 2018 that the Company doing well enough (i.e., that "the math works out") to warrant reducing MoviePass' monthly fee to $6.95 per subscriber—were false.

506. In response to the statements between April 16, 2018 and April 19, 2018, Helios stock dropped ***$1.66*** per share, from a close of $4.21 per share on April 16, 2018, to close at $2.55 per share on April 19, 2018—a drop of ***39.4%***. Specifically, over those days, Helios closing stock price decreased from $4.21 on April 16, 2018, to $3.96 on April 17, 2018, to $3.83 on April 18, 2018, to $2.55 on April 19, 2018.

507. On May 8, 2018 the Company filed the May 8, 2018 Current Report which announced Helios had "approximately $15.5 million in available cash and approximately $27.9 million on deposit with our merchant processors for a total of approximately $43.4 million." The May 8, 2018 Current Report further revealed the truth of Helios' past false and misleading statements and was a materialization of the risk. In response to the May 8, 2018 Current Report, Helios stock dropped ***$0.66*** from a close of $2.11 on May 7, 2018 to close at $1.45 on May 8, 2018, representing a one day drop of ***31.3%***—on extremely heavy and unusual volume. Helios stock continued to plummet in the following trading days, falling to close at $0.79 on May 9, 2019—down ***62.6***% from May 7, 2018. Following the May 8, 2018 Current Report, Helios stock never rose back to $1.00 per share and continued to trade at depressed levels until July 25, 2018.

508. On May 24, 2018 before the opening bell, Business Insider released an article titled "MoviePass said a $300 million lifeline could sustain it for over a year, but that money could slip

through its fingers." That article corrected Defendants' prior false and misleading statements on the Company's purported "equity line of credit" by confirming that they were referring to "the 'at-the-market'(ATM)." Business Insider also disclosed that Defendants had—at most—"$265 million" remaining on Helios' ***entire shelf registration statement***, correcting Defendants' prior claims of having between $375 and $300 million remaining—depending which figure Defendants chose to tout. In response, Helios stock dropped $0.03 from a close of $0.49 on May 23, 2018 to close at $0.46 on May 24, 2018, representing a one day drop of ***6.1%***—on extremely heavy and unusual volume.

509. On June 19, 2018 after market close, the Company filed a Schedule 14A Proxy Statement with the SEC disclosing that the Company was seeking shareholder approval to effectuate a reverse stock split. In response to the June 19, 2018 Schedule 14A Proxy Statement, Helios stock dropped $0.14 from a close of $0.45 on June 19, 2018 to close at $0.31 on June 20, 2018 representing a one day drop of ***31.1%***—on extremely heavy and unusual volume.

510. The truth was further partially revealed to public and the risk materialized with the announcement of the Company's reverse stock split. On July 24, 2018, Helios announced that it would implement a 1 for 250 reverse stock split to be effectuated at 4:01 p.m. Eastern Time on Tuesday July 24, 2018. According to Farnsworth, the 1 for 250 reverse was approved to "facilitate our access to capital over the next several years and enable us to implement our growth plans for MoviePass." In response to the announcement of the reverse split and the news that the Company was desperate for capital, the price of Helios common stock declined ***$11.90***, or ***52.88%***, from a closing price of $22.50 per share on July 24, 2018 to a closing price of $10.60 per share on July 25, 2018 on an adjusted basis (*i.e.* adjusting the close on July 24, 2018 to a post-split price to make

a like comparison). The Company's stock price continued to decline to $6.83 per share on July 26, 2018.

511. On July 27, 2018, the truth was fully revealed and the risk fully materialized when the Company disclosed that it had issued a demand note in the principal amount of $6.2 million because it was not able to make required payments to its merchants and fulfillment processors, leading to a service interruption. This announcement caused the Company's common stock to decline ***$4.83***, or ***70.72%***, from a closing price of $6.83 per share on July 26, 2018 to a closing price of $2.00 per share on July 27, 2018. The price of the Company's common stock continued to decline over the next few days, falling another $1.76 to close at $0.23 per share on August 1, 2018, an overall drop from July 24, 2018 of approximately ***98.98%***.

512. As a result of their purchases of Helios shares during the Class Period at artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The timing and magnitude of the price decline in Helios shares negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## CLASS ACTION ALLEGATIONS

513. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Helios publicly traded securities between August 15, 2017 and July 26, 2018, inclusive, seeking to pursue remedies under the Exchange Act. Excluded from the Class are Helios and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

514. Because Helios securities were actively traded on the NASDAQ, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by Helios or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

515. Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.

516. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

a. Whether Defendants violated the federal securities laws as alleged herein;

b. Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Helios' business and operations;

c. Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether the Individual Defendants caused Helios to issue false and misleading SEC filings and public statements during the Class Period;

e. Whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f. Whether the prices of Helios securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g. Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

517. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE

518. Plaintiffs are presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for the Company's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

a. Helios' common stock was actively traded on the NASDAQ;

b. The market price of Helios common stock reacted promptly to the dissemination of public information regarding the Company;

c. The Company's stock was followed by financial analysts, including those cited in this Complaint;

d. The average weekly trading volume for Helios stock during the Class Period was approximately 334,000 shares;

e. As a regulated issuer, Helios filed with the SEC periodic public reports during the Class Period;

f. Helios regularly communicated with pubic investors via established market communication mechanisms; and

g. During the Class Period, the Company's market capitalization was over $232,000,000 on October 11, 2017 and the Company had over 421 million shares outstanding prior to the 1 for 250 reverse stock split effectuated on July 25, 2018.

519. Throughout the Class Period, the Company was consistently followed by the market, including securities analysts. The market relies upon the Company's financial results and management to accurately present the Company's financial results. During this period, Helios and the Individual Defendants continued to pump materially false and misleading information into the marketplace regarding the Company and the status and success of MoviePass. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of the Company's securities.

520. As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for Helios' common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

521. Plaintiffs and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Helios' common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

522. Plaintiffs and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) because claims asserted in this

Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

523. Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have purchased Helios' common stock at artificially inflated prices.

**NO STATUTORY SAFE HARBOR**

524. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

525. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

526. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Helios who knew that the statement was false when made.

## CLAIMS FOR RELIEF

## COUNT I

## For Violations of Section 10(b) of the Exchange Act and Rule 10b-5

***Against All Defendants***

527. Plaintiffs reallege each allegation as if fully set forth herein.

528. This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

529. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Helios stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Helios stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

530. During the Class Period, Defendants, by the use of means and instrumentalities of interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, all in an effort to maintain artificially high market prices for Helios stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants acted individually and in concert in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

531. During the Class Period, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

532. As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, *et seq.*) including, but not limited to Subsection of Regulation S-K, such as Item 303 of SEC Reg. S-K (17 C.F.R. § 229.303(a)(3)(ii)), Rule 8-04 of Regulation S-X (17 CFR § 210.8-04), and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

533. The Individual Defendants, who are the senior officers and/or directors of the Company and/or MoviePass, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members

of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

534. As a result of the foregoing, the market price of Helios securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements and knowing and/or reckless inability to effectuate their purported business plans, Plaintiffs and the other members of the Class relied on the statements and business plans described above and/or the integrity of the market price of Helios securities during the Class Period in purchasing Helios securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

535. Had Plaintiffs and the other members of the Class been aware that the market price of Helios securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Helios securities at the artificially inflated prices that they did, or at all.

536. As a result of the wrongful conduct alleged herein, Plaintiffs and the other members of the Class have suffered damages in an amount to be established at trial. Plaintiffs and the Class' losses were proximately caused by Defendants' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiffs and other members of the Class purchased Helios stock in reliance on the integrity of the market price of that stock, and Defendants manipulated the price of Helios stock through their misconduct as described herein. Plaintiffs' and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of, among other things,

Defendants' knowing and/or reckless inability to carry out their purported business plans, notwithstanding affirmative representations to the contrary.

537. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Helios securities during the Class Period.

**Count II**

**For Violations of Section 20(a) of the Exchange Act**

***Against the Individual Defendants***

538. Plaintiffs reallege each allegation as if fully set forth herein.

539. This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

540. Helios and the Individual Defendants are liable as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

541. the Individual Defendants acted as controlling persons of Helios within the meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual Defendants had the power and authority to cause Helios and MoviePass to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

542. Specifically, the Individual Defendants, by reason of their status as senior executive officers and/or directors of Helios and/or MoviePass, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases and interviews with various news sources

cited herein related to Plaintiffs' and the Class' investments in Helios securities within the meaning of Section 20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

543. the Individual Defendants controlled and had the authority to control the content of the Company's SEC statements, press releases and other public statements. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

544. the Individual Defendants knew or recklessly disregarded the fact that Helios' representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

545. By virtue of their high-level positions and their participation in and awareness of Helios' operations and public statements, the Individual Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

546. The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

547. As set forth herein, the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are further liable pursuant to Section 20(a) of the Exchange Act.

548. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of Helios securities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such equitable/injunctive or other relief in Plaintiffs' favor as the Court may deem just and proper.

## JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

DATED: April 3, 2019

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

By: *__/s/Shannon L. Hopkins_______*

Shannon L. Hopkins (SH-1887)
shopkins@zlk.com
Stephanie A. Barone (admitted *Pro Hac Vice*)
sbartone@zlk.com
Gregory M. Potrepka
gpotrepka@zlk.com
Andrew Rocco (*Pro Hac Vice* forthcoming)
arocco@zlk.com
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171

*Counsel for Lead Plaintiff and Lead Counsel for the Class*