**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE HELIOS AND MATHESON ANALYTICS, INC. SECURITIES LITIGATION** | No. 1:18-CV-06965-JGK<br><br>**CLASS ACTION** |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR LIMITED RELIEF FROM THE PSLRA DISCOVERY STAY**

Dated: June 23, 2020

**LEVI & KORSINSKY, LLP**

Shannon L. Hopkins (SH-1887)
shopkins@zlk.com
Gregory M. Potrepka (GP-1275)
gpotrepka@zlk.com
Andrew W. Rocco (admitted *Pro Hac Vice*)
arocco@zlk.com
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**TABLE OF CONTENTS**

I. INTRODUCTION ........ 1

II. FACTUAL DEVELOPMENTS ........ 2

III. ARGUMENT ........ 6

A. The Artificial Distinction Between "Books and Records" and Discovery is Irrelevant ........ 6

B. The Trustee Complaint Amplifies Lead Plaintiff's Showing of Undue Prejudice ........ 7

1. Lead Plaintiff Is Clearly Disadvantaged ........ 7

2. The Trustee Is Procedurally Advancing Past Lead Plaintiff ........ 8

3. Partial Relief from the Stay Does Not Offend Congress' Intent ........ 8

IV. CONCLUSION ........ 9

# TABLE OF AUTHORITIES

**Cases**

*Friedman v. Quest Energy Partner LP*,
2009 U.S. Dist. LEXIS 117050 (W.D. Okla. Dec. 15, 2009) .......... 8

*Gruber v. Gilbertson*,
2017 U.S. Dist. LEXIS 142746 (S.D.N.Y. Sept. 5, 2017) .......... 7

*In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*,
2007 U.S. Dist. LEXIS 10408 (E.D. Mich. 2007) .......... 2, 7

*In re LaBranche Sec. Litig.*,
333 F. Supp. 2d 178 (S.D.N.Y. 2004) .......... 9

*In re Petrobras Sec. Litig.*,
2015 U.S. Dist. LEXIS 51451 (S.D.N.Y. Apr. 13, 2015) .......... 8

*In re Refco, Inc. Sec. Litig.*,
2006 U.S. Dist. LEXIS 55639 (S.D.N.Y. Aug. 8, 2006) .......... 8

*In re Worldcom Sec. Litig.*,
234 F. Supp. 2d 301 (S.D.N.Y. 2002) .......... 7

*Turocy v. El Pollo Loco*,
2017 U.S. Dist. LEXIS 71662 (C.D. Cal. May 10, 2017) .......... 6, 8

Defendants' opposition to Lead Plaintiff's motion fundamentally misunderstands the motion. *See* Dkt. 111; Dkt. 113 ("Opposition").[1] Lead Plaintiff seeks limited relief to seek relief from the Bankruptcy court in order to obtain a discrete and particularized set of documents that would return the securities and derivative actions to equal footing (so that neither is unduly prejudiced), while respecting the purpose of the PSLRA. The Motion should be granted.

## I. INTRODUCTION

The Motion, as filed, sought an order allowing discovery from Defendants ***or***, alternatively, to "file a motion" in the Bankruptcy court to "obtain partial relief from the bankruptcy stay." Dkt. No. 109 at 2. Lead Plaintiff was careful not to formally seek documents from the Trustee without first obtaining relief from this Court, so that Lead Plaintiff could then file a motion in the Bankruptcy court for relief from the stay imposed under 11 U.S.C. §362(a). At the time, Lead Plaintiff had reason to believe Defendants had provided documents to the Trustee and saw no indication that production was complete. Defendants have since represented they "never provided documents to the Trustee." Opposition at 1.[2] Lead Plaintiff accepts this representation.[3] However, Defendants' statement that "Plaintiffs seek discovery that does not exist" (Opposition at 1), is false and does not resolve this Motion because Lead Plaintiff cannot petition the Bankruptcy court until the PSLRA stay is lifted. The Trustee is unequivocally in possession of non-public documents that it

[1] All defined terms shall have the same meaning ascribed to them in Lead Plaintiff's opening Memorandum of Law in Support of Motion (the "Motion") for Limited Relief from the PSLRA Discovery Stay. Dkt. No. 110. As used herein, "Defendants" means the Individual Defendants.

[2] Unless otherwise noted, all emphasis is added and internal citations are omitted.

[3] Lead Plaintiff is filing herewith an amended proposed order. *See* Hopkins Decl. at Ex. 1.

***relied on*** in filing a complaint against Defendants. *See* Declaration of Shannon L. Hopkins ("Hopkins Decl.") at Ex. 2 ("Trustee Complaint"); *see also Nisselson v. Farnsworth et. al*. Case No. 1:20-ap-1182-smb, (the "Adversarial Proceeding"). Regardless of the label applied to the non-public documents, whether it be discovery or "books and records," the Trustee was in possession of relevant internal emails, board-level documents, and projections. *See* Section II, *infra*. Thus, the PSLRA stay is circumventing Congress' intent—it is hampering Lead Plaintiff in a straightforward fraud case.

The Opposition focuses solely on Defendants' documents and says ***nothing*** on Lead Plaintiff's request to petition the Bankruptcy court. Defendants ignore that lifting the PSLRA stay is a necessary precondition to a motion to lift the stay in place in the Bankruptcy Action.[4] Since the Motion was filed, ***significant*** developments occurred ***confirming***: (1) the Trustee possesses non-public documents relevant to and substantiating Lead Plaintiff's allegations; (2) Lead Plaintiff is at a clear informational disadvantage vis-à-vis the Trustee, who filed a 68-page pleading based on non-public documents; (3) Defendants have not disputed settlement discussions are ongoing; and (4) Lead Plaintiff and the Trustee are competing over the same limited insurance.

## II. FACTUAL DEVELOPMENTS

On June 2, 2020, after filing the Motion, Lead Plaintiff informally requested that the Trustee, Reid Collins (the Trustee's litigation counsel), and Defendants' counsel produce all discovery related to the derivative claims. The Trustee responded on June 3, 2020, refusing to produce the

[4] *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 2007 U.S. Dist. LEXIS 10408, at *7 n.8 (E.D. Mich. 2007) (bankruptcy court "directed Lead Plaintiffs to first seek relief from the PSLRA" and after "they could then return to the Bankruptcy Court and renew their motion to lift the bankruptcy stay.").

non-public documents obtained from Helios stating "[t]he trustee has relied on the books and records of the Debtors' estates in asserting his claims." *See* Dkt. No. 112-1.

On June 5, 2020, the Trustee filed the Trustee Complaint citing a trove of undisclosed evidence:

| Trustee Complaint (Ex. 2) | TAC (Dkt. No. 92) |
|---|---|
| **Overuse/Profitability** | |
| • By ***November 2017***, VP of Analytics Kiran Srinivas emailed Farnsworth and Lowe highlighting issues from frequent MoviePass users stressing that those on Wall Street ***"NEED TO KNOW how the future will offset the current losses."*** ¶46.<br>• Throughout the ***Q12018***, Srinivas worked closely with Lowe, Benson and Farnsworth and kept them informed of all concerns, continued to worry about losses created by super users.... These officers collectively decided ***"[t]he goal here is to reduce the % of heavy users as much as possible."*** ¶49.<br>• In February 2018, Lowe worried about MoviePass spending, stating: "This is why we need for this coming weekend to gray out Titles or theaters to save money" and proceeded to dictate a plan for manipulating members' service. ¶¶53-4.<br>• ***In April 2018*** Lowe and Farnsworth circulated internally a draft letter that would ***falsely*** tell a frequent user that their account had been flagged for suspicious activity or potential fraud. ¶¶55-6. | • Farnsworth: "***So it is a very sustainable model***. ***That's, that's not our issue at all***." ¶258 (11/24/2017).<br>• Farnsworth: "And we're, ***we're thrilled because MoviePass within the next sixty days should be self-sufficient on its own***.... ***Ya, like self-sufficient where you are not going through cash flow***." ¶272 (1/9/2018).<br>• Farnsworth: ***"[t]he internal metrics are tracking as planned which gives us continued confidence on our path of profitability***." ¶298 (4/4/2018)<br>• Farnsworth: "***We are thrilled with our current metrics in-house moving toward profitability***, and ***we believe we will be profitable by the end of the year***...." ¶312 (4/6/2018).<br>• Lowe: "***They [the people who see a lot of movies] <u>become more valuable to us</u>***." ¶317 (4/12/2018).<br>• Farnsworth: "We are not changing our guidance on 5 million subscribers by the end of this year, which ***should make us profitable/cash flow-positive*** according ***to our business model***." ¶334 (5/9/2018). |

| **Losses/Ability to Survive** | |
|---|---|
| • In ***February 2018***, Srinivas worried ticket spending would eclipse "***$1.0-$1.1b at current trajectory***." He warned Lowe, Farnsworth and Benson***, "we need to be careful here? I don't have a good answer how to guide here."*** ¶48.<br>• On ***April 2, 2018***, Benson forecasted MoviePass' projected cash losses from May 2018 through March 2019 to be $576 million. Benson then reported that Farnsworth asked Benson, Lowe and Puri to ***"revisit"*** the model's projections. Benson also explained: "Ted felt our neg cash for 2018 was closer to $40M[]-[]$50M NOT $116M (see Q4 2018)." Hours later, Benson ***changed the forecast to $235,099,537, making approximately $340 million disappear in a matter of hours.*** ¶¶64-5. | • Farnsworth: "***I assure you that capital is not an issue. I'm sitting on hundreds of millions of dollars of dry powder…This is a unicorn company***." ¶327 (4/17/2018).<br>• Farnsworth: "***I'm not worried about the cash burn at all***." ¶332 (5/8/2018).<br>• Farnsworth: "We've got 17 months' worth of cash ***without further raises of capital***." ¶336 (5/13/2018).<br>• Lowe: "***the company's financial troubles have been exaggerated***." ¶349 (5/16/18).<br>• Farnsworth: "***The money side is the least of our worries***." ¶351 (6/12/2018). |
| **The "Big Three" Theatre Companies** | |
| • Another MoviePass employee stated in an email, "The common theme at ***every*** meeting and call is that the big three exhibitors ***do not want the studios working with MoviePass***[.]" The email was forwarded to ***Farnsworth and Lowe*** stating***:*** "re: big three, gentlemen, I am getting this from all sides." ¶80. | • SEC filing falsely warning: "***MoviePass may not gain acceptance from large national exhibitors (movie theater chains)***…." ¶253 (throughout the Class Period). |
| **"Data" Capabilities** | |
| • In late 2017 Lowe and Farnsworth were told that Helios received interest from Fox for data services. The email noted that data was not MoviePass' "strong suit" and there was "***an inherent tension in what they want and what we have***." ¶90.<br>• In February and March 2018, Lowe received financial projections. The financial model projected data licensing revenues at $16 million in 2018, growing to $40 million by 2021. Despite this already unrealistic and rosy view of MP's revenues, ***Lowe did not like the projections and instructed Puri and Srinivas to hype up MP's financial model even more to hit certain*** | • Farnsworth: "***It's about the data***." ¶232 (10/13/2017).<br>• Lowe: "It's all about ***technology and data behind your retail business***, uh, to drive ***more profit*** and ***more growth***." ¶238 (10/16/2017).<br>• Farnsworth: "***More subscribers mean more data. Together, I believe HMNY and MoviePass can offer important analytics to movie studios and exhibitors….***" ¶240 (10/24/2017).<br>• Farnsworth: "***We have a real opportunity here to use data to inform the movie business about their audiences and, more importantly, to deliver real intelligence on what works and what doesn't***." ¶301 |

| | |
|---|---|
| ***EBITDA targets*. *Per Lowe's direct instruction, the new financial model projected dramatically lower losses, based on Srinivas and Puri "ramping up other revenues meaningfully."*** Those "other revenues" included data licensing. This new and improved model laughably projected MoviePass would make $125-$130 million from data licensing in 2019, rising to $524 million from data licensing in 2021. Srinivas later stated the obvious to Lowe and Puri: ***"My personal opinion is our numbers are TOO HIGH."*** ¶¶94-5.<br>• It was not until ***April 30, 2018*** that MP finally hired a Chief Data Officer, Ed Vincent, ***who noticed immediately that MP did not have monetizable data about its users***. ¶96. | (2/26/2018).<br>• Farnsworth: "***[w]e think there's a lot of money to be made per subscriber***." ¶310 (3/27/2018). |
| **Internal Controls/Scienter** | |
| • HM's oversight procedures were severely deficient or nonexistent. ***Helios' accounting firm observed material weaknesses, including issues with the approval of equity and debt transactions, material errors in all important accounts, no process to capture and record contracts' effects on the financial statements, and an insufficient accounting department***. ¶119. | • The Company's goodwill impairments, restatement of revenue and liabilities, admissions of materially false statements in financial reports related to MoviePass, admissions of material weaknesses in managing subscriber accounts and financial reporting, and inability to file an annual report for 2018 or a quarterly report for 2019 supports a strong inference of scienter. ¶¶467. |
| **Recklessness/Scienter** | |
| • Farnsworth was known by those in charge of MP's and HM's finances, including Benson, as a reckless spender, and he used HM's resources for a host of unreasonable and unmerited perks. ***In October 2017, Benson noted in an email that Farnsworth's comingling of business and large personal expenses would "cause us to be written up for lack of internal controls."*** ¶106. | • Defendants Lowe and Farnsworth dreamed of breaking into the movie production business and being major players in Hollywood and were motivated during the Class Period to use proceeds from public offerings and Helios common stock to fund personal projects that were ancillary to subscription-based revenue and data-related revenue touted to investors. ¶514-24. |

After filing the Trustee Complaint, the Trustee dismissed the Federal Derivative Action. As such, the Trustee is no longer subject to this Court's stay order and has initiated derivative claims based on non-public documents—effectively leap-frogging Lead Plaintiff.

## III. ARGUMENT

Defendants first argue the Trustee is not in possession of discovery. Whatever Defendants choose to call such documents, the Trustee Complaint clearly relied on non-public information. Defendants then attack each of Lead Plaintiff's prejudice arguments asking the Court to consider them individually. However, when considering Lead Plaintiff's undue prejudice arguments holistically, courts in this Circuit and across the country have lifted the PSLRA stay for such limited purposes. Defendants failed to cite a single analogous counterexample.

### A. The Artificial Distinction Between "Books and Records" and Discovery is Irrelevant

Defendants argue that the Trustee has not received discovery and therefore "there are no such documents" to be obtained. Opp. at 5. Whether the Trustee received the documents through formal discovery procedures is irrelevant. The Trustee is in possession of and "has access to all of the estate's legal property, which includes the Company's books and records" (Opposition at 5), and Lead Plaintiff has demonstrated, above, that these books and records include, *inter alia*: (1) emails to Defendants; (2) board-level documents; and (3) financial projections. The artificial distinction is irrelevant because what the Trustee considers books and records would constitute discovery to the Lead Plaintiff, and Defendants cite no authority to the contrary. *See Turocy v. El Pollo Loco*, 2017 U.S. Dist. LEXIS 71662, at *7 (C.D. Cal. May 10, 2017) (granting motion to lift stay to allow class plaintiff to receive §220 "books and records" material available in parallel derivative action).[5]

The Trustee Complaint's allegations relate directly to Defendants' false statements. Lead Plaintiff requests relief from the PSLRA stay to file a motion in the Bankruptcy Action to obtain

[5] Title 8, §220 of the Delaware Code allows for production of "books and records."

the same documents the Trustee and/or his counsel reviewed, considered, or relied on in drafting the Trustee Complaint. *See* Ex. 1. By specifying the applicable documents, Lead Plaintiff's request is sufficiently "particularized." *See In re Worldcom Sec. Litig*., 234 F. Supp. 2d 301, 306 (S.D.N.Y. 2002) (request particularized where it involves "a clearly defined universe of documents").

### B. The Trustee Complaint Amplifies Lead Plaintiff's Showing of Undue Prejudice

#### 1. Lead Plaintiff Is Clearly Disadvantaged

Defendants assert Lead Plaintiff's prejudice argument is "speculative" because they "have not produced any documents to the Trustee." Opp. at 7. As evidenced above, the Trustee possesses ***and relied on*** non-public documents, putting plaintiffs at an informational disadvantage. Defendants also argue this situation is "no different than when a plaintiff litigates against any party with access to its own documents." *Id*. This case is ***anything but*** typical.[6] Helios is in chapter 7 liquidation. The "party" with access to "its own" documents (*i.e.*, the Trustee), was formerly a nominal co-defendant with these Defendants in the Federal Derivative Action and now asserts claims against them for overlapping insurance coverage, in competition with Lead Plaintiff. Defendants do not dispute they are exploring settlement with the Trustee, nor that the Trustee's claim ($187 million) far exceeds Defendants' policy limits.[7] *See In re Delphi Corp*., 2007 U.S. Dist. LEXIS

---

[6] *Gruber v. Gilbertson*, cited throughout the Opposition, is inapposite. 2017 U.S. Dist. LEXIS 142746 (S.D.N.Y. Sept. 5, 2017). There, plaintiffs' main goal was to preserve discovery, not level the playing field with a competing litigation. Further, *Gruber* notes certain circumstances, present here, that would constitute undue prejudice including: (1) information disadvantage vis-à-vis competing litigants; and (2) settlement negotiations in competing actions. *Id*. at *7-8 ("Plaintiffs do not face any risk that would put them at a disadvantage to other civil litigants.")

[7] Defendants' cases all are distinguishable. *See In re Refco, Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 55639 at *5-6 (S.D.N.Y. Aug. 8, 2006) (plaintiff had already settled with one defendant which "undercut" the "prejudice of the

10408, at *24-25 (without access to documents available to "interested parties in the [] bankruptcy action, Plaintiffs would be unfairly disadvantaged"). It is also disingenuous for Defendants to argue that competition between derivative and class claims is common. Even when it does occur, it is uncommon that the derivative action has access to documents withheld from the class action. *See generally*, *El Pollo Loco*, 2017 U.S. Dist. LEXIS 71662.

**2. The Trustee Is Procedurally Advancing Past Lead Plaintiff**

Defendants argue because no "discovery" has yet occurred, the Trustee has not advanced past Lead Plaintiff procedurally. The Trustee: (1) now possesses the most important collection of non-public documents that would have been relevant to either the securities action or the Federal Derivative Action; (2) reviewed, considered, and drafted the Trustee Complaint relying on such documents; (3) is no longer subject to this Court's case management stay; and (4) is leveraging those documents to exact the remaining D&O insurance proceeds. Regardless of whether the Trustee violated any prior order, it is undeniable the Trustee has procedurally surpassed Lead Plaintiff.

**3. Partial Relief from the Stay Does Not Offend Congress' Intent**

Defendants half-heartedly argue that Lead Plaintiff's claims are "frivolous" or that the PSLRA stay is meant to "deter excessive settlements and serial amendments." Opp. at 2. Lead Plaintiff has thoroughly investigated its claims. The merit of Lead Plaintiff's claims have been confirmed by: (1) the fact the Trustee decided to bring derivative claims against the same Defendants based on internal documents; and (2) the allegations contained in the Trustee Complaint that ***directly*** support Lead Plaintiff's claims. Thus, PSLRA is working directly contrary to Congress'

stay"); *In re Petrobras Sec. Litig.*, 2015 U.S. Dist. LEXIS 51451, at *6-7 (S.D.N.Y. Apr. 13, 2015) (where defendant not in bankruptcy, no risk plaintiff "will be left to pursue its actions against defendants who no longer have anything"); *Friedman v. Quest Energy Partner LP*, 2009 U.S. Dist. LEXIS 117050, at *11 (W.D. Okla. Dec. 15, 2009) (same).

stated purpose and should be lifted to prevent undue prejudice to Lead Plaintiff. *In re LaBranche Sec. Litig.*, 333 F. Supp. 2d 178, 183 (S.D.N.Y. 2004) (lifting the discovery stay, in part, because "the SEC...[is] continuing to investigate the precise schemes alleged by Lead Plaintiffs in the Complaint").

## IV. CONCLUSION

Wherefore, Lead Plaintiff respectfully requests that the Court lift the PSLRA discovery stay so that Lead Plaintiff can apply to the Bankruptcy court for stay relief.

DATED: June 23, 2020

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

By: /s/ *Shannon L. Hopkins*
Shannon L. Hopkins (SH-1887)
shopkins@zlk.com
Gregory M. Potrepka (GP-1275)
gpotrepka@zlk.com
Andrew W. Rocco (admitted *Pro Hac Vice*)
arocco@zlk.com
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**CERTIFICATE OF COMPLIANCE**

I, Shannon L. Hopkins, counsel for Lead Plaintiff, the Helios and Matheson Investor Group, hereby certify on this 23rd day of June, 2020, that according to the word count feature of the word processing program used to prepare this brief, this brief contains 2,796 words (exclusive of the cover page, certificate of compliance, certificate of service, table of contents, table of authorities, and signature blocks) and complies with Local Civil Rule 11.1 of the Southern District of New York, as well as with Individual Practice Rule 2.D of the Honorable John G. Koeltl.

/s/ *Shannon L. Hopkins*
Shannon L. Hopkins

**CERTIFICATE OF SERVICE**

I, Shannon L. Hopkins, hereby certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 23rd day of June, 2020.

/s/ *Shannon L. Hopkins*
Shannon L. Hopkins